|  | : |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Whitehall Manor, Inc., | : | Case No. 25-15245 (PMM) |
| *Debtor.* | : | (Jointly Administered) |
|  | : |  |

**SECURED CREDITOR LEHIGH VALLEY 1, LLC'S**
**OBJECTION TO JOINT MOTION PURSUANT TO 11 U.S.C.**
**§ 363 FOR ENTRY OF AN ORDER AUTHORIZING THE**
**DEBTORS TO ENTER INTO AND PERFORM UNDER USE**
**AND OCCUPANCY AGREEMENTS**

Secured Creditor Lehigh Valley 1, LLC ("Lender") hereby objects to the Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors To Enter Into and Perform Under Use and Occupancy Agreements (ECF 182, the "U&O Motion"), which was filed jointly by Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (collectively, the "Manor Debtors") and Whitehall Trust and Saucon Trust (collectively, the "Trusts"). In support of this objection, Lender states as follows:

## I.      Introduction

1.      In the U&O Motion, the Manor Debtors and the Trusts seek this Court's imprimatur on spurious insider deals that serve no bankruptcy purpose. The proposed Use and Occupancy Agreements – which license occupancy that is already occurring, are terminable at will, and require the Manor Debtors to maintain the property as they have been doing and have been required to do for years – serve no purpose other than to inappropriately seek this Court's blessing on Abraham Atiyeh's agreement with himself to drastically reduce the rent due for the Manor Debtors' use of the properties.

2.      The Motion should be denied for five reasons.

3.  *First,* the proposed Use and Occupancy Agreements impermissibly alter the status quo that this Court's April 2, 2026 Stay Order and the automatic stay preserve. While the dismissal of the Trusts' bankruptcy cases is on appeal, everything is stayed and the status quo governs: just as the Lender may not pursue its foreclosure remedies under the parties' contracts while the appeal is pending, the Debtors may not rewrite the underlying terms of those same contracts—above all the rent, which Mr. Atiyeh himself set and which was part of the consideration required for the Trusts' $30+ million HUD-insured loan.

4.  *Second,* the proposed Use and Occupancy Agreements are insider deals that cannot satisfy the heightened standard applicable to insider transactions under Section 363(b)(1) of the Bankruptcy Code. The Manor Debtors and the Trusts are related parties. The District Court has already found that they have actual conflicts of interest, which are instantiated in the proposed transactions at issue in the Motion. And the Debtors have done nothing else to justify the proposed Use and Occupancy Agreements.

5.  *Third,* the proposed Use and Occupancy Agreements serve no business purpose. In effect, all they do is memorialize the existing status quo – other than the rent amount – when there is no need to do so. As to the rent amount, they seek to drastically reduce it – well below fair market rent – for the sole benefit of the Atiyehs.

6.  *Fourth,* the proposed agreements improperly seek to impose an unduly low rental rate, one that is well below fair market rate, let alone the rate due under applicable law. Under Pennsylvania law, a holdover tenant is generally obligated to pay rent at the rate due under the last applicable lease. Here, that is approximately $140,000 per month for each of the properties. The actual fair market rent established in the appraisals the Lender has obtained, though somewhat lower, is well above the amount Mr. Atiyeh has

agreed to with himself, and supports the reasonableness of the amounts due under the prior leases.

7. *Fifth,* the Motion is the Debtors' latest attempt – in approximately the sixth month of these cases, after three full hearings with testimony and rulings by two courts – to relitigate the rent due from the Manor Debtors. The Manor Debtors and the Trusts should not get yet another bite at the apple.

8. For all these reasons, as discussed in more detail below, the U&O Motion should be denied.

## II.   Relevant Background

9. Lender incorporates by reference the detailed Factual Background set forth in the First Objection of Secured Creditor Lehigh Valley 1, LLC to Motion for (1) Interim and Final Orders (A) **Authorizing** Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (ECF 41).

10. The Manor Debtors lease the real properties owned by the Trusts and operate personal care homes on them.

11. The Whitehall Manor property is governed by an Operating Lease Agreement originally dated August 14, 2008, amended by the First through Third Amendments. *See* Ex. A, Whitehall Lease Agreement. With the Fourth Amendment voided by the District Court's December 19 Order, the Third Amendment is the governing Amendment, dated and effective as of August 31, 2018. Under the most recently operative version of the Whitehall Lease, the monthly rent due was $139,000.

12. The Whitehall Lease Agreement is a triple net lease, meaning the lease requires Whitehall Manor to pay – separate from and in addition to the stated amount of monthly rent – all taxes, insurance, maintenance, and other operating expenses of the property. *See id.* at § 4.05.

13. Section 2 of the Third Amendment to the Whitehall Lease Agreement provides that: "Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023." Ex. A, Whitehall Lease Agreement. The Whitehall Lease Agreement was not renewed or extended thereafter.

14. The Saucon Manor property is governed by a Lease Agreement originally dated January 1, 2006, subsequently amended by the First through Fifth Amendments. *See* Ex. B, Saucon Lease Agreement. With the Sixth Amendment voided by the December 19 Order, the terms established by the Fifth Amendment, dated and effective as of July 1, 2018, govern. Under the most recently operative version of the Saucon Lease Agreement, the monthly rent due was $142,118.

15. The Saucon Lease Agreement, like the Whitehall Lease Agreement, is a triple net lease. *See id.* at § 5. Thus, Saucon Manor is required to pay all taxes, insurance, maintenance, and other operating expenses of the property in addition to the stated monthly rent amount. *See id.*

16. The Fifth Amendment to the Saucon Lease Agreement provides: "The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the 'Termination Date')." *Id.* at § 7. The Saucon Lease Agreement was not renewed or extended thereafter.

17. As this Court held, "no one disputes here that the Leases expired by their terms pre-petition." ECF 11, Order at 3; *see also* ECF 182, Use and Occupancy Motion ¶ 13.

18. Accordingly, Whitehall Manor and Saucon Manor have been operating their personal care homes on the respective Trusts' properties without valid leases since August 31, 2023, when the Leases expired.

19. Lender has a security interest in all rents owed by or to the Manor Debtors. ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages, Security Agreements, and Lessee Security Agreements attached hereto as Exhibits C through H.

20. Lender's collateral package is more extensive than a typical mortgage. Lender holds by assignment:

- **Mortgages**: Against real property, improvements, equipment, personal property, and "rents, profits and other attributes."

- **Security Agreements (Trusts)**: Security Agreement, with filed UCC-1s against all personal property, accounts receivable, cash, and rents of Debtor Whitehall Trust and of Debtor Saucon Trust.

- **Lessee Security Agreements (Manor Debtors)**: Lender also holds signed Lessee Security Agreements with filed UCC-1's providing Lender with perfected, first-priority security interests in all personal property, accounts receivable, and rents of both of the Manor Debtors.

*See* ECF 41, at ¶ 27 (Case No. 25-15241).

21. Accordingly, Lender has a security interest in all rent the Manor Debtors owe to the Trusts, including all post-petition rent.

### III. The Use and Occupancy Agreements Impermissibly Alter the Status Quo Preserved by the Stay Order and the Automatic Stay

22. On March 19, 2026, this Court dismissed the Trusts' bankruptcy cases, and on April 2, 2026, this Court stayed the dismissal of the Trusts' bankruptcy cases pending

appeal. ECF 264 (Case No. 25-15241); ECF 274 (Case No. 25-15241) (the "Stay Order"). A stay pending appeal "suspend[s] judicial alteration of the status quo." *Nken v. Holder*, 556 U.S. 418, 429 (2009). Applying *Nken*, this Court has already held that, while the Trusts' appeal is pending, "the status quo ante prevails": the Trusts "retain the rights and responsibilities they had on March 18, 2026," and the Manor Properties "remain property of the Trusts' estates, subject to the protection of the automatic stay." ECF 124, May 15 Order at 5–7.

23. The status quo cuts both ways. Because everything is stayed, the Lender cannot presently pursue its foreclosure remedies under the contracts entered into by the parties; this Court denied relief from the automatic stay for precisely that reason. ECF 124, May 15 Order at 10–12. By the same token, the Manor Debtors and the Trusts cannot use Section 363 to change the underlying terms of those same contracts – most importantly, the rent. While the Trusts' appeal is before the Third Circuit Court of Appeals, the underlying rent terms are part of the status quo that is stayed and preserved. Neither side may proceed, and neither side may change the terms. The status quo is to leave the rent where the parties' agreements put it.

24. That is especially so because the rents at issue are not incidental terms. The rent payable by the Manor Debtors to the Trusts was among the contractual arrangements required for the Trusts to obtain their $30+ million HUD-insured loan: Mr. Atiyeh set those rent figures and submitted them in support of the loan, and the original lender and HUD required and relied upon them – and upon the supporting appraised valuation of approximately $32 million – in underwriting and funding the loan. The Lender's perfected security interest in those rents is part of the collateral package securing that loan. An insider agreement that cuts the contractual rent in half is not a preservation of

the status quo; it is a unilateral alteration of the status quo at the direct expense of the Lender's collateral.

25. Indeed, the Manor Debtors and the Trusts themselves purport to invoke "the interests of all of the Debtors in preserving the status quo pending the resolution of these chapter 11 cases (including the appeals)." U&O Motion ¶ 24. But the proposed Agreements change exactly one substantive term of the parties' relationship: the rent. If the status quo is to be preserved – and, under the Stay Order and the automatic stay, it must be – the Motion should be denied.

26. For the same reasons, the Trusts' joinder in the Motion adds nothing. The Trusts' bankruptcy cases have been dismissed; they remain before this Court only because the Stay Order preserves the status quo while they pursue their appeals. A stay pending appeal is a shield, not a sword: it preserves the parties' positions pending review, but it does not entitle the Trusts to deploy their provisionally-preserved debtor status offensively, to restructure – on insider terms – the rent stream that is at once the principal asset of their estates and the Lender's collateral, while the appeal over their very eligibility to be debtors is pending.

27. Nor can the Trusts' participation supply what the Motion fatally lacks: a disinterested decisionmaker on the landlord's side of the Agreements. If the Trusts are treated as debtors in possession pending appeal, the Agreements are insider transactions subject to heightened scrutiny – which, as shown below, they cannot survive. If instead the dismissal of the Trusts' cases stands, the only independent fiduciary with authority over their properties – the Receiver – is sidelined by Section 543 and the Stay Order, and the Trusts act solely through Mr. Atiyeh's own fiduciary entity. Either way, no one independent of Mr. Atiyeh has agreed to anything on the Trusts' behalf, and a landlord's

eagerness to join a motion slashing its own only source of income confirms whose interests the Agreements actually serve.

## IV. The Manor Debtors and the Trusts Have Not Met the Heightened Standard for Approval of Insider Transactions Under Section 363(b)

28. The proposed Use and Occupancy Agreements for which approval is sought in the Motion are insider deals between the Manor Debtors and the Trusts, both controlled by Mr. Atiyeh. Because of that insider relationship, the proposed transaction is subject to heightened scrutiny. The transaction plainly cannot withstand any sort of heightened scrutiny, and the Motion should therefore be denied.

29. Section 363(b)(1) of the Bankruptcy Code provides that the trustee or debtor-in-possession, after notice and a hearing, may use, sell, or lease property of the estate outside the ordinary course of business. 11 U.S.C. § 363(b)(1).[1]

30. Approval of a sale outside the ordinary course of business requires the proponent to establish "not only that there is both a 'sound business purpose' … but that the proponent must also make a strong showing that all of the requirements for any § 363(b)(1) sale are met. These elements are the provision of accurate and reasonable notice; a showing that the price to be paid is adequate, i.e., fair and reasonable; and establishing that 'good faith,' i.e., the absence of any lucrative deals with insiders, is present." *In re Industrial Valley Refrigeration & Air Conditioning Supplies, Inc.,* 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (citations omitted); *see also In re Scimeca Found., Inc.,* 497

---

[1] While the Movants suggest that the Use and Occupancy Agreements might be in the ordinary course of business, ECF 182, U&O Motion ¶ 23, they make no argument to support that suggestion. In fact, considering that the transactions involve leases of the entire property owned by the Trusts and the properties that the Manor Debtors depend on to operate their personal care homes, these transactions plainly are not in the ordinary course of business.

B.R. 753, 771 (Bankr. E.D. Pa. 2013) ("[T]he Court considers factors such as: (1) any improper or bad faith motive; (2) price is fair and the negotiations or bidding occurred at arm's length, (3) adequate procedure, including proper exposure to the market and accurate and reasonable notice to all parties in interest." (cleaned up)).

31. However, when the proposed Section 363(b)(1) transaction involves an insider or affiliate of the debtor, courts apply a heightened scrutiny standard that is more demanding than the ordinary business judgment inquiry. As this Court held in *Industrial Valley Refrigeration*, the involvement of insiders in the transaction by itself calls into question the required showing of good faith. *Id.* ("'good faith,' i.e., the absence of any lucrative deals with insiders").

32. Other courts in the Third Circuit have recognized that a heightened standard applies to insider transactions. *See, e.g., In re AIG Fin. Prods. Corp,* 651 B.R. 463, 476 (Bankr. D. Del. 2023) ("[T]here is no per se prohibition on a sale of a debtor's assets to an insider, although such transactions are subject to a heightened scrutiny standard."), *aff'd sub nom. In re AIG Fin. Prods. Corp.,* No. BR 22-11309-MFW, 2024 WL 3967465 (D. Del. Aug. 28, 2024); *In re Summit Glob. Logistics, Inc.,* No. 08-11566, 2008 WL 819934, at *11 (Bankr. D.N.J. Mar. 26, 2008) ("The Debtors have clearly recognized their burden to prove with heightened scrutiny the propriety of the proposed insider transaction...."); *In re Garbinski*, 465 B.R. 423, 428 (Bankr. W.D. Pa. 2012) ("To sum up, given the insider status of the proposed sale, the lack of any evidence to show the fairness of the proposed price, the other options available to the Trustee apart from an insider sale, and the proposed distribution of sale proceeds, the Court would be unable to conclude the sale meets the applicable good faith standard.").

9

33.     Courts have noted that various factors are relevant to the heightened scrutiny standard due to a proposed insider transaction, including:

- Whether the debtor engaged in active marketing efforts, *Summit Glob. Logistics,* Inc., 2008 WL 819934, at *12 ("the transparency of the sale process and the marketing efforts of the Debtors satisfy the Debtors' heightened burden"); *Garbinski,* 465 B.R. at 428 ("the other options available to the Trustee apart from an insider sale"); *In re Exaeris Inc.,* 380 B.R. 741, 744 (Bankr. D. Del. 2008) ("the dearth of evidence of marketing");

- Whether the insider receives other benefits separate from the transaction before the court, *Industrial Valley Refrigeration,* 77 B.R. at 22 ("We would rarely, if ever, find the requisite good faith present where the purchase agreement is linked with contracts or other arrangement in which an insider is offered a greater salary or other emoluments than the insider is receiving from the Debtor prior to the sale."); and

- The fairness of the price, *Garbinski,* 465 B.R. at 428 ("the lack of any evidence to show the fairness of the proposed price").

34.     In the U&O Motion, the Manor Debtors and the Trusts do not even mention the insider nature of the proposed transaction or the heightened scrutiny to which the Motion is subject as a result. This is for good reason: It is immediately apparent that the Motion cannot be granted under the heightened scrutiny standard.

35.     The Use and Occupancy Agreements before the Court suffer from most of the infirmities that have doomed prior insider transactions.

36.     *First*, this is an insider deal that the Manor Debtors and the Trusts entered into without any effort to determine if they could find a more profitable alternative. The Trusts have made no effort to market the leases or determine whether there is another operator who would be willing to operate the personal care homes currently being operated by the Manor Debtors in exchange for a larger rent payment.

37. *Second*, the proposed transaction benefits insiders – the Atiyeh family – by allowing them to continue to control and profit from the personal care homes without satisfying the loans Mr. Atiyeh took out to establish the personal care homes and without paying fair market rent.

38. *Third*, the rent the Manor Debtors propose to pay to the Trusts for use of their properties is well below the fair market rent, as shown below.

39. *Finally*, and most significantly, the U&O Motion ignores that the District Court has already determined that there are actual conflicts of interest between the Manor Debtors and the Trusts, which the proposed transaction exemplifies. As the District Court concluded in an appeal from this case, the Manor Debtors and the Trusts suffer from actual conflicts of interest:

> It cannot be denied that there is an actual conflict of interest with respect to the Manor Debtors' obligation to pay rent to the Trust Debtors and in what amount. Accordingly, the same law firm cannot properly advise both the Trust Debtors and the Manor Debtors as to how the leases between the Debtors should be treated in the bankruptcies.

ECF 23 (Case No. 5:26-cv-662-CH). During these bankruptcy cases, this conflict of interest has risen to the fore in various ways, including with regard to whether Section 365(d)(3) of the Bankruptcy Code applies to the rent the Manor Debtors owe the Trusts, and whether the Court should compel the Manor Debtors to assume their leases or grant relief from the automatic stay since the leases have expired. In the above-referenced appeal, the District Court concluded that those conflicts of interest preclude one law firm from representing both the Manor Debtors and the Trusts.

40. Now, this same actual conflict has come to the fore again, where Mr. Atiyeh is causing the Trusts to enter into an insider deal with the Manor Debtors that advantages

only one side, the Manor Debtors, by seeking to allow them to pay a lower rent payment (far below the fair market rent) to the Trusts.

41.     Moreover, the Manor Debtors and the Trusts are affiliated entities under the common control of Mr. Atiyeh. Affiliated debtors may not use these bankruptcy cases to decide which affiliate will prosper and which will suffer at the expense of its creditors. Yet that is the Agreements' entire function: they strip the Trusts – whose only source of income is the rent – of roughly half of that income, for the sole benefit of the Manor Debtors and their insiders, while the Trusts' secured creditor bears the loss. This Court has already recognized this very pattern in these cases, observing that the purpose of the voided 2023 Lease Amendments "was to starve the Trusts of income pledged to the mortgagee," and that the Court had "no appetite" to credit such dealing. ECF 124, May 15 Order at 10 n.5. The proposed Agreements are the same maneuver in a new form.

42.     Mr. Atiyeh is also estopped from disavowing the rents that he himself set. To obtain and support the Trusts' $30+ million HUD-insured loan, Mr. Atiyeh had to back into rent figures sufficient to support the monthly debt service, and he submitted those figures – together with an appraised valuation of approximately $32 million – as consideration for the loan. Having obtained more than $30 million on the strength of those representations, the Manor Debtors and the Trusts cannot now be heard to claim that the very same rent figures are, and always were, wrong.

43.     The positions taken in the Motion itself confirm that the conflict persists notwithstanding the retention of separate counsel. The rent is the Trusts' only source of funds. A landlord acting in the interest of its own estate and creditors would be petitioning this Court for more rent, not agreeing to slash it. The Trusts' willingness to join a motion whose only effect is to impoverish their own estates for the benefit of their affiliated tenant

demonstrates that the Agreements reflect Mr. Atiyeh's interests, not the Trusts' independent business judgment.

44. In the face of that conflict, as well as the lack of marketing, other insider benefits, and unfair price, the proposed Use and Occupancy Agreements cannot withstand the required heightened scrutiny and should be rejected by the Court.

**V. There is No Business Purpose for the Use and Occupancy Agreements**

45. Even if the Motion were not subject to heightened scrutiny because it is an insider transaction, it cannot be approved even under a business judgment standard because it has no "sound business purpose." *Industrial Valley Refrigeration,* 77 B.R. at 21.

46. The Use and Occupancy Agreements make no meaningful change in the parties' relationship, other than to affirm spuriously the (below market) rent. They grant the Manor Debtors a license to occupy the Trusts' property, which they are already doing. They are freely terminable by either party at any time, which is already the case. They require the Manor Debtors to maintain the properties, which they are already required to do under the prior leases, bankruptcy law, and state regulatory requirements.

47. Literally nothing will change if the Court grants the Motion, except to improperly grant the Court's imprimatur on the unduly low rent.

48. That imprimatur is the Motion's true object – and it is a reason to deny the Motion, not to grant it. The proposed Monthly U&O Charges are the very debt-service amounts this Court has already ordered, on an interim basis, in its May 26, 2026 cash-collateral order. ECF 168. The Agreements therefore add nothing to the Debtors' operations. What they would do is convert an interim, court-controlled adequate-protection figure into a party-"agreed" rent bearing this Court's approval – a number the

Debtors could then present at plan confirmation as though it were a market-tested restatement of the Leases. If the Agreements truly change nothing, they are unnecessary; if they change anything, it is only the rent – and only for the benefit of Mr. Atiyeh.

49. The proposed transaction has no business purpose and should be rejected accordingly.

**VI. The Manor Debtors Should be Compelled to Pay Rent at the Rate Provided in the Prior Leases, Not the Far-Below Fair Market Rent Proposed in the Use and Occupancy Agreements**

50. As noted above, in order to obtain approval of a proposed transaction under Section 363(b)(1), the proponents must make "a showing that the price to be paid is adequate, i.e., fair and reasonable...." *Industrial Valley Refrigeration,* 77 B.R. at 21.

51. Where a lease has expired and the tenant holds over – as is the case here – under Pennsylvania law the rent is ordinarily the same as was due under the prior lease. "[W]here a tenant holds over after the expiration of his term, and no different arrangement has been made between the landlord and tenant, a tenancy for another year is created." *Clairton Corp. v. Geo-Con, Inc.,* 635 A.2d 1058, 1060 (Pa. Super. Ct. 1993) (citing *Harvey v. Gunzberg,* 148 Pa. 294, 195-96, 23 A. 1005, 1005 (1892)); *see also Penn Ctr. Harrisburg, L.P. v. T-Mobile Ne., LLC,* No. 1306 MDA 2012, 2013 WL 11266340, at *5 (Pa. Super. Ct. Apr. 26, 2013) ("When a tenant becomes a holdover tenant he is subject to all of the covenants and stipulations within the original lease as far as they are compatible with the yearly holding." (citing *Routman v. Bohm,* 168 A.2d 612, 615 (Pa. Super. Ct. 1961))).

52. As the Lender has demonstrated time and again, the most recently effective leases required monthly rental payments of $139,000 from Whitehall Manor and $142,118 from Saucon Manor.

53. Generally, the prior rental rate is controlling to determine the amount of rent due post-petition in the absence of clear evidence that that amount is unreasonable. *In re F.A. Potts & Co., Inc.,* 137 B.R. 13, 18 (E.D. Pa. 1992) ("It is nonetheless clear that the rental value fixed in the lease will control, unless there is convincing evidence that such rental rate is unreasonable."); *In re Sportsman's Warehouse, Inc.,* 436 B.R. 308, 315 (Bankr. D. Del. 2009) ("The amount of the benefit to the estate is presumed to be the contract rate of rent.").

54. The Manor Debtors and the Trusts have not presented convincing evidence that the rent under the prior leases is unreasonable. These were amounts to which the Manor Debtors agreed, and which indeed were dictated by Mr. Atiyeh himself. The appraisals and fair market rent estimates the Manor Debtors and the Trusts have provided are unconvincing.

55. Indeed, the Lukens "market rent" figures on which the Manor Debtors and the Trusts rely cannot bear any weight, because they are not derived from market rents at all. Lukens did not base its conclusion on rents actually paid for comparable facilities. Instead, it back-calculated a "rent" by multiplying its own depressed "real estate only" value conclusion by a 6.50% capitalization rate of its own selection – a rate it derived by "compressing" its own going-concern capitalization rate based on published commentary about skilled nursing lending. *See* U&O Motion exs. D & E (Supplemental Letters). It says nothing about what a willing landlord and a willing tenant would actually agree to in the market.

56. The provenance of the Lukens reports confirms as much. They were not prepared for the Debtors or their estates: the client and the only intended users are "Mr. Abraham Atiyeh and his legal counsel," and the reports' value conclusions are

retrospective to a valuation date selected by the client. The Motion's description of "Lukens' analyses of the fair market rental value of the Trusts' facilities," U&O Motion ¶¶ 15, 23, is counsel's characterization, not the appraisers' opinion.

57.     The Lender's HealthTrust appraisals, by contrast, do precisely what the Debtors' appraisals do not: at the Lender's request, they expressly develop fair market rent – derived from actual arm's-length leases of comparable senior housing communities using an EBITDAR lease-coverage analysis – together with a current "as is" market value of the properties. The HealthTrust appraisals conclude a fair market rent of $96,667 per month for the Saucon property and $88,333 per month for the Whitehall property. The only fair market rent evidence before the Court thus confirms that the proposed Monthly U&O Charges – let alone the Lukens "market rent" figures of $34,937.50 and $27,625 per month – are far below fair market rent.

58.     In fact, the Debtors' new appraisals impeach the Debtors' own valuation narrative. The Trusts obtained their $30+ million HUD-insured loan on the strength of an appraised valuation of approximately $32 million – a valuation Mr. Atiyeh knew of, relied upon, and submitted in support of the loans. The Debtors now proffer appraisals valuing the same collateral at a fraction of that amount. Both cannot be true. Having borrowed more than $30 million on the strength of the higher valuation, Mr. Atiyeh cannot now sponsor – and the Court should not credit – appraisals premised on the proposition that those earlier representations were wrong. The new appraisals do not justify a lower rent; they impeach the reliability of the Debtors' valuation evidence altogether.

59.     Moreover, the Debtors' own submissions admit substantial deferred maintenance and a complete absence of reserves: HVAC equipment requiring immediate

replacement – by itself a variance of more than ten percent from their budget – and a roof whose required replacement materially purportedly reduces the appraised value of the collateral by more than $1.5 million. The Manor Debtors are obligated under the triple net Leases to maintain the properties, and they have no reserves with which to do so. And this deterioration is occurring now, during these cases: the roof and HVAC repairs are unfunded and worsening while the Manor Debtors occupy the properties. Admitted, ongoing deferred maintenance and absent reserves are grounds for a higher rent – sufficient to fund reserves for these admitted capital needs – not a lower one.

60.     In fact, to the extent evidence of fair market rent is necessary, it supports requiring the Manor Debtors to continue paying rent at the prior lease rates. Attached hereto are appraisals of the market value of the properties, including fair market rent, prepared by HealthTrust (the "HealthTrust Appraisals"). Copies of the HealthTrust Appraisals for the Saucon and Whitehall properties are attached hereto as Exhibits I and J, respectively.

61.     As demonstrated in the HealthTrust Appraisals, fair market rent for the Saucon and Whitehall properties is $96,667 and $88,333 per month, respectively.

62.     While those amounts are somewhat lower than the amount due under the prior leases, they do not suggest that the prior contract rate was unreasonable.

63.     Accordingly, Lender respectfully submits that the Manor Debtors should be required to pay rent at the rates established in the most recently effective amendments to the prior leases, or alternatively, at the fair market rent specified in the HealthTrust Appraisals.

**VII. Debtors Are Attempting to Relitigate the Rent for the Sixth Time**

64. Finally, the Motion is the latest installment in the Manor Debtors' and the Trusts' serial efforts to reduce the rent and the payments protecting the Lender's interests – efforts now in approximately their sixth consecutive month. The rent issue has been the subject of three full hearings before this Court, with testimony as to the rent due and the appropriate rent. The rents were also reviewed in the District Court, where Judge Henry struck Mr. Atiyeh's 2023 attempts to amend the rents as null, void, and of no legal effect. ECF 164 (Case No. 24-cv-02627). And this Court has repeatedly fixed the payments due while these cases are pending – most recently in its May 26, 2026 Order, which requires monthly payments matching the debt service due to the Lender plus $35,000 per Debtor in additional adequate protection

65. The affiliated Debtors cannot continue to seek the same relief month after month after it has been fully reviewed by two judges through significant motion practice, numerous hearings, and testimony in both the District Court and this Court. The Manor Debtors and the Trusts should not get yet another bite at the apple.

**VIII. Reservation of Rights**

66. Lender reserves all rights with regard to its interests in the rent the Manor Debtors owe to the Trusts, the use of cash collateral, and adequate assurance for the use of cash collateral or any other property of the Manor Debtors or the Trusts.

67. Lender reserves all of its present and future rights, claims, and remedies with respect to its liens and security interests in the Manor Debtors' property, including, without limitation, (i) its right to challenge the validity, extent, perfection, and priority of any liens or interests asserted by the Debtor or any other party in interest in such property; (ii) its right to contest the Manor Debtors' proposed use of cash collateral and

to seek appropriate adequate protection, including additional or replacement liens, additional adequate protection payments, or superpriority claims; (iii) its right to require valuations and to object to any valuation methodologies; (iv) its right to seek modification, expansion, or termination of the use of cash collateral if protections are inadequate; (v) its right to seek relief from the automatic stay on any applicable grounds or to seek other relief as permitted by the Bankruptcy Code; (vi) its right to seek to dismiss the Manor Debtors' bankruptcy cases on any available grounds; and (vii) any other rights and remedies available under applicable law, equity, or contract.

WHEREFORE, the Lender respectfully requests that this Court enter an Order denying the Use and Occupancy Motion.

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: July 10, 2026

By: */s/ Matthew A. Hamermesh*
 Matthew A. Hamermesh
 Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*