# EXHIBIT I

  

# HEALTHTRUST
Seniors Housing & Healthcare Real Estate Advisory Services

Boston | Denver | Los Angeles | Sarasota

# REAL ESTATE APPRAISAL

### APPRAISAL REPORT

Saucon Valley Manor

March 10, 2026

**Saucon Valley Manor**

1050 Main Street

Hellertown, Pennsylvania 18055

HT File No. 20260124



Prepared by:
HealthTrust
6801 Energy Court, Suite 200 | Sarasota, FL 34240
P: 941.363.7500 | F: 941.363.7525 | healthtrust.com





July 7, 2026

Mr. Matthew A Hamermesh, Esq
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
Philadelphia, PA 19103

**RE:**     **Real Estate Appraisal of**
        Saucon Valley Manor
        1050 Main Street
        Hellertown, Pennsylvania 18055
        HT File No. 20260124

Dear Mr. Hamermesh:

At your request and authorization, HealthTrust has prepared an Appraisal Report of the subject, an existing Assisted Living/Memory Care Residence. The "as is" market value is relevant as to the date we last inspected the site, or March 10, 2026. The date of this report is July 7, 2026.

Lying on approximately 2.61 acres, the subject contains 168 units with 201 beds. As of the date of value, the property reported occupancy of 92% in assisted living (AL) and 87% in memory care (MC). By comparison, the market exhibits an average occupancy of 84% in assisted living and 88% in memory care.

Please note, we were provided with conflicting information about unit mix between the rent roll (some units were duplicates, with vacant units not identifying care levels), information provided to us during our physical inspection, building plans, and prior work. We relied upon the unit mix provided during our site visit, and rates shown on the January 2026 rent roll. The subject is licensed for 201 beds which we considered for our estimates of effective gross income and expenses.

The subject is currently encumbered with a lease agreement between related parties. The lease payment has not been included in our analysis of cash flows. At the request of the client, we appraised the fee simple interest. In addition, at the request of the client, we have been asked to estimate the fair market rent for the subject property. The subject property is being leased to the current tenant as a result of a related party lease-back transaction involving the two parties. The subject's lease is set to expire December 31, 2028, per the most recent lease amendment (the "Sixth Amendment" effective September 21, 2023). We have included our estimates of the expected market lease in the Fair Market Rent section of this report.

Also note, we relied upon the roof repair estimate provided by the operator and deducted this amount as deferred maintenance. Any variation to true cost would be a dollar-for-dollar adjustment to the deduction applied.

The report will be used to provide a third-party opinion of the market value of the subject. The effective date of the "as is" value was estimated under market conditions observed at that time, reflecting the fee simple interest in the market value of the going concern. Appraisal terms are defined in the following report. Complete descriptions of the property, together with the sources of information and the bases of our estimates, are stated in the accompanying sections of this report.

The report is an Appraisal Report that complies with the reporting requirements set forth in Standards Rule 2-2 of the Uniform Standards of Professional Appraisal Practice guidelines.

Following our investigation and analysis, we have estimated the "as is" market value of the fee simple interest in the subject including the going concern (real estate, personal property and total intangible assets), as depicted in the following table:

| VALUATION SUMMARY(1) | |
| --- | --- |
| **Date of Value/Appraised Interest** | **As-Is** |
| | 10-Mar-2026 |
| Market Value of Fee Simple Estate | $15,700,000 |
| **Real Property Allocation** | |
| Real Property | $13,340,000 |
| FF&E (Personal Property) | $1,260,000 |
| Business Value | $1,100,000 |
| Market Value of the Going Concern | $15,700,000 |

(1) Subject to the Certification, Standard Conditions and Special Conditions
Source: HealthTrust

The accompanying prospective financial analyses are based on estimates and assumptions developed in the appraisal. However, some assumptions inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our prospective financial analyses will vary from our estimates and the variations may be material.

This report, the final estimates of value and the prospective financial analyses are intended solely for your information and assistance for the function stated above and should not be relied upon for any other purpose.

Neither our report nor any of its contents nor any reference to the appraisers or our firm, may be included or quoted in any document, offering circular or registration statement, prospectus, sales brochure, other appraisal, loan or other agreement without HealthTrust's prior written approval of the form and context in which it will appear.

Respectfully submitted,

*HealthTrust*

HealthTrust



## Certification

I certify that, to the best of my knowledge and belief:

The statements of fact contained in the accompanying report are to the best of our knowledge true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, unbiased professional analyses, opinions, and conclusions.

We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest or bias with respect to the parties involved or the property that is the subject of this report. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute and in conformity with the current Edition of the Uniform Standards of Professional Appraisal Practice.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Alan C. Plush, MAI inspected the subject. Marissa Cassman, MAI, has assisted with the valuation analysis and has not inspected the subject. Derrick Washington has assisted with the market research and has not inspected the subject. David Rey Salinas, MAI, has reviewed this report and has not inspected the subject. No one, other than those so named in the certification pages herein, aided the undersigned with preparation of this report.

Alan C. Plush, MAI has not provided services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three years immediately preceding acceptance of this assignment.

The subject of this appraisal, Saucon Valley Manor, is located at 1050 Main Street, Hellertown, Pennsylvania 18055.

As of the date of this report, Alan C. Plush, MAI, has completed the requirements of the continuing education program for Designated Members of the Appraisal Institute.

X _____

Alan C. Plush, MAI
Certified General Appraiser GA001255L (PA)
6801 Energy Court, Suite 200
Sarasota, FL 34240
(941) 363-7501
alan.plush@healthtrust.com

**Standard Terms and Conditions**

The following Standard Terms and Conditions apply to real estate appraisals and consulting assignments prepared by HealthTrust, LLC ("HealthTrust"). This report shall be subject to standard conditions, permitted and/or limited usage, and terms of engagement, which are outlined as follows:

**Report Content**

Appraisals are performed, and written reports are prepared in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and with the Appraisal Institute's Standards of Professional Appraisal Practice and Code of Professional Ethics.

Unless specifically stated, the value or other conclusion(s) contained in the appraisal applies to the real estate only, and does not include personal property, machinery and equipment, trade fixtures, business value, goodwill or other non-realty items unless specifically stated or identified.

The appraisal and/or consulting report covering the subject is limited to surface rights only and does not include any inherent subsurface or mineral rights. Income tax considerations have not been included or valued unless so specified in the appraisal. We make no representations as to the value changes that may be attributed to such considerations.

The legal description used in this report is assumed to be correct and we have made no survey of the property. We assume that there are no hidden or unapparent conditions of the property, subsoil, or structures that would impact its value.

No opinion is rendered as to property title, which is assumed to be good and marketable. Unless otherwise stated, no consideration is given to liens or encumbrances against the property. Sketches, maps, photos, or other graphic aids included in appraisal reports are intended to assist the reader in ready identification and visualization of the property and are not intended for technical purposes.

It is assumed that legal, engineering, or other professional advice, as may be required, has been or will be obtained from professional sources and that the appraisal report will not be used for guidance in legal or technical matters such as, but not limited to, the existence of encroachments, easements or other discrepancies affecting the legal description of the property. It is assumed that there are no concealed or dubious conditions of the subsoil or subsurface waters including water table and flood plain, unless otherwise noted. We further assume there are no regulations of any government entity to control or restrict the use of the property unless specifically referred to in the report. It is assumed that the property will not operate in violation of any applicable government regulations, codes, ordinances or statutes.

This report is not intended to be an engineering report. We are not qualified as structural or environmental engineers; therefore, we are not qualified to judge the structural or environmental integrity of the improvements, if any. Consequently, no warranty or representations are made, nor any liability assumed for the structural soundness, quality, adequacy, or capacities of said improvements and utility services, including the construction materials, particularly the roof, foundations, and equipment, including the HVAC systems, if applicable. Should there be any question concerning same, it is strongly recommended that an engineering, construction and/or environmental inspection be obtained. The value estimate(s) or any other opinions stated in this appraisal and/or consulting assignment, unless noted otherwise, is predicated on the assumptions that all improvements, equipment and building services, if

any, are structurally sound and suffer no concealed or latent defects or inadequacies other than those noted in the appraisal and/or consulting report. We will call to your attention any apparent defects or material adverse conditions which come to our attention.

In the absence of competent technical advice to the contrary, it is assumed that the property being appraised/analyzed is not adversely affected by concealed or unapparent hazards such as, but not limited to asbestos, hazardous or contaminated substances, toxic waste or radioactivity.

Information furnished by others is presumed to be reliable, and where so specified in the report, has been verified; but no responsibility, whether legal or otherwise, is assumed for its accuracy, and it cannot be guaranteed as being certain. No single item of information was completely relied upon to the exclusion of other information.

Appraisal and consulting reports may contain estimates of future financial performance, estimates or opinions that represent the appraiser's view of reasonable expectations at a point in time, but such information, estimates or opinions are not offered as predictions or as assurances that a level of income or profit will be achieved, that events will occur, or that a price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analyses will vary from those described in our report, and the variations may be material.

Any proposed construction or rehabilitation referred to in the appraisal and/or consulting report is assumed to be completed within a reasonable time and in a workmanlike manner according to or exceeding currently accepted standards of design and methods of construction.

Any inaccessible portions of the subject property or improvements not inspected are assumed to be as reported or like the areas that are inspected.

It should be specifically noted by any prospective mortgagee that the appraisal and/or consulting report assumes the property will be competently managed, leased, and maintained by financially sound owners over the expected period of ownership. This engagement does not entail an evaluation of management's or owner's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey and analysis of this property to determine whether it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value and/or performance of the property.

### Use of the Report

The report, the final estimate of value and estimates of future financial performance included therein, are intended for the information of the person or persons to whom they are addressed, solely for the purposes stated therein, and should not be relied upon for any other purpose. The addressee shall not distribute the report to third parties without prior permission of HealthTrust. Before such permission shall be provided, the third party shall agree to hold HealthTrust harmless relative to their use of the report.

The report may identify one or more "intended users" of the appraisal and/or consulting report, either by name or type of user. The purpose of this identification is for HealthTrust to determine the appropriate reporting of the appraisal in a manner that is clear and understandable to the identified intended user(s). Neither the appraisers identified in the report nor HealthTrust is responsible to parties who are not identified as intended users or for uses not identified as intended uses.

Neither our report, nor its contents, nor any reference to the appraisers or HealthTrust, may be included or quoted in any offering circular or registration statement, prospectus, preliminary offering statement, sales brochure, other appraisal, loan or other agreement or document without our prior written permission. Permission will be granted only upon meeting certain conditions. Generally, HealthTrust will not agree to the use of its name as a "named expert" within the meaning of the Securities Act of 1933 and the Securities Act of 1934.

The valuation applies only to the property described and for the purpose so stated and should not be used for any other purpose. Possession of the report, or copy thereof, does not carry with it the right of publication. Any allocation of total price between land and the improvements as shown is invalidated if used separately or in conjunction with any other report.

Neither the report nor any portions thereof (especially any conclusions as to value, the identity of the appraisers or HealthTrust, or any reference to the Appraisal Institute or other recognized appraisal organization or the designations they confer) shall be disseminated to the public through public relations media, news media, advertising media, sales media or any other public means of communication without the prior written consent and approval of the appraisers and HealthTrust.

The date(s) of the valuation to which the value estimate, conclusions, or analysis to which the conclusions and opinions apply within a consulting report, is set forth in the letter of transmittal and within the body of the report. The value is based on the purchasing power of the United States dollar as of that date.

**Terms of the Engagement**

Appraisal and consulting assignments are accepted with the understanding that there is no obligation to furnish services after completion of the original assignment. If the need for subsequent service related to an appraisal assignment (e.g., testimony, updates, conferences, reprint or copy service) is contemplated, special arrangements acceptable to HealthTrust must be made in advance. The working papers for this engagement have been retained in our files and are available for your reference.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject property of energy shortage or future federal, state or local legislation, including any environmental or ecological matters or interpretations thereof.

We take no responsibility for any events, conditions or circumstances affecting the subject property or its value, that take place after either the effective date of value cited in the appraisal or the date of our field inspection, whichever occurs first.

If any provision of these Standard Terms and Conditions is held, in whole or part, to be unenforceable or invalid for any reason, the remainder of that provision and the remainder of the entire Terms and Conditions will be severable and remain in effect. If any of these Terms and Conditions conflict with an executed client Appraisal Services Agreement, the terms and conditions of the Appraisal Services

Agreement shall control, but only as between Client and HealthTrust, unless the Appraisal Services Agreement expressly states otherwise.

This engagement may be terminated whether by client or HealthTrust at any time upon written notice to that effect to the other parties. We reserve the right to withhold or withdraw services due to non-payment, delayed payment, or an ethical standard or disagreement arises. It being understood that, unless HealthTrust shall unilaterally terminate the engagement without the client's consent and without reasonable cause, the provisions related to the payment of fees and expenses through the date of termination will survive any termination, and it being further understood that the indemnification and hold harmless provisions shall survive any termination thereof, whether or not such termination is unilateral.

Acceptance of and/or use of this report constitutes acceptance of all Standard Terms and Conditions.

For more information on the NIC MAP® Data Service, please visit www.NIC.org/NIC-map or call 410-267-0504.

**Hypothetical Conditions**

None noted.

**Extraordinary Assumptions**

Although this appraisal is not contingent upon any specific management, it does presume that the subject's management is competent and experienced with operations of an Assisted Living/Memory Care Residence.

Please note that the use of these extraordinary assumptions and hypothetical conditions might affect our assignment results.

## TABLE OF CONTENTS

CERTIFICATION                                                                IV
STANDARD TERMS AND CONDITIONS                                                V
HYPOTHETICAL CONDITIONS                                                      IX
EXTRAORDINARY ASSUMPTIONS                                                    IX

**TABLE OF CONTENTS**                                                       **1**

**PREFACE**                                                                 **3**

GLOSSARY OF TERMS                                                            5
SENIORS HOUSING AND HEALTH CARE INDUSTRY OVERVIEW                            8

**INTRODUCTION**                                                          **18**

SCOPE OF WORK                                                               19
APPLICABILITY OF APPROACHES                                                 20
INSPECTION AND EFFECTIVE DATES OF APPRAISAL                                 21
USE PREMISE                                                                 21

**DESCRIPTIVE DATA**                                                      **22**

SITE DESCRIPTION                                                            22
ZONING                                                                      23
ASSESSMENT AND TAXES                                                        24
IMPROVEMENT DESCRIPTION                                                     25

**MARKET ANALYSIS**                                                       **29**

REGIONAL ANALYSIS                                                           29
SENIOR HOUSING REGIONAL ANALYSIS                                            34
NEIGHBORHOOD ANALYSIS                                                       38

**COMPETITIVE MARKET ANALYSIS**                                           **41**

REGULATORY OVERVIEW                                                         41
DEFINITION OF PRIMARY MARKET AREA                                           42
PMA SUPPLY ANALYSIS                                                         43
COMPETITIVE MARKET SUPPLY                                                   44
DEMAND ANALYSIS                                                             47
PENETRATION ANALYSIS                                                        56
MARKET CATEGORIZATION                                                       57
SWOT ANALYSIS                                                               59

**HIGHEST AND BEST USE**                                                  **60**

AS IF VACANT                                                                60
AS CURRENTLY IMPROVED                                                       60

**VALUATION ANALYSIS**                                                    **62**

**INCOME APPROACH**                                                       **62**

ESTIMATES OF MARKET RENT - SENIORS HOUSING                                 70
STABILIZED OCCUPANCY                                                        72

OTHER REVENUE SOURCES                                              73
TOTAL REVENUE ESTIMATES                                           73
OPERATING EXPENSES                                                75
NET OPERATING INCOME ESTIMATE                                     87
CAPITALIZATION RATE DERIVATION                                    89
DISCOUNT RATE DERIVATION                                          95
INCOME ASSUMPTIONS AND CHARTS                                     95
INCOME APPROACH CONCLUSION                                        97

**FAIR MARKET RENT ANALYSIS**                                    **98**

**SALES COMPARISON APPROACH**                                    **101**

SALES COMPARISON APPROACH – MATRIX ADJUSTMENTS                   105
SALES COMPARISON APPROACH CONCLUSION                             110

**RECONCILIATION AND FINAL VALUE ESTIMATES**                     **111**

ASSET VALUE ALLOCATION                                            112
MARKETABILITY ANALYSIS                                            120

**ADDENDA**                                                      **122**

## PREFACE



## Saucon Valley Manor

### Property Data

| | |
|---|---|
| **Name:** | Saucon Valley Manor |
| **Address:** | 1050 Main Street |
| | Hellertown, Pennsylvania 18055 |
| **Property Type:** | Assisted Living/Memory Care Residence |
| **Gross Building Area (SF):** | 170,590 |
| **Land Area (acres):** | 2.61 |
| **Year Built:** | 1930 |
| **Condition:** | Average |
| **Effective Age:** | 25 |
| **Total Density:** | 168 |

|  | *As-Is* | |
|---|---|---|
| **Unit Mix:** | *No. Units* | *Set-Up Beds* |
| AL | 81 | 101 |
| MC | 87 | 100 |
| *Total* | **168** | **201** |

| | |
|---|---|
| **Parcel Number:** | Q7SW2A 1 3 0715 |
| **Assessor's Fair Market Value:** | $8,128,000 |
| **Property Taxes:** | $123,059 |
| **Zoning District:** | M - (Mixed District) |
| **Flood Zone:** | Outside |
| **Owner of Record:** | Saucon Trust |
| **Management Company:** | Manors of the Valley |
| **Highest & Best Use:** | |
| *As Though Vacant* | Assisted Living/Memory Care Residence |
| *As Currently Improved* | Assisted Living/Memory Care Residence |

## EXECUTIVE SUMMARY (CONT.)

**Financial Analysis Summary**

| | |
|---|---|
| **Purpose of the Appraisal:** | provide a third-party opinion of the market value of the subject |

**Salient Dates of Appraisal:**

| | |
|---|---|
| *As Is* | March 10, 2026 |
| *Prospective Stabilized* | |
| **Interest Appraised:** | fee simple |
| **Excess Land:** | $0 |
| **Excess CON:** | $0 |
| **Valuation Assumptions:** | |
| *Capitalization Rate:* | 9.00% |
| *Terminal Capitalization Rate:* | 9.50% |
| *Discount Rate:* | 12.00% |
| *Revenue Growth Rate:* | 3.00% |
| *Expense Growth Rate:* | 3.00% |
| *Management Fee:* | 5.00% |
| *Reserves (Capex) Per Unit:* | $500 |
| *Stabilized Expense Ratio* | 85% |
| *Stabilized Occupancy* | 94% |

**Value Indication(s)**

| | As-Is<br>10-Mar-2026 |
|---|---|
| The Cost Approach - Fee Simple | N/A |
| The Income Approach - Fee Simple | $15,700,000 |
| The Sales Approach - Fee Simple | $14,400,000 |

**Value Conclusion(s)**

| | |
|---|---|
| Market Value of Going Concern | $15,700,000 |

**Value Allocation(s)**

| | |
|---|---|
| Real Property | $13,340,000 |
| FF&E (Personal Property) | $1,260,000 |
| Business Value | $1,100,000 |
| Market Value of the Going Concern | $15,700,000 |

The values presented above are subject to the Certification of Value, Standard Conditions, and Extraordinary Conditions and may not be distributed in partial context without the entire appraisal document. The summary values cannot be completely understood without the entire document and/or additional information from our work files. The accompanying prospective financial analyses are based on estimates and assumptions developed in connection with the appraisal. However, some assumptions inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by our prospective financial analyses will vary from our estimates and the variations may be material.

## Glossary of Terms

**Activities of daily living (ADLs).** Everyday personal care tasks necessary for a person to maintain independence. These tasks include bathing, dressing, transferring, eating, toileting, and continence maintenance. This term is used in the analysis of senior housing properties, especially in assisted living facilities where additional charges can be tied to ADLs. [†]

**Actuary.** A mathematician, often employed by an insurance company, who calculates premiums, reserves, dividends, and insurance, pension and annuity rates, using risk factors obtained through empirical analysis. [†]

**Ad valorem tax.** A tax levied in proportion to the value of the thing(s) being taxed. Exclusive of exemptions, use-value assessment provisions and the like, the property tax is an ad valorem tax [†]

**Business value.** The market value of a going-concern, including real property, personal property, and the intangible assets of the business. [†]

**Certificate of Need (CON).** A legal document required in many states before proposed acquisitions, expansions, or creations of facilities are allowed.

**Density.** Sum of independent living units, assisted living units, memory care units and skilled nursing beds.

**Effective gross income multiplier (EGIM).** The ratio between the sale price (or value) of a property and its effective gross income. [†]

**Entrepreneurial incentive.** The amount an entrepreneur expects or wants to receive as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial incentive is the expectation of future reward as opposed to the profit actually earned on the project.[†]

**Extraordinary assumption.** An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis, which, if found to be false, could alter the appraiser's opinions or conclusions. [‡]

**Fee simple estate.** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. [†]

**Furniture, fixtures, and equipment (FF&E).** Business trade fixtures and personal property, exclusive of inventory. [†]

**Highest and best use.** The reasonably probable use of property that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. [†]

**Hypothetical condition.** A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. [‡]

**HT Stabilized.** Appraisal stabilized forecast as if the subject was stabilized in year 1 of the analysis. Forecast may differ from the stabilized period given differing years of stabilization.

**Investment value.** The value of a property interest to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.[†]

**Leased fee interest.** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lase plus the reversionary right when the lease expires.[†]

**Leasehold interest.** The right held by the lessee to use and occupy real estate for a stated term and under conditions specified in the lease. [†]

**Liquidation value.** The most probable value price that a specified interest in real property should bring under the following conditions: 1. Consummation of a sale within a short time period; 2. The property is subjected to market conditions prevailing as of the date of valuation. 3. Both buyer and seller are acting

prudently and knowledgeably. 4. The seller is under extreme compulsion to sell. 5. The buyer is typically motivated. 6. Both parties are acting in what they consider to be their best interests. 7. A normal marketing effort is not possible due to brief exposure time. 8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms. See also disposition value; distress sale; forced-sale price. [†]

**Market value.** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;

(2) Both parties are well informed or well advised, and acting in what they consider their own best interests;

(3) A reasonable time is allowed for exposure in the open market;

(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [*]

**Market rent.** The most probable rent that a property should bring in a competitive and open market under all conditions requisite to a fair lease transaction, the lessor and lessee each acting prudently and knowledgeably, and assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:

(1) Lessor and lessee are typically motivated;

(2) Both parties are well informed or well advised, and acting in what they consider their own best interests;

(3) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(4) The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs). [†]

**Market value of the going concern.** The market value of an established and operating business including the real property, personal property, financial assets and intangible assets of the business. [†]

**Personal property.** Any tangible or intangible article that is subject to ownership and not classified as real property including identifiable tangible objects that are considered by the general public as being "personal,' such as furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; and intangible property that is created and stored electronically such as plans for installation art, choreography, emails or designs for digital tokens.[‡]

**Real property.** The interests, benefits, and rights inherent in the ownership of real estate. [‡]

**Replacement cost for insurance purposes.** The estimated cost, at current prices as of the effective date of valuation of a substitute for the building being values, using modern materials and current standards, design and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). [†]

**Stabilized Income.** Per the 7th edition of The Dictionary of Real Estate Appraisal:

(1) An estimate of income, either current or forecasted, that presumes the property is at stabilized occupancy.
(2) The forecast of the subject property's yearly average income (or average-equivalent

income) expected for the economic life of the subject property.

(3) Projected income that is subject to change but has been adjusted to reflect an equivalent, stable annual income.

**Stabilized Value.** A value estimate derived by applying the appropriate rate to the stabilized income (see above). Note, a value premise as if the subject property is stabilized on a current date reflects the hypothetical condition that the property is already stabilized. A stabilized value with a prospective effective date reflects a special assumption that the property has achieved the stabilized date as of that time.

**Surplus land.** Land that is not currently needed to support the existing improvement but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use. ¤

**Uniform Standards of Professional Appraisal Practice (USPAP).** In the United States, professional standards developed for appraisers and users of appraisal services by the Appraisal Standards Board of The Appraisal Foundation, that are required for use in federally related transactions. Compliance with USPAP is also required in certain appraisals by state certification and licensing boards. [†]

---

[†] *The Dictionary of Real Estate Appraisal*, Sixth Edition, Appraisal Institute, 2022.

¤ *The Appraisal of Real Estate Appraisal*, Fifteenth Edition, Appraisal Institute, 2020.

* Office of the Comptroller of Currency (OCC), Title 12 – Banks and Banking, Code of Federal Regulations (C.F.R.), Subpart C – Real Estate Lending and Appraisals, Part 34.42 (g).

‡ The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice*, 2024-2025 Edition.

**Seniors Housing and Health Care Industry Overview**

Seniors housing and health care is a term used to cover three types of residential facilities designed specifically for retirees: Independent Living, Assisted Living, and Skilled Nursing. These three comprise the heart of five-category spectrum of elderly residential care. In order of care intensity, or *acuity*, from lowest to highest the categories are:

- ☐ Active Adult
- ☐ Independent living
- ☐ Assisted living
- ☐ Skilled nursing
- ☐ Hospital/acute care

When someone refers to seniors housing/health care, they are commonly talking about one of the middle three: Independent Living, Assisted Living, Skilled Nursing, or any combination thereof. This overview introduces these product types and touches on current trends affecting the seniors housing/health care industry.



**Active Adult:** "Active adult," "senior apartments" and "55+" or "62+" or "65+" communities, are age-restricted multifamily rental properties with a focus on lifestyle. They are not normally called seniors housing/health care but are related on the acuity spectrum. Akin to traditional apartment complexes, they have clubhouses, fitness centers, covered or garage parking, and swimming pools. Health care services, meals, and housekeeping are not provided by on-site staff, but social activities are usually available. Residents are active adults not needing assistance with activities of daily living (ADLs). Units typically include a full kitchen, washer and dryer hook-ups, balconies or patios, window treatments and floor coverings. These communities typically range from 130 to 150 units.

The NIC MAP® *Active Adult Report 3Q 2025* indicated a total of over 840 communities with a total nearing 125,000 units. The average occupancy reported at stabilized properties 95.7%. The distribution of communities across the nation is shown as follows:



Source: NIC MAP®

We are seeing traditional multifamily developers, operators and investors begin to offer more specifically geared towards the baby boomers and are seeing seniors housing operators, such as Discovery Senior Living and Kisco, build projects to attract this demographic. This lifestyle-oriented product is a growing niche in the seniors housing spectrum.

**Independent Living:** Independent Living Communities (ILCs) were developed in the 1980s to meet growing demand for accommodations specifically designed for seniors. They typically range from 115 to 300 units and are designed like apartment complexes. They have self-contained units with cooking facilities but also offer formal dining and common amenities like exterior courtyards, beauty salons, lounge and activity areas. Standard services include weekly housekeeping, linen service, maintenance of grounds, social activities, and at least one meal a day. Limited health services can be provided by third-party home health agencies *a la carte*, but residents must be physically and mentally able to perform all ADLs. Unlike higher acuity seniors housing, ILCs are less need-driven, with lifestyle and social choices driving the residency decision.



According to the NIC MAP® 4Q 2025 *Monitor*, occupancy increased 40 basis points from the prior quarter to 90.6% and 210 basis points above this quarter last year. Construction remains low with fewer than 1,200 units added to the supply and less than 8,000 units under construction. Net absorption for the quarter exceeded 2,200 units, while rent growth remained steady at 4.0%.

The NIC MAP® Data Service reported the following supply and demand trends for Majority Independent Living Communities:



Source: NIC MAP® Monitor 4Q 2025

**Assisted Living:** Assisted Living Residences (ALRs) are for seniors who can no longer perform all ADLs. The acuity is roughly between independent living and skilled nursing. Residents live in separate units, but ADLs are centrally provided and supervised by on-site staff. Standard services include three meals a day, grooming, bathing, dressing, and toileting. Other services are offered for additional charges. Many ALRs have a secured "Memory Care" wings for Alzheimer's/dementia with higher staff ratios, a "wander-guard" system, and dedicated amenities designed to improve quality of life. Most states require little additional certification to offer a memory care unit.

Many states offer Medicaid reimbursement for stays at ALRs, often known as "waiver". This appears to be the final level of support needed to legitimize ALRs for institutional investment.

According the NIC MAP® 4Q 2025 *Monitor*, occupancy continued to improve by 60 basis points to 87.7%, and net absorption exceeded 2,600 units. Construction has declined to under 8,600 units a level not seen since mid-2012.



The annual rate growth accelerated for the third consecutive quarter to 4.9%. NIC MAP® Data Service indicated the following supply and demand trends for Majority Assisted Living Communities:



Source: NIC MAP® 4Q 2025

**Skilled Nursing Facilities:** Skilled Nursing Facilities (SNFs) are the oldest seniors housing/health care product and one step below hospitals on the acuity spectrum. They are for residents needing 24-hour care and supervision by on-site nursing personnel. They contain smaller, more institutional rooms without cooking facilities. Many older SNFs have a high ratio of semi-private (double resident) rooms. Newer SNFs are trending toward more private rooms to target profitable short-term rehab residents.

Most SNF revenue comes from The Centers for Medicare and Medicaid Services (CMS), which combined, paid about 57% of the $219 billion expended for skilled nursing care in 2024. This heavy reliance on subsidies means any changes in reimbursements can directly impact a SNF's profitability.

In recent decades, SNFs turned their focus to more profitable short-term rehab residents reimbursed by Medicare. Many buildings were redesigned to create more private rooms, bigger physical therapy spaces, and dedicated common areas for short-term residents. This was driven by concerns about lower reimbursement levels for long-term care and the growing trend of long-term care residents moving to ALRs and home health settings. However, following the Affordable Care Act, more rehab residents are now being discharged directly to residential settings with support from home health agencies, sometimes bypassing a short-term stay in a SNF.

The latest NIC MAP® Data Service *Construction Monitor* indicates that there were 1,386 (new construction and expansion) Nursing Care Beds under construction in the 100 largest MSAs, in 4Q25. Many new SNFs are being developed within a continuum of care that includes IL, AL and MC units, or as standalone "transitional care" facilities focused almost exclusively on short-term rehab. According to the Centers for Medicare and Medicaid Services (CMS) there are 1.57 million certified SNF beds as of June 2025, but we note that the total supply has contracted over the last five years. According to NIC MAP® *Construction Monitor*, among the 100 largest MSAs, SNF construction as a share of existing inventory is only 0.2%. Many projects are replacement facilities, as CMS reports little growth in total beds. Supply and demand trends are summarized as follows:



Source: NIC MAP® Q4 2025

**Acute Care Hospitals:** The final level of care on the acuity spectrum is the acute care hospital, which often represents the last step in the life cycle. Although part of the acuity spectrum, hospitals are a distinct kind of facility outside the seniors housing/health care classification. There is little exhibited interrelationship in the supply and demand characteristics of acute care hospitals to other elements of the seniors housing market. However, skilled nursing facilities benefit from proximity to and referral relationships with acute care hospitals.

**Continuing Care Retirement Communities and Other Product Types:** In seniors housing/health care there are numerous hybrids and combinations of care types under one roof. A facility may offer independent and assisted living together or have mostly skilled nursing with an assisted living wing. The most common combined facility is the Continuing Care Retirement Community (CCRC), or Life Plan community, offering all three care types from independent living to skilled nursing on one large campus, allowing residents to "age in place". CCRCs can house hundreds, or even thousands of residents in several buildings on a campus with heightened amenities not available in smaller scale ILCs, ALRs, and SNFs.

CCRCs often require large initial entry fee deposits ("IEDs") or buy-ins from new residents in exchange for, and offsetting, the cost of future healthcare benefits and to help reduce monthly fees during residency. Many variations exist on refund policies of the IED ranging from 0% to 100%. Many communities amortize the entire non-refundable fee over four to eight years, in some cases where no refund is due, noting currently, the most popular plans tend to be 80-90% refundable upon release of a members IL unit.

**Summary:** This review of seniors housing is intentionally brief and is designed to acquaint the reader with the general product types and services available to the retiree consumer differentiated by price and acuity level.

**Development Trends**

The most recent quarterly update from NIC MAP® Data Service details development trends in the 31 largest MSAs in Seniors Housing (Independent and Assisted Living):

| Seniors Housing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Existing Inventory | | Occupancy | | Supply and Demand | | Under Construction | | Annual Rent |
| | # Properties | # Units | All | Stabilized | Absorption | Inventory Growth | # Properties | # Units | Growth |
| 4Q25 | 5,438 | 712,373 | 89.1% | 89.8% | 4,833 | 1,840 | 149 | 16,194 | 4.4% |
| 3Q25 | 5,429 | 710,533 | 88.7% | 89.5% | 6,604 | 1,412 | 162 | 17,396 | 4.5% |
| 2Q25 | 5,423 | 709,121 | 87.9% | 88.8% | 5,619 | 81 | 170 | 18,502 | 4.4% |
| 1Q25 | 5,424 | 709,040 | 87.1% | 88.2% | 2,807 | 1,182 | 177 | 18,367 | 4.2% |
| 4Q24 | 5,423 | 707,858 | 86.9% | 88.1% | 5,700 | 1,794 | 188 | 20,159 | 4.2% |
| 3Q24 | 5,418 | 706,064 | 86.3% | 87.4% | 6,618 | 1,998 | 202 | 20,970 | 4.1% |
| 2Q24 | 5,406 | 704,066 | 85.6% | 86.8% | 5,669 | 2,489 | 212 | 22,501 | 4.5% |
| 1Q24 | 5,388 | 701,577 | 85.1% | 86.3% | 3,429 | 1,296 | 232 | 24,852 | 4.8% |
| 4Q23 | 5,380 | 700,281 | 84.8% | 86.1% | 6,306 | 1,415 | 244 | 26,693 | 5.3% |
| 4Q22 | 5,342 | 693,071 | 82.5% | 84.1% | 8,353 | 3,049 | 306 | 32,997 | 5.4% |
| 4Q21 | 5,279 | 681,818 | 80.1% | 82.1% | 8,666 | 2,209 | 361 | 39,122 | 2.8% |
| 4Q20 | 5,151 | 666,922 | 79.8% | 82.2% | -5,966 | 4,779 | 381 | 40,948 | 1.7% |
| 4Q19 | 5,007 | 647,822 | 87.4% | 89.7% | 3,378 | 4,659 | 462 | 49,587 | 3.6% |

Source: NIC MAP® 4Q 2025

Within these same metro areas, skilled nursing facilities demonstrate the following trends per the NIC MAP® Data Service:

| Majority Nursing Care | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Existing Inventory | | Occupancy | | Supply and Demand | | Under Construction | | Annual Rent |
| | # Properties | # Units | All | Stabilized | Absorption | Inventory Growth | # Properties | # Units | Growth |
| 4Q25 | 3,905 | 544,830 | 86.5% | 86.6% | 1,324 | 165 | 15 | 985 | 5.3% |
| 3Q25 | 3,904 | 544,665 | 86.3% | 86.4% | 61 | -470 | 17 | 1,144 | 5.4% |
| 2Q25 | 3,905 | 545,135 | 86.2% | 86.3% | 1,492 | -631 | 20 | 1,360 | 5.1% |
| 1Q25 | 3,911 | 545,766 | 85.9% | 85.9% | 2,027 | -1,295 | 22 | 1,380 | 5.0% |
| 4Q24 | 3,923 | 547,061 | 85.3% | 85.3% | 2,551 | -1,582 | 24 | 1,374 | 4.6% |
| 3Q24 | 3,931 | 548,643 | 84.6% | 84.6% | 607 | -1,037 | 25 | 1,366 | 4.4% |
| 2Q24 | 3,936 | 549,680 | 84.3% | 84.4% | 1,092 | -728 | 20 | 995 | 4.6% |
| 1Q24 | 3,942 | 550,408 | 84.0% | 84.1% | 4,397 | -410 | 19 | 926 | 4.4% |
| 4Q23 | 3,947 | 550,818 | 83.1% | 83.2% | 3,277 | -972 | 18 | 1,067 | 4.7% |
| 4Q22 | 3,992 | 557,319 | 80.0% | 80.0% | 2,758 | -1,397 | 19 | 1,168 | 3.5% |
| 4Q21 | 4,030 | 562,657 | 77.1% | 77.2% | 4,117 | -885 | 32 | 1,992 | 2.3% |
| 4Q20 | 4,059 | 567,336 | 75.2% | 75.4% | -3,870 | 175 | 32 | 2,188 | 2.4% |
| 4Q19 | 4,062 | 567,829 | 86.4% | 86.6% | -126 | -349 | 42 | 3,381 | 3.1% |

Source: NIC MAP® 4Q 2025

In the years leading up to the pandemic, the industry added over 90,000 units to the existing inventory. Coming out of the pandemic, the industry, collectively and individually, was at historically low occupancies as even more communities, representing another 70,000 units, came on line. As of early 2026, construction costs for all regions are 30-47% higher than in early 2021 while capital costs are 325 to 350 basis points (bps) higher. Besides occupancies being depressed during much of this period and rate growth generally at 3-6%, labor costs for residential care and nursing are 18% higher than five years ago.

The convergence of these trends results in little new development occurring, despite many markets moving past pre-pandemic occupancy levels and beginning to show some shortages. With a three-year typical development period and the demand only swelling, there is interest in development but little appetite for the meager to non-existent returns that pencil for most proposed projects. Until that math changes, development will remain constrained, allowing existing properties to implement stronger rate increases and build margin back up..

**Transactions**

The rapid rise in capital costs caused deal volume to drop across all real estate classes. However, with tremendous capital entering the space and capital costs in decline, the activity in 2025 has grown and 2026 is poised to be very active. The NIC MAP® Data Service Q4 2025 *Transaction Report* illustrates transaction activity over the last several years as follows:



Source: NIC MAP® Data Service Sales Transactions Report, Q4 2025

Stabilized seniors housing assets remain quite desirable, but even the value-add represent far greater returns with lower risk than new construction does at this point. With returns not as strong for other asset classes and the broader supply and demand dynamics suggesting a long runway for improving operations, buyer are now purchasing for yield but from operations and the exit at the end of the holding period.

In skilled nursing, some investors remain bullish while others are slowing down activity. Although spared the staffing mandates and the worst of the potential cuts proposed under the One Big Beautiful Bill Act (OBBBA), Medicaid is being impacted and cuts to provider taxes for managed care organizations (MCOs) are likely to have an indirect impact on nursing homes. Two states (Idaho and North Carolina) have already announced cuts to nursing home Medicaid rates. With increased focus on foreign-born workers, who by some estimates represent about 20% of the nurses in the nation, operating challenges remain significant. Nonetheless, the same dynamics - aging population and limited supply with more onerous barriers to entry than seniors living – are attracting investors in this segment as well.

**Key Themes for 2026**

We identified the following key themes affecting the seniors housing and care industry both in terms of cash flows and valuations:

❑ **Influx of Capital:** After years of blown covenants and worse, banks have returned to lending rather than just managing portfolios. Life companies are returning and competing with the Government-Sponsored Enterprises (GSEs). Both Fannie and Freddie expected to issue $2B in FY 2025 (ending September 30) and while Freddie likely did, Fannie fell short; nonetheless both expect to have a stronger 2026. With the appointment of Frank Cassidy at HUD, the agency is streamlining its processes and reducing red tape. In 2024, HUD issued firm commitments of $4.1B and the outlook is materially higher in FY 2026.

❑ **Capital Costs:** The Federal Reserve's ramp-up in rates ended in mid-2023, and declines have started with more expected. With mixed data on inflationary and jobs, the economic picture remains opaque but The Fed did cut the rate by 75 basis points in the second half of 2025. Some While The Fed has held steady thus far in 2026, some speculate that with a new chairman, more cuts are likely to materialize. With tremendous media coverage on the aging population, limited supply and increased recognition of seniors housing as an investment asset class, we are seeing a flood of capital – both debt and equity – that resembles the levels seen in the 1990s. Consequently, with the increased competition, we are seeing spreads drop to the low 200s over SOFR and the 10-year.

❑ **Buyers:** In late October 2025, Welltower announced $14 billion in transactions including a new deal with Barchester Healthcare to acquire 284 communities in the U.K. for a sum totaling more than $6.9 billion. Over the last 12 months, the public buyers have really increased investment, shooting to the top of the active buyers list. The top five buyers included private and institutional buyers namely: Welltower ($3.1 billion in aggregate), Ventas ($1.8 billion), the RMR Group ($566 million), Care Trust REIT ($469 million), and Autumn Lake Healthcare ($379 million). Over the last four quarters, private equity has been responsible for over 50% of the acquisitions for majority assisted living and nearly 60% of transactions in the skilled nursing sector, despite states and the federal government targeting private equity ownership.

The following graphic from the *NIC Investment Guide* shows these returns relative to other commercial property types:



Now that NCREIF recognizes senior housing as an investment class and the data suggests that it has outperformed all asset classes but industrial and self-storage over the long-term holding periods, as well as over the last year, investors are increasingly compelled to add seniors housing to their investment portfolios.

☐ **Labor:** The Journal of American Medical Association (JAMA) reported that skilled nursing facilities saw a 7.6% decline in employment between 2020 and 2023 and was still 1% below pre-pandemic levels in 2024. The delay and presumed tabling of the national staffing mandate will alleviate some stress, but we note the intersection of an aging workforce and the limited capacity of nursing schools with an aging US population will lead to continued shortages without immigration reform:



Source: National Nursing Workforce Survey (2020, 2022), BLS and Claritas

The problem is especially acute in rural markets where fewer staff live or can commute and satellite suburban markets that must compete with a nearby metro area for talent. Many large operators now have recruitment and retention programs designed to keep quality personnel with signing bonuses, higher wages, educational allowances, meals, transportation, and other perks. This situation puts pressure on developers in assembling competent staff for a new facility.

☐ **Operations:** *The State of Seniors Housing Q3 Performance Trends* report suggests that occupancy is beginning to stabilize while revenue growth for IL slows. For majority AL, revenues declined from the prior quarter, but remain substantially higher than those achieved in 2024. Expense growth for IL communities is below the revenue growth reported for each period. However, the 7% increase over 2024 is more than twice the unadjusted 3.0% Consumer Price Index (CPI) increase for 12 months ended September 2025. AL communities in the sample also report expense growth above inflationary levels over the last year. However, both IL and AL communities reported only a 1% increase in operating expenses over the prior quarter. Both IL and AL communities report lower labor expense as a ratio of revenues than a year ago and declining labor

costs during Q3 compared to the prior quarter. In terms of net operating income and margins, IL communities continue to report improvement in Q3 over the prior quarter and 2024. However for AL communities, the slight contraction in revenues, despite restrained expense growth, resulted in declines in both net operating income per occupied unit and margins, underscoring the impact of concessions. With development stifled, many in the industry reasonably expect double-digit profit growth and expanding margins over the next few years, even for "stabilized" properties.

For skilled nursing, many states stepped up payments, providing some relief to operators caught between rebuilding census and paying agency labor costs. However, broader cuts to Medicaid funding and restrictive immigration policies will continue to challenge margin growth. The eroding margins are particularly dire for rural nursing homes with 472 nursing homes closing between 2008 and 2019 according to The American Health Care Association. Since the onset of the pandemic, rural nursing homes have comprised nearly one-third of the 774 closures.

❑ **Regulations/Government:** On a federal level, trillions in debt have been incurred since the beginning of the pandemic as both federal and state governments stepped up financial support for the industry in terms of Provider Relief Funds and Medicaid rate add-ons. The passage of OBBBA is expected to increase the deficit further still. With the approved cut of $964 billion in Medicaid spending over the next decade in OBBBA, states will be pressed to operate their Medicaid programs as efficiently as possible and will likely accelerate the trend of states converting to Managed Care programs, which, while not reflecting outright cuts, do bring increased operational scrutiny. Like Medicare, many states are instituting reimbursement structures that emphasize outcomes and performance over older models based on coding and length of stay. Nonetheless, the frequent and generally negative headlines about seniors facility deaths (conflating skilled nursing with seniors housing) has increased scrutiny by CMS and led to a House investigation of the assisted living industry. With SNFs receiving over $10 billion in Provider Relief Fund (PRF) revenues and licensed seniors housing receiving an estimated $700 million, increased federal oversight is a likely outcome.

With improving margins despite operating challenges, the seniors housing industry has a strong long-term outlook, supported by demographic shifts and strong operational track records. However, we note that the new generation (Baby Boomers) approaching seniors housing have different priorities than their parents. Some of the original product for seniors housing has become obsolete and even newer buildings with too many studio or shared units may lack market appeal. In states with supportive reimbursement, we are seeing new nursing home development and significant capital expenditures to better meet the news of these new consumers. From a valuation viewpoint, the market has become increasingly bifurcated between the haves – newer, functionally attractive buildings operating at stabilized occupancy – and the have nots (everything else), requiring understanding in each assignment of the likely buyer and the likely lender.

## INTRODUCTION

**Legal Description:** We note that the subject's identification on the local tax roll is presented in the *Assessment and Taxes* section of this report. We requested a legal description for the subject as well and presented it in the addenda of this report. The subject is identified as Unit One on the Condominium Declaration Plan for Condos at Saucon Valley Manor, recorded in Map Book Volume 2006-5, Page 759. We presume the descriptions shown in this report are correct and assume no liability for them.

**Three-Year Sales History:** We have researched and analyzed the subject's sale history in accordance with USPAP for the past three years prior to the date of appraisal. We are unaware of any sales or listings of the subject over the past three years. Additionally, we are unaware of any pending transactions or listings.

The subject is currently encumbered with a lease agreement between related parties. The lease payment has not been included in our analysis of cash flows. At the request of the client, we appraised the fee simple interest. The subject property is being leased to the current tenant as a result of a related party lease-back transaction involving the two parties. The subject's lease is set to expire December 31, 2028, per the most recent lease amendment (the "Sixth Amendment" effective September 21, 2023). We have included our estimates of the expected market lease in the Fair Market Rent section of this report.

**Operational Summary:** The subject is operated by Manors of the Valley who have been providing a full continuum of care across five different communities in Lehigh Valley since 1998. Based on the financial and performance data provided, the subject's occupancy and operational trends are summarized as follows:

| OPERATIONAL SUMMARY | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Level of Care | Appraisal - Stabilized | | 11/2025 T11 Actual | | 2024 Actual | | 2023 Actual | | 2022 Actual | | 2021 Actual | |
| | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD |
| AL | 94% | $126.36 | 188% | $140.64 | 102% | $248.04 | 94% | $246.38 | 208% | $105.30 | 183% | $124.50 |
| MC | 94% | $164.84 | 0% | — | 80% | $0.00 | 78% | $0.00 | 0% | — | 0% | — |
| Average Occupancy | 94% | | 95% | | 91% | | 86% | | 104% | | 92% | |
| Total Revenues | | $149.51 | | $144.52 | | $143.37 | | $138.59 | | $108.03 | | $128.10 |
| Profit Margin | | 14.6% | | 0.1% | | 1.5% | | -11.5% | | 1.1% | | 1.1% |
| Source: HealthTrust and Manors of the Valley | | | | | | | | | | | | |

*Historical 2022 and 2021 financials do not itemize occupancy.*

**Client, Purpose and Intended Use of the Appraisal:** Our client is Hangley Aronchick Segal Pudlin & Schiller. The purpose of the appraisal is to estimate the "as is" market value of the subject as a going concern including personal and intangible property. The intended use of this appraisal is to provide a third-party opinion of the market value of the subject. The intended users are representatives of the client: Hangley Aronchick Segal Pudlin & Schiller, Berger Law Group P.C., LEHIGH VALLEY 1, LLC.

**Scope of Work**

**Appraisal Development and Reporting Process:** Standards Rule 1-2(h) and 2-2(a)(viii) of USPAP requires each written real property appraisal report to describe the extent of the process of collecting, confirming and reporting data to develop the appraisal. The Scope of Work is a written set of expectations between the client and the appraiser in which to be sufficient to produce credible assignment results: we performed a seven-step process to prepare our appraisal:



1. Define appraisal problem.

2. Determine Scope of Work.

3. Collect and verify the data.

4. Analyze the data.

5. Apply necessary approaches to value.

6. Reconcile various value indicators.

7. Prepare and deliver appraisal report.

IDENTIFY THE PROBLEM ⇒ DETERMINE & PERFORM SCOPE OF WORK NECESSARY ⇒ DISCLOSE SCOPE OF WORK IN REPORT

Based on the identified objective of the appraisal, we view the income-producing potential of the subject as the most salient valuation issue. As part of the appraisal process, we have:

- ☐ Identified the subject and what interest is to be appraised (fee simple, leased fee, leasehold)
- ☐ Determined the intended use (purpose) and user of the appraisal
- ☐ Determined the effective date of value (current, prospective, retrospective)
- ☐ Considered any special assignment conditions (HUD, Fannie Mae, Freddie Mac, Litigation)
- ☐ Inspected the interior and exterior of the subject, driven the neighborhood and general market area
- ☐ Gathered and analyzed public records: legal, ownership history, zoning, tax assessment
- ☐ Examined supply and demand factors
- ☐ Analyzed current demographic data and projected changes over the next five years
- ☐ Researched development trends, building construction costs
- ☐ Analyzed operating characteristics of the subject and comparable properties
- ☐ Analyzed valuation trends and market characteristics impacting the subject
- ☐ Researched the legislative environment and any necessary licensure requirements

**The Income Approach.** We have surveyed the most comparable properties in this market area to assess typical demand and market rates in the primary market area ("PMA"). As the subject is an income-producing property type that is typically purchased by investors, we have spent the most time, effort and

original research on verifying income and expense comparables, rent comparables, identifying trends that may impact the subject's operations. Moreover, the subject is a going concern which may have material intangible value making it highly reliant on an income and expense analysis. The greatest extent of our research and analysis was given to the income approach.

**The Sales Comparison Approach:** While we have attempted to limit this research to the subject's primary market area, due to lack of improved sales, we have expanded our search to properties throughout the region, or in some cases the United States. We gathered information from public records, industry market participants, along with our proprietary software database HealthComps®. We believe that most or all-discoverable pertinent market information has been obtained and considered. All sales were verified through a party to the transaction and to the extent possible, have been inspected by the appraisers or associates at HealthTrust.

**The Cost Approach:** The subject property was constructed in 1930 and is operated as a going concern. We find that investors rarely rely on the cost approach and given the subject's age, lack of market support for depreciation estimates and the fact that the property is income-producing. Therefore, we have not included the Cost Approach to develop our appraisal estimates. Further, we find that investors place more weight on replacement cost indications, as it provides a more relevant data point to juxtapose to the sustainability of the income approach conclusion.

Lastly, as a part of this process we have obtained and verified data with local market participants (owners and operators of comparable properties), state regulatory agencies as well as local governing officials.

The resulting value estimates have been reconciled based on their relative strengths, weaknesses and appropriateness into a final value estimate. This appraisal report is a written record of our conclusions and opinions, containing the most pertinent market data used and a discussion of the reasoning underlying our estimates.

**Applicability of Approaches**

The **COST APPROACH** is the sum of the land value and the cost new of the improvements less accrued depreciation. The cost approach is based on the premise that an informed, rational investor/purchaser would pay no more for an existing property than the cost to reproduce a substitute property with the same utility without undue delay.

The **INCOME APPROACH** is based on the premise that a prudent investor would pay no more for the subject property than for another investment with similar risk and return characteristics. Since the value of an investment can be considered equal to the present worth of anticipated future benefits in the form of dollar income or amenities, this approach estimates the present value of the net income that the property can produce. These amounts are discounted at a rate that reflects the risk to the investor and the amount of income necessary to support debt service or the mortgage requirement.

The **SALES COMPARISON APPROACH** (market approach) is the process where prices of reasonably similar properties are compared to the subject and are adjusted for differences in financing, sale conditions, time, location and physical characteristics. This approach is based upon the principle of substitution, which implies that a prudent purchaser would not pay more to buy the subject than for a comparable substitute property in a similar location.

Each approach to value has its strengths and weaknesses, depending on a large extent on the type of property being appraised and the quantity and quality of data available. In most instances, one or more of these approaches will produce a more reliable value indication than the other approach(es). Therefore, the final step in the appraisal process is the RECONCILIATION and correlation of all the value indications into a final value estimate. This step usually begins with a discussion of the merits and demerits of each approach and an analysis of the reliability of the data used in each approach. It concludes with a statement of the final value estimate.

In addition, it is necessary to identify any business value and personal property value separate from the real estate. The allocated contribution values were estimated following the reconciliation and final value estimates. This report should be read in its entirety for a complete understanding of the scope of the appraisal and the limiting conditions that apply to this valuation and report. Specific attention should be drawn to the Letter of Transmittal, Certification, Standard Conditions and Significant Issues.

The USPAP Competency Rule requires that appraisers have or obtain the ability and knowledge to complete an appraisal assignment while being cognizant of and in compliance with applicable laws and regulations. HealthTrust, LLC exclusively works with properties involved in healthcare and housing for older adults and the appraisers identified in the Certification comply with the Competency Rule.

**Inspection and Effective Dates of Appraisal**

Alan C. Plush, MAI inspected the interior and exterior of the subject property on March 10, 2026. The "as is" valuation date is also March 10, 2026. The appraisal is based upon market conditions observed at that time.

**Use Premise**

The subject property valued herein is based on the an existing use as an Assisted Living/Memory Care Residence. The implications relative to this premise on the highest and best use of the property are addressed in a later section of this report.

## DESCRIPTIVE DATA

### Site Description

We have made a visual inspection of the subject property. Where applicable, we have supplemented our analysis with information provided by the subject's management and/or the client. As previously noted, we are not experts in the presence of hazardous substances or the structural integrity of the site or improvements. Based on our inspection of the property, the subject's site characteristics are as follows:

| SITE DESCRIPTION | | | |
|---|---|---|---|
| **Access** | | **General** | |
| Primary Frontage: | Main Street | Site size: | 2.61 acres |
| Type: | 2-way, 1 lane each way | Source: | Public Records |
| Median Divided: | No | Shape: | Irregular |
| Accessibility | Good | Topography: | Mostly Level |
| Visibility | Excellent | | |
| Exposure | Good | **Other Site Improvements** | |
| | | Paved Drives: | Yes |
| **Facilitating Entry to Site** | | Walkways: | Yes |
| Turn Lane: | No | Landscaping: | Yes |
| Stop Sign: | No | Signage: | Yes |
| Traffic Light: | No | Ancillary Buildings: | Yes |
| | | Retention Ponds or areas: | No |
| **Easements** | | | |
| Right of Way: | Yes | | |
| Utility: | Yes | **Parking** | |
| Ingress/Egress: | Yes | Open Parking spaces: | 31 |
| Drainage: | No | Covered Parking spaces: | 0 |
| Other (specify): | Parking | Garage spaces: | 0 |
| | | Handicap spaces: | 4 |
| **Utility Services** | | Total | 35 |
| Electric: | Yes | | |
| Gas: | Yes | **Soil** | |
| Water: | Public | Drainage: | Adequate |
| Sewer: | Public | Soil Conditions: | Normal |
| Telephone | Yes | Above-Ground Storage Tanks: | Yes - |
| Cable: | Yes | Underground Storage Tanks: | No |
| | | Hazardous Substances: | No |
| **Flood Zone** | | Costs to cure: | $0 |
| Flood Plain: | Outside | | |
| Designation: | X | **Seismic** | |
| Community Panel: | 42095C0329E | Zone: | B |
| Date: | July 16, 2014 | | |

We assume that typical easements exist and are unaware of any restraints that would hinder development of the subject if vacant

**AERIAL MAP**



## Zoning

We verified the subject's zoning designation and reviewed the corresponding zoning ordinance with the Borough of Hellertown. A summary of the zoning requirements is as follows:

| ZONING DESIGNATION | |
|---|---|
| Designation: | M - (Mixed District) |
| Zoning Authority: | Borough of Hellertown |
| Permitted Uses: | Single-family, multi-family, condos, government building, library, forestry, and medical marijuana dispensary. Assisted living facilities and nursing homes require a special permit |
| Maximum Height: | 40 feet or 2 stories |
| Permitted Density: | N/A |
| Max. Permitted FAR: | N/A |
| Required Parking: | 1 space per dwelling unit plus 1 space per maximum number employees at one time |
| Subject Permitted As: | conditional use |

**Assessment and Taxes**

The subject property is assessed by Northampton County. The subject's real estate is assessed on no set schedule, with the most recent assessment having occurred in 2026. The next assessment has yet to be determined. The sale of a property does not automatically trigger a reassessment the following year. In addition, arm's length transactions will not impact the subject's assessed value in subsequent years. We note that the subject's land use is classified as condominium/commercial, therefore, it does not have a land value. The following table details the subject's most recent assessment and tax information:

| SUMMARY OF REAL ESTATE TAXES | | | |
|---|---|---|---|
| **Parcel ID** | **Land** | **Building** | **Total** |
| **Q7SW2A 1 3 0715** | $0 | $8,128,000 | $8,128,000 |
| Total Assessor's Implied Fair Market Value: | | | $8,128,000 |
| Adjustments & Taxes: | | | |
| Exempt Value: | | | $0 |
| Assessment Ratio: | | | 17% |
| Taxable Value: | | | $1,382,600 |
| Effective Tax (Millage) Rate: | | 89.0055 | per $1,000 |
| Total Ad Valorem Real Estate Taxes: | | | $123,059 |
| Total Non-Ad Valorem Real Estate Taxes: | | | $0 |
| Total Real Estate Taxes | | | $123,059 |
| Total Taxes: | | | $123,059 |
| Assessment Year | | | 2026 |
| Tax Year | | | 2026 |
| Total Taxes Per: | $732 Unit | Bed | $612 |

Further, we have juxtaposed the subject real estate tax indications with the comparable properties, as follows:

| TAX COMPARABLE ANALYSIS | | | |
|---|---|---|---|
| **Property** | **Year Built** | **Assessed/Density** | **Taxes/Density** |
| Sacred Heart Senior Living | 2005 | $84,803 | $1,962 |
| The Birches of Lehigh Valley | 2024 | $31,459 | $2,584 |
| Bethlehem Manor | 1935 | $14,820 | $436 |
| The Vero at Bethlehem | 2023 | $27,651 | $2,160 |
| Above and Beyond at the Knights | 1989 | $27,619 | $934 |
| Franklin Court Senior Living | 1988 | $5,937 | $1,216 |
| The Bridges at Warwick | 2016 | $7,997 | $1,516 |
| Subject | 1930 | $8,230 | $732 |
| Market Median | 1997 | $21,219 | $1,366 |
| Market Mean | 1989 | $26,064 | $1,442 |
| Source: Assessor's Office; *Personal property tax not included | | | |

In conclusion, the subject is assessed at $8,230 per unit, which is within the range of the tax comparables, while the taxes per unit are within the range of the comparables surveyed. Overall, we have forecasted the subject's taxes as follows:

| HT REAL ESTATE TAX FORECAST | | |
|---|---|---|
| Concluded Real Estate Assessment | | $1,382,600 |
| Per Density | | $8,230 |
| Ad-Valorem Tax Rate | 89.0055 | per $1,000 |
| Ad-Valorem Taxes | | $123,059 |
| Non-Ad Valorem Taxes | | $0 |
| Total Real Estate Taxes | | $123,059 |
| | | |
| Tax Growth | | 3.00% |
| Projected Taxes | | $126,751 |
| Existing Taxes | | $123,059 |
| Difference | | $3,692 |
| | | |
| HT Projected Taxes | | $126,751 |
| Per Density | | $754 |
| Source: HealthTrust | | |

**Improvement Description**

The following description of the subject improvements is based on our inspection of the subject as well as a review of information provided by the operator. Received plans are contained in the Addenda of this report. We have partitioned the subject's gross building area as follows:

| SUMMARY OF GBA | |
|---|---|
| **Portion** | **GBA** |
| Assisted/Memory Care | 170,590 |
| **Total** | **170,590** |

| DESCRIPTION OF IMPROVEMENTS | | | |
|---|---|---|---|
| **Improvement Description:** | | | |
| Year Built: | 1930 | Building Shape | irregular |
| Year of Last Major Renovation | 2000 / 2010 | Basement | Partial |
| Number of Buildings | 1 | Balconies | No |
| Number of Stories | 4 | Number of Elevators | 2 |
| Nurse's Stations | 7 | Dining Rooms | 7 |
| Overall Condition | Average | Deferred Maintenance | Yes |
| Overall Quality | Average | Functional Obsolescence | No |

In estimating the subject's remaining economic life, we have assessed its physical condition as well as the functionality of the plant. We then extracted implied economic lives from the improved sales and compared them to suggested guidelines by the *Marshall Valuation Service*.

The subject property was constructed in phases and was originally designed as a high school. The improvements are well-maintained but show minimal signs of deferred maintenance other than the roof. Based on a bid estimate provided (included in the addenda of this report), we've allocated $1,064,263 to repair the roof and deducted as deferred maintenance.

Overall, we find that the subject property has an effective age of 25 years, compared to its actual age of 96 years, due to the adequate maintenance of the improvements. Consequently, we deem the subject to have a remaining economic life of 25 years. The subject's improvements are detailed as follows:

| DESCRIPTION OF IMPROVEMENTS (CONT.) | |
|---|---|
| **Construction Details:** | |
| Foundation Type: | Concrete slab |
| Structure Type: | Masonry |
| Roof Type: | Flat |
| Exterior Wall Finish: | Brick Veneer |
| Interior Partitions - Common Areas: | Latex paint over drywall |
| Interior Partitions - Resident Units: | Latex paint over drywall |
| Ceilings - Common Areas: | Latex paint over drywall and suspended acoustical tiles |
| Ceilings - Resident Units: | Latex paint over drywall and suspended acoustical tiles |
| Lighting - Common Areas: | Fluorescent |
| Lighting - Resident Units: | Fluorescent |
| HVAC - Common Areas: | Central |
| HVAC - Resident Units: | PTACs |
| Floor Coverings - Common Areas: | Vinyl tile |
| Floor Coverings - Resident Units: | Vinyl tile |
| Windows: | Aluminum frame, single-hung |
| Sprinkler/Security System: | All units have 24-hour emergency call system with central monitoring. The building is sprinklered and contains smoke detectors. |
| FF&E: | This appraisal includes all chattel and personal property associated with the subject's operation such as furnishings for all common and administrative areas, office equipment, kitchen and laundry equipment, maintenance equipment, and all other accessory items required for normal operation. |

### Community Layout

Originally a high school, the subject was converted to senior housing in 2010. The first floor contains resident rooms, offices, and a dining room, with all rooms located to the right and left of the lobby. Resident rooms are located on each floor split between seven sections/units all of which are supported by nurses' stations, various amenities, and activity areas. The subject also provides various acuity levels, including one of the highest care levels in state for personal care. Lastly, the subject building was impacted by a fire but appears to have been remediated from observations during our inspection. Overall, we find the improvements are functional for seniors housing and see no indications of any functional obsolescence.

The following table illustrates the amenities offered by the subject. Overall, we find these to be typical in the market, and adequate given the subject's age, quality and prospective resident:

## SUMMARY OF AMENITIES

**Unit Amenities:**

| | | | |
|---|---|---|---|
| Balconies/porches | No | Individually controlled HVAC | Yes |
| Cable/satellite TV | Yes | Kitchenettes | Yes |
| Emergency pull-cords | Yes | Private baths | Yes |
| Fire/smoke detectors | Yes | Walk-in closets | Yes |
| Full kitchens | No | Washer/dryer hookups | Yes |
| High-speed internet | No | Washers/dryers | Yes |

**Community Amenities:**

| | | | |
|---|---|---|---|
| Activity rooms | Yes | Laundry facilities | Yes |
| Arts & crafts rooms | No | Library | No |
| Assistance w/ ADLs | Yes | Linen Service | Yes |
| Bank branch | No | Lounge areas | Yes |
| Beauty/barber shop | Yes | Medications | Yes |
| Business Center | No | Pharmacy | No |
| Chapel | No | Postal services | Yes |
| Coffee Shop/Deli | No | Putting green | No |
| Computer room | No | Reception Area | Yes |
| Concierge service | No | Scheduled transportation | Yes |
| Courtyard | Yes | Security 24 hour | Yes |
| Covered parking | No | Skilled nursing care | No |
| Dining room - main | Yes | Social activities | Yes |
| Dining room - private | No | Spa/Whirlpool | No |
| Exercise facilities | No | Storage area/bin | No |
| Game/billiards rooms | No | Swimming Pool | No |
| Garage parking | No | Tennis courts | No |
| General store | No | Theater/Auditorium | Yes |
| Golf course | No | Therapy Room | Yes |
| Guest Accommodations | No | Utilities | Yes |
| Health center | No | Walking/nature trails | No |
| Housekeeping | Yes | Wanderer Mgt. System | Yes |
| Ice cream parlor | No | Woodworking shop | No |

The subject contains a total of 168 units and 201 beds, indicating the following unit sizes and mix:

## UNIT MIX

| Type of Unit | No. of Units | Size (sf) | Net Rentable Area |
|---|---|---|---|
| **Assisted Living** | | | |
| Semi-Private | 20 | 450 - 450 | 42,088 |
| Studio | 61 | 375 - 550 | 5,400 |
| **Memory Care** | | | |
| Semi-Private | 13 | 450 - 450 | 17,113 |
| Studio | 74 | 375 - 550 | 13,950 |
| **Total** | 168 | | 78,551 |

Compared to the overall industry the subject's improvement metrics are as follows:

| SUMMARY OF IMPROVEMENTS | | | | |
|---|---|---|---|---|
| **Level of Care:** | **No. of Units** | **No. SU Beds** | **No. Lic Beds** | **2025 State of Seniors Housing Average No. Of Units** |
| AL | 81 | 101 | 101 | |
| MC | 87 | 100 | 100 | |
| **Total** | **168** | **201** | **201** | 83 |

| **Building Efficiency:** | **Subject** | **2025 State of Seniors Housing Median Indications** | | |
|---|---|---|---|---|
| | | **IL** | **AL/MC** | **CCRC** |
| Gross Building Area (GBA): | 170,590 | 102,351 | 75,350 | 471,735 |
| Ratio of Net Rentable Area | 46% | 68% | 54% | 67% |
| GBA/Unit | 1,015 | 867 | 908 | 1,359 |
| GBA/Bed | 849 | N/A | N/A | N/A |

**Americans With Disabilities Act:** The Americans With Disabilities Act sets strict and specific standards for handicapped access to and within most commercial and industrial buildings. Determination of compliance with these standards is beyond appraisal expertise and, therefore, has not been attempted by the appraisers. For this appraisal, we are assuming the improvements comply. We assume no responsibility for the cost of such determination, and our appraisal is subject to revision if the improvements are not in compliance.

**Conclusion -** Subject Property Data: Following our review of available plans and our property inspection, we find that the subject site is adequate to support the improvements. Furthermore, we did not note evidence of functional obsolescence inherent in the subject's design and believe that they are functional for seniors housing and care. Finally, we did note material deferred maintenance at the subject.

## MARKET ANALYSIS

The subject of this appraisal is in Hellertown in the Allentown-Bethlehem-Easton, PA-NJ Metropolitan Statistical Area (MSA). Appraisal theory recognizes four factors (environmental, social, economic, and governmental) that influence property values within a region, county, neighborhood or district. Accordingly, a review of each as it relates to the most influential MSA, as well as the subject's more immediate neighborhood, is presented.

### Regional Analysis

The subject's location relative to the most influential MSA is as follows:

**AREA MAP**



Additionally, the following pages were provided by *Moody's Economy.com, Précis Metro* reports to provide a comprehensive analysis regarding current and projected economic conditions for the subject's MSA.



# MOODY'S   Allentown-Bethlehem-Easton PA-NJ   PRÉCIS® U.S. Metro

Data Buffet® MSA code: IUSA_MALL

| ECONOMIC DRIVERS | EMPLOYMENT GROWTH RANK | RELATIVE COSTS | VITALITY | QUALITY |
|---|---|---|---|---|

**ECONOMIC DRIVERS**
- MEDICAL CENTER
- MANUFAC-TURING
- LOGISTICS

**EMPLOYMENT GROWTH RANK**
- 2024-2026: **138** 2nd quintile
- 2024-2029: **159** 2nd quintile
- Best=1, Worst=417

**RELATIVE COSTS**
- LIVING: **101%**
- BUSINESS: **97%**
- U.S.=100

**VITALITY**
- RELATIVE: **0.03** Rank: 172
- Best=1, Worst=411

**QUALITY**
- OF LIFE: **283**
- Best=1, Worst=407

## BUSINESS CYCLE STATUS



## STRENGTHS & WEAKNESSES

### STRENGTHS
» Proximity to East Coast ports and densely populated metro divisions.
» Competitive business costs.
» Encouraging migration trends, population growth.
» Ample developable land.

### WEAKNESSES
» Unfavorable age dynamics.
» Overexposed to federal policy shifts.
» Below-average educational attainment.

## FORECAST RISKS



**SHORT TERM** ▼    **LONG TERM** ▲

**RISK EXPOSURE 2025-2030**   **213** 3rd quintile   Most=1, Least=411

### UPSIDE
» New semiconductor facilities attract more tech companies.
» Tariffs are lowered, limiting damage to logistics and manufacturing.

### DOWNSIDE
» Tariff-induced inflation and trade wars hit logistics harder than expected.
» Increased automation permanently removes manufacturing/logistics jobs.
» Federal CHIPS Act spending is revoked.

## MOODY'S RATING

**Aa1**   COUNTY AS OF OCT 01, 2019

## ANALYSIS

**Recent Performance.** Allentown-Bethlehem-Easton's expansion is holding course. Top-line payrolls have continued to rise since the start of 2025, though the pace of gains has decelerated more recently. Healthcare has been the clear leader of job gains, while logistics provided some support as manufacturing struggled to grow. The household survey paints a somewhat dimmer picture as the jobless rate ticks up and the size of the labor force remains stagnant. House prices are up since the start of the year, although appreciation has slowed. Residential construction remains elevated compared with pre-pandemic years, thanks largely to strong multifamily permit issuance and relatively stable single-family permits.

**Logistics.** Transportation/warehousing will muddle through the coming quarters as tariffs and trade tensions remain high. Bridging central Pennsylvania and northern New Jersey, ALL sits at a strategic junction of major East Coast trade routes. These advantages connect it to key metro areas, ports, and the Canadian border, sustaining a logistics job share nearly twice that of the nation. The Trump administration's trade policies—particularly higher tariffs and frayed ties with Canada and Mexico—have exerted pressure on the industry. At best, logistics job growth will be steady but subdued, as volatile trade policy and elevated tariffs through the remainder of Trump's term keep risks tilted to the downside. In addition, tariff-driven inflation has been milder than expected but will persist into 2026. If rising prices weigh on consumer goods spending, logistics demand will take another hit. Still, once the dust settles, strong geographic reach, competitive costs, and ample developable land will keep ALL a vital logistics hub.

**Manufacturers.** The outlook for manufacturing remains tenuous as tariffs lift input costs. ALL has a diverse manufacturing base, with subsectors spanning consumer goods such as beverages, intermediate goods such as plastics and pharmaceuticals, and durable goods including heavy machinery. While an aging U.S. population will sustain pharmaceutical demand, higher input costs from tariffs and trade disruptions will dampen near-term growth elsewhere in manufacturing. Citing tariffs and weaker demand, top employer Mack Trucks recently laid off hundreds of workers. Still, new investments brighten the longer-run outlook. Medical device maker B. Braun is expanding and will add more than 150 jobs in the next three years. Further out, large semiconductor projects—Infinera's packaging and testing facility and Coherent's materials plant—will enhance ALL's industrial base and generate hundreds of high-paying positions.

**Health services.** Healthcare will mainly provide support in the near term following the industry's impressive post-pandemic surge. ALL's outsize 65-and-older cohort and strong population growth have resulted in a share of healthcare jobs that ranks within the top 10% of U.S. metro areas. Demand will remain solid as the senior population, the largest users of healthcare, maintains rapid growth. However, the expiration of federal Affordable Care Act tax credits and steep Medicaid funding cuts will push job growth into the slow lane. In the long run, strong population growth will underpin steadier healthcare demand and ease labor shortages relative to much of the region, keeping ALL outperforming its state and regional peers.

**Allentown-Bethlehem-Easton's economy will decelerate over the next few quarters. Logistics and healthcare will lend support, though volatile federal policy will keep risks elevated. Longer term, fresh investments, strong population growth, and competitive business costs will keep it one of the region's better performers.**

*Jackie Copfer*
*September 2025*

| 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | INDICATORS | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46.6 | 44.5 | 47.1 | 47.5 | 48.8 | 50.4 | Gross metro product (C17$ bil) | 51.6 | 52.5 | 53.5 | 54.7 | 56.1 | 57.7 |
| 1.1 | -4.4 | 5.7 | 0.9 | 2.8 | 3.1 | % change | 2.5 | 1.8 | 1.9 | 2.3 | 2.5 | 2.8 |
| 380.8 | 353.4 | 369.8 | 384.7 | 389.6 | 395.3 | Total employment (ths) | 401.3 | 401.8 | 403.1 | 405.3 | 407.9 | 411.2 |
| 1.5 | -7.2 | 4.6 | 4.0 | 1.3 | 1.5 | % change | 1.5 | 0.1 | 0.3 | 0.6 | 0.7 | 0.8 |
| 4.4 | 9.1 | 6.1 | 4.2 | 4.0 | 3.9 | Unemployment rate (%) | 4.3 | 5.1 | 5.2 | 5.0 | 4.7 | 4.5 |
| 5.8 | 7.0 | 6.6 | 1.8 | 6.1 | 4.1 | Personal income growth (%) | 5.3 | 4.5 | 4.3 | 3.8 | 3.9 | 4.1 |
| 68.6 | 70.9 | 72.8 | 76.4 | 81.2 | 83.5 | Median household income ($ ths) | 86.8 | 89.8 | 93.0 | 95.7 | 98.3 | 101.2 |
| 858.8 | 861.6 | 870.1 | 871.4 | 878.5 | 886.4 | Population (ths) | 894.6 | 898.7 | 901.4 | 903.7 | 905.7 | 908.4 |
| 0.3 | 0.3 | 1.0 | 0.1 | 0.8 | 0.9 | % change | 0.9 | 0.5 | 0.3 | 0.3 | 0.2 | 0.3 |
| 2.3 | 4.2 | 9.5 | 3.2 | 8.1 | 8.7 | Net migration (ths) | 9.0 | 5.1 | 3.8 | 3.4 | 3.2 | 4.0 |
| 1,078 | 1,110 | 1,716 | 1,586 | 1,329 | 1,368 | Single-family permits (#) | 1,592 | 2,002 | 1,952 | 1,926 | 1,894 | 1,854 |
| 267 | 578 | 890 | 723 | 406 | 1,117 | Multifamily permits (#) | 722 | 458 | 455 | 438 | 420 | 405 |
| 4.2 | 5.5 | 14.4 | 15.5 | 8.7 | 7.7 | FHFA house price index (% change) | 6.4 | 2.3 | 2.3 | 3.1 | 3.6 | 3.8 |

MOODY'S ANALYTICS » Precis U.S. Metro » September 2025

## PRÉCIS® U.S. METRO • Allentown-Bethlehem-Easton PA-NJ



### ECONOMIC HEALTH CHECK

| 3-MO MA | Mar 25 | Apr 25 | May 25 | Jun 25 | Jul 25 | Aug 25 |
|---|---|---|---|---|---|---|
| Employment, change, ths | 0.6 | 0.5 | 0.7 | 0.3 | 0.1 | 0.2 |
| Unemployment rate, % | 4.0 | 4.0 | 4.1 | 4.2 | 4.2 | 4.1 |
| Labor force participation rate, % | 62.4 | 62.3 | 62.4 | 62.5 | 62.4 | 62.3 |
| Average weekly hours, # | 33.5 | 33.8 | 33.9 | 34.1 | 34.3 | 34.4 |
| Industrial production, 2012=100 | 99.5 | 99.9 | 99.8 | 99.7 | 99.7 | 99.7 |
| Residential permits, single-family, # | 1,368 | 1,355 | 1,377 | 1,327 | 1,417 | 1,259 |
| Residential permits, multifamily, # | 524 | 1,909 | 1,666 | 1,908 | 560 | 1,014 |
| Dec/Dec | Dec 19 | Dec 20 | Dec 21 | Dec 22 | Dec 23 | Dec 24 |
| Employment, change, ths | 5.4 | -23.6 | 18.8 | 9.2 | 4.2 | 6.8 |

Stronger than prior 3-mo MA    Unchanged from prior 3-mo MA    Weaker than prior 3-mo MA

*Sources: BLS, Census Bureau, Moody's Analytics*

### BUSINESS CYCLE INDEX
JAN 2015=100

*Source: Moody's Analytics*

### INDUSTRY EMPLOYMENT
% CHANGE YR AGO

- Government
- Goods producing
- Private services

*Sources: BLS, Moody's Analytics*

### CURRENT EMPLOYMENT TRENDS
% CHANGE YR AGO, 3-MO MA

| | Aug 24 | Feb 25 | Aug 25 |
|---|---|---|---|
| Total | 1.6 | 1.9 | 1.6 |
| Mining | -6.3 | -0.9 | 0.0 |
| Construction | -2.5 | 2.0 | 0.1 |
| Manufacturing | -1.1 | -0.8 | -0.1 |
| Trade | -0.1 | 0.9 | -0.0 |
| Trans/Utilities | -2.0 | -0.0 | 0.3 |
| Information | -2.2 | 0.7 | 1.9 |
| Financial Activities | -3.1 | -0.2 | 2.3 |
| Prof & Business Svcs. | 3.4 | 1.1 | -0.1 |
| Edu & Health Svcs. | 6.0 | 5.6 | 5.6 |
| Leisure & Hospitality | 0.1 | 1.3 | 1.9 |
| Other Services | 3.2 | 3.1 | 2.7 |
| Government | 3.1 | 1.4 | -0.4 |

*Sources: BLS, Moody's Analytics*

### DIFFUSION INDEX
3-DIGIT NAICS LEVEL, 6-MO MA

- ALL
- PA
- U.S.

*Sources: BLS, Moody's Analytics*

### RELATIVE EMPLOYMENT PERFORMANCE
JAN 2015=100

- ALL
- PA
- U.S.

*Sources: BLS, Moody's Analytics*

### RELATIVE EMPLOYMENT FORECAST
VS. 6 MO PRIOR

| | 2-Yr | 5-Yr |
|---|---|---|

*Sources: BLS, Moody's Analytics*

### HOUSE PRICE
2005Q1=100, NSA

- ALL
- PA
- U.S.

*Sources: FHFA, Moody's Analytics*

### RENTAL AFFORDABILITY
GREATER THAN 100=MORE AFFORDABLE

- ALL
- PA
- U.S.

*Sources: Census Bureau, BLS, Moody's Analytics*

### HOUSE PRICE TRENDS
%

- Overvalued
- Undervalued

*Source: Moody's Analytics*

### HOUSING AFFORDABILITY
GREATER THAN 100=MORE AFFORDABLE

- ALL
- PA
- U.S.

*Sources: NAR, Moody's Analytics*

## PRÉCIS® U.S. METRO • Allentown-Bethlehem-Easton PA-NJ

### TOP EMPLOYERS

| | |
|---|---|
| Lehigh Valley Health Network | 19,000+ |
| St. Luke's University Health Network | 11,000+ |
| Walmart Inc | 4,223 |
| Dorney Park/Wildwater Kingdom | 2,871 |
| Mack Trucks | 2,775 |
| Sands Bethworks Gaming LLC | 2,500 |
| Giant Food Stores | 2,449 |
| Air Products and Chemicals | 2,000 |
| Lehigh University | 1,863 |
| Lutron Electronics Co Inc | 1,500 |
| Northampton Community College | 1,473 |
| Weis Markets Inc | 1,400 |
| Victaulic Co | 1,270 |
| Good Shepherd Rehabilitation Network | 1,265 |
| Crayola LLC | 1,200 |
| Wells Fargo Bank N A | 1,057 |
| Wind Creek Casinos | 1,000-4,999 |
| Amazon | 1,000-4,999 |
| Power Service Inc | 1,000-4,999 |
| F L Smidth Inc | 1,000-4,999 |

Sources LVB Book of Lists 2023 Pennsylvania Department of Labor & Industry 2022

### PUBLIC

| | |
|---|---|
| Federal | 2,524 |
| State | 2,516 |
| Local | 34,350 |
| 2024 | |

### INDUSTRIAL DIVERSITY

Most Diverse (U S )

0.65

Least Diverse

### EMPLOYMENT VOLATILITY

Due to U.S. fluctuations — Relative to U.S.

97% — 124 — 100

Not Due — Due — ALL — U S

### ENTREPRENEURSHIP

BROAD-BASED START-UP RATE; U.S.=100

ALL — PA

Sources Census Bureau, Moody's Analytics, 2023

### EXPORTS

| Product - 2023 | $ mil |
|---|---|
| Food and kindred products | 495.3 |
| Chemicals | 1,838.4 |
| Primary metal manufacturing | ND |
| Fabricated metal products | ND |
| Machinery, except electrical | 421.5 |
| Computer and electronic products | 586.9 |
| Transportation equipment | ND |
| Miscellaneous manufacturing | 279.4 |
| Other products | 1,078.1 |
| Total | 4,699.6 |

| Destination - 2023 | $ mil |
|---|---|
| Africa | 38.8 |
| Asia | 1,161.5 |
| European Union | 1,026.4 |
| Canada & Mexico | ND |
| South America | 252.7 |
| Rest of world | 2,220.1 |
| Total | 4,699.6 |
| % of GDP | 8.0 |
| Rank among all metro areas | 81 |

Sources: BEA, International Trade Administration, Moody's Analytics

### COMPARATIVE EMPLOYMENT AND INCOME

| | % OF TOTAL EMPLOYMENT | | | AVERAGE ANNUAL EARNINGS | | |
|---|---|---|---|---|---|---|
| Sector | ALL | PA | U.S. | ALL | PA | U.S. |
| Mining | 0.1 | 0.3 | 0.4 | ND | $103,774 | $131,906 |
| Construction | 3.3 | 4.2 | 5.2 | $85,537 | $83,101 | $82,250 |
| Manufacturing | 10.4 | 9.2 | 8.1 | $77,918 | $76,675 | $86,889 |
| Durable | 6.0 | 5.4 | 5.0 | $78,439 | $77,907 | $92,803 |
| Nondurable | 4.4 | 3.8 | 3.1 | $77,219 | $74,918 | $77,181 |
| Transportation/Utilities | 9.0 | 5.4 | 4.6 | $67,289 | $65,805 | $76,385 |
| Wholesale Trade | 3.9 | 3.5 | 3.9 | $112,743 | $102,080 | $104,604 |
| Retail Trade | 9.8 | 9.6 | 9.8 | $37,978 | $37,683 | $43,419 |
| Information | 1.5 | 1.5 | 1.9 | $67,581 | $120,392 | $170,800 |
| Financial Activities | 3.2 | 5.5 | 5.8 | $99,423 | $118,341 | $126,450 |
| Prof. and Bus. Services | 13.1 | 13.6 | 14.3 | $88,720 | $107,323 | $104,768 |
| Educ. and Health Services | 22.7 | 22.2 | 16.8 | $69,029 | $65,251 | $64,445 |
| Leisure and Hosp. Services | 9.4 | 9.3 | 10.6 | $32,387 | $33,549 | $38,571 |
| Other Services | 3.7 | 4.3 | 3.8 | $53,940 | $54,249 | $64,400 |
| Government | 10.0 | 11.4 | 14.8 | $69,260 | $72,445 | $78,132 |

Sources: Percent of total employment — BLS, Moody's Analytics, 2024. Average annual earnings — BEA, Moody's Analytics, 2024

### PRODUCTIVITY

REAL OUTPUT PER WORKER, $

127,658 — 133,269 — 147,537

ALL — PA — U.S.

Sources BEA, Moody's Analytics, 2024



### BUSINESS COSTS

U.S.=100

Total
Unit labor
Energy
State & local taxes
Office rent

0  20  40  60  80  100  120

2018 — 2023

Source Moody's Analytics

### EMPLOYMENT

#### HIGH-TECH

| | Ths | % of total |
|---|---|---|
| ALL | 17.0 | 4.3 |
| U.S. | 8,351.2 | 5.3 |

#### HOUSING-RELATED

| | Ths | % of total |
|---|---|---|
| ALL | 30.4 | 7.7 |
| U.S. | 15,584.6 | 9.9 |

Source Moody's Analytics, 2024

### LEADING INDUSTRIES BY WAGE TIER



| NAICS | Industry | Location Quotient | Employee (ths) |
|---|---|---|---|
| 11 | Offices of physicians | 1.7 | 12.1 |
| 311 | Management of companies & enterprises | 1.5 | 9.5 |
| 5413 | Architectural, engineering & rel. srvcs. | 0.8 | 3.8 |
| 9 | Federal Government | 0.3 | 2.5 |
| GVL | Local Government | 0.9 | 34.4 |
| 6221 | General medical and surgical hospitals | 1.8 | 22.8 |
| 4931 | Warehousing and storage | 4.9 | 22.4 |
| 6113 | Colleges, universities & prof. schools | 1.9 | 8.1 |
| 7225 | Restaurants and other eating places | 0.8 | 21.4 |
| 4451 | Grocery stores | 1.3 | 9.2 |
| 5613 | Employment services | 1.1 | 9.2 |
| 6241 | Individual and family services | 1.1 | 8.9 |

High — Mid — Low

Source: Moody's Analytics, 2024

## PRÉCIS® U.S. METRO • Allentown-Bethlehem-Easton PA-NJ



### BLOCK GROUPS BY INCOME
% OF TOTAL

Sources: Census Bureau, Moody's Analytics, 2023

### PER CAPITA INCOME
$ THS

Sources: BEA, Moody's Analytics

### ECONOMIC INEQUALITY

| Index | 2023 | Rank* |
|---|---|---|
| Gini coefficient | 0.45 | 252 |
| Block Group Income ratio | 0.43 | 208 |
| Poverty rate | 11.1% | 278 |

*Most unequal=1; Most equal=417

### HOUSEHOLDS BY INCOME, %

Sources: Census Bureau, ACS, Moody's Analytics, 2023

### MIGRATION FLOWS

#### INTO ALLENTOWN PA

| | Number of Migrants |
|---|---|
| New York NY | 5,373 |
| Newark NJ | 3,580 |
| Montgomery County PA | 2,370 |
| Lakewood NJ | 1,622 |
| Reading PA | 922 |
| Philadelphia PA | 872 |
| Scranton PA | 718 |
| Nassau County NY | 448 |
| Harrisburg PA | 206 |
| Orlando FL | 167 |
| Total in-migration | 28,130 |

#### FROM ALLENTOWN PA

| | |
|---|---|
| Newark NJ | 2,109 |
| Montgomery County PA | 2,034 |
| New York NY | 1,505 |
| Reading PA | 1,333 |
| Philadelphia PA | 831 |
| Lakewood NJ | 794 |
| Scranton PA | 685 |
| Orlando FL | 487 |
| Tampa FL | 265 |
| Harrisburg PA | 264 |
| Total out-migration | 27,292 |
| **Net migration** | **838** |

### COMMUTER FLOWS
% OF ALL RESIDENTS WORKING IN...

80.8%

| Allentown PA | Share |
|---|---|
| Newark NJ | 6.6 |
| Montgomery County PA | 4.0 |
| Lakewood NJ | 2.5 |
| New York NY | 1.9 |
| Reading PA | 1.3 |

### COMMUTER FLOWS
% OF ALL WORKERS LIVING IN...

89.6%

| Allentown PA | Share |
|---|---|
| Reading PA | 2.9 |
| Montgomery County PA | 2.9 |
| Newark NJ | 1.9 |
| Scranton PA | 0.6 |
| Philadelphia PA | 0.4 |

Sources: Census Bureau, Moody's Analytics, avg 2016-2020

### NET MIGRATION, #, ALL

| | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Domestic | 8,478 | -381 | 1,873 | 1,254 |
| Foreign | 1,011 | 3,593 | 6,222 | 7,423 |
| Total | 9,489 | 3,212 | 8,095 | 8,677 |

Sources: IRS (top), 2022, Census Bureau, Moody's Analytics

### GENERATIONAL BREAKDOWN
POPULATION BY GENERATION, %

Sources: Census Bureau, Moody's Analytics, 2024

### EDUCATIONAL ATTAINMENT
% OF ADULTS 25 AND OLDER

| | ALL | PA | U.S. |
|---|---|---|---|
| College | 8 | 8 | 10 |
| High school | 33 | 33 | 26 |
| Some college | 26 | 24 | 28 |
| < High school | 21 | 21 | 22 |
| Graduate school | 13 | 14 | 14 |

Sources: Census Bureau, ACS, Moody's Analytics, 2023

### POPULATION BY AGE, %

Sources: Census Bureau, Moody's Analytics, 2024

*Regional Analysis Summary*

Benefits of the Allentown-Bethlehem-Easton, PA-NJ market area include proximity to East Coast ports and densely populated metro divisions, competitive business costs, and ample developable land. However, weaknesses of the area include unfavorable age dynamics, being overexposed to federal policy shifts, and below-average educational attainment. Unemployment is expected to be 5.3% by 2030, while the population is expected to increase by approximately 13,800 in the same time.

**Senior Housing Regional Analysis**

The National Investment Center (NIC) tracks occupancy and rate statistics for the 140 largest metropolitan areas. Please note that the following data is separated by level of care by predominant unit type, and classified by Majority IL, AL, MC and SN. With regards to seniors housing, a summary of the current market characteristics in the subject's metro area in comparison to the 31 largest metro areas (Primary) and the next 69 largest metro areas (Secondary) and the expanded 40 markets (Additional) is as follows:

| MARKET SUMMARY | | | | |
|---|---|---|---|---|
| | **Allentown, PA** | **Primary Markets** | **Secondary Markets** | **Additional Markets** |
| *Majority IL* | | | | |
| Occupancy | 93.80% | 90.00% | 91.10% | 91.10% |
| Units Under Construction | 0 | 6,918 | 4,059 | 731 |
| Construction as % of Supply | 0.00% | 2.37% | 2.60% | 2.08% |
| Average Monthly Rate | $3,581 | $4,408 | $3,937 | $4,242 |
| Annual Rate Growth | 1.70% | 4.20% | 4.20% | 3.80% |
| *Majority AL* | | | | |
| Occupancy | 94.50% | 86.90% | 88.80% | 89.10% |
| Units Under Construction | 0 | 7,178 | 2,532 | 618 |
| Construction as % of Supply | 0.00% | 2.39% | 1.58% | 1.98% |
| Average Monthly Rate | $5,777 | $7,016 | $6,171 | $6,316 |
| Annual Rate Growth | 0.50% | 3.70% | 3.90% | 3.60% |
| *Majority MC* | | | | |
| Occupancy | 92.50% | 86.80% | 88.50% | 89.40% |
| Units Under Construction | 0 | 3,021 | 1,212 | 173 |
| Construction as % of Supply | 0.00% | 2.76% | 2.15% | 1.71% |
| Average Monthly Rate | $8,531 | $8,842 | $7,825 | $7,856 |
| Annual Rate Growth | 0.80% | 3.40% | 3.70% | 4.20% |
| *Majority NC* | | | | |
| Occupancy | 80.60% | 86.20% | 85.60% | 86.50% |
| Units Under Construction | 286 | 1,268 | 892 | 84 |
| Construction as % of Supply | 5.50% | 0.23% | 0.31% | 0.19% |
| Average Daily Rate | $433 | $417 | $382 | $397 |
| Annual Rate Growth | 1.80% | 4.30% | 4.40% | 4.50% |
| Source: NIC MAP® Data Service Q3 2025 | | | | |

Further, over the last several quarters the subject's metro area has exhibited the following, according to NIC MAP® Data Service:

**Philadelphia, PA - Seniors Housing | Quarterly | 4Q2025**



Source: NIC MAP®. Use of NIC MAP® data is subject to the NIC MAP® Data Attribution Requirements (https://www.nicmap.com/data-attribution-requirements/).

© 2026 NIC MAP®. All rights reserved. Data believed to be accurate but not guaranteed; subject to future revision.
Distribution of this report or any part of this report without prior written consent or license by NIC MAP is strictly prohibited.
Subject to the NIC MAP Terms of Use. For license information please contact NIC MAP at (844) 668-3282.

Date Printed: 02/18/2026 08:59 PM

**Philadelphia, PA - Majority AL | Quarterly | 4Q2025**



Source: NIC MAP®. Use of NIC MAP® data is subject to the NIC MAP® Data Attribution Requirements (https://www.nicmap.com/data-attribution-requirements/).

© 2026 NIC MAP®. All rights reserved. Data believed to be accurate but not guaranteed; subject to future revision.
Distribution of this report or any part of this report without prior written consent or license by NIC MAP is strictly prohibited.
Subject to the NIC MAP Terms of Use. For license information please contact NIC MAP at (844) 668-3282.

Date Printed: 02/18/2026 09:08 PM

In terms of development pipeline, we are aware of the following properties currently under construction or in the planning phases of development in the MSA as provided by the Dodge Report:

| PROPOSED PIPELINE | | |
|---|---|---|
| **Project Name** | **Status** | **Construction Notes** |
| **Commonwealth House Assisted Living** 643 Commonwealth Ave, Warwick *Assisted Living/ALF* Issue Date: 5/1/2024 | Preliminary plans under review - Advancement pending approvals - Schedules undetermined | Replace existing home with a 14 bed extended care facility |
| **Grinnell Mansion Elderly Housing Renovation** 379 County St, New Bedford *Senior Apartments* Issue Date: 1/1/2025 | Community Preservation Act funds approved - Advancement pending permitting - Schedules undetermined | Historic renovation of 17 existing elderly affordable housing units with professional management and supportive services. |
| **Age-Restricted Multi-Family (Conversion from** 35 Kearsarge St, New Bedford *Senior Apartments* Issue Date: 2/1/2025 | State tax credits approved - Extension of approvals - Further schedules undetermined | Convert St Josephs Elementary School into 34 senior apartments |
| **Temple Landing II New Infill Senior Residential** 370 Middle St, New Bedford *Senior Apartments* Issue Date: 3/1/2025 | Approvals in place -GC to be announced - Schedules undetermined | 27 units senior housing |
| **Delano Apartments** 696 Dartmouth St, Dartmouth *Independent Living* Issue Date: 4/1/2025 | Foundation permit issued April 1 - Additional permitting pending | 89-unit, independent living facility for people 55 years and older - 208 parking spaces, a courtyard area with amenities, and improved landscaping and drainage features. - SF is a Dodge estimate |
| **The Met Senior Living Buildings** 500 Veterans Memorial Pkwy, East *Senior Apartments* Issue Date: 6/1/2025 | Local approvals granted - Advancement pending state approvals and permitting - Schedules undetermined | Bldg I: 4-story 68,000 sf 80 units with 20,400 sf basement parking for 52 cars - Bldg J: 4-story 69,000 sf 80 units with 20,600 sf basement parking for 58 cars - Bldg K: 3-story 105,500 sf 80 units |
| **Fish Road Village Residential Development** 1101 Fish Rd, Tiverton *Senior Apartments* Issue Date: 8/1/2025 | Two concept plans submitted for town reviews - Advancement pending various approvals - Schedules and final scope undetermined | Development of 255 housing units (including 64 affordable units) in 5 apartment buildings OR 103 manufactured homes age-restricted to 55 and over (with 26 affordable units) |
| **Ade Bethune House Affordable Senior Housing** 110 Bristol Ferry Rd, Portsmouth *Senior Apartments* Issue Date: 8/13/2025 | Construction starting this week | Create new senior center and 54 housing units at former Anne Hutchinson School property. Possible reuse of existing building currently housing the Portsmouth Multi-Purpose Senior Center - Total SF estimated |
| **Tiffany Laurel Reserve Senior Housing** 2028 New London Turnpike, *Assisted Living/ALF* Issue Date: 9/1/2025 | Planned construction - Advancement pending funding - Schedules undetermined | Proposed Independent Living, Assisted Living & Care Facility with 127 independent living units, and 77 assisted living units and memory care units - 56 structured parking garage spaces |
| **Retirement Facility** 947 Park St, Attleboro *Senior Apartments* Issue Date: 10/1/2025 | Owner seeking local and/or state approvals - Further action pending outcome of approvals and Owner decision to proceed | N/A |
| **Senior Housing Redevelopment (Former** 53 Bay State Rd, Rehoboth *Senior Apartments* Issue Date: 11/1/2025 | Proposed for construction - Further action pending Owner's decision to proceed - No construction schedule set | The Rehoboth Housing Authority is planning to convert the old Anawan School into senior housing. The project is still in the early stages, with efforts ongoing to secure funding for design and construction. |
| **RFP/DEV: Affordable Senior Rental Units** 120 W Main St, Norton *Senior Apartments* Issue Date: 11/1/2025 | Bid date has been Extended From December 10 - Request for proposals for Developer Services to Owner due on January 7, 2026 at 04:00 PM (EST) | Developers for the development of approximately 100 units of affordable senior rental housing, on roughly 5 acres of land owned by the Housing Authority in Norton, MA. The parcel is addressed on land at 120 West Main Street |
| *Source: Dodge Report* | | |

Overall, none of the properties are in the subject's primary market area. Going forward, we expect the subject to benefit from its location in the MSA, given the low unemployment and lack of new supply coming online, particularly in the immediate area.

**Neighborhood Analysis**

The key focus of the neighborhood analysis is not as much competition oriented as it is physical and use oriented. More specifically, this analysis describes the area of generally homogenous uses within which the subject is located. This neighborhood is not intended to reflect the competitive neighborhood of the subject; however, it instead reflects the neighborhood in physical proximity to the subject. Our assessment of the subject neighborhood is presented as follows:

**NEIGHBORHOOD MAP**

## NEIGHBORHOOD TRAITS

### Boundaries

|  | **Neighborhood** | **Abutters** |
|---|---|---|
| North | West High Street | Convenience Stores |
| East | New York Avenue | Retail Stores |
| South | West Water Street | Gas Station |
| West | Saucon Creek | Condominiums |

| Type of Neighborhood | Mixed-use |
|---|---|

### Composition

| | **Present** | **Prevalence** |
|---|---|---|
| Agriculture | No | None |
| Community (Recreation) | Yes | Low |
| Hospitality | No | None |
| Industrial | Yes | Low |
| Medical | Yes | Low |
| Office | Yes | Low |
| Public/Governmental | No | None |
| Residential (Single-Family) | Yes | High |
| Residential (Multifamily) | Yes | Low |
| Retail | Yes | Moderate |

**Neighborhood Cycle**

### Demand Generators

| Hospital | No |
|---|---|
| Regional Mall | No |
| Churches | Yes |
| Seniors Housing | No |
| Adult Children Homes | Yes |

### Access/Influences

| Local Area Access | Main street |
|---|---|
| Regional Ingress/Egress | Highway 78 |
| Neighborhood Cycle | Stability |
| Neighborhood Influence | Positively impacts the subject |

The subject's neighborhood is mixed-use with primarily single-family residential homes. The neighborhood is stable and positively impacts the subject. The closest hospital is St. Luke's Hospital Bethlehem located 3.2 miles from the subject.

Proximity to hospitals is often an important consideration when selecting a seniors housing and care community. Nearby hospitals are identified in the following map and table:

### HOSPITAL MAP



| SUMMARY OF NEARBY HOSPITALS | | |
| --- | --- | --- |
| **Hospital** | **Beds** | **Distance from Subject** |
| St Luke's Hospital Bethlehem | 817 | 3.2 Miles |
| St Luke's Hospital - Anderson Campus | 215 | 5.3 Miles |
| Source: American Hospital Directory | | |

## COMPETITIVE MARKET ANALYSIS

### Regulatory Overview

**Assisted Living:** State regulations vary considerably for this level of care, ranging from states that have no regulations and classify them as hotel/motel properties to states that are considering some type of CON regulations. It is probable that, in the future, as state reimbursement becomes more common, some type of barrier to entry legislation will become common.

States typically feel that use of CON or similar legislation enhances profitability in that full occupancy is more efficient than partial occupancy, and ruinous competition is a danger to the industry and quality of care overall. As the subject is in Pennsylvania, which has regulatory legislation, at this point it is appropriate to review this legislation and the impact it will have on the subject and residences in the market.

**Pennsylvania Assisted Living Legislation:** Pennsylvania defines and regulates assisted living facilities and personal care homes under the Department of Public Welfare. Personal care homes are defined under Chapter 2600 and assisted living facilities are defined under Chapter 2800 of the Pennsylvania Human Services Code. We have reviewed both Chapter 2600 and Chapter 2800.

*Personal Care Homes (PCH)* are defined as: "A premise in which food, shelter, and personal assistance or supervision are provided for a period exceeding 24 hours, for four or more adults who are not relative of the operator, who do not require the services in or of a licensed long-term care facility, but who do require assistance or supervision in activities."

*Assisted Living Residences* is defined as: "Any premises in which food, shelter, assisted living services, assistance or supervision and supplemental health care services are provided for a period exceeding 24-hours for four or more adults who are not relatives of the operator, who require assistance or supervision in matters such as dressing, bathing, diet, financial management, evacuation from the residence in the event of an emergency or medication prescribed for self-administration."

These facilities are required to comply with the various requirements contained in State statutes. These guidelines are applicable to those homes operated for profit, or not-for-profit, whether freestanding or on the grounds of a long-term care nursing facility. A set of interpretative guidelines which are applicable to State regulations are available through the Pennsylvania Department of Public Welfare. The interpretative guidelines are intended to promote uniformity and consistency in the interpretation and enforcement of the Personal Care Home licensing and Assisted Living licensing regulation.

Licensing activities are conducted by the Pennsylvania Department of Public Welfare, Office of Social Programs. Requirements include design review, continuing education requirements, staff licensure, and mechanisms for ensuring financial feasibility of operators. Further, financial management, medications, social services, activities, health services, laundry services, food service, resident abuse and complaint methodologies are contained in the document.

We assume that the subject, operationally, is in full compliance of current state regulations. Personal Care Home physical requirements include a minimum area of 80 square feet for a private room and 60 square feet per person for a non-private room, up to a maximum of four residents. Specific items of furniture

(e.g., bed, linens, chair, dresser and mirror, etc.) must be provided for each resident in his/her room. Assisted living physical requirements include for residences constructed after January 18, 2011, 225 square feet of floor space for each private living unit and 300 square feet for a non-private room. For facilities in existence prior to January 18, 2011, each living unit must have at least 160 square feet for a private room and 210 for a non-private room. A maximum of two residents shall be permitted in any living unit. Specific items of furniture (e.g., bed, linens, chair, dresser and mirror, etc.) must be provided for each resident in his/her room.

While we have specialized expertise in the appraisal of nursing and health care facilities, we do not purport to be experts in the analysis of Medicaid reimbursement rate setting policies and applications. As part of our due diligence in the appraisal of the subject, we have studied the CON and licensure requirements and the Medicaid reimbursement system, which will impact the subject, and the market in which it operates. Our analysis of these documents will form the basis for several aspects of our valuation of the subject. We have presented a relatively brief overview of the information contained in these documents; nevertheless, we note that they are quite extensive and detailed. For an accurate interpretation of any aspect of these documents, please refer to an accountant or legal counsel with specialized experience in these matters.

**Definition of Primary Market Area**

*The 2009 Overview of Assisted Living* completed by the Assisted Living Federation of America (ALFA), and now known as Argentum, in conjunction with AAHSA, ASHA, NCAL and NIC indicates that typical assisted living residences draw 85% of their residents from within 15 miles, which shows a change from five years earlier when 73% of the demand would emanate from within a 15-mile radius.

In our analysis, we assume that demand for the subject's services emanate from within the PMA. While residents come to a community from outside the primary market, residents will also leave the primary market to reside elsewhere. While we do consider the prevalence of migration in and out of the PMA within our penetration analysis, it is viewed as being anecdotal in nature and difficult to quantify. Moreover, the Claritas projections serve to estimate the future migration, as they pertain to the subject's PMA. Nonetheless, we will discuss later in the following sections, the prevalence of adult children as a primary indicator of migration.

Based on our interviews with both executive directors and directors of marketing at comparable projects in the area, including the subject's operator, we have determined that the subject's primary market area (PMA) is a five-mile radius. A map detailing the primary market is as follows:

**PMA MAP**



## PMA Supply Analysis

In terms of measuring the PMA supply, while we considered management's opinion of primary competition, we have only included units/beds in the PMA that house seniors that are comparable to the subject. Consequently, we have excluded those facilities considered to be "mom and pop", generally containing less than 25 beds or operating out of a skilled nursing wing.

Regarding memory care, we note that most state regulatory agencies do not have licensure separate from assisted living and that many residents with mild dementia can be accommodated in traditional assisted living buildings. Nonetheless, as more developers build memory care-dedicated buildings and recognizing the differences in rates, design and staffing, we have broken out the memory care supply niche from assisted living.

We estimate the total number of existing and proposed beds/units in this market as presented in the following table(s):

| AL SUPPLY | | |
|---|---|---|
| **Assisted Living Beds** | | |
| | PMA | |
| | 2026 | 2031 |
| Kirkland Village | 33 | 33 |
| Riverton Enhanced Senior Living | 68 | 68 |
| The Birches of the Lehigh Valley | 51 | 51 |
| Behtlehem Manor | 75 | 75 |
| Grace Mansion | 28 | 28 |
| Sacred Heart Senior Living by Saucon Creek | 45 | 45 |
| Subject | 101 | 101 |
| All Other | 0 | 0 |
| Total | 401 | 401 |
| @ 100% from PMA | 401 | 401 |

| MC SUPPLY | | |
|---|---|---|
| **Memory Care Beds** | | |
| | PMA | |
| | 2026 | 2031 |
| Bethlehem Manor II | 30 | 30 |
| Sacred Heart Senior Living by Saucon Creek | 24 | 24 |
| The Birches of the Lehigh Valley | 41 | 41 |
| Subject | 100 | 100 |
| All Other | 0 | 0 |
| Total | 195 | 195 |
| @ 100% from PMA | 195 | 195 |

Based on our survey, current market occupancy is 84% in AL and 88% in MC. There are seven communities in AL including the subject and four communities for MC. The newest property is The Birches of the Lehigh Valley, which was built in 2024.

**Characteristics of Pipeline Activity**

As noted in the preceding Senior Housing Regional Analysis, no communities are proposed in the subject competitive market area.
**Competitive Market Supply**

Additionally, we have more closely examined the following properties that we, and management, have identified as being the subject's primary competition. Due to unresponsive communities in the PMA, we have expanded our search outside of the five-mile radius to identify other competitors:

- Sacred Heart Senior Living
- The Birches of Lehigh Valley
- Bethlehem Manor
- The Vero at Bethlehem
- Above and Beyond at the Knights

We find the following relationship among the subject and its primary competitors:



Notes: Bubble size reflects relative variance of asking private pay rates. Performance Index based on HealthTrust proprietary scoring system.

Detailed comparable write-ups of these reports can be found in the Valuation Analysis of this report. A summary of the competitive supply is as follows:

| Property | Saucon Valley Manor | Sacred Heart Senior Living | The Birches of Lehigh Valley | Bethlehem Manor | The Vero at Bethlehem | Above and Beyond at the Knights |
|---|---|---|---|---|---|---|
| **SUMMARY OF COMPETITIVE SUPPLY** | | | | | | |
| Location | Hellertown | Center Valley | Easton | Bethlehem | Bethlehem | Allentown |
| Year Opened | 1930 | 2005 | 2024 | 1935 | 2023 | 1989 |
| Quality | Average | Average | Excellent | Average | Good | Average |
| Condition | Average | Average | Excellent | Average | Excellent | Average |
| | | | | | | |
| Unit/Bed Mix | | | | | | |
| AL Units/Beds | 81/101 | 42 | 52/62 | 44/44 | 90/90 | 124/124 |
| MC Units/Beds | 87/100 | 24 | 41/57 | 26/26 | 34/36 | 24/24 |
| | | | | | | |
| Occupancy | | | | | | |
| AL | 92% | 85% | -- | 75% | 100% | 98% |
| MC | 87% | 85% | -- | 95% | 100% | 100% |
| | | | | | | |
| Rate Range | | | | | | |
| AL | $3,495 - $7,995 | $4,495 - $5,910 | $4,500 - $6,000 | $2,800 - $3,995 | $4,295 - $7,960 | $4,000 - $5,500 |
| MC | $4,495 - $7,295 | $4,900 - $7,995 | $5,000 - $6,600 | $3,495 - $4,495 | $5,705 - $8,190 | $6,000 - $7,500 |
| | | | | | | |
| Level of Care | | | | | | |
| AL Type | All-inclusive | Levels | Levels | All-inclusive | Levels | All-inclusive |
| AL Range | -- - -- | $695 - $1,795 | $595 - $1,895 | -- - -- | $ - $2,535 | -- - -- |
| MC Type | All-inclusive | All-inclusive | Levels | All-inclusive | All-inclusive | All-inclusive |
| MC Range | -- - -- | $695 - $1,795 | $595 - $1,895 | -- - -- | $ - $ | -- - -- |

Source: HealthTrust

**Demand Analysis**

A major factor in estimating potential market demand for seniors housing and care communities involves an analysis of the number of residents within the primary market area that are qualified for residency in terms of age and income level. Prospective residents for a seniors housing and care community are typically at least 75 years of age or older; private pay residents will also have sufficient income to cover monthly rental fees and other living expenses. Historical and anticipated growth in the senior age groups, nationally, is presented in the following table:

| US POPULATION PROJECTIONS - % OF TOTAL BY AGE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2015** | **2020** | **2025** | **2030** | **2035** | **2040** | **2045** | **2050** | **2055** | **2060** |
| 45 to 64 | 26.09% | 24.93% | 23.43% | 22.56% | 22.64% | 23.26% | 23.63% | 23.65% | 23.43% | 23.18% |
| 65-84 | 12.88% | 14.76% | 16.65% | 17.81% | 17.78% | 17.26% | 16.61% | 16.45% | 16.86% | 17.57% |
| 85 and up | 1.96% | 2.00% | 2.13% | 2.50% | 3.13% | 3.71% | 4.23% | 4.50% | 4.44% | 4.33% |

Source: US Census Bureau; 2012 National Population Projections



The elderly group age 85 and over represents the fastest-growing segment of the U.S. population. According to the US Census Bureau, there were 4.3 million seniors aged 85+ in 2000 and this segment will swell to 18.0 million by 2050. This is a key market for the seniors housing industry because 44% of those over 85 need long-term care or assistance with activities of daily living. As a result, industry analysts project strong growth in seniors housing revenue through the end of the decade and beyond.

In terms of identifying potential demand, we have begun with the examination of the number of households with persons at least 75 years of age. While we note that residents residing in senior housing communities are generally much older than 75 years of age, we have used this cohort as a minimum standard for residency to better reflect potential demand source across all product types.

Please note that the senior population estimates and projections prepared by Claritas are presented in the addenda of this report. A summary of the estimated senior population and growth rates for the PMA are presented in the following chart:



To test the viability of the market, we have surveyed current and future supply pattern, analyzing age, size, amenities and service package. Moreover, we have analyzed market occupancy, current and future penetration rates, historical rate growth, development interest and the geographic composition. We firmly believe that characterizing a market based on any single factor can be inaccurate and misleading. Overall, we follow this process in identifying demand for seniors housing communities in a market:



In terms of care levels, the following criterion is used by level of care:



In addition to reviewing the demographics, it is important to account for the potential resident's location prior to moving to seniors housing. ALFA's 2009 *Overview of Assisted Living* indicates the following prior residences before moving into an assisted living residence:

| RESIDENCE PRIOR TO MOVING INTO AN ALR | | |
|---|---|---|
| | **AL/MC** | **IL/AL** |
| Private Home | 71.6% | 70.1% |
| Family Residence | 9.5% | 6.9% |
| Different ALR | 6.1% | 6.9% |
| Independent Living Community | 6.8% | 13.8% |
| Nursing Home | 6.1% | 2.3% |
| Source: 2009 Overview of Assisted Living | | |

As previously mentioned, we have relied on estimates and projections of senior population in the subject PMA prepared by Claritas. During discussions with senior management at Claritas, we learned that per census procedures, Claritas household estimates only reflect seniors living in their primary residence acting as head of household. Therefore, the income statistics will not reflect that portion of the demand that emanates from nursing homes (institutionalized population) or in a family residence not acting as head of household. Thus, we have calculated a factor for each level of care to more accurately reflect demand sources not captured in the household data provided by Claritas. Based on this premise, we have adjusted the household numbers, which we refer to as a Claritas Factor, as follows:

| DEMAND CAPTURED BY CLARITAS | | |
|---|---|---|
| | **AL/MC** | **IL/AL** |
| Private Home | 71.6% | 70.1% |
| Different ALR | 6.1% | 6.9% |
| Independent Living Community | 6.8% | 13.8% |
| | | |
| Total | 84.5% | 90.8% |
| Corresponding Claritas Factor (Inverse of Total) | 1.18 | 1.10 |
| Source: 2009 Overview of Assisted Living | | |

Thus, we can, nonetheless, reasonably estimate total demand in the PMA by using the information prepared by Claritas and dividing it by the ratio of total demand the private residence component represents. For example, for independent living, if we calculated the current total of age/need/income-qualified households in the market, we can divide it by 90.8% to reach an estimate of total private pay demand:

$$\text{Claritas Household Demand}/90.8\% \quad \begin{aligned} &= 100\% \text{ of IL demand} \\ &= 1/0.908 \\ &= 1.10 \end{aligned}$$

Please note that for the purposes of this analysis, we have also applied the relevant factors for the AL and memory care populations of 1.18.

Additionally, we need to adjust the household data in order for it to be viewed in terms of population. This is only done for assisted living and memory care, as independent living communities generally only attract the entire household, and rarely use semi-private accommodations of unrelated individuals. Accordingly, on the supply side, we only view the number of units as opposed to the number of residents or beds.

Therefore, for assisted living and memory care, we have adjusted the household figures by dividing the adjusted 75 and up population by the number of 75 and up households. The adjusted population is calculated by subtracting the institutionalized nursing home population from the overall population. This is referred to as the Household/Population Factor in the following tables.

### Independent Living

According to the American Seniors Housing Association (ASHA) 2023 study *Independent Then and Now: Notable Trends and Emerging Expectations* surveyed residents of independent living communities, and found the following conclusions and key findings:

☐ Only 18% of new independent living residents reported having difficulty with an Activity of Daily Living (ADL), typically going in and out of the bathtub. Further, 82% self-reported health as being good or better.

☐ Roundly 36% ILC residents have long term care insurance, up from 31% when the last survey (2012) was conducted.

☐ A total of 19% of independent living residents reported incomes of less than $25,000 and most (60%) reported net worth exceeding $500,000.

☐ Smaller communities were more likely to attract an older clientele who are single. Conversely, larger residences tend to attract a younger, wealthier and married clientele.

☐ Fewer than 30% of new residents had been hospitalized in the previous six month prior to moving in to the independent living community.

The 2023 report suggests the following about residents choosing independent living:

- ☐ Community was within 20 miles of current residence
- ☐ The timing of the move had no urgency (59%)
- ☐ The decision to move was typically that of the resident with someone else (family member)
- ☐ Residents generally shop one to five communities but quickly limit the contenders to one or two properties
- ☐ While 24% or residents were offered financial incentives, these incentives did not factor into to decision-making in selecting a community

Overall, independent living is ultimately viewed as a lifestyle choice, as opposed to a need based service. Consequently, we have only viewed the age and income criterion as driving factors for residency at these communities.

### *Assisted Living*

The *National Health Interview Survey* is conducted by the Center for Disease Control and uses data based on household interviews of a sample of the civilian non-institutionalized population identifying personal care needs among those aged 65 and up. Personal care needs are defined as requiring assistance with any Activity of Daily Living (ADL). The NHIS has been conducted continuously since 1957, with the primary objective of monitoring the health of the United States population. The cross-sectional study includes a sample size of approximately 35,000 households and 87,500 persons, allowing for the valid reporting of health status and limitations, injuries, healthcare access and utilization in the US. The publication is widely accepted throughout the industry, including the American Seniors Housing Association. Over the last several years the survey has found the following, though we note that while there are variances year to year, they have not been defined as statistically significant:

| % 65+ NEEDING PERSONAL CARE | | |
|---|---|---|
| Year | % | 95% CI Interval |
| 2000 | 6.4% | 5.9% - 6.9% |
| 2001 | 6.5% | 6.0% - 7.0% |
| 2002 | 6.2% | 5.7% - 6.7% |
| 2003 | 6.5% | 6.0% - 7.1% |
| 2004 | 6.3% | 5.8% - 6.8% |
| 2005 | 6.3% | 5.8% - 6.8% |
| 2006 | 6.1% | 5.4% - 6.7% |
| 2007 | 6.9% | 6.2% - 7.6% |
| 2008 | 6.4% | 5.8% - 7.0% |
| 2009 | 6.4% | 5.8% - 6.9% |
| 2010 | 7.0% | 6.4% - 7.6% |
| 2011 | 7.3% | 6.8% - 7.8% |
| 2012 | 6.4% | 5.9% - 6.8% |
| 2013 | 7.2% | 6.7% - 7.8% |
| 2014 | 6.5% | 6.0% - 6.9% |
| 2015 | 6.9% | 6.4% - 7.5% |
| 2016 | 6.4% | 5.9% - 6.9% |
| 2017 | 6.7% | 6.3% - 7.2% |
| 2018 | 7.0% | 6.4% - 7.7% |

Source: NHIS

2018 data is through September 2018



Thus, to estimate potential demand for assisted living services we have applied the following personal care factors to the respective age groups:

| PERSONAL CARE NEEDS | |
|---|---|
| **Age Group** | **Percent** |
| 65-74 | 3.9% |
| 75-84 | 8.3% |
| 85+ | 20.9% |

*Source: CDC National Health Interview Survey United States 9/2018*

**Memory Care**

In estimating potential demand for memory care, we have surveyed the *Prevalence of Dementia in the United States: The Aging, Demographics and Memory Study* published in October 2007 and performed by Plassman, et al. for Duke University Medical Center in which a nationally representative sample of individuals 71 and older from the *Health and Retirement Study* were evaluated for dementia via a comprehensive in-home examination. This is the first nationally representative population-based study of dementia in the United States. Based on the study the prevalence of Alzheimer's Dementia among those 71 and older was 9.7%; however, this statistic does not differentiate between the level of Alzheimer's Dementia, thus not all would be candidates for traditional memory care units. The most recent data we have found on prevalence of moderate and severe dementia is from a study released by the GAO in 1998, which found the following prevalence rates:

| ALZHEIMER'S PREVALENCE RATES | | |
|---|---|---|
| | **Mild, Moderate & Severe** | **Moderate or Severe** |
| 65-74 | 1.63% | 0.92% |
| 75-84 | 6.45% | 3.53% |
| 85+ | 24.58% | 14.54% |

*Source: GAO Alzheimer's Disease*

Accordingly, we have only considered the statistics relevant to moderate or severe dementia to be eligible for occupancy in memory care units.

**Income-Qualifications (Seniors Housing)**

Based on the prevailing rates in the market, we have estimated a minimum monthly fee for the subject, multiplied by 12 months and assuming the rental fee would account for 75% of all living expenses. We note it is inappropriate to use an average rent as we are estimating the actual demand for units in the subject's price range. Additionally, based on *The Independent Living Report*, the resident's monthly fee accounts for 59% to 88% of a resident's spending in a month. Therefore, the following annual minimum incomes (rounded) would be required:

| ANNUAL INCOME THRESHOLD | | |
|---|---|---|
| **Level of Care** | **Minimum Monthly Rate** | **Income Threshold** |
| Assisted Living | $3,300 | $52,800 |
| Memory Care | $4,200 | $67,200 |

Claritas household income demographics are compiled from census data, which generally defines income as receipts for the previous year. Consequently, we find that while household income is generally a good indicator of affordability for the subject's services, it does not necessarily correlate into a prospective resident's ability to pay for services. Moreover, in terms of affordability a prospective resident's net worth must be considered as assets are often spent down and home equity is tapped in order to meet housing and expense obligations. As provided within the 2023 study *Independent Then and Now: Notable Trends and Emerging Expectations,* the following income vs. net worth characteristics reflect residents of independent, assisted and CCRC residents:

| INCOME AND NET WORTH OF RESIDENTS | | | |
|---|---|---|---|
| | **Independent Living*** | **Assisted Living** | **CCRC** |
| **Income** | | | |
| Less than $15 | 5% | $11.5 Lower Quartile | |
| $15 - 24.9 | 6% | $18.9 Median | $21 Median for AL |
| $25 - 34.9 | 16% | | $27.5 Median for SNF |
| $35 - 49.9 | 17% | $36.0 Upper Quartile | $48.8 Median for IL |
| $50 - 99.9 | 32% | | |
| $100+ | 14% | | |
| **Net Worth** | | | |
| Under $50 | 9% | | |
| $50 - 99.9 | 9% | $62 Lower Quartile | $250 Median for SNF |
| $100 - 299.9 | 18% | $205 Median | $281 Median for AL |
| $300 - 499.9 | 15% | | |
| $500 - 749.9 | 15% | $564 Upper Quartile | $569 Median for IL |
| $750+ | 33% | | |

*Source: American Seniors Housing Association Independent Then and Now: Notable Trends and Emerging Expectations, 2023; *Inclusive of IL Entrance Fee residents*

*Assisted Living Federation of America, with AAHSA, ASHA, NCAL< and NIC, Overview of Assisted Living, 2009.*
*American Association of Homes and Services for the Aging, with ASHA and NIC, Continuing Care Retirement Communities: 2005 Profile*



The 2006 and 2009 Overview of Assisted Living indicated the following sources of primary payment:

| PRIMARY PAYMENT SOURCE | | | | |
|---|---|---|---|---|
| | 2006 | 2009 | 2006 | 2009 |
| | AL/MC | | IL/AL | |
| Self | 57.9% | 63.5% | 66.3% | 82.6% |
| Family | 30.9% | 14.7% | 14.7% | 7.0% |
| Insurance | 4.7% | 7.1% | 3.3% | 3.5% |
| Medicaid | 2.6% | 12.2% | 13.6% | 5.8% |
| SSI | 1.3% | 1.9% | 2.2% | 1.2% |
| VA | 2.6% | 0.0% | 0.0% | 0.0% |
| Unknown | 0.0% | 0.6% | 0.0% | 0.0% |
| Source: 2006 and 2009 Overview of Assisted Living | | | | |

As seen in the foregoing, residents are not typically responsible for their entire fee in senior housing communities. Further, if we view typical incomes of residents with current average fees, it is apparent that a resident's income is not the primary source of funds:

| INCOME TO CHARGE COMPARISON | | | | | |
|---|---|---|---|---|---|
| | Average Monthly Rate^ | Annual Income Threshold* | Median Income of Resident** | $ Surplus/ Shortfall | % Shortfall/ Surplus |
| Independent Living | $4,002 | $64,032 | $74,412 | $10,380 | 16.21% |
| Assisted Living | $6,042 | $96,672 | $29,558 | $-67,114 | -69.42% |

^NIC MAP® Data Service Q3 2025 2025

*Average Monthly Rate/75%*12

**The Benefits of Independent Living Communities, 2003 & Overview of Assisted Living, 2009 both trended to current dollars.

Therefore, while our analysis will focus on the income-qualified senior, we must recognize that for private pay communities, adult children and long-term care insurance policies are often covering a senior who has lower than required annual income and resources. Moreover, residents are also likely to spend down their assets to fund care, particularly for higher levels of care (assisted living and memory care). Because household income statistics provided by Claritas only include money receipts (pension income, social security income, etc.) for a specific year, they do not include the following sources that could also fund residency:

- ☐ Stocks, bonds and other liquid assets
- ☐ Assistance from family
- ☐ Home equity
- ☐ Medicaid Waivers

Consequently, we have adjusted our income-qualifications below that of the income threshold calculated previously to account for these additional sources of income. We have viewed those residents indicating incomes of $50,000 and up for assisted living and $50,000 and up for memory care. We note that the difference between the required minimal income and the concluded income qualification used reflects spending down of assets associated with a resident's net worth, assistance from adult children and other sources including long-term care insurance.

Finally, based on the foregoing, we have calculated the potential demand for seniors housing as shown:

| DEMAND INDICATIONS | | |
|---|---|---|
| **Assisted Living** | | |
| | PMA | |
| | 2026 | 2031 |
| 75+ Population | 10,810 | 13,064 |
| Nursing Home Population | 982 | 986 |
| Adjusted 75+ Population^ | 9,828 | 12,078 |
| 75+ Households | 6,536 | 7,792 |
| Annual Minimum Income Threshold | $52,800 | |
| Median Owner-Occupied House Value | $336,119 | $396,485 |
| Income Qualification: | $50,000 and up | |
| **Age and Income Qualified Households** | | |
| 75-84 | 2,626 | 3,508 |
| 85+ | 774 | 922 |
| **Personal Care Factor by Age** | | |
| 75-84 | 8.30% | 8.30% |
| 85+ | 20.90% | 20.90% |
| Households Meeting Income and Acuity | 380 | 484 |
| Household/Population Factor* | 1.50 | 1.55 |
| Nielsen Factor | 1.18 | 1.18 |
| Potential Assisted Living Demand | 677 | 889 |
| **Memory Care** | | |
| | PMA | |
| | 2026 | 2031 |
| 75+ Population | 10,810 | 13,064 |
| Nursing Home Population | 982 | 986 |
| Adjusted 75+ Population^ | 9,828 | 12,078 |
| 75+ Households | 6,536 | 7,792 |
| Annual Minimum Income Threshold | $67,200 | |
| Median Owner-Occupied House Value | $336,119 | $396,485 |
| Income Qualification: | $50,000 and up | |
| **Age and Income Qualified Households** | | |
| 75-84 | 2,626 | 3,508 |
| 85+ | 774 | 922 |
| **AD Factor by Age** | | |
| 75-84 | 3.53% | 3.53% |
| 85+ | 14.54% | 14.54% |
| Households Meeting Income and Acuity | 205 | 258 |
| Household/Population Factor* | 1.50 | 1.55 |
| Nielsen Factor | 1.18 | 1.18 |
| Potential Memory Care Demand | 366 | 474 |
| *Adjusted Population/Households | | |
| ^General Population less Nursing Home Population | | |
| Source: Nielsen GAO, CDC, HealthTrust | | |

**Penetration Analysis**

For this analysis, the market penetration rate is measured as the number of residents from the PMA living in seniors housing communities divided by the total number of age/income/need qualified households. It can be expressed as:

[Market Occupancy x Supply x Ratio from the PMA]/Income-Qualified Demand

The market penetration rate is viewed as a comparison of supply and demand relative to a snapshot in time for both the current year and projected year based on information available as of the date of the inspection. Based on the PMA average occupancy level, we find that the market is currently demonstrating the following penetration level:

| PENETRATION ANALYSIS | | |
| --- | --- | --- |
| **Assisted Living** | | |
| | PMA | |
| | 2026 | 2031 |
| Total Supply | 401 | 401 |
| Market Occupancy | 84% | 94% |
| Total Potential Demand | 677 | 889 |
| Penetration Rate | 49.61% | 42.42% |
| **Memory Care** | | |
| | PMA | |
| | 2026 | 2031 |
| Total Supply | 195 | 195 |
| Market Occupancy | 88% | 94% |
| Total Potential Demand | 366 | 474 |
| Penetration Rate | 47.04% | 38.68% |
| Source: HealthTrust | | |

Penetration rates are indices that represent the relationship between supply and demand, which allow for meaningful comparison to the broader market. Unlike other real estate asset classes, penetration rates are not to be analyzed based on their absolute value, but rather used for their relative values when compared to the larger market. Due to the imperfect nature of the available data, resulting penetration rates can sometimes lead to indications that could be construed as being misleading. For example, a penetration rate over 100% is not necessarily indicative of a saturated market, but only to the extent of how it relates to other market derived penetration rates using identical methodology. In doing hundreds of appraisals and market studies annually of senior housing properties, we have found the following significant trends and conclusions:

☐ Markets with high penetration rates have better-educated populations with regards to the seniors housing product type. Further, among the 140 MSAs, there is a positive correlation between penetration rates and occupancy levels. Conversely, as penetration rates increase, average rents decrease, indicative of a competitive market.

❑ Based on our analysis of the 140 largest MSAs, we find a significant variance in assisted living and memory care penetration rates for the largest 31 MSAs (primary markets) relative to that of the smaller MSAs (32-100, or secondary and 101-140, additional). Generally, the latter indicates on average, 25% to 35% higher penetration rates, depending on age and income qualifications. Further, in our experience, we find this variance to be even more pronounced in tertiary markets. While, it is anecdotal, we attribute this to the following:

      o Greater in-migration from rural out-bounding areas due to availability of healthcare resources.

      o Fewer living options available in the secondary markets relative to the larger, metropolitan markets.

      o Smaller sized markets require increased education and product awareness.

❑ Adult Children (45-64 age cohorts) play a primary role in the decision process for a prospective resident for assisted living and even more so to memory care. Higher prevalence rates among adult children generate net-in migration for care and result in increased penetration. This is not necessarily the case for independent living, where no correlation is found among adult children.

❑ Availability of State Assistance (Medicaid) is a driving demand force for senior housing properties. The use of such programs allows for increased access to residents who could otherwise not afford the product, thereby resulting in higher penetration rates. States with high utilization of State Assistance include North Carolina, Oregon and Washington.

Overall, while penetration rates provide a barometer for the makeup of a specific market, in analyzing any market, primary weight is placed on market occupancy levels, once adjusted for variances among the age and quality of assets available.

**Market Categorization**

To categorize the market, we have compared the subject's PMA against the 140 largest MSAs. To provide for industry benchmarks, we have used supply estimates from NIC MAP® Data Service Q3 2025 and applied our supply and demand methodology previously described. Please note that the NIC MAP® Data Service indications are based exclusively on the specific level of care. The subject's PMA relative to the broader market is as follows:

| ASSISTED LIVING | | | | | | |
|---|---|---|---|---|---|---|
| | Top 140 MSA Benchmark | | | MSA | Subject PMA | |
| | Median | Lower Quartile | Upper Quartile | Allentown, PA | 2026 | 2031 |
| Average Occupancy | 89.00% | 86.33% | 91.05% | 94.50% | 83.70% | 94.00% |
| Average Monthly Rent | $6,042 | $5,621 | $6,751 | $5,777 | N/A | N/A |
| Median House Value | $361,819 | $267,366 | $469,916 | $336,185 | $336,119 | $396,485 |
| Adult Child Prevalence | 3.12% | 2.46% | 4.38% | 4.91% | 4.06% | 4.07% |
| AL Percentage | 71.50% | 68.23% | 74.76% | 75.61% | 67.28% | 67.28% |
| **Penetration Rates** | | | | | | |
| $50,000 and up | 45.5% | 35.4% | 56.5% | 75.0% | 49.6% | 42.4% |

| MEMORY CARE | | | | | | |
|---|---|---|---|---|---|---|
| | **Top 140 MSA Benchmark** | | | **MSA** | **Subject PMA** | |
| | Median | Lower Quartile | Upper Quartile | Allentown, PA | 2026 | 2031 |
| Average Occupancy | 89.00% | 85.90% | 91.60% | 92.50% | 88.25% | 94.00% |
| Average Monthly Rent | $7,605 | $6,888 | $8,797 | $8,531 | N/A | N/A |
| Median House Value | $361,819 | $267,366 | $469,916 | $336,185 | $336,119 | $396,485 |
| Adult Child Prevalence | 1.27% | 0.96% | 1.53% | 1.55% | 2.08% | 1.98% |
| MC Percentage | 28.50% | 25.24% | 31.77% | 24.39% | 32.72% | 32.72% |
| **Penetration Rates** | | | | | | |
| $50,000 and up | 34.1% | 25.9% | 42.1% | 44.0% | 47.0% | 38.7% |

## Conclusions

Based on its estimated stabilized occupancy level, we find the market's AL penetration rate is above the median and the memory care penetration rate is above the median of the 140 MSAs.

Our observations of hundreds of markets annually resulted in the following general interpretation of market indicators:

| MARKET ANALYSIS INTERPRETATION | | | |
|---|---|---|---|
| **Category** | **Occupancy** | **Penetration** | **Market Conclusion** |
| I | PMA > NIC MAP Median | & PMA > Median | PMA has positive rate growth and absorption. May have net in-migration and/or prevalence of state assistance. Experienced and highly competitive market with potential of moving into II or IV depending on demographic growth and/or proposed supply. |
| II | PMA < NIC MAP Median | & PMA > Median | PMA is overbuilt, low/negative rate growth and low/negative absorption. Market may be skewed by dated, uncompetitive communities. |
| III | PMA < NIC MAP Median | & PMA < Median | PMA's consumers are not fully accepting or are inexperienced with seniors housing and/or market has net out-migration |
| IV | PMA > NIC MAP Median | & PMA < Median | PMA has significant potential and is under-served with high rate growth and occupancy, indicating unmet demand. |
| Source: HealthTrust | | | |



The subject's PMA is best characterized as a Type II market in AL and Type II market in MC. Over the next five years, we expect the market to remain a Type II for AL and Type I for MC, supported by an increase in the senior population and lack of proposed projects entering the supply.

**SWOT Analysis**

At this point, we have developed a SWOT (Strengths, Weaknesses, Opportunities and Threats) Analysis for the subject identifying internal strengths and weakness as well as external opportunities and threats, as follows:

| SWOT ANALYSIS | |
|---|---|
| **Strengths:** | **Weaknesses:** |
| ➤ Regional operator<br>➤ Good central location and visibility | ➤ Older physical plant<br>➤ Poor historical operational performance |
| **Opportunities:** | **Threats:** |
| ➤ Expected increase in the senior population<br>➤ Cosmetic updates | ➤ Uncertainty surrounding lease up of the market<br>➤ Staffing shortages |

Source: HealthTrust

## HIGHEST AND BEST USE

Highest and best use is an appraisal concept defined as that use of many possible and legally allowable alternative uses, which may reasonably be expected to produce the greatest net return to the property in the foreseeable future. To estimate the highest and best use of the subject property, we have considered the possible and most probable uses of the site, including those uses for which the land is adapted with respect to size, configuration, contour, and location. We considered those uses that are legally permissible, physically possible, and in conformity with existing improvements in the area, and which result in the highest economic return to the land. Legal uses permitted under local zoning ordinances have been analyzed as well as probable uses stemming from an analysis of economic aspects affecting the use of the land. This analysis is conducted as if the site were vacant to identify the ideal improvements for the site, and then as improved to compare the existing improvements to the ideal improvements.

### As If Vacant

**Physically Possible:** The site is comprised of one parcel containing a gross land area of 2.61 acres. The site's shape is irregular, and its terrain is mostly level. The building site lies in an X flood zone, and drainage is adequate. All utilities are available to the site and we are unaware of any soil conditions that may hinder development. Hence, the site appears to be readily developable from a physical standpoint.

The subject's immediate vicinity is developed with convenience stores, retail stores, gas station and condominiums. In summary, the site "as vacant" has few physical restrictions that would impact development of the site.

**Legally Permissible:** The subject is zoned M - (Mixed District). Permitted uses include single-family, multi-family, condos, government building, library, forestry, medical marijuana dispensary. Assisted living facilities and nursing homes require a special permit. The subject property is permitted as a conditional use. Therefore, we believe that the subject would likely be approved if the site were currently vacant.

**Economic Feasibility:** Based on the subject's permitted uses, we have focused the remainder of our efforts on seniors housing, particularly an Assisted Living/Memory Care Residence. As mentioned in the preceding Competitive Market Analysis, the subject's primary market area (PMA) is a five-mile radius. Further, our supply and demand analysis indicates positive demand for the subject property, while the following valuation analysis suggests it is feasible as well. Therefore, we have concluded the subject is economically feasible.

**Maximally Productive:** We have identified an Assisted Living/Memory Care Residence development as the only use which is immediately financially feasible and would therefore provide the greatest return to the site. Hence, we have concluded that an Assisted Living/Memory Care Residence is the highest and best use of the property, as vacant.

### As Currently Improved

**Financially Feasible:** Both physical and legal issues were discussed previously in the highest and best use, as if vacant scenario. Demand in the subject's market area is adequate for the existing units, as presented in the previous analysis. Hence, we feel that continued operation of the subject is economically feasible.

**Maximally Productive:** It is clearly apparent that the subject is worth more as an operational enterprise than it would be were the improvements demolished and the land sold separately. As previously discussed, no other uses were considered feasible. The subject's existing improvements do meet the first three criteria for highest and best use; hence, they are also considered to represent the maximally productive use of the site. Therefore, we conclude that the subject's highest and best use "as currently improved," is to continue operation of the Assisted Living/Memory Care Residence.

## VALUATION ANALYSIS

## INCOME APPROACH

We have been provided with the income and expense data for the subject. A copy of these statements may be found in the addenda of this report. We have carefully examined the data, deducted expenses that are not associated with the operation of an Assisted Living/Memory Care Residence and compared the adjusted totals with the experience of other communities. The resulting net income estimates are the basis for our valuation of the subject.

We have surveyed comparable and competitive communities in and near the subject's primary market area. These communities are described on the following pages:

### RENT COMPARABLE MAP



The subject is depicted by the orange pin while the comparables are shown by colored circles.



**SUBJECT**

| | |
|---|---|
| Record ID: | 202603100 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | Saucon Valley Manor |
| Address: | 1050 Main Street, Hellertown, Northampton, PA, 18055 |
| Verification: | |
| With: | Management at 610-748-8888 |
| Management: | Manors of the Valley |

| BUILDING CHARACTERISTICS | | | |
|---|---|---|---|
| Year Opened: | 1930 | Quality: | Average |
| Number Of Buildings: | 1 | Condition: | Average |
| Number Of Stories: | 4 | Construction Type: | Masonry |
| Land Area: | 2.61 acres | Gross Building Area: | 170,590 |

| PROPERTY MIX | | | |
|---|---|---|---|
| Level | Capacity | % Occupancy | Meals |
| IL | --- | --- | --- |
| AL | 101 beds | 92% | 3 daily |
| ALZ | 100 beds | 87% | 3 daily |
| SN | --- | --- | --- |

| LEVEL OF CARE TYPE | | | |
|---|---|---|---|
| Level | Type | Min | Max |
| AL | All-inclusive | --- | --- |
| ALZ - AL | All-inclusive | --- | --- |
| Other | --- | --- | --- |

**PROJECT AMENITIES**

- Activity rooms
- Assistance w/ ADLs
- Beauty/barber shop
- Courtyard
- Dining room - main
- Housekeeping
- Laundry facilities
- Linen Service
- Lounge areas
- Medications
- Postal services
- Reception Area
- Scheduled transportation
- Security 24 hour
- Social activities
- Theater/Auditorium
- Therapy Room
- Utilities
- Wanderer Mgt. System

**UNIT AMENITIES**

- Cable/satellite TV
- Emergency pull-cords
- Fire/smoke detectors
- Individually controlled HVAC
- Kitchenettes
- Private baths
- Walk-in closets
- Washer/dryer hookups
- Washers/dryers

| ASSISTED LIVING RENTAL ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
| Semi-Private | Monthly | $3,495 | $6,495 | $0 | --- | 20 | 40 | 450 | --- |
| Studio | Monthly | $4,495 | $7,995 | $0 | --- | 61 | 61 | 375 | 550 |

| MEMORY CARE RENTAL ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
| Semi-Private | Monthly | $4,495 | $6,495 | $0 | --- | 26 | 13 | 450 | --- |
| Studio | Monthly | $5,395 | $7,295 | $0 | --- | 74 | 74 | 375 | 550 |

## RENTAL COMPARABLE #1



| | |
|---|---|
| **Record ID:** | 8185012 |
| **Property Type:** | Assisted Living/Memory Care Residence |
| **Name:** | Sacred Heart Senior Living |
| **Address:** | 4851 Saucon Creek, Center Valley, PA, 18034 |
| **Verification:** | |
| **With:** | Staff at (610) 814-2700 |

### BUILDING CHARACTERISTICS

| | | | |
|---|---|---|---|
| **Year Opened:** | 2005 | **Quality:** | --- |
| **Number Of Buildings:** | 1 | **Condition:** | --- |
| **Number Of Stories:** | 3 | **Construction Type:** | Steel Frame |
| **Land Area:** | 3.27 acres | **Gross Building Area:** | 57,264 |

### PROPERTY MIX

| Level | Capacity | % Occupancy | Meals |
|---|---|---|---|
| IL | --- | --- | --- |
| AL | 42 beds | 85% | 3 daily |
| ALZ | 24 beds | 85% | --- |
| SN | --- | --- | --- |

### LEVEL OF CARE TYPE

| Level | Type | Min | Max |
|---|---|---|---|
| AL | Levels | $695 | $1,795 |
| ALZ - AL | All-inclusive | $695 | $1,795 |
| Other | --- | --- | --- |

### PROJECT AMENITIES

- Activity rooms
- Computer room
- Dining room - main
- Dining room - private
- Exercise facilities
- Game/billiards rooms
- Housekeeping
- Laundry facilities
- Library
- Linen Service
- Lounge areas
- Social activities
- Theater/Auditorium
- Therapy Room

### UNIT AMENITIES

- Emergency pull-cords
- Fire/smoke detectors
- Kitchenettes
- Private baths

### ASSISTED LIVING RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Daily | $4,495 | --- | $4,495 | --- | --- | --- | --- | --- |
| Studio | Daily | $5,910 | --- | $5,910 | --- | --- | --- | --- | --- |
| Extra Person | Monthly | $900 | --- | --- | --- | --- | --- | --- | --- |

### MEMORY CARE RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $4,900 | $6,650 | $4,900 | $6,650 | --- | --- | --- | --- |
| Studio | Monthly | $7,450 | $7,995 | $7,450 | $7,995 | --- | --- | --- | --- |

**REMARKS:** Sacred Heart Senior Living offers Independent Living, Assisted Living, and Memory care with private and semi-private room options. Marketing mentioned that 84 of their 108 beds are interchangeable between assisted living and independent living using their private and semi-private format. Memory care consists of 24 beds and features all inclusive care rates.



## RENTAL COMPARABLE #2

| | |
|---|---|
| Record ID: | 8185013 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | The Birches of Lehigh Valley |
| Address: | 5030 Freemansburg Avenue, Easton, PA, 18045 |
| Verification: | |
| With: | Staff at (215) 664-7914 |

### BUILDING CHARACTERISTICS

| | | | |
|---|---|---|---|
| Year Opened: | 2024 | Quality: | Excellent |
| Number Of Buildings: | 1 | Condition: | Excellent |
| Number Of Stories: | 2 | Construction Type: | --- |
| Land Area: | 8.05 acres | Gross Building Area: | 57,654 |

### PROPERTY MIX

| Level | Capacity | % Occupancy | Meals |
|---|---|---|---|
| IL | --- | --- | --- |
| AL | 62 beds | --- | 3 daily |
| ALZ | 57 beds | --- | 3 daily |
| SN | --- | --- | --- |

### LEVEL OF CARE TYPE

| Level | Type | Min | Max |
|---|---|---|---|
| AL | Levels | $595 | $1,895 |
| ALZ - AL | Levels | $595 | $1,895 |
| Other | --- | --- | --- |

### PROJECT AMENITIES

- Activity rooms
- Arts & crafts rooms
- Assistance w/ ADLs
- Beauty/barber shop
- Courtyard
- Dining room - main
- Dining room - private
- Exercise facilities
- Housekeeping
- Laundry facilities
- Library
- Linen Service
- Lounge areas
- Medications
- Postal services
- Reception Area
- Scheduled transportation
- Social activities
- Theater/Auditorium
- Utilities

### UNIT AMENITIES

- Cable/satellite TV
- Emergency pull-cords
- Fire/smoke detectors
- High-speed internet
- Individually controlled HVAC
- Kitchenettes
- Private baths

### SERVICE PACKAGE

- Water/Sewer
- Electricity
- Housekeeping

### ASSISTED LIVING RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $4,500 | --- | $3,750 | --- | 20 | 10 | --- | --- |
| Studio | Monthly | $5,000 | --- | $3,750 | --- | --- | --- | --- | --- |
| 1-Bedroom | Monthly | $6,000 | --- | $3,750 | --- | --- | --- | --- | --- |

### MEMORY CARE RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $5,000 | --- | $3,750 | --- | 32 | 16 | --- | --- |
| Studio | Monthly | $6,600 | --- | $3,750 | --- | 25 | 25 | --- | --- |

**REMARKS:** Marketing would not disclose their occupancy.



## RENTAL COMPARABLE #3

| | |
|---|---|
| Record ID: | 8185014 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | Bethlehem Manor |
| Address: | 815 Pennsylvania Avenue, Bethlehem, PA, 18018 |
| Verification: | |
| With: | Staff at (610) 841-8888 |

| BUILDING CHARACTERISTICS | | | |
|---|---|---|---|
| Year Opened: | 1935 | Quality: | Average |
| Number Of Buildings: | 1 | Condition: | Average |
| Number Of Stories: | 2 | Construction Type: | --- |
| Land Area: | 3.02 acres | Gross Building Area: | --- |

### PROPERTY MIX

| Level | Capacity | % Occupancy | Meals |
|---|---|---|---|
| IL | --- | --- | --- |
| AL | 44 beds | 75% | 3 daily |
| ALZ | 26 beds | 95% | 3 daily |
| SN | --- | --- | --- |

### LEVEL OF CARE TYPE

| Level | Type | Min | Max |
|---|---|---|---|
| AL | All-inclusive | --- | --- |
| ALZ - AL | All-inclusive | --- | --- |
| Other | --- | --- | --- |

### PROJECT AMENITIES

- Activity rooms
- Assistance w/ ADLs
- Dining room - main
- Housekeeping
- Laundry facilities
- Library
- Linen Service
- Lounge areas
- Medications
- Postal services
- Reception Area
- Scheduled transportation
- Security 24 hour
- Utilities
- Wanderer Mgt. System

### UNIT AMENITIES

- Emergency pull-cords
- Fire/smoke detectors

### SERVICE PACKAGE

- Water/Sewer
- Electricity
- Housekeeping

### ASSISTED LIVING RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $2,800 | --- | --- | --- | --- | --- | --- | --- |
| Studio | Monthly | $3,295 | $3,995 | --- | --- | --- | --- | --- | --- |

### MEMORY CARE RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $3,495 | --- | --- | --- | --- | --- | --- | --- |
| Studio | Monthly | $4,495 | --- | --- | --- | --- | --- | --- | --- |

**REMARKS:** Bethlehem Manor is an AL/MC community located in Bethlehem, PA. This community was originally just AL with a MC sister community (Bethlehem Manor II) located a few miles away. Recently, the sister community closed and all residents moved into Bethlehem Manor. This community does not charge a community fee, extra person fee, or additional levels of care.



## RENTAL COMPARABLE #4

| | |
|---|---|
| Record ID: | 8185010 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | The Vero at Bethlehem |
| Address: | 4720 Bath Pike, Bethlehem, PA, 18017 |

| | |
|---|---|
| Verification: | |
| With: | Staff at (610) 936-9848 |

### BUILDING CHARACTERISTICS

| | | | |
|---|---|---|---|
| Year Opened: | 2023 | Quality: | Good |
| Number Of Buildings: | 1 | Condition: | Excellent |
| Number Of Stories: | 2 | Construction Type: | Steel Frame |
| Land Area: | 8.82 acres | Gross Building Area: | 102,172 |

### PROPERTY MIX

| Level | Capacity | % Occupancy | Meals |
|---|---|---|---|
| IL | --- | --- | --- |
| AL | 90 beds | 100% | 3 daily |
| ALZ | 36 beds | 100% | 3 daily |
| SN | --- | --- | --- |

### LEVEL OF CARE TYPE

| Level | Type | Min | Max |
|---|---|---|---|
| AL | Levels | $0 | $2,535 |
| ALZ - AL | All-inclusive | $0 | $0 |
| Other | --- | --- | --- |

### PROJECT AMENITIES

- Activity rooms
- Arts & crafts rooms
- Assistance w/ ADLs
- Beauty/barber shop
- Courtyard
- Dining room - main
- Dining room - private
- Health center
- Housekeeping
- Laundry facilities
- Library
- Linen Service
- Lounge areas
- Medications
- Postal services
- Reception Area
- Scheduled transportation
- Social activities
- Utilities
- Wanderer Mgt. System

### UNIT AMENITIES

- Cable/satellite TV
- Emergency pull-cords
- Fire/smoke detectors
- Individually controlled HVAC
- Private baths

### SERVICE PACKAGE

- Water/Sewer
- Cable/Satellite TV
- Electricity
- Housekeeping

### ASSISTED LIVING RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Studio | Monthly | $4,425 | $4,295 | $3,250 | --- | 25 | 25 | 327 | 355 |
| 1-Bedroom | Monthly | $6,400 | --- | $3,250 | --- | 53 | 53 | 412 | 573 |
| 2-Bedroom | Monthly | $7,960 | --- | $3,250 | --- | 12 | 12 | 787 | 872 |

## RENTAL COMPARABLE #4

| | | | | MEMORY CARE RENTAL ANALYSIS | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
| Semi-Private | Monthly | $5,705 | --- | $3,250 | --- | 4 | 2 | 260 | 260 |
| Studio | Monthly | $8,190 | --- | $3,250 | --- | 32 | 32 | 266 | 355 |

**REMARKS:** The property consists of assisted living and memory care, and its LOC for both assisted living and memory care is all-inclusive.

## RENTAL COMPARABLE #5



| | |
|---|---|
| Record ID: | 8185008 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | Above and Beyond at the Knights |
| Address: | 1545 Greenleaf Street NW, Allentown, PA, 18102 |
| Verification: | |
| With: | Staff at (610) 434-7433 |

### BUILDING CHARACTERISTICS

| | | | |
|---|---|---|---|
| Year Opened: | 1989 | Quality: | Average |
| Number Of Buildings: | 1 | Condition: | Average |
| Number Of Stories: | 1 | Construction Type: | Wood Frame |
| Land Area: | 2.89 acres | Gross Building Area: | 52,950 |

### PROPERTY MIX

| Level | Capacity | % Occupancy | Meals |
|---|---|---|---|
| IL | --- | --- | --- |
| AL | 124 beds | 98% | 3 daily |
| ALZ | 24 beds | 100% | 3 daily |
| SN | --- | --- | --- |

### LEVEL OF CARE TYPE

| Level | Type | Min | Max |
|---|---|---|---|
| AL | All-inclusive | --- | --- |
| ALZ - AL | All-inclusive | --- | --- |
| Other | --- | --- | --- |

### PROJECT AMENITIES

- Activity rooms
- Arts & crafts rooms
- Assistance w/ ADLs
- Beauty/barber shop
- Courtyard
- Dining room - main
- Housekeeping
- Laundry facilities
- Library
- Linen Service
- Lounge areas
- Medications
- Postal services
- Reception Area
- Scheduled transportation
- Security 24 hour
- Social activities
- Therapy Room
- Utilities

### UNIT AMENITIES

- Emergency pull-cords
- Fire/smoke detectors
- Individually controlled HVAC
- Private baths

### SERVICE PACKAGE

- Water/Sewer
- Electricity
- Housekeeping

### ASSISTED LIVING RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $4,000 | --- | $1,750 | --- | --- | --- | --- | --- |
| Studio | Monthly | $5,500 | --- | $1,750 | --- | --- | --- | --- | --- |

### MEMORY CARE RENTAL ANALYSIS

| Unit Type | Fee basis | Min Fee | Max Fee | Community Fee Min | Community Fee Max | Beds | Units | Min Size | Max Size |
|---|---|---|---|---|---|---|---|---|---|
| Semi-Private | Monthly | $6,000 | --- | $1,750 | --- | --- | --- | --- | --- |
| Studio | Monthly | $7,500 | --- | $1,750 | --- | --- | --- | --- | --- |

**REMARKS:** Formerly known as Green Meadows, Above and Beyond at the Knights is an AL/MC community located in Allentown, PA.

**Estimates of Market Rent - Seniors Housing**

| ASSISTED LIVING ASKING RENTAL ANALYSIS | | | | |
|---|---|---|---|---|
| | Semi-Private | | Studio | |
| **Property** | **Min** | **Max** | **Min** | **Max** |
| Saucon Valley Manor | $3,495 | $6,495 | $4,495 | $7,995 |
| Sacred Heart Senior Living | $4,495 | -- | $5,910 | -- |
| The Birches of Lehigh Valley | $4,500 | -- | $5,000 | -- |
| Bethlehem Manor | $2,800 | -- | $3,295 | $3,995 |
| The Vero at Bethlehem | -- | -- | $4,425 | $4,295 |
| Above and Beyond at the Knights | $4,000 | -- | $5,500 | -- |
| **Median** | | $4,248 | | $4,495 |
| **Average** | | $4,298 | | $4,990 |
| **Mode** | | -- | | -- |
| **Range** | $2,800 - $6,495 | | $3,295 - $7,995 | |
| **Standard Deviation** | | $1,256 | | $1,371 |
| Source: HealthTrust | | | | |

In addition to the base rates, assisted living services are provided via a variety of pricing models, the most common being:

- All-inclusive, whereby all services, including personal care and assistance with activities of daily living, are included in the monthly fee.

- Levels or point systems, where the base rent includes meals, housekeeping, activities, maintenance and security, but assistance with ADLs and personal care are charged based on the health assessment of each resident.

- Ala carte, where the base rent includes meals, housekeeping, activities, maintenance and security, but every need (toileting, incontinence, medication reminders, showers) has a separate charge.

Thus, adjusted for level of care pricing, the subject's rates fall within the comparable range. In this market, the comparables report the following care pricing:

| SUMMARY OF CARE PRICING - AL | | | |
|---|---|---|---|
| **Community** | **Service Type** | **Min Fee** | **Max Fee** |
| Saucon Valley Manor | All-inclusive | -- | -- |
| Sacred Heart Senior Living | Levels | $695 | $1,795 |
| The Birches of Lehigh Valley | Levels | $595 | $1,895 |
| Bethlehem Manor | All-inclusive | -- | -- |
| The Vero at Bethlehem | Levels | $0 | $2,535 |
| Above and Beyond at the Knights | All-inclusive | -- | -- |

| MEMORY CARE ASKING RENTAL ANALYSIS | | | | |
| --- | --- | --- | --- | --- |
| | Semi-Private | | Studio | |
| **Property** | **Min** | **Max** | **Min** | **Max** |
| Saucon Valley Manor | $4,495 | $6,495 | $5,395 | $7,295 |
| Sacred Heart Senior Living | $4,900 | $6,650 | $7,450 | $7,995 |
| The Birches of Lehigh Valley | $5,000 | -- | $6,600 | -- |
| Bethlehem Manor | $3,495 | -- | $4,495 | -- |
| The Vero at Bethlehem | $5,705 | -- | $8,190 | -- |
| Above and Beyond at the Knights | $6,000 | -- | $7,500 | -- |
| **Median** | | $5,353 | | $7,373 |
| **Average** | | $5,343 | | $6,865 |
| **Mode** | | -- | | -- |
| **Range** | | $3,495 - $6,650 | | $4,495 - $8,190 |
| **Standard Deviation** | | $1,072 | | $1,299 |
| Source: HealthTrust | | | | |

In the market, care pricing for memory care residents varies, with most properties offering services on an all-inclusive basis. A summary of memory care pricing models is summarized as shown:

| SUMMARY OF CARE PRICING - MC | | | |
| --- | --- | --- | --- |
| **Community** | **Service Type** | **Min Fee** | **Max Fee** |
| Saucon Valley Manor | All-inclusive | -- | -- |
| Sacred Heart Senior Living | All-inclusive | $695 | $1,795 |
| The Birches of Lehigh Valley | Levels | $595 | $1,895 |
| Bethlehem Manor | All-inclusive | -- | -- |
| The Vero at Bethlehem | All-inclusive | $0 | $0 |
| Above and Beyond at the Knights | All-inclusive | -- | -- |

The subject's rental rates are generally within the range of the comparable properties. In our opinion, the subject has average market placement and warrants rents in the lower half of the market asking range. Placing most weight on the most recently signed leases, our analysis of the rent roll yielded the following conclusions for the subject's market rent:

| ASSISTED LIVING RENT ROLL SUMMARY | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **Reconciled** | **Average** | **Median** | **Mode** | **Recent** | **Range** | **Street Rate Range\*** |
| Semi-Private | **$3,300** | $3,268 | $2,998 | $2,730 | $5,295 | $2,310 - $5,295 | $2,800 - $6,495 |
| Studio | **$4,200** | $4,117 | $4,195 | $4,195 | $3,295 | $2,807 - $6,095 | $3,295 - $7,995 |
| MEMORY CARE RENT ROLL SUMMARY | | | | | | | |
| | **Reconciled** | **Average** | **Median** | **Mode** | **Recent** | **Range** | **Street Rate Range\*** |
| Semi-Private | **$4,200** | $4,045 | $3,995 | $3,995 | $4,595 | $2,951 - $6,067 | $3,495 - $6,650 |
| Studio | **$5,300** | $5,190 | $5,250 | $6,295 | $5,295 | $3,145 - $6,591 | $4,495 - $8,190 |
| Source:HealthTrust; \*Unadjusted Market Range | | | | | | | |

The foregoing chart includes only the most recently signed lease, where the following chart includes a summary of current rates and contracts in place partitioned by move-in year. Our reconciled rates relative to the operator's trended performance is as follows:

| ASSISTED LIVING RENT ROLL TREND SUMMARY | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year: | | 2026 | | 2025 | | 2024 | |
| Unit Type | Reconciled | Contracts | Avg Rate | Contracts | Avg Rate | Contracts | Avg Rate |
| **Semi-Private** | **$3,300** | 0 | $0 | 23 | $3,286 | 7 | $2,968 |
| **Studio** | **$4,200** | 1 | $3,295 | 18 | $4,541 | 23 | $3,898 |
| MEMORY CARE RENT ROLL TREND SUMMARY | | | | | | | |
| Year: | | 2026 | | 2025 | | 2024 | |
| Unit Type | Reconciled | Contracts | Avg Rate | Contracts | Avg Rate | Contracts | Avg Rate |
| **Semi-Private** | **$4,200** | 1 | $4,595 | 9 | $4,241 | 7 | $3,755 |
| **Studio** | **$5,300** | 1 | $5,295 | 28 | $5,359 | 20 | $4,931 |
| Source: HealthTrust | | | | | | | |

Ultimately, our estimates are well supported by the rent roll that provides the best indication of the subject's current, revenue-generating potential. Our overall implied potential gross rental income is similar to the annualized rent roll overall, within 2%, and appropriately above historical indications.

| RENT ROLL INCOME SUMMARY | | | | | | |
|---|---|---|---|---|---|---|
| **Care Level** | **HT Stabilized** | **Subject Rent Roll** | **Δ %** | **11/2025 T11 Actual** | **2024 Actual** | **2023 Actual** |
| Assisted Living EGI | $4,378,896 | $4,268,196 | -2.53% | $9,753,625 | $9,370,308 | $8,575,878 |
| Assisted Living PGI | $4,658,400 | $4,635,353 | -0.49% | $10,318,309 | $10,249,970 | $9,937,771 |
| Memory Care EGI | $5,655,792 | $5,807,964 | 2.69% | $0 | $0 | $0 |
| Memory Care PGI | $6,016,800 | $5,866,630 | -2.50% | $0 | $0 | $0 |
| Total Rental EGI | $10,034,688 | $10,076,160 | 0.41% | $9,753,625 | $9,370,308 | $8,575,878 |
| Total Rental PGI | $10,675,200 | $10,501,983 | -1.62% | $10,318,309 | $10,249,970 | $9,937,771 |
| Source: HealthTrust, Operator; PGI implied by EGI/Occupancy % | | | | | | |

### Stabilized Occupancy

The subject and comparables indicate the following as of the day of the most recent inspection:

| OCCUPANCY ANALYSIS | | |
|---|---|---|
| **Property** | **AL** | **MC** |
| Saucon Valley Manor | 92% | 87% |
| Sacred Heart Senior Living | 85% | 85% |
| Bethlehem Manor | 75% | 95% |
| The Vero at Bethlehem | 100% | 100% |
| Above and Beyond at the Knights | 98% | 100% |
| **Median** | 92% | 95% |
| **Average** | 93% | 91% |
| **Mode** | -- | 100% |
| **Range** | 75% - 100% | 85% - 100% |
| **PMA Average Occupancy** | 84% | 88% |

Overall, the subject's occupancy history and projections (based on set-up capacity) are summarized as follows:

| OPERATIONAL SUMMARY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Level of Care** | **Appraisal - Stabilized** | | **11/2025 T11 Actual** | | **2024 Actual** | | **2023 Actual** | | **2022 Actual** | | **2021 Actual** | | | |
| | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | Occ % | Total/RD | | |
| AL | 94% | $126.36 | 188% | $140.64 | 102% | $248.04 | 94% | $246.38 | 208% | $105.30 | 183% | $124.50 | | |
| MC | 94% | $164.84 | 0% | --- | 80% | $0.00 | 78% | $0.00 | 0% | -- | 0% | --- | | |
| Average Occupancy | 94% | | 95% | | 91% | | 86% | | 104% | | 92% | | | |
| Total Revenues | | $149.51 | | $144.52 | | $143.37 | | $138.59 | | $108.03 | | $128.10 | | |
| Profit Margin | | 14.6% | | 0.1% | | 1.5% | | -11.5% | | 1.1% | | 1.1% | | |
| Source: HealthTrust and Manors of the Valley | | | | | | | | | | | | | |

With no additions entering the market and average market occupancy at 84% in AL and 88% in, we have estimated a stabilized occupancy level for the subject of 94%, reconciling between historical levels, market indications and current occupancy.

Following our estimates of rental levels and occupancy, we have estimated the subject's effective gross rental income as shown:

| SUMMARY OF REVENUE PROJECTIONS | | | | |
|---|---|---|---|---|
| | | | Year: | **HT Stabilized** |
| | No. Units/Beds | Monthly Rent | | |
| **AL Revenues** | | | | |
| Semi-Private | 40 | $3,300 | | $1,584,000 |
| Studio | 61 | $4,200 | | $3,074,400 |
| Total Potential AL Base Fee Income | 101 | | | $4,658,400 |
| Less AL Vacancy | @ | | | 6.00% |
| | | | | -$279,504 |
| Lifecare Utilization Discount | | | | $0 |
| Effective Gross AL Base Fee Income | | | | $4,378,896 |
| **MC Revenues** | | | | |
| Semi-Private | 26 | $4,200 | | $1,310,400 |
| Studio | 74 | $5,300 | | $4,706,400 |
| Total Potential MC Fee Income | 100 | | | $6,016,800 |
| Less MC Vacancy | @ | | | 6.00% |
| | | | | -$361,008 |
| Effective Gross MC Fee Income | | | | $5,655,792 |

Source: HealthTrust

**Other Revenue Sources**

Other revenues at the subject include the sale of additional meals to guests, supplies, and other services. Other income has varied at this property ranging from $2.73 to $3.88 per resident day; placing most weight on the recent indications, we have incorporated $4.00 into our rent estimates.

**Total Revenue Estimates**

Incorporating the estimates of market rents, stabilized occupancies, and ancillary income, we have prepared the following statements of estimated revenues for the subject. To determine an inflationary factor, we have reviewed the consumer price index trends over the past ten years, as shown in the following table:

| 10-YEAR CONSUMER PRICE INDEX TRENDS | | |
|---|---|---|
| **Year** | **CPI** | **Annual Increase** |
| 2015 | 237.0 | -- |
| 2016 | 240.0 | 1.3% |
| 2017 | 245.1 | 2.1% |
| 2018 | 251.1 | 2.4% |
| 2019 | 255.7 | 1.8% |
| 2020 | 258.8 | 1.2% |
| 2021 | 271.0 | 4.7% |
| 2022 | 292.7 | 8.0% |
| 2023 | 304.7 | 4.1% |
| 2024 | 313.7 | 2.9% |
| 2025 | 321.9 | 2.6% |
| 10-Year Average | | 3.1% |
| 10-Year Compounded Annual Change | | 3.1% |
| Source: US Department of Labor | | |

Further, based on our analysis of provided budget projections for more than 1,000 properties over the last year, most market participants are reporting strong revenue increases year-over-year. The *State of Seniors Housing Q3 2025 Performance Trends* report suggests that revenue increases are exceeding expense growth in 2025. Until new development ramps up, we expect that this trend will continue but that over the long term, inflationary pressure will be closer to the long-term CPI indications above:

| | Majority Independent Living | | | | |
|---|---|---|---|---|---|
| **Period** | **Q3 2025** | **Q2 2025** | **Implied Q3 2024** | **Change QoQ** | **Change YoY** |
| Total Properties | 580 | 580 | 580 | 0 | 0 |
| Occupancy | 91% | 91% | 89% | 0% | 2% |
| Revenues per Occupied Unit | $19,663 | $19,120 | $18,042 | 3% | 9% |
| Operating Expenses per Occupied Unit | $13,475 | $13,282 | $12,586 | 1% | 7% |
| Labor as a Ratio of Revenues | 38% | 39% | 38% | -2% | -1% |
| Senior Housing Expenses as Ratio of Revenues | 6% | 6% | 7% | -1% | -7% |
| NOI per Occupied Unit | $6,188 | $5,838 | $5,456 | 6% | 13% |
| Operating Margin | 31% | 31% | 30% | 3% | 4% |
| | Majority Assisted Living | | | | |
| **Period** | **Q3 2025** | **Q2 2025** | **Implied Q3 2024** | **Change QoQ** | **Change YoY** |
| Total Properties | 549 | 549 | 549 | 0 | 0 |
| Occupancy | 89% | 88% | 85% | 1% | 4% |
| Revenues per Occupied Unit | $21,909 | $22,423 | $18,441 | -2% | 19% |
| Operating Expenses per Occupied Unit | $16,726 | $16,505 | $14,102 | 1% | 19% |
| Labor as a Ratio of Revenues | 45% | 45% | 46% | 0% | -1% |
| Senior Housing Expenses as Ratio of Revenues | 5% | 5% | 6% | 9% | -8% |
| NOI per Occupied Unit | $5,183 | $5,918 | $4,339 | -12% | 19% |
| Operating Margin | 24% | 26% | 24% | -10% | 1% |

Source: HealthTrust, *The State of Seniors Housing*

Considering the reimbursement and rate increases evident in the market, continued wage pressures and nursing shortages for some time and the industry's history, we have incorporated an annual rate of increase for revenues of 3.00%.

| SUMMARY OF REVENUE PROJECTIONS | | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
|---|---|---|---|---|---|---|
| **Summary of Effective Gross Fee Income** | | | | | | |
| AL Revenues | | $8,069,292 | $8,575,878 | $9,370,308 | $9,753,625 | $4,378,896 |
| MC Revenues | | $0 | $0 | $0 | $0 | $5,655,792 |
| Total Effective Gross Base Fee Income | | $8,069,292 | $8,575,878 | $9,370,308 | $9,753,625 | $10,034,688 |
| | | | | | | |
| **Ancillary and Other Fees** | | | | | | |
| Other Revenues | $4.00 /RD | $208,830 | $198,068 | $245,439 | $269,144 | $275,672 |
| Community Fees | $0 /move-in | $0 | $0 | $0 | $0 | $0 |
| Prior Period Adjustments | $0 /month | $0 | $0 | $0 | $0 | $0 |
| | | | | | | |
| **Total Effective Gross Income** | | $8,278,121 | $8,773,946 | $9,615,747 | $10,022,770 | $10,310,360 |
| **EGI/Unit (Bed)** | | $49,275 | $52,226 | $57,237 | $59,659 | $61,371 |
| **EGI/Resident Day** | | $108.03 | $138.59 | $143.37 | $144.52 | $149.51 |
| Change % (per resident day) | | | | | | |

Source: HealthTrust

## Operating Expenses

Operating expenses are based upon an analysis of historical operating expense data of the subject, as well as those of comparable properties. Based upon our careful analysis of these data and our judgment and experience, we have estimated operating expenses and staffing at what we considered reasonable and customary levels for the subject property.

*Real Estate Taxes*

Fixed expenses include liability insurance and property taxes. In addition to the tax comparables presented earlier in the PMA, we have examined tax levels at comparable properties in the region. Placing most weight on the subject's assessment and expected changes, we have estimated property taxes at $126,751 annually.

| REAL ESTATE TAXES TREND AND FORECAST | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
|---|---|---|---|---|---|
| Total | $46,080 | $184,751 | $60,125 | $0 | $126,751 |
| Per Unit/Bed | $274 | $1,100 | $358 | $0 | $754 |
| Per Resident Day | $0.60 | $2.92 | $0.90 | $0.00 | $1.84 |
| Ratio of EGI | 0.56% | 2.11% | 0.63% | 0.00% | 1.23% |

Source: HealthTrust

Overall, on a per unit/bed basis, our concluded Stabilized expense is lower than the median expense comparable indication, and within the comparable range.

| REAL ESTATE TAXES COMP COMPARISON | HT Stabilized | Comp Min | Comp Max | Comp Median |
|---|---|---|---|---|
| Total | $126,751 | | | |
| Per Unit/Bed | $754 | $399 | $2,069 | $1,364 |
| Per Resident Day | $1.84 | $1.16 | $5.72 | $3.63 |
| Ratio of EGI | 1.23% | 0.76% | 3.94% | 2.50% |

Source: HealthTrust

*Insurance*

Building and liability insurance is estimated based primarily on national and regional comparables. The insurance expense does not reflect an umbrella insurance program but does include general and professional liability as well as worker's comp. The subject's 11/2025 T11 Actual performance indicated a total expense of $332,843 in this department, which is 0.10% lower than our Stabilized indication.

| INSURANCE TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Insurance (General, Professional) | $24,956 | $730,138 | $220,808 | $230,675 | $237,595 |
| Worker's Comp | $113,469 | $164,574 | $123,861 | $102,169 | $95,585 |
| Total Insurance | $138,425 | $894,712 | $344,670 | $332,843 | $333,180 |
| Per Unit/Bed | $824 | $5,326 | $2,052 | $1,981 | $1,983 |
| Per Resident Day | $1.81 | $14.13 | $5.14 | $4.80 | $4.83 |
| Ratio of EGI | 1.67% | 10.20% | 3.58% | 3.32% | 3.23% |
| Source: HealthTrust | | | | | |

On a per unit/bed basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range.

| INSURANCE COMP COMPARISON | | | | |
|---|---|---|---|---|
| | HT Stabilized | Comp Min | Comp Max | Comp Median |
| Insurance (General, Professional) | $237,595 | | | |
| Worker's Comp | $95,585 | | | |
| Total Insurance | $333,180 | | | |
| Per Unit/Bed | $1,983 | $1,136 | $3,429 | $1,655 |
| Per Resident Day | $4.83 | $3.20 | $9.47 | $4.81 |
| Ratio of EGI | 3.23% | 1.72% | 6.52% | 3.17% |
| Source: HealthTrust | | | | |

*Utilities*

We have estimated utilities expenses including water, gas, trash, electricity and sewer as shown, noting that this amount falls as shown relative to the comparable properties. The subject's 11/2025 T11 Actual performance indicated a total expense of $543,058 in this department, which is 2.91% lower than our Stabilized indication.

| UTILITIES TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Water | $148,030 | $109,784 | $113,826 | $116,205 | $119,691 |
| Gas | $87,726 | $99,410 | $123,184 | $114,345 | $117,776 |
| Trash | $0 | $32,854 | $31,849 | $38,296 | $39,445 |
| Electricity | $136,684 | $168,790 | $193,670 | $207,530 | $213,756 |
| Other Utilities not above | $0 | $0 | $0 | $66,681 | $68,682 |
| Total Utilities | $372,440 | $410,838 | $462,529 | $543,058 | $559,350 |
| Per Unit/Bed | $2,217 | $2,445 | $2,753 | $3,232 | $3,329 |
| Per Resident Day | $4.86 | $6.49 | $6.90 | $7.83 | $8.11 |
| Ratio of EGI | 4.50% | 4.68% | 4.81% | 5.42% | 5.43% |
| Source: HealthTrust | | | | | |

Overall, on a per unit/bed basis, our concluded Stabilized expense is higher than the median expense comparable indication, and above the comparable range.

| UTILITIES COMP COMPARISON | | | | |
|---|---|---|---|---|
| | **HT Stabilized** | **Comp Min** | **Comp Max** | **Comp Median** |
| Water | $119,691 | | | |
| Gas | $117,776 | | | |
| Trash | $39,445 | | | |
| Electricity | $213,756 | | | |
| Other Utilities not above | $68,682 | | | |
| Total Utilities | $559,350 | | | |
| Per Unit/Bed | $3,329 | $1,471 | $2,121 | $1,791 |
| Per Resident Day | $8.11 | $4.15 | $5.64 | $4.95 |
| Ratio of EGI | 5.43% | 2.74% | 3.89% | 2.88% |
| Source: HealthTrust | | | | |

*Maintenance Department*

The maintenance department includes salaries for the maintenance administration, grounds, security personnel, maintenance crew and clerical support. In addition, the department includes the supplies and repairs and purchased services. The subject's 11/2025 T11 Actual performance indicated a total expense of $419,898 in this department, which is 10.73% higher than our Stabilized indication.

| MAINTENANCE TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | **2022 Actual** | **2023 Actual** | **2024 Actual** | **11/2025 T11 Actual** | **HT Stabilized** |
| Repairs and Supplies | $425,809 | $298,579 | $231,650 | $261,598 | $241,371 |
| Maintenance Salaries | $170,529 | $165,085 | $109,897 | $158,300 | $137,834 |
| Total Maintenance | $596,338 | $463,664 | $341,547 | $419,898 | $379,205 |
| Per Unit/Bed | $3,550 | $2,760 | $2,033 | $2,499 | $2,257 |
| Per Resident Day | $7.78 | $7.32 | $5.09 | $6.05 | $5.50 |
| Ratio of EGI | 7.20% | 5.28% | 3.55% | 4.19% | 3.68% |
| Source: HealthTrust | | | | | |

Overall, on a per unit/bed basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range. Our estimate relative to the comparables is shown:

| MAINTENANCE COMP COMPARISON | | | | |
|---|---|---|---|---|
| | **HT Stabilized** | **Comp Min** | **Comp Max** | **Comp Median** |
| Repairs and Supplies | $241,371 | | | |
| Maintenance Salaries | $137,834 | | | |
| Total Maintenance | $379,205 | | | |
| Per Unit/Bed | $2,257 | $1,102 | $2,918 | $2,095 |
| Per Resident Day | $5.50 | $2.93 | $8.22 | $5.91 |
| Ratio of EGI | 3.68% | 2.02% | 4.64% | 3.91% |
| Source: HealthTrust | | | | |

*Marketing Department*

The subject's 11/2025 T11 Actual performance in the Marketing Department indicated a total expense of $493,910 in this department, which is significantly higher than our Stabilized indication.

| MARKETING TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Advertising and Media | $480,587 | $322,452 | $435,136 | $372,611 | $275,852 |
| Marketing Salaries | $65,379 | $0 | $0 | $121,299 | $133,525 |
| Total Marketing | $545,967 | $322,452 | $435,136 | $493,910 | $409,377 |
| Per Unit/Bed | $3,250 | $1,919 | $2,590 | $2,940 | $2,437 |
| Per Resident Day | $7.12 | $5.09 | $6.49 | $7.12 | $5.94 |
| Ratio of EGI | 6.60% | 3.68% | 4.53% | 4.93% | 3.97% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range. The subject's advertising and marketing expenses, including payroll, is estimated as follows:

| MARKETING COMP COMPARISON | | | | |
|---|---|---|---|---|
| | HT Stabilized | Comp Min | Comp Max | Comp Median |
| Advertising and Media | $275,852 | | | |
| Marketing Salaries | $133,525 | | | |
| Total Marketing | $409,377 | | | |
| Per Unit/Bed | $2,437 | $479 | $2,864 | $1,570 |
| Per Resident Day | $5.94 | $1.32 | $8.07 | $4.43 |
| Ratio of EGI | 3.97% | 0.91% | 4.94% | 2.93% |
| Source: HealthTrust | | | | |

*Admin and General Department*

The administration department includes supplies, telephone, bad debt and office expenses required to operate the administrative office. Other expenses reflect the subject's historical performance. The subject's 11/2025 T11 Actual performance indicated a total expense of $900,792 in this department, which is significantly higher than our Stabilized indication.

| ADMINISTRATIVE AND GENERAL TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Admin Supplies & Other Admin | $370,383 | $370,508 | $309,130 | $384,074 | $344,816 |
| Admin Salaries | $530,955 | $547,843 | $644,746 | $516,718 | $324,909 |
| Total Administrative | $901,339 | $918,352 | $953,876 | $900,792 | $669,724 |
| Per Unit/Bed | $5,365 | $5,466 | $5,678 | $5,362 | $3,986 |
| Per Resident Day | $11.76 | $14.51 | $14.22 | $12.99 | $9.71 |
| Ratio of EGI | 10.89% | 10.47% | 9.92% | 8.99% | 6.50% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is lower than the median expense comparable indication, and within the comparable range. We note that some of the expense comparables account for all their payroll and related costs in this department. A summary of our estimate compared to the subject's performance and regional trends is presented; please note that some of the comparables may include payroll in this category, whereas the subject's history and our projections break that expense out departmentally:

| ADMINISTRATIVE AND GENERAL COMP COMPARISON | | | | |
|---|---|---|---|---|
| | **HT Stabilized** | **Comp Min** | **Comp Max** | **Comp Median** |
| Admin Supplies & Other Admin | $344,816 | | | |
| Admin Salaries | $324,909 | | | |
| Total Administrative | $669,724 | | | |
| Per Unit/Bed | $3,986 | $646 | $7,080 | $6,213 |
| Per Resident Day | $9.71 | $1.72 | $19.95 | $17.17 |
| Ratio of EGI | 6.50% | 1.18% | 12.16% | 10.69% |
| Source: HealthTrust | | | | |

*Housekeeping/Laundry Department*

Housekeeping and laundry expenses include both staffing and miscellaneous supply expenses. The subject contains in-house laundry facilities. The subject's 11/2025 T11 Actual performance indicated a total expense of $658,508 in this department, which is significantly higher than our Stabilized indication.

| HOUSEKEEPING AND LAUNDRY TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | **2022 Actual** | **2023 Actual** | **2024 Actual** | **11/2025 T11 Actual** | **HT Stabilized** |
| Housekeeping and Laundry Supplies | $172,209 | $163,292 | $184,531 | $248,151 | $137,926 |
| Housekeeping and Laundry Salaries | $247,545 | $437,350 | $461,359 | $410,357 | $175,491 |
| Total Housekeeping and Laundry | $419,754 | $600,641 | $645,891 | $658,508 | $313,418 |
| Per Unit/Bed | $2,499 | $3,575 | $3,845 | $3,920 | $1,866 |
| Per Resident Day | $5.48 | $9.49 | $9.63 | $9.50 | $4.54 |
| Ratio of EGI | 5.07% | 6.85% | 6.72% | 6.57% | 3.04% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range.

| HOUSEKEEPING AND LAUNDRY COMP COMPARISON | | | | |
|---|---|---|---|---|
| | **HT Stabilized** | **Comp Min** | **Comp Max** | **Comp Median** |
| Housekeeping and Laundry Supplies | $137,926 | | | |
| Housekeeping and Laundry Salaries | $175,491 | | | |
| Total Housekeeping and Laundry | $313,418 | | | |
| Per Unit/Bed | $1,866 | $473 | $2,335 | $1,515 |
| Per Resident Day | $4.54 | $1.26 | $6.45 | $4.41 |
| Ratio of EGI | 3.04% | 0.87% | 4.44% | 2.90% |
| Source: HealthTrust | | | | |

*Dietary Department*

One of the three major departmental expenses is the dietary department, which provides food service for the residents and employees. Good quality food and service are priority considerations in seniors housing communities.

Our analysis of this department is based on the staffing levels at this property type in general and information provided by other national and regional operators. Based upon the estimated occupancy ratios, we have estimated a raw food cost of $8.50 per resident day, which falls above the comparable range.

The subject's 11/2025 T11 Actual performance indicated a total expense of $1,794,018 in this department, which is significantly higher than our Stabilized indication.

| DIETARY TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Food Cost | $661,111 | $925,802 | $917,045 | $1,014,128 | $586,186 |
| Supplies & Other Dietary Costs | $77,278 | $96,839 | $81,014 | $97,860 | $86,204 |
| Dietary Salaries | $604,211 | $725,935 | $717,316 | $682,031 | $718,723 |
| Total Dietary | $1,342,600 | $1,748,576 | $1,715,375 | $1,794,018 | $1,391,113 |
| Per Unit/Bed | $7,992 | $10,408 | $10,211 | $10,679 | $8,280 |
| Per Resident Day | $17.52 | $27.62 | $25.58 | $25.87 | $20.17 |
| Ratio of EGI | 16.22% | 19.93% | 17.84% | 17.90% | 13.49% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range. Our estimate, relative to comparable properties and the subject's performance, is summarized as follows:

| DIETARY COMP COMPARISON | | | | |
|---|---|---|---|---|
| | HT Stabilized | Comp Min | Comp Max | Comp Median |
| Food Cost | $586,186 | | | |
| Supplies & Other Dietary Costs | $86,204 | | | |
| Dietary Salaries | $718,723 | | | |
| Total Dietary | $1,391,113 | | | |
| Per Unit/Bed | $8,280 | $3,018 | $8,231 | $6,897 |
| Per Resident Day | $20.17 | $8.03 | $23.95 | $19.47 |
| Ratio of EGI | 13.49% | 5.53% | 15.76% | 11.85% |
| Source: HealthTrust | | | | |

*Nursing/Personal Care Department*

One of the costliest services provided by the subject property is nursing care. Staffing requirements are estimated based on the subject's current staffing and our experience with comparable communities.

The subject's 11/2025 T11 Actual performance indicated a total expense of $3,247,048 in this department, which is 2.73% higher than our Stabilized indication.

| NURSING TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Nursing Supplies & Other | $32,472 | -$78,942 | -$72,627 | $45,528 | $46,632 |
| Contract Nursing | $52,446 | $2,843 | $3,591 | $0 | $0 |
| Nursing/Personal Care Salaries | $2,451,404 | $2,944,231 | $3,146,538 | $3,201,520 | $3,114,107 |
| Total Nursing | $2,536,323 | $2,868,132 | $3,077,502 | $3,247,048 | $3,160,740 |
| Per Unit/Bed | $15,097 | $17,072 | $18,318 | $19,328 | $18,814 |
| Per Resident Day | $33.10 | $45.30 | $45.89 | $46.82 | $45.83 |
| Ratio of EGI | 30.64% | 32.69% | 32.00% | 32.40% | 30.66% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is higher than the median expense comparable indication, and within the comparable range.

| NURSING COMPARISON | | | | |
|---|---|---|---|---|
| | HT Stabilized | Comp Min | Comp Max | Comp Median |
| Nursing Supplies & Other | $46,632 | | | |
| Contract Nursing | $0 | | | |
| Nursing/Personal Care Salaries | $3,114,107 | | | |
| Total Nursing | $3,160,740 | | | |
| Per Unit/Bed | $18,814 | $173 | $18,377 | $11,988 |
| Per Resident Day | $45.83 | $0.46 | $51.79 | $34.88 |
| Ratio of EGI | 30.66% | 0.32% | 28.48% | 22.95% |
| Source: HealthTrust | | | | |

*Activities/Social Services Department*

Activities and social expenses include entertainment, transportation expenses, supplies and associated salaries. The subject's 11/2025 T11 Actual performance indicated a total expense of $241,495 in this department, which is significantly higher than our Stabilized indication.

| ACTIVITIES/SOCIAL TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Activities/Social Supplies | $19,170 | $18,631 | $19,919 | $18,428 | $18,875 |
| Activities/Social Salaries | $230,735 | $208,600 | $175,984 | $223,067 | $174,671 |
| Total Activities/Social | $249,905 | $227,232 | $195,903 | $241,495 | $193,547 |
| Per Unit/Bed | $1,488 | $1,353 | $1,166 | $1,437 | $1,152 |
| Per Resident Day | $3.26 | $3.59 | $2.92 | $3.48 | $2.81 |
| Ratio of EGI | 3.02% | 2.59% | 2.04% | 2.41% | 1.88% |
| Source: HealthTrust | | | | | |

Overall, on a per resident day basis, our concluded Stabilized expense is lower than the median expense comparable indication, and within the comparable range. Our estimate, in comparison to the comparable properties, is as follows:

| ACTIVITIES/SOCIAL COMP COMPARISON | | | | |
|---|---|---|---|---|
| | **HT Stabilized** | **Comp Min** | **Comp Max** | **Comp Median** |
| Activities/Social Supplies | $18,875 | | | |
| Activities/Social Salaries | $174,671 | | | |
| Total Activities/Social | $193,547 | | | |
| Per Unit/Bed | $1,152 | $189 | $1,773 | $1,460 |
| Per Resident Day | $2.81 | $0.50 | $5.16 | $4.12 |
| Ratio of EGI | 1.88% | 0.35% | 3.40% | 2.47% |
| Source: HealthTrust | | | | |

*All Other Payroll and Employee Overhead*

Typically, seniors housing communities will either charge these expenses to the staffed departments (i.e., administrative, dietary, nursing, housekeeping, and maintenance) or charge them all to administrative. We have allocated these expenses to each operated department.

Nationally, we have seen a predominant range of payroll taxes and benefits of 12-25% of wages and salaries, depending on how holiday, vacation and sick time are accounted. Some regions, notably the Northeast, will produce higher payroll taxes and benefits. Additionally, not-for-profit operations typically report higher levels of payroll taxes and benefits. For the purposes of this appraisal, we have estimated payroll taxes of 8% of payroll with a benefit load of 6%, incorporating the subject's trend and market parameters. Our payroll tax and benefit load is within the range exhibited by the comparables.

Payroll taxes and benefits may be greater for salaried and full-time staff and lower for part-time staff and those at lower wage levels. Although expenses are estimated by department, staff employed in one department may occasionally perform other duties on an as needed basis, to maintain efficient operation of the property.

| OTHER PAYROLL TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | **2022 Actual** | **2023 Actual** | **2024 Actual** | **11/2025 T11 Actual** | **HT Stabilized** |
| Payroll Taxes | $375,864 | $431,124 | $445,945 | $511,856 | $382,341 |
| Benefits | $162,037 | $187,257 | $232,194 | $287,827 | $286,756 |
| Total Other Payroll Costs | $537,902 | $618,381 | $678,139 | $799,683 | $669,096 |
| Per Unit/Bed | $3,202 | $3,681 | $4,037 | $4,760 | $3,983 |
| Per Resident Day | $7.02 | $9.77 | $10.11 | $11.53 | $9.70 |
| Ratio of EGI | 6.50% | 7.05% | 7.05% | 7.98% | 6.49% |
| Source: HealthTrust | | | | | |

With respect to salary and wage expenses, as noted we have allocated staffing to each department departmentally/separately. Consequently, these amounts are included above. However, we have total wages expenses for comparison purposes between the subject's historical performance as well as the comparable properties. A summary of our conclusions relative to the subject's history is as follows:

| SALARIES AND WAGE EXPENSES TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | **2022 Actual** | **2023 Actual** | **2024 Actual** | **11/2025 T11 Actual** | **HT Stabilized** |
| Total | $4,300,758 | $5,029,045 | $5,255,840 | $5,313,292 | $4,779,260 |
| Per Unit/Bed | $25,600 | $29,935 | $31,285 | $31,627 | $28,448 |
| Per Resident Day | $56.13 | $79.43 | $78.36 | $76.62 | $69.30 |
| Ratio of EGI | 51.95% | 57.32% | 54.66% | 53.01% | 46.35% |
| Source: HealthTrust | | | | | |

To estimate staffing for the subject, we have relied on actual staffing patterns presently exhibited by the operator and have tempered that staffing schedule with patterns presented by the expense comparables later in this section as well as our experience with comparable operations. A summary of our staffing forecast by department as well as our FTE forecasts compared to the most recent *State of Seniors Housing* indications:

| STAFFING MATRIX | | | |
|---|---|---|---|
| | **Stabilized FTEs** | **Wage Rate** | **Stabilized Total** |
| **Admin & General** | | | |
| Executive Director | 1.00 | $52.06 | $108,281 |
| Receptionists/Clerical | 2.00 | $19.78 | $82,294 |
| Office Staff | 1.00 | $23.28 | $48,431 |
| Finance Staff | 1.00 | $41.30 | $85,903 |
| | | | |
| **Marketing** | | | |
| Marketing Director | 1.00 | $64.19 | $133,525 |
| | | | |
| **Dietary** | | | |
| Food Service Director | 1.00 | $33.02 | $68,687 |
| Other Managers or Supervisors | 1.00 | $30.84 | $64,137 |
| Cooks | 6.00 | $18.44 | $230,081 |
| Utility Workers | 2.00 | $17.26 | $71,794 |
| Servers | 8.00 | $17.07 | $284,024 |
| | | | |
| **Housekeeping/Laundry** | | | |
| Housekeepers | 3.78 | $17.52 | $137,713 |
| Laundry | 1.00 | $18.16 | $37,778 |
| | | | |
| **Nursing** | | | |
| RNs | 2.00 | $47.33 | $196,874 |
| LPNs | 1.00 | $31.52 | $65,559 |
| Personal Care | 77.23 | $17.75 | $2,851,674 |
| | | | |
| **ACTIVITIES/SOCIAL** | | | |
| Director of Resident Services | 1.00 | $39.55 | $82,272 |
| Assistant | 1.00 | $22.81 | $47,447 |
| Driver | 1.00 | $21.61 | $44,953 |
| | | | |
| **MAINTENANCE** | | | |
| Maintenance Director | 1.00 | $28.41 | $59,084 |
| Maintenance Technicians | 1.00 | $18.60 | $38,697 |
| Grounds | 1.00 | $19.26 | $40,053 |
| Source: HealthTrust | | | |

| | | | | STAFFING INDICATIONS - FTEs/RD | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Year** | | **HealthTrust** | | | | | SOSH 2025 Average | | | | |
| **Department** | **1** | **2** | **3** | **Stabilized** | **IL** | **IL/AL** | **IL/AL/MC** | **AL** | **AL/MC** | **MC** | **CCRC** |
| Admin & General | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.04 | 0.05 | 0.05 | 0.06 | 0.06 | 0.03 |
| Marketing | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.02 | 0.02 | 0.02 | 0.01 |
| Dietary | 0.10 | 0.10 | 0.10 | 0.10 | 0.09 | 0.13 | 0.13 | 0.09 | 0.11 | 0.10 | 0.15 |
| Housekeeping/Laundry | 0.03 | 0.03 | 0.03 | 0.03 | 0.03 | 0.04 | 0.04 | 0.03 | 0.04 | 0.04 | 0.06 |
| Nursing/Personal Care | 0.42 | 0.42 | 0.42 | 0.42 | 0.06 | 0.26 | 0.27 | 0.47 | 0.59 | 0.87 | 0.23 |
| Activities/Social | 0.02 | 0.02 | 0.02 | 0.02 | 0.01 | 0.02 | 0.02 | 0.02 | 0.02 | 0.05 | 0.02 |
| Maintenance | 0.02 | 0.02 | 0.02 | 0.02 | 0.01 | 0.02 | 0.02 | 0.02 | 0.02 | 0.02 | 0.03 |
| Total | 0.61 | 0.61 | 0.61 | 0.61 | 0.19 | 0.39 | 0.49 | 0.48 | 0.71 | 0.82 | 0.54 |

*Source: HealthTrust and State of Seniors Housing 2025 Sum of the parts may not equal the whole*

*Management Fee*

Management fees also include general bookkeeping and various incidental and legal consultation fees. According to the 2025 edition of *The State of Seniors Housing*, management fees vary as shown by property type:

| MANAGEMENT FEES AS PERCENTAGE OF TOTAL REVENUES BY COMMUNITY TYPE | | | |
|---|---|---|---|
| **Community Type** | **Minimum** | **Average** | **Maximum** |
| Independent Living | 2.5% | 5.2% | 9.7% |
| Independent/Assisted Living | 1.3% | 5.1% | 12.0% |
| Independent/Assisted Living with Memory Care | 2.5% | 5.2% | 15.6% |
| Assisted Living | 2.0% | 5.9% | 14.0% |
| Assisted Living/Memory Care | 1.5% | 5.2% | 19.3% |
| Memory Care | 1.6% | 5.6% | 11.5% |
| CCRC | 1.4% | 4.9% | 12.3% |
| **ALL COMMUNITIES** | **1.3%** | **5.3%** | **19.3%** |
| *Source: The State of Seniors Housing, 2025* | | | |

More than the acuity of care, management fees vary by the size of the community. We have estimated management fees at 5.0% of effective gross income, falling within the range seen above and supported by our experience with comparable properties.

*Replacement Reserves*

Finally, we have also allocated a reserve for replacement fund used to replace short-lived items such as appliances, furniture, fixtures, equipment, roofing, and carpeting. Traditionally, there has been a wide spread in actual expenditures – which are to some degree discretionary as to timing – and what is budgeted. Furthermore, *The State of Seniors Housing* data indicates that properties built in the last 10 years may only spend 50% of what older properties invest on average. Most lenders and agencies with whom we have spoken use between $300 and $600 per unit.

HUD has recently announced on an appraisal call that they want to use actual capital expenditure, which would result in an investment value rather than a market value estimate. We asked five skilled nursing home buyers the amounts they use when reaching an investment decision, summarized below:

| SNF CAPITAL RESERVES PER AVAILABLE BED | |
|---|---|
| **Operator** | **Capital Expenditure Budget** |
| Tryko | $350 |
| TL Management | $350 |
| Cascade | $350 |
| Hill Valley Healthcare | $550-750 |
| Source: HealthTrust | |

Considering the foregoing as well as the age and condition of the subject, we have used $500 per unit for the estimate of replacement reserve in developing our opinion of market value.

**Operating Expense Summary**

Total Stabilized forecasted operating expenses, exclusive of management fee and reserves are estimated at $8,205,501 on a stabilized basis. Including management fees and reserves, we estimate operating expenses to be $8,805,019 for the same period. A summary of our total expense forecasts relative to the subject's performance and the expense comparables is as follows:

| OPERATING EXPENSES TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | **2022 Actual** | **2023 Actual** | **2024 Actual** | **11/2025 T11 Actual** | **HT Stabilized** |
| Total | $8,184,977 | $9,780,428 | $9,475,480 | $10,016,393 | $8,805,019 |
| Per Unit/Bed | $48,720 | $58,217 | $56,402 | $59,621 | $52,411 |
| Per Resident Day | $106.81 | $154.48 | $141.28 | $144.43 | $127.68 |
| Ratio of EGI | 98.87% | 111.47% | 98.54% | 99.94% | 85.40% |
| Source: HealthTrust | | | | | |

| EXPENSE COMPARABLE SUMMARY - TRENDED | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Property** | **Subject** | | | **1** | | | **1** | | | **3** | | | **4** | | | **5** | | | |
| State | PA | | | PA | | | PA | | | PA | | | PA | | | PA | | | |
| No. IL | 0 | | | 0 | | | 22 | | | 0 | | | 0 | | | 0 | | | |
| No. AL | 81 | | | 79 | | | 43 | | | 70 | | | 54 | | | 84 | | | |
| No. MC | 87 | | | 8 | | | 0 | | | 0 | | | 40 | | | 16 | | | |
| No. SN | 0 | | | 0 | | | 0 | | | 0 | | | 0 | | | 0 | | | |
| Total Units/Beds | 168 | | | 87 | | | 65 | | | 70 | | | 94 | | | 100 | | | |
| | | | | | | | | | | | | | | | | | | | |
| Year | Stabilized | | | 10/31/24 | | | 8/31/24 | | | 12/31/23 | | | 2/28/25 | | | 10/31/24 | | | |
| Trended To: | | | | 3/10/26 | | | 3/10/26 | | | 3/10/26 | | | 3/10/26 | | | 3/10/26 | | | |
| Year Built | 1930 | | | 2001 | | | 2017 | | | 1958 | | | 2007 | | | 1987 | | | |
| GBA | 170,590 | | | 73,503 | | | 51,263 | | | 45,194 | | | 68,412 | | | 53,718 | | | |
| Occupancy | 94% | | | 94% | | | 91% | | | 94% | | | 93% | | | 92% | | | |
| Total Resident Days | 68,963 | | | 32,705 | | | 23,523 | | | 24,058 | | | 33,357 | | | 35,430 | | | |
| EGI/RD | $149.51 | | | $145.25 | | | $160.19 | | | $151.97 | | | $186.70 | | | $151.38 | | | |
| | | | | | | | | | | | | | | | | | | | |
| **EXPENSES** | $/RD | $/Unit | %EGI | $/RD | $/Unit | %EGI | $/RD | $/Unit | %EGI | $/RD | $/Unit | %EGI | $/RD | $/Unit | %EGI | $/RD | $/Unit | %EGI |
| Real Estate Taxes | $1.84 | $754 | 1.2% | $3.63 | $1,364 | 2.5% | $5.72 | $2,069 | 3.9% | $1.16 | $399 | 0.8% | $3.01 | $1,069 | 1.6% | $4.75 | $1,684 | 3.1% |
| Insurance | $4.83 | $1,983 | 3.2% | $5.04 | $1,893 | 3.5% | $9.47 | $3,429 | 6.5% | $4.81 | $1,655 | 3.2% | $3.20 | $1,136 | 1.7% | $3.98 | $1,411 | 2.6% |
| Utilities | $8.11 | $3,329 | 5.4% | $5.64 | $2,121 | 3.9% | $4.95 | $1,791 | 3.4% | $4.33 | $1,488 | 2.8% | $5.38 | $1,910 | 2.9% | $4.15 | $1,471 | 2.7% |
| Maintenance | $5.50 | $2,257 | 3.7% | $2.93 | $1,102 | 2.0% | $4.59 | $1,661 | 3.2% | $7.06 | $2,426 | 4.6% | $8.22 | $2,918 | 4.4% | $5.91 | $2,095 | 3.9% |
| Marketing | $5.94 | $2,437 | 4.0% | $1.96 | $735 | 1.3% | $1.32 | $479 | 0.9% | $7.51 | $2,582 | 4.9% | $8.07 | $2,864 | 4.3% | $4.43 | $1,570 | 2.9% |
| Administrative | $9.71 | $3,986 | 6.5% | $1.72 | $646 | 1.2% | $17.17 | $6,213 | 11.8% | $18.48 | $6,350 | 12.2% | $19.95 | $7,080 | 10.7% | $10.40 | $3,686 | 6.9% |
| Dietary | $20.17 | $8,280 | 13.5% | $8.03 | $3,018 | 5.5% | $15.11 | $5,468 | 10.4% | $23.95 | $8,231 | 15.8% | $22.13 | $7,854 | 11.9% | $19.47 | $6,897 | 12.9% |
| Housekeeping/Laundry | $4.54 | $1,866 | 3.0% | $1.26 | $473 | 0.9% | $6.45 | $2,335 | 4.4% | $4.41 | $1,515 | 2.9% | $3.09 | $1,096 | 1.7% | $4.89 | $1,734 | 3.2% |
| Nursing/Personal Care | $45.83 | $18,814 | 30.7% | $0.46 | $173 | 0.3% | $25.97 | $9,399 | 17.9% | $34.88 | $11,988 | 23.0% | $51.79 | $18,377 | 27.7% | $43.11 | $15,275 | 28.5% |
| Activities | $2.81 | $1,152 | 1.9% | $0.50 | $189 | 0.3% | $2.40 | $869 | 1.7% | $5.16 | $1,773 | 3.4% | $4.60 | $1,634 | 2.5% | $4.12 | $1,460 | 2.7% |
| Other Payroll, Taxes & Benefits | $9.70 | $3,983 | 6.5% | $68.89 | $25,896 | 47.4% | $9.33 | $3,375 | 6.4% | $8.31 | $2,857 | 5.5% | $27.89 | $9,898 | 14.9% | $11.58 | $4,102 | 7.6% |
| Management Fees | $7.48 | $3,069 | 5.0% | $7.26 | $2,730 | 5.0% | $8.01 | $2,899 | 5.0% | $7.60 | $2,611 | 5.0% | $9.34 | $3,313 | 5.0% | $7.57 | $2,682 | 5.0% |
| Reserves | $1.22 | $500 | 0.8% | $1.33 | $500 | 0.9% | $1.38 | $500 | 0.9% | $1.45 | $500 | 1.0% | $1.41 | $500 | 0.8% | $1.41 | $500 | 0.9% |
| Total | $127.68 | $52,411 | 85.4% | $108.64 | $40,841 | 74.8% | $111.88 | $40,487 | 76.4% | $129.11 | $44,374 | 85.0% | $168.09 | $59,649 | 90.0% | $125.79 | $44,566 | 83.1% |
| | | | | | | | | | | | | | | | | | | | |
| **Key Categories (Included Above)** | | | | | | | | | | | | | | | | | | |
| Wages | $69.30 | $28,448 | 46.4% | $67.27 | $25,289 | 46.3% | $51.99 | $18,816 | 35.8% | $72.52 | $24,924 | 47.7% | $78.73 | $27,938 | 42.2% | $64.86 | $22,981 | 42.8% |
| Other PR Tax & Ben (as % of Wages) | | | 14.0% | | | 102.4% | | | 17.9% | | | 11.5% | | | 35.4% | | | 17.8% |
| Worker's Comp | $1.39 | $569 | 0.9% | $1.08 | $406 | 0.7% | $1.55 | $562 | 1.1% | $1.68 | $577 | 1.1% | | | | $1.42 | $503 | 0.9% |
| Food Cost | $8.50 | $3,489 | 5.7% | $7.05 | $2,650 | 4.9% | $6.91 | $2,501 | 4.8% | $8.38 | $2,878 | 5.5% | $7.84 | $2,784 | 4.2% | $8.43 | $2,986 | 5.6% |

Source: HealthTrust

In selecting expense comparables, we chose properties serving similar levels of care in the subject's state. Further, we chose the most recent periods of the financial data we had for each comparable. We have attempted to reconcile our estimates with the market while considering the subject's actual performance. Our estimate for the subject lies within the comparable range both based on an amount per resident per day and as a ratio of revenues. Consequently, we find our estimates reasonable.

**Net Operating Income Estimate**

In terms of net operating income (NOI), our estimated Stabilized NOI of $1,505,342 compares to the subject's 11/2025 T11 Actual NOI of $6,377. In prior periods, the subject has reported NOI of $140,267 and $-1,006,481. Our estimates represent a higher NOI than the historical actual periods, which reflect significantly above-market operating expenses. In general, we trended forward the subject's in-place PRD revenue indications, then normalized expenses to market levels based on comparable data. A summary of our forecasts relative to the subject's performance is as follows:

| NET OPERATING INCOME TREND AND FORECAST | | | | | |
|---|---|---|---|---|---|
| | 2022 Actual | 2023 Actual | 2024 Actual | 11/2025 T11 Actual | HT Stabilized |
| Total | $93,144 | -$1,006,481 | $140,267 | $6,377 | $1,505,342 |
| Per Unit/Bed | $554 | -$5,991 | $835 | $38 | $8,960 |
| Per Resident Day | $1.22 | -$15.90 | $2.09 | $0.09 | $21.83 |
| Ratio of EGI | 1.13% | -11.47% | 1.46% | 0.06% | 14.60% |
| Source: HealthTrust | | | | | |

Our year estimates are presented on the following page juxtaposed with the subject's adjusted budget:

**SUMMARY OF APPRAISAL ESTIMATES AND SUBJECT'S ADJUSTED FINANCIAL STATEMENTS**

| Year | HT Stabilized | | | | 11/2025 T11 Actual | | | | 2024 Actual | | | | 2023 Actual | | | | 2022 Actual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Days/Rates | Days | Rate | | | Days | Rate | | | Days | Rate | | | Days | Rate | | | Days | Rate | | |
| Assisted Living | 34,653 | $126.36 | | | 69,350 | $140.64 | | | 37,778 | $248.04 | | | 34,808 | $246.38 | | | 76,628 | $105.30 | | |
| Memory Care | 34,310 | $164.84 | | | 0 | N/A | | | 29,291 | $0.00 | | | 28,503 | $0.00 | | | 0 | N/A | | |
| Total Resident Days | 68,963 | | | | 69,350 | | | | 67,069 | | | | 63,311 | | | | 76,628 | | | |
| Total Units/Beds | 168 | | | | 168 | | | | 168 | | | | 168 | | | | 168 | | | |
| Occupancy | 94% | | | | 95% | | | | 91% | | | | 86% | | | | 104% | | | |
| | Total $ | $/Unit | $/RD | % EGI | Total $ | $/Unit | $/RD | % EGI | Total $ | $/Unit | $/RD | % EGI | Total $ | $/Unit | $/RD | % EGI | Total $ | $/Unit | $/RD | % EGI |
| **Revenues** | | | | | | | | | | | | | | | | | | | | |
| AL Rental Revenues | $4,378,896 | $26,065 | $63.50 | 42.5% | $9,753,625 | $58,057 | $140.64 | 97.3% | $9,370,308 | $55,776 | $139.71 | 97.4% | $8,575,878 | $51,047 | $135.46 | 97.7% | $8,069,292 | $48,031 | $105.30 | 97.5% |
| MC Rental Revenues | $5,655,792 | $33,665 | $82.01 | 54.9% | $0 | $0 | $0.00 | 0.0% | $0 | $0 | $0.00 | 0.0% | $0 | $0 | $0.00 | 0.0% | $0 | $0 | $0.00 | 0.0% |
| Other Revenues | $275,672 | $1,641 | $4.00 | 2.7% | $269,144 | $1,602 | $3.88 | 2.7% | $245,439 | $1,461 | $3.66 | 2.6% | $198,068 | $1,179 | $3.13 | 2.3% | $208,830 | $1,243 | $2.73 | 2.5% |
| **Total Effective Gross Revenue** | $10,310,360 | $61,371 | $149.51 | 100.0% | $10,022,770 | $59,659 | $144.52 | 100.0% | $9,615,747 | $57,237 | $143.37 | 100.0% | $8,773,946 | $52,226 | $138.59 | 100.0% | $8,278,121 | $49,275 | $108.03 | 100.0% |
| **Expenses** | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | $126,751 | $754 | $1.84 | 1.2% | $0 | $0 | $0.00 | 0.0% | $60,125 | $358 | $0.90 | 0.6% | $184,751 | $1,100 | $2.92 | 2.1% | $46,080 | $274 | $0.60 | 0.6% |
| Insurance | $333,180 | $1,983 | $4.83 | 3.2% | $332,843 | $1,981 | $4.80 | 3.3% | $344,670 | $2,052 | $5.14 | 3.6% | $894,712 | $5,326 | $14.13 | 10.2% | $138,425 | $824 | $1.81 | 1.7% |
| Utilities | $559,350 | $3,329 | $8.11 | 5.4% | $543,058 | $3,232 | $7.83 | 5.4% | $462,529 | $2,753 | $6.90 | 4.8% | $410,838 | $2,445 | $6.49 | 4.7% | $372,440 | $2,217 | $4.86 | 4.5% |
| Maintenance | $379,205 | $2,257 | $5.50 | 3.7% | $419,898 | $2,499 | $6.05 | 4.2% | $341,547 | $2,033 | $5.09 | 3.6% | $463,664 | $2,760 | $7.32 | 5.3% | $596,338 | $3,550 | $7.78 | 7.2% |
| Marketing | $409,377 | $2,437 | $5.94 | 4.0% | $493,910 | $2,940 | $7.12 | 4.9% | $435,136 | $2,590 | $6.49 | 4.5% | $322,452 | $1,919 | $5.09 | 3.7% | $545,967 | $3,250 | $7.12 | 6.6% |
| Administrative/General | $669,724 | $3,986 | $9.71 | 6.5% | $900,792 | $5,362 | $12.99 | 9.0% | $953,876 | $5,678 | $14.22 | 9.9% | $918,352 | $5,466 | $14.51 | 10.5% | $901,339 | $5,365 | $11.76 | 10.9% |
| Housekeeping/Laundry | $313,418 | $1,866 | $4.54 | 3.0% | $658,508 | $3,920 | $9.50 | 6.6% | $645,891 | $3,845 | $9.63 | 6.7% | $600,641 | $3,575 | $9.49 | 6.8% | $419,754 | $2,499 | $5.48 | 5.1% |
| Dietary | $1,391,113 | $8,280 | $20.17 | 13.5% | $1,794,018 | $10,679 | $25.87 | 17.9% | $1,715,375 | $10,211 | $25.58 | 17.8% | $1,748,576 | $10,408 | $27.62 | 19.9% | $1,342,600 | $7,992 | $17.52 | 16.2% |
| Nursing/Personal Care | $3,160,740 | $18,814 | $45.83 | 30.7% | $3,247,048 | $19,328 | $46.82 | 32.4% | $3,077,502 | $18,318 | $45.89 | 32.0% | $2,868,132 | $17,072 | $45.30 | 32.7% | $2,536,323 | $15,097 | $33.10 | 30.6% |
| Activities/Social | $193,547 | $1,152 | $2.81 | 1.9% | $241,495 | $1,437 | $3.48 | 2.4% | $195,903 | $1,166 | $2.92 | 2.0% | $227,232 | $1,353 | $3.59 | 2.6% | $249,905 | $1,488 | $3.26 | 3.0% |
| Other Payroll, Payroll Taxes and Benefits | $669,096 | $3,983 | $9.70 | 6.5% | $799,683 | $4,760 | $11.53 | 8.0% | $678,139 | $4,037 | $10.11 | 7.1% | $618,381 | $3,681 | $9.77 | 7.0% | $537,902 | $3,202 | $7.02 | 6.5% |
| **Total Operating Expenses** | $8,205,501 | $48,842 | $118.98 | 79.6% | $9,431,254 | $56,138 | $136.00 | 94.1% | $8,910,693 | $53,040 | $132.86 | 92.7% | $9,257,730 | $55,106 | $146.23 | 105.5% | $7,687,071 | $45,756 | $100.32 | 92.9% |
| Management Fee | $515,518 | $3,069 | $7.48 | 5.0% | $501,138 | $2,983 | $7.23 | 5.0% | $480,787 | $2,862 | $7.17 | 5.0% | $438,697 | $2,611 | $6.93 | 5.0% | $413,906 | $2,464 | $5.40 | 5.0% |
| Reserve for Replacement | $84,000 | $500 | $1.22 | 0.8% | $84,000 | $500 | $1.21 | 0.8% | $84,000 | $500 | $1.25 | 0.9% | $84,000 | $500 | $1.33 | 1.0% | $84,000 | $500 | $1.10 | 1.0% |
| **Total Expenses** | $8,805,019 | $52,411 | $127.68 | 85.4% | $10,016,393 | $59,621 | $144.43 | 99.9% | $9,475,480 | $56,402 | $141.28 | 98.5% | $9,780,428 | $58,217 | $154.48 | 111.5% | $8,184,977 | $48,720 | $106.81 | 98.9% |
| **Net Operating Income (EBITDAR)** | $1,505,342 | $8,960 | $21.83 | 14.6% | $6,377 | $38 | $0.09 | 0.1% | $140,267 | $835 | $2.09 | 1.5% | -$1,006,481 | -$5,991 | -$15.90 | -11.5% | $93,144 | $554 | $1.22 | 1.1% |

Source: HealthTrust

**Capitalization Rate Derivation**

In selecting an appropriate capitalization rate for the subject property, we conducted an investor survey and considered indications provided by the comparable sales, the Band of Investment, and the Debt Coverage Ratio.

Overall, rates will be higher than more traditional multifamily property types. In fact, as care level increases, rates generally increase. We consistently derive our capitalization rates from prospective cash flows and exclude leased fee indications. Our analysis of cap rate trends shows volatility in skilled nursing capitalization rates – yet always between 12.00% and 14.00% - and relative stability in seniors housing capitalization rates. Cap rates for seniors housing have compressed as the federal funds rate declined in 2024-2025, while skilled nursing cap rates have been stable the last few years:



Source: HealthTrust

Each quarter, we survey investors, operators, brokers and lenders regarding investment criteria for communities primarily comprised of IL, AL, MC and SN. The recent responses regarding going-in and terminal capitalization rates are summarized as follows:

| 2026 - Q1 SENIORS HOUSING AND CARE INVESTMENT SURVEY | | | | | | |
|---|---|---|---|---|---|---|
| | **Going-in Cap Rate** | | | **Terminal Cap Rate** | | |
| | Min | Max | Average | Min | Max | Average |
| IL | 5.00% | 7.50% | 6.43% | 5.75% | 7.50% | 6.89% |
| AL | 6.00% | 8.00% | 7.50% | 6.25% | 8.50% | 7.71% |
| MC | 7.00% | 12.00% | 8.78% | 7.25% | 9.50% | 8.61% |
| SN | 11.50% | 13.50% | 12.40% | 12.00% | 13.50% | 12.86% |

Source: HealthTrust Q1 2026 Seniors Housing and Care Investment Survey

Capitalization rates measure risk. One of the challenges of the valuation process is to insulate the process against short-term fluctuations and ensure that longer-term trends are adequately reported. To the extent that a temporary decrease or imbalance exists, valuation theory should dilute this in favor of the longer-term value trends, much like the stock market and the valuation of individual stocks. Other factors (operational and market risk) mitigate the impact below a certain threshold.

The National Investment Center and Real Capital Analytics collects capitalization rate data from regional and national appraisal firms who work on all seniors housing property types. Over the last twelve months, indications for seniors housing and NIC sectors have varied as follows:



Source: NIC MAP® Sales Transactions Report, Q4 2025

Both sale prices and volume have improved over the last 12 months for seniors housing and skilled nursing.

## Summary of Investment

| | | SENIORS HOUSING | | NURSING CARE | | TOTAL | |
|---|---|---|---|---|---|---|---|
| | | Actual | YOY Chg | Actual | YOY Chg | Actual | YOY Chg |
| Volume ($M) | past 12 months | $15,625.1 | 33% | $8,547.7 | 54% | $24,172.8 | 39% |
| | Q4 '25 | $4,498.5 | 9% | $1,770.1 | 29% | $6,268.7 | 14% |
| # Props | past 12 months | 1079 | 8% | 754 | 21% | 1833 | 13% |
| | Q4 '25 | 281 | -1% | 164 | -18% | 445 | -8% |
| Total Units/beds | past 12 months | 105826 | 10% | 85233 | 20% | 191059 | 14% |
| | Q4 '25 | 26946 | -5% | 18164 | -13% | 45110 | -9% |
| Price per unit/bed* | past 12 months | $182,769 | 29% | $112,883 | 49% | $151,408 | 35% |
| | Q4 '25 | $212,211 | 28% | $113,823 | 76% | $176,555 | 46% |
| Avg Cap Rate | past 12 months | 8.2% | -190 bps | Protected | Protected | 8.6% | -126 bps |
| | Q4 '25 | | | | | | |

*Any senior housing or nursing care property transaction with a price-per-unit (PPU) below $20,000 in excluded from this calculation.

Source: NIC MAP® Sales Transactions Report, Q4 2025

The NIC MAP® database has inadequate SNF cap rate data to publish, but LevinPro LTC reports stable SNF cap rates at 12.10-12.20% from Q2 2024 through Q4 2025 and HealthComps® concurs that SNF cap rates have been stable over the last year. However, because the HealthTrust cap rates are derived from prospective income, we report average SNF cap rate at 13.15-13.20% over the last two years.

Seniors housing cap rates in 2025 were at 7.8%, down 40 basis points per LevinPro LTC for IL/AL communities compared to the prior year. The NIC MAP® reporting suggests a bigger drop of 190 basis points while the HealthComps® data falls between the two other sources with a 64-basis-point decline in 2025.

As with all real estate, good quality assets will retain value (location, operations, physical, plant) better than second or third tier assets. Since fundamentals are still very strong in the skilled nursing industry, we expect rates will stay where they are, with higher tier and portfolio assets seeing compression and investors continue to chase yield.

In terms of spreads with other investments, such as the 10-Year Treasuries Notes, we find that capitalization rates of skilled nursing facilities typically suggest a 900- to 1,300-basis-point spread, while seniors housing suggests a 400- to 650-point variance:

| CAPITALIZATION RATE SPREADS | | | |
|---|---|---|---|
| **Year** | **Average SNF Cap Rate** | **Average SH Cap Rate** | **10-Yr Treasuries** |
| 2016 | 12.31% | 7.89% | 1.84% |
| 2017 | 11.68% | 7.69% | 2.33% |
| 2018 | 11.82% | 7.86% | 2.91% |
| 2019 | 12.13% | 7.46% | 2.14% |
| 2020 | 13.67% | 7.47% | 0.89% |
| 2021 | 12.26% | 7.54% | 1.45% |
| 2022 | 12.38% | 8.05% | 2.95% |
| 2023 | 13.39% | 8.54% | 3.96% |
| 2024 | 13.18% | 8.84% | 4.21% |
| 2025 | 13.15% | 8.20% | 4.29% |
| 10-yr Avg | 12.54% | 7.93% | 2.52% |



Source: HealthTrust and Federal Reserve

Finally, although we place primary weight on actual sales transactions and investor surveys, we have employed standard appraisal methodology to abstract capitalization rates. Our *Senior Housing and Care Investment Survey* reports the following indications for equity dividend rates:

| 2026 - Q1 SENIORS HOUSING AND CARE INVESTMENT SURVEY | | | |
|---|---|---|---|
| | **Equity Dividend (Cash on Cash) Rate** | | |
| | **Min** | **Max** | **Average** |
| IL | 8.00% | 10.00% | 9.00% |
| AL | 8.50% | 11.00% | 10.13% |
| MC | 9.00% | 12.00% | 11.25% |
| SN | 12.00% | 15.00% | 14.00% |

Source: HealthTrust Q1 2026 Seniors Housing and Care Investment Survey

Each of the abstracted rates considers the requirement of debt and equity to reach an appropriate capitalization rate. To that end, we have incorporated an industry typical weighted-average interest rate of 5.75%, a 65% loan-to-value ratio, an amortization period of 25 years, and a debt coverage ratio of 1.50. Equity requirements include an equity dividend (cash on cash) rate of 11.00% and an equity yield rate of 17.25%.

The comparable sales presented in the following section of this report suggest a range of 4.97% to 21.66% in overall capitalization rates, summarized as follows:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | SENIOR HOUSING/HEALTHCARE TRANSACTIONS | | | | | | | | |
| Sale No. | Name/Location | Date | No. Units/Beds | Year Built | Sale Price | $/Unit | NOI/Unit | Occ. | OAR |
| 1 | Confidential Pending IL/AL/MC<br>N/A, Pennsylvania | Feb-26 | 90 | 2001 | $11,375,000 | $126,389 | $15,457 | 85% | 12.23% |
| 2 | Walden Place<br>Cortland, New York | Sep-25 | 80 | 2001 | $8,500,000 | $106,250 | $10,286 | 73% | 9.68% |
| 3 | Legacy at Maiden Park<br>Rochester, New York | Jan-25 | 78 | 2016 | $6,955,000 | $89,167 | $4,429 | 79% | 4.97% |
| 4 | Four IL/AL/MC PA-NJ<br>Milford, Pennsylvania | Dec-25 | 389 | 1977 | $55,000,000 | $141,388 | $13,199 | 97% | 9.34% |
| 5 | Brandywine Living at Senior Suites<br>Norristown, Pennsylvania | Jun-24 | 114 | 1988 | $8,650,000 | $75,877 | $16,436 | 71% | 21.66% |
| Source: HealthTrust | | | | | | | | | |

We have attempted to limit our selection of improved sales to those that occurred at a time when capital costs were near the cost as of the date of this appraisal. Demand remains strong for stabilized, core properties. For the older and truly distressed properties, more capital is available than in recent years, but the resulting capitalization rates may reflect the seller choosing ability to close over the highest sale price. Buyers are well aware of this and expect discounts for their access to capital.

Finally, we note that for seniors housing communities, age matters; HealthComps® data suggest the following variances by age of community:



Source: HealthTrust

Overall, we anticipate an appropriate cap rate range for the subject to vary between 8.00% and 10.00%. Factors that ultimately influence the selection of the subject's capitalization rate include:

**Lower end of the range:**
- ❒ Good local market conditions
- ❒ Projected margin towards the bottom of the comparable range
- ❒ Lower interest rate environment than the sales

**Upper end of the range:**
- ❒ Older asset than the sale comparables
- ❒ Significant increase in NOI forecasted over historical performance
- ❒ Central tendency of improved sales at 9.68%-11.57%

Therefore, we have reconciled to a going-in rate near the middle of the expected range, or 9.00%. To account for the greater risk involved with the property at the time of reversion due to unknown factors of the market and the condition of the buildings at that time, an additional 50 basis points have been added to the overall capitalization rate to derive a terminal capitalization rate of 9.50%. However, we have not applied a premium to the subject's capitalization rate at stabilization for the following reasons:

- ❒ Brokers tell us that they are seeing exit cap rates lower than going in rates as they expect cost of capital to be stable or lower by the time of our projected stabilized value date. Further, in a few years the industry will be far more likely to be materially under-supplied as new development has slowed considerably and while there is a projected 50% increase in the 85+ population during this decade with aggregate numbers equaling the current inventory of seniors housing and skilled nursing combined.

- ❒ There is less uncertainty regarding market conditions in 2-3 years (the period for stabilization) than at the conclusion of a 10-year holding period.

| SUMMARY OF CAPITALIZATION RATE INDICATIONS | | | | | | |
|---|---|---|---|---|---|---|
| MORTGAGE INTEREST RATE | | | | | | 5.75% |
| AMORTIZATION TERM | | | | | | 25 |
| LOAN TO VALUE RATIO | | | | | | 65.00% |
| DEBT COVERAGE RATIO | | | | | | 150.00% |
| EQUITY DIVIDEND RATE | | | | | | 11.00% |
| EQUITY YIELD RATE | | | | | | 17.25% |
| **BAND OF INVESTMENT** | | | | | | |
| DEBT COMPONENT: | 65% | x | 0.0755 | | = | 0.0491 |
| EQUITY COMPONENT: | 35% | x | 0.1100 | | = | 0.0385 |
| | | | | | | 0.0875703 |
| ROUNDED TO: | | | | | | 8.76% |
| **DEBT COVERAGE** | 65% | x | 1.5 | x | 0.0755 | 0.0736 |
| ROUNDED TO: | | | | | | 7.36% |
| **IMPROVED SALE INDICATIONS** | | | | | 4.97% to | 21.66% |
| **SELECTED OVERALL CAPITALIZATION RATE:** | | | | | | **9.00%** |
| Source: HealthTrust | | | | | | |

**Discount Rate Derivation**

Our most recent *Senior Housing and Care Investment Survey* suggests the following ranges for discount rates in the seniors housing and nursing markets.

| | Unlevered IRR | | | Levered IRR | | |
|---|---|---|---|---|---|---|
| | **Min** | **Max** | **Average** | **Min** | **Max** | **Average** |
| IL | 8.50% | 10.50% | 9.58% | 12.75% | 15.00% | 13.85% |
| AL | 9.50% | 12.00% | 11.05% | 13.75% | 18.00% | 15.05% |
| MC | 11.00% | 14.00% | 12.42% | 14.00% | 20.00% | 16.40% |
| SN | 15.00% | 17.50% | 15.57% | 17.50% | 20.00% | 18.30% |

**2026 - Q1 SENIORS HOUSING AND CARE INVESTMENT SURVEY**

Source: HealthTrust Q1 2026 Seniors Housing and Care Investment Survey

Considering the investor surveys, we have used a 12.00% discount rate in this analysis.

**Income Assumptions and Charts**

Our assumptions for the discounted cash flow analysis and direct capitalization are presented below, followed by our discounted cash flow analysis and direct capitalization analysis:

**GLOBAL VALUATION ASSUMPTIONS**

| Saucon Valley Manor | |
|---|---|
| Revenue Growth Rate | 3.00% |
| Expense Growth Rate | 3.00% |
| Management Fee | 5.00% |
| Reserves (Capex) Per Unit | $500 |
| Stabilized Occupancy | 94% |
| Rent Loss | $0 |
| Projection Period (Yrs) | 10 |
| Capitalization Rate | 9.00% |
| Terminal Capitalization Rate | 9.50% |
| Discount Rate | 12.00% |
| Sale Costs | 2.00% |

Source: HealthTrust

| DISCOUNTED CASH FLOW ANALYSIS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | Reversion |
| **REVENUES** | | | | | | | | | | | |
| Effective Gross Rental Revenues | $10,034,688 | $10,335,729 | $10,645,800 | $10,965,175 | $11,294,130 | $11,632,954 | $11,981,942 | $12,341,401 | $12,711,643 | $13,092,992 | $13,485,782 |
| Entrance Fee Revenues | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ancillary Revenues | $275,672 | $283,942 | $292,461 | $301,234 | $310,272 | $319,580 | $329,167 | $339,042 | $349,213 | $359,690 | $370,480 |
| **TOTAL EFFECTIVE GROSS REVENUE** | $10,310,360 | $10,619,671 | $10,938,261 | $11,266,409 | $11,604,401 | $11,952,533 | $12,311,109 | $12,680,443 | $13,060,856 | $13,452,682 | $13,856,262 |
| **EXPENSES** | | | | | | | | | | | |
| Real Estate Taxes | $126,751 | $130,553 | $134,470 | $138,504 | $142,659 | $146,939 | $151,347 | $155,887 | $160,564 | $165,381 | $170,342 |
| Insurance | $333,180 | $343,176 | $353,471 | $364,075 | $374,997 | $386,247 | $397,835 | $409,770 | $422,063 | $434,725 | $447,766 |
| Utilities | $559,350 | $576,131 | $593,415 | $611,217 | $629,553 | $648,440 | $667,893 | $687,930 | $708,568 | $729,825 | $751,720 |
| Maintenance | $379,205 | $390,581 | $402,298 | $414,367 | $426,798 | $439,602 | $452,790 | $466,374 | $480,365 | $494,776 | $509,620 |
| Marketing | $409,377 | $421,658 | $434,308 | $447,337 | $460,757 | $474,580 | $488,818 | $503,482 | $518,587 | $534,144 | $550,169 |
| Bad Debt | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Administrative/General | $669,724 | $689,816 | $710,510 | $731,826 | $753,780 | $776,394 | $799,686 | $823,676 | $848,386 | $873,838 | $900,053 |
| Housekeeping/Laundry | $313,418 | $322,820 | $332,505 | $342,480 | $352,754 | $363,337 | $374,237 | $385,464 | $397,028 | $408,939 | $421,207 |
| Dietary | $1,391,113 | $1,432,847 | $1,475,832 | $1,520,107 | $1,565,710 | $1,612,682 | $1,661,062 | $1,710,894 | $1,762,221 | $1,815,087 | $1,869,540 |
| Nursing/Personal Care | $3,160,740 | $3,255,562 | $3,353,229 | $3,453,825 | $3,557,440 | $3,664,163 | $3,774,088 | $3,887,311 | $4,003,930 | $4,124,048 | $4,247,770 |
| Activities/Social | $193,547 | $199,353 | $205,334 | $211,494 | $217,838 | $224,374 | $231,105 | $238,038 | $245,179 | $252,534 | $260,110 |
| Other Payroll, Payroll Taxes and Benefits | $669,096 | $689,169 | $709,844 | $731,140 | $753,074 | $775,666 | $798,936 | $822,904 | $847,591 | $873,019 | $899,210 |
| **SUB-TOTAL OPERATING EXPENSES** | $8,205,501 | $8,451,666 | $8,705,216 | $8,966,372 | $9,235,363 | $9,512,424 | $9,797,797 | $10,091,731 | $10,394,483 | $10,706,317 | $11,027,507 |
| Management Fee | $515,518 | $530,984 | $546,913 | $563,320 | $580,220 | $597,627 | $615,555 | $634,022 | $653,043 | $672,634 | $692,813 |
| Reserve for Replacement | $84,000 | $86,520 | $89,116 | $91,789 | $94,543 | $97,379 | $100,300 | $103,309 | $106,409 | $109,601 | $112,889 |
| **TOTAL EXPENSES** | $8,805,019 | $9,069,169 | $9,341,244 | $9,621,482 | $9,910,126 | $10,207,430 | $10,513,653 | $10,829,062 | $11,153,934 | $11,488,552 | $11,833,209 |
| **NET OPERATING INCOME (EBITDAR)** | $1,505,342 | $1,550,502 | $1,597,017 | $1,644,927 | $1,694,275 | $1,745,103 | $1,797,457 | $1,851,380 | $1,906,922 | $1,964,129 | $2,023,053 |
| | | | | | | | | | | | $21,295,297 |
| | | | | | | | | | | | -$425,906 |
| | | | | | | | | | | | $20,869,391 |
| DISCOUNTED @ 12.00% | 0.89286 | 0.79719 | 0.71178 | 0.63552 | 0.56743 | 0.50663 | 0.45235 | 0.40388 | 0.36061 | 0.32197 | 0.32197 |
| **NPV SUMMARY** | $1,344,055 | $1,236,051 | $1,136,725 | $1,045,381 | $961,377 | $884,124 | $813,078 | $747,741 | $687,655 | $632,397 | $6,719,385 |

| | | | | | |
|---|---|---|---|---|---|
| Reversion Revenue | $13,856,262 | | NPV Cash Flows | | $16,207,970 |
| Reversion Expenses | $11,833,209 | | Less Deferred Maintenance: | | -$1,064,263 |
| Reversion NOI | $2,023,053 | | Plus Excess Land/CON: | | $0 |
| Terminal Rate | 9.50% | | | | |
| Reversion Value | $21,295,297 | | Discounted Cash Flow Value: | | $15,143,707 |
| Less: Broker Fee (2.00%) | -$425,906 | | | | |
| Total Reversion | $20,869,391 | | Rounded to: | | $15,100,000 |

Source: HealthTrust

| DIRECT CAPITALIZATION | | |
|---|---|---|
| **REVENUES** | | |
| | | |
| Effective Gross Rental Revenues | $10,034,688 | |
| Entrance Fee Revenues | $0 | |
| Ancillary Revenues | $275,672 | |
| **Total Effective Gross Revenue** | | $10,310,360 |
| | | |
| **EXPENSES** | | |
| Real Estate Taxes | $126,751 | |
| Insurance | $333,180 | |
| Utilities | $559,350 | |
| Maintenance | $379,205 | |
| Marketing | $409,377 | |
| Administrative/General | $669,724 | |
| Housekeeping/Laundry | $313,418 | |
| Dietary | $1,391,113 | |
| Nursing/Personal Care | $3,160,740 | |
| Activities/Social | $193,547 | |
| Other Payroll, Payroll Taxes and Benefits | $669,096 | |
| **SUB-TOTAL OPERATING EXPENSES** | | $8,205,501 |
| | | |
| Management Fee | | $515,518 |
| Reserve for Replacement | | $84,000 |
| **TOTAL EXPENSES** | 85.40% | $8,805,019 |
| | | |
| **NET OPERATING INCOME (EBITDAR)** | | $1,505,342 |
| | | |
| Capitalized @ | 9.00% | $16,726,018 |
| Less Deferred Maintenance: | | -$1,064,263 |
| Plus Excess Land/CON: | | $0 |
| Less Rent Loss | | $0 |
| Direct Capitalization Value: | | $15,661,755 |
| | | |
| **Rounded to:** | | **$15,700,000** |
| Source: HealthTrust | | |

**Income Approach Conclusion**

**As Is:** Applying a reversion capitalization rate of 9.50% and a discount rate of 12.00% to the estimated cash flows developed in this report results in a total estimated "as is" value for the subject (after deducting 2% from the reversion value for sale costs) of $15,100,000, rounded.

Alternatively, direct capitalization suggests a value of $15,700,000, rounded. Overall, we have more confidence in the market support for the direct capitalization rate than the discount rate and have placed more weight on its indication. Therefore, we have reconciled to the direct capitalization indication of $15,700,000.

## FAIR MARKET RENT ANALYSIS

At the request of the client, we have been asked to estimate the fair market rent for the subject property. The subject property is being leased to the current tenant as a result of a related party lease-back transaction involving the two parties. A summary of the lease terms is as follows:

| SUMMARY OF LEASE TERMS | |
| --- | --- |
| Landlord | Abraham R. Atiyeh |
| Tenant | Saucon Valley Manor, Inc. |
| Commencement Date | 1/1/2006 |
| Initial Term Through | 7/31/2012 |
| Initial Rent Amount | $1,149,600 |
| Current Rent | $1,440,000 |
| Renewal Options | None |
| Purchase Option | None |
| Rate Increases | None |
| Expenses | NNN |
| Source: HealthTrust | |

Lease coverage ratios above market levels, indicate lower risk to the landlord as there is more operating cash flow to cover the lease payments, while low coverage ratios indicate more risk:



To derive a fair market rent of the subject property, we have viewed senior living properties similar to that of the subject. The subject is an income-producing property, and as such, both lessor and lessee of the subject property will view the viability of the underlying business in addition to the condition and quality of the real estate.

There are two primary measures of deriving a fair market rental value. The first utilizes the application of a coverage ratio to a property's earnings before interest, taxes, depreciation, amortization and rent costs ("EBITDAR"). This method is typical for properties that are operational at the commencement of the lease. Coverage ratios will vary depending on a variety of factors, including: level of care, size, historical performance and operating margin. The other primary measure is utilized for proposed properties, or properties under construction. In this instance, rents are largely a basis of total development costs, and consistent with a real estate only value.

Given the subject's current disposition as an operational entity, we have utilized an EBITDAR Coverage Ratio (or NOI) in formulating a fair market rent of the subject property based on the income approach illustrated previously. We have researched leases of other senior housing communities throughout the country. We note that universe of arm's length leases are limited. Consequently, we have expanded our search nationally to provide the most comparable leases available. These leases are summarized as follows:

| SENIORS HOUSING LEASES | | | | |
|---|---|---|---|---|
| **Name** | **Property Type Density** | **Start Date** | **Initial Rent** | **Coverage** |
| **Location** | **(Units/Beds)** | **Initial Term (Yrs.)** | **EBITDAR** | **Rent/Density** |
| **McArthur Manor Assisted Living** | AL | 21-Jun | $487,500 | 1.13 |
| Manchester, TN | 48 | 12 | $550,000 | $10,156 |
| **Sabra, Legacy Living sale-leaseback** | IL/AL | 21-Oct | $1,822,590 | 1.20 |
| OH, KY | 113 | Not known | $2,187,108 | $16,129 |
| **Mangrove Bay** | IL/AL/MC | 22-Feb | $5,992,000 | 1.25 |
| Jupiter, FL | 160 | Not known | $7,490,000 | $37,450 |
| **The Courtyard at Oshkosh** | AL/MC | 22-Apr | $964,250 | 1.10 |
| Oshkosh, WI | 53 | 15 | $1,064,000 | $18,193 |
| **Bickford of Virginia** | AL | 22-Nov | $1,376,000 | 1.63 |
| Virginia Beach, VA | 60 | Not known | $2,236,000 | $22,933 |
| **Robinwood Landing & Preserve at Beavercreek** | MC | 23-Jun | $1,785,000 | 2.20 |
| OH & MI | 100 | 15 | $3,926,000 | $17,850 |
| **Atria Encino Terrace** | AL | 24-Jul | $780,000 | 1.43 |
| Encino, CA | 73 | 5 | $1,117,000 | $10,685 |
| **Juniper Village at Paramus** | AL/MC | 25-Mar | $3,680,850 | 1.16 |
| Paramus, NJ | 120 | 15 | $4,260,000 | $30,674 |
| **6 MC Communities - CountryHouse** | MC | 25-Apr | $5,056,000 | 1.24 |
| Nebraska | 205 | 15 | $6,250,000 | $24,663 |
| **Montage Creek** | IL/AL/MC | 25-Jan | $1,680,000 | 1.16 |
| Montrose, CO | 108 | 10 | $1,950,000 | $15,556 |

| Coverage Indications | |
|---|---|
| Median | 1.22 |
| Average | 1.35 |
| **Rent/Density Indications** | |
| Median | $18,022 |
| Average | $20,429 |

Source: HealthTrust

Overall, the foregoing properties indicate coverage ratios ranging from 1.10 to 2.20 with a median of 1.22 and an average indication of 1.35. Further, the comparables indicated an amount per bed value ranging from $10,156 to $37,450 with a median of $18,022 and an average indication of $20,429. Based on our discussions with market participants and our experience, we find that coverage ratios are largely impacted by the following:

❏ Level of Care: Higher acuity properties will warrant higher coverage ratios. This is a result of both the higher costs associated with a frailer population, but also the increased likelihood that the payor of such services will be derived from public sources.

❏ Size: Properties with fewer beds will generally warrant higher coverage ratios due to the lower economies of scale.

❏ Lease Terms: Specific lease terms will also impact the resulting coverage ratio. Specifically, the lease term, rate increases, renewal options and purchase options will all impact the initial coverage ratio. To the extent that any are viewed as being above or below typical market levels, the resulting coverage ratio accordingly. None of the comparable leases surveyed included any atypical lease terms.

❏ Additionally, while difficult to quantify, leases resulting from a transaction will generally result in lower coverage ratios than those negotiated in the absence of sale. This is a result of a transaction involving increased participants within a bidding process.

We have used our previously estimated EBITDAR, or NOI, in the following analysis. Therefore, based on the foregoing, we have reconciled to a lease coverage rate and an annual fair market rent as follows:

| FAIR MARKET RENT ANALYSIS | |
|---|---|
| Subject Stabilized NOI | $1,505,342 |
| Reconciled Market Coverage | 1.30 |
| Indicated Annual Fair Market Rent | $1,157,955 |
| Reconciled Annual Fair Market Rent | $1,160,000 |
| Per Month | $96,667 |
| Per Unit/Bed (total density) | $6,905 |
| Source: HealthTrust | |

Based on the foregoing, we have concluded to a market lease coverage rate of 1.30. Overall, the reconciled coverage ratio is similar to the median and average indications. Moreover, the average per bed indication while below the comparable range, is reasonable based on the subject's earnings ability. Thus, we find our concluded market rent estimate appropriate and have reconciled accordingly.

In conclusion, total fair market rent has been estimated at $6,905 per unit, $96,667 per month, or $1,160,000 annually. This projection is supported by the above Lease Coverage Analysis. We expect typical terms to range from 5 to 10 years with annual escalations based on CPI; however, these are both negotiable.

### SALES COMPARISON APPROACH

The sales comparison approach is predicated upon the principle of substitution that asserts that the amount a buyer will pay for a property is limited by the cost of comparable properties with similar utility. In practicality, we find that investors in the seniors housing and care space collect comparable sale data to act as a rough gauge of reasonableness, as the myriad of differences between properties do not facilitate recognizable adjustments.

To apply this approach in the analysis, we have selected sales of communities throughout the nation, as this type of property (senior housing or healthcare usage) does not transfer frequently. In fact, the Q4 2025 edition of the NIC MAP® Sales Transactions Report indicates only 445 properties traded in the past quarter across the nation (combined seniors housing and nursing care), down 8% from a year ago. Over the last 12 months, over 1,833 properties have traded including portfolio transactions, sale-leasebacks and distressed dispositions. LevinPro LTC reports only 875 sales of seniors housing and care properties in 2025, up from 721 in 2024. We find that in any given year, most states have, at best, one arms' length, non-distressed transaction. NIC MAP reports the following distribution:



Source: NIC MAP Transaction Monitor Q4 2025

Therefore, from the hundreds of sales in our proprietary HealthComps® database, we have focused our search and selected properties based on the following criteria:

- ☐ Geography: Within 500 miles of the subject
- ☐ Property Type: Assisted living and memory care communities
- ☐ Asset Class: Class C to Class B+ properties
- ☐ Sale Date: Transaction closed in the previous two years

Although we have attempted to select sales most like the subject, significant differences remain between the subject and these properties. Consequently, when comparing the sales based on price per bed, or unit (the most consistent unit of measure), transaction prices will be affected by many variables such as:

**Interest:** The first element that requires consideration is the interest appraised. A property that is leased to a third-party operator or encumbered by a ground lease will not include the same bundle of rights as one that does. To the extent that the interest of the comparable property differs from that we are appraising in the subject, we have adjusted.

**Financing/Conditions of Sale:** Favorable financing or unusual conditions of sale (such as assemblage, seller duress, related parties, sale lease- or sale management-back, etc.) can impact the sales price of a property.

**Time/Market Conditions:** The time adjustment reflects changes in market conditions (e.g., supply, demand, macroeconomic conditions) between those existing at the time of sale and those as of the effective date of appraisal. Statistical data gathered and contained in our proprietary database (HealthComps®) has been tracked over the past 10 years and is presented below. On a per bed basis, LevinPro LTC suggests SNF values hit a peak at nearly $124,000 per bed Q1 2025 but have dropped to $85,000-90,000 per bed for the following three quarter. Seniors housing communities, according to LevinPro LTC spiked by 60% from 2024 to 2025 with an average price of $267,000. NIC MAP® reports per unit values for seniors housing are up 28% over the prior 12 months while per-bed prices for skilled nursing facilities are 76% higher than a year ago. Our data suggests that the seniors housing transactions that closed in in 2025 suggest values are 22% above the average price in 2024 while skilled nursing values are up 20%. LevinPro LTC suggests appreciation of 60% for seniors housing and 26% for skilled nursing while NICMAP® indications for seniors are closer to ours at 29% but well above LevinPro LTC for skilled nursing at 49%:



Source: HealthTrust

**Location:** Location factors such as visibility, access, size of market (including regional, local, rural, metropolitan buyer perceptions) and neighborhood composition often will impact the selling price.

**Occupancy:** Effective gross income and profit margins will be directly impacted by a property's historical, and potential occupancy levels. Whether a property has maintained a stabilized occupancy at the time of sale will have a material impact on a selling price.

**Age:** Our research for the American Senior Housing Association concluded that the age of a community has a significant impact on sale price and capitalization rates. As the remaining economic life of an asset decreases, the price per unit typically decreases, reflecting the risk associated with an older property that may suffer competitive disadvantages due to its failure to keep up with recent development trends as well as higher maintenance. Seniors housing communities demonstrate the following relationship as evidenced by transactions database:



Source: HealthTrust

**Census:** Properties that sell with a high quality mix are typically more desirable than those with low quality mixes due to profitability margins. Census is more relevant when analyzing long term care, and to some extent assisted living transactions.

**Size:** The relative size of a property (total number of units/beds) should be considered relative to the economies of scale, or the tendency for larger assets to sell for less than smaller assets on a price per square foot, or per unit/bed basis.

Investors purchase and sell seniors housing communities based on the number of units because the number of beds can vary daily with turnover and deaths, the number of couples and the demand for lower-priced, shared units. Walls do not move and typically, shared occupancy does not impact the bottom line as the fee for a second person is primarily designed to cover the increased variable costs.

Therefore, we analyze seniors housing communities based on total units while using set-up bed capacity for skilled nursing properties

The selected sales are described in summary on the following pages along with a map identifying the location of each property. Complete detailed sale information has been provided in the Addenda of this report.

**IMPROVED SALES MAP**

The subject is depicted by the orange pin while the comparables are shown by colored circles.

| Sale No. | Name/Location | Date | No. Units/Beds | Year Built | Sale Price | $/Unit | NOI/Unit | Occ. | OAR |
|---|---|---|---|---|---|---|---|---|---|
| | **SENIOR HOUSING/HEALTHCARE TRANSACTIONS** | | | | | | | | |
| 1 | Confidential Pending IL/AL/MC N/A, Pennsylvania | Feb-26 | 90 | 2001 | $11,375,000 | $126,389 | $15,457 | 85% | 12.23% |
| 2 | Walden Place Cortland, New York | Sep-25 | 80 | 2001 | $8,500,000 | $106,250 | $10,286 | 73% | 9.68% |
| 3 | Legacy at Maiden Park Rochester, New York | Jan-25 | 78 | 2016 | $6,955,000 | $89,167 | $4,429 | 79% | 4.97% |
| 4 | Four IL/AL/MC PA-NJ Milford, Pennsylvania | Dec-25 | 389 | 1977 | $55,000,000 | $141,388 | $13,199 | 97% | 9.34% |
| 5 | Brandywine Living at Senior Suites Norristown, Pennsylvania | Jun-24 | 114 | 1988 | $8,650,000 | $75,877 | $16,436 | 71% | 21.66% |
| Source: HealthTrust | | | | | | | | | |

**Sales Comparison Approach – Matrix Adjustments**

In this Sales Grid Analysis, we have adjusted the comparables based on elements of comparison, including size, location, quality, and economic characteristics.

The direction and magnitude of adjustments in this approach are based on a comparison of published indices observed differences between properties included in our database, HealthComps®. Further, we have examined arm's length transactions that have occurred over the last five years. This evidence-based analysis of the sales data permits supported adjustments to the comparable sales with respect to the subject property.

***Transactional Adjustments:*** This category includes adjustments to the comparable sales for differences in interest appraised, financing, conditions of sale and market conditions. A summary is as follow:

| IMPROVED SALES GRID ANALYSIS - INTEREST, FINANCING, SALE CONDITIONS & MARKET CONDITION ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
| NAME/ATTRIBUTES | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| INTEREST APPRAISED | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| SALE DATE | - - - | Feb-26 | Sep-25 | Jan-25 | Dec-25 | Jun-24 |
| SALE PRICE | - - - | $11,375,000 | $8,500,000 | $6,955,000 | $55,000,000 | $8,650,000 |
| PRICE PER DENSITY | - - - | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| **ADJUSTMENTS** | | | | | | |
| INTEREST APPRAISED | | 0% | 0% | 0% | 0% | 0% |
| ADJUSTED INDICATION | | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| FINANCING | | 0% | 0% | 0% | 0% | 0% |
| ADJUSTED INDICATION | | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| CONDITIONS OF SALE | | 0% | 0% | 0% | 0% | 0% |
| ADJUSTED INDICATION | | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| MARKET CONDITIONS | | 0% | 0% | 0% | 0% | 0% |
| ADJUSTED INDICATION | | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| Source: HealthTrust | | | | | | |

Three data sources (HealthTrust, LevinPro LTC and NIC MAP) all suggest that prices in 2025 are at least 20% higher than they were in 2024. For seniors housing, we expect that the convergence of expanding margins/growing profits with expected cuts in the federal funds rate to lead to rising values throughout 2026. We have adjusted the comparable sales accordingly. For skilled nursing, the reliance on government funding and a limited labor pool do not allow the same broadly available opportunity to increase operating income. Nonetheless, as America ages and the number of nursing homes continues to decline, demand for skilled nursing facilities remains robust and we expect valuations to at least remain stable with the 2025 pricing.

***Size Adjustments:*** For this category, size adjustments reflect both the number of units or beds at each comparable relative to the subject as well as the transaction type, i.e., whether it occurred as a single-asset transaction (SAT) or a multiple asset transaction (MAT).

Note that for seniors housing communities, investors generally view properties on a per-unit basis, as the number of beds can fluctuate daily. Further, we find that the revenue stream of the second residents is largely offset by the expenses incurred to support that resident. As such, an increase in the number of beds does not have a corresponding impact on the property's value.

Based on our analysis of the sales data in HealthComps®, the larger properties sell for more on a per unit basis, on average, than smaller ones due to economies of scale in operations:

| PRICE/DENSITY MATRIX | | | |
|---|---|---|---|
| | **Comparables** | | |
| Size | Less than 60 | 60 - 180 | More than 180 |
| **Subject** Less than 60 | 0% | -10% | -25% |
| 60 - 180 | 10% | 0% | -20% |
| More than 180 | 35% | 25% | 0% |
| Source: HealthComps™; indications rounded to nearest 5% | | | |

We also find that buyers will pay a slight premium for a portfolio, as there are economies of scale in the due diligence and closing costs that offset the slightly higher per-unit price. Based on the sales in HealthComps®, we have measured this difference as shown:

| TRANSACTION TYPE MATRIX | | |
|---|---|---|
| | **Comparables** | |
| Type | MAT | SAT |
| **Subject** MAT | 0% | 15% |
| SAT | -15% | 0% |
| Source: HealthComps™; indications rounded to nearest | | |

After we adjusted the sales for property size and transaction type, we averaged the adjustments to reach an overall size adjustment:

| IMPROVED SALES GRID ANALYSIS - SIZE ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
| NAME/ATTRIBUTES | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| TRANSACTION TYPE | SAT | SAT | SAT | SAT | MAT | SAT |
| NO. IL UNITS | 0 | 32 | 0 | 0 | 101 | 0 |
| NO. AL UNITS | 81 | 49 | 60 | 78 | 217 | 73 |
| NO. MC UNITS | 87 | 9 | 20 | 0 | 71 | 41 |
| NO. SN BEDS | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DENSITY | 168 | 90 | 80 | 78 | 389 | 114 |
| **ADJUSTMENTS** | | | | | | |
| SIZE | | | | | | |
| Density | | 0% | 0% | 0% | -20% | 0% |
| Transaction Type | | 0% | 0% | 0% | -15% | 0% |
| Concluded Size Adjustment | | 0% | 0% | 0% | -20% | 0% |
| Source: HealthTrust | | | | | | |

***Location Adjustments:*** Our location adjustments reflect a blend of the observed differences of wage index (as of the Fiscal Year 2026 final rule), market type (Primary, Secondary and Tertiary) and housing index (provided by Federal Housing Finance Agency (FHFA) as of Q2 2025). We believe that these two factors best relate to differences in wages for staff and the rents a property can command (noting that the sale of a home often funds a seniors' residency).

Additionally, we note that many investors not only view rural locations are riskier, but state their desire is for barrier-to-entry locations, typically in the largest metro areas. To best capture this variable, we have adjusted the sales based on the NIC MAP® Data Service market classifications. Primary is defined as being in the 31 largest Metropolitan Statistical Areas (MSAs), noting that there are multiple CBSAs in some MSAs (Boston, New York, etc.). Secondary markets are in the remaining defined CBSAs, while remaining markets are considered Tertiary, or non-urban areas. Average price/unit indications by market type and resulting adjustments are as follows:

| MARKET TYPE MATRIX | | | |
|---|---|---|---|
| | **Comparables** | | |
| *Size* | *Primary* | *Secondary* | *Tertiary* |
| *Primary* | 0% | 15% | 75% |
| *Secondary* | -10% | 0% | 55% |
| *Tertiary* | -45% | -35% | 0% |

Source: HealthComps™; indications rounded to nearest 5%

Like the size adjustment, we have averaged the three indications to a single location adjustment:

| IMPROVED SALES GRID ANALYSIS - LOCATION ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
| NAME/ATTRIBUTES | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| | Hellertown,Pennsylvania | N/A, Pennsylvania | Cortland, New York | Rochester, New York | Milford, Pennsylvania | Norristown, Pennsylvania |
| MSA | Allentown-Bethlehem-Easton, PA-NJ | Reading, PA | New York | Rochester, NY | Pennsylvania | Montgomery County-Bucks County-Chester County, PA |
| WAGE INDEX | 1.0016 | 1.02 | 0.89 | 0.94 | 0.85 | 0.97 |
| HOUSING INDEX | 328.04 | 313.84 | 426.65 | 310.82 | 372.88 | 355.86 |
| MARKET TYPE | Secondary | Secondary | Tertiary | Secondary | Tertiary | Primary |
| **ADJUSTMENTS** | | | | | | |
| **LOCATION** | | | | | | |
| *Wage Index* | | 0% | 10% | 5% | 15% | 5% |
| *Market Type* | | 0% | 55% | 0% | 55% | -10% |
| *Housing Index* | | 5% | -25% | 5% | -10% | -10% |
| *Concluded Location Adjustment* | | 0% | 15% | 5% | 20% | -5% |
| Source: HealthTrust | | | | | | |

**Quality Adjustments:** We have viewed composite averages of various quality ratings in the construction of seniors housing properties, as provided by *Marshall Valuation Service* and used the difference as one measure of quality. In addition, we have also viewed investment class, which is a common classification among senior housing asset classes, though generally more subjective in nature. Again, we have used the price per unit indications among transactions in HealthComps® on a continuum of excellent (A) to fair (D) to support our adjustments.

| INVESTMENT CLASS MATRIX | | | | | |
|---|---|---|---|---|---|
| | _Comparables_ | | | | |
| _Investment Class_ | _A_ | _B+_ | _B-_ | _C_ | _D_ |
| A | 0% | 55% | 145% | 300% | 560% |
| B+ | -35% | 0% | 55% | 155% | 320% |
| B- | -60% | -35% | 0% | 65% | 170% |
| C | -75% | -50% | -30% | 0% | 65% |
| D | -85% | -75% | -65% | -30% | 0% |

(Left axis label: _Subject_)

Source: HealthComps™; indications rounded to nearest 5%

We have used the average of these two factors as the concluded quality adjustment for each comparable:

| IMPROVED SALES GRID ANALYSIS - QUALITY ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
| NAME/ATTRIBUTES | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| CONSTRUCTION QUALITY | Average | Good | Above Average | Above Average | Good | Above Average |
| INVESTMENT CLASS | C | B- | B- | C | B+ | B- |
| **ADJUSTMENTS** | | | | | | |
| QUALITY | | | | | | |
| _Construction Quality_ | | -18% | -10% | -10% | -18% | -10% |
| _Investment Class_ | | -30% | -30% | 0% | -50% | -30% |
| _Concluded Quality Adjustment_ | | -25% | -20% | -5% | -35% | -20% |

Source: HealthTrust

**_Occupancy:_** We view material differences in occupancy – due to management or market competition - between the subject property and the comparables can impact value. Stabilized properties have less risk than those that are not and will command higher prices. Based on the sales in our database, this difference becomes measurable at occupancy levels below and above 75%, as seen:

| OCCUPANCY MATRIX | | |
|---|---|---|
| | _Comparables_ | |
| _Occupancy_ | _Less than 75%_ | _75% and up_ |
| _Less than 75%_ | 0% | -20% |
| _75% and up_ | 30% | 0% |

(Left axis label: _Subject_)

Source: HealthComps™; indications rounded to nearest

We have concluded to the following economic adjustments:

| IMPROVED SALES GRID ANALYSIS - ECONOMIC ADJUSTMENTS | | | | | | |
|---|---|---|---|---|---|---|
| | SUBJECT | 1 | 2 | 3 | 4 | 5 |
| NAME/ATTRIBUTES | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| OCCUPANCY @ SALE | 94% | 85% | 73% | 79% | 97% | 71% |
| ECONOMIC (OCCUPANCY) | | | | | | |
| _Concluded Economic Adjustment_ | | 0% | 10% | 0% | 0% | 10% |

Source: HealthTrust

We found no other differences between the subject and the sales set either significant enough to warrant adjustment or having sufficient empirical data to support an adjustment. Hence, there are no other adjustments made to the data set.

A summary of our adjustments and conclusion are as follows:

| IMPROVED SALES GRID ANALYSIS - MATRIX GRID | | | | | | |
|---|---|---|---|---|---|---|
| | **SUBJECT** | **1** | **2** | **3** | **4** | **5** |
| **NAME/ATTRIBUTES** | Saucon Valley Manor | Confidential Pending IL/AL/MC | Walden Place | Legacy at Maiden Park | Four IL/AL/MC PA-NJ | Brandywine Living at Senior Suites |
| MSA | Allentown-Bethlehem-Easton, PA-NJ | Reading, PA | New York | Rochester, NY | Pennsylvania | Montgomery County-Bucks County-Chester County, PA |
| WAGE INDEX | 1.0016 | 1.02 | 0.89 | 0.94 | 0.85 | 0.97 |
| HOUSING INDEX | 328.04 | 313.84 | 426.65 | 310.82 | 372.88 | 355.86 |
| MARKET TYPE | Secondary | Secondary | Tertiary | Secondary | Tertiary | Primary |
| TRANSACTION TYPE | SAT | SAT | SAT | SAT | MAT | SAT |
| YEAR BUILT | 1930 | 2001 | 2001 | 2016 | 1977 | 1988 |
| CONSTRUCTION QUALITY | Average | Good | Above Average | Above Average | Good | Above Average |
| INVESTMENT CLASS | C | B- | B- | C | B+ | B- |
| INTEREST APPRAISED | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| OCCUPANCY @ SALE | 94% | 85% | 73% | 79% | 97% | 71% |
| OVERALL CAPITALIZATION RATE | - - - | 12.23% | 9.68% | 4.97% | 9.34% | 21.66% |
| EGIM | - - - | 2.03 | 1.89 | N/A | 1.95 | 1.13 |
| EXPENSE RATIO | 85% | 75% | 82% | N/A | 82% | 76% |
| NO. IL UNITS | 0 | 32 | 0 | 0 | 101 | 0 |
| NO. AL UNITS | 81 | 49 | 60 | 78 | 217 | 73 |
| NO. MC UNITS | 87 | 9 | 20 | 0 | 71 | 41 |
| NO. SN BEDS | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL DENSITY | 168 | 90 | 80 | 78 | 389 | 114 |
| LAND AREA (AC) | 2.61 | N/A | 4.88 | 6.22 | 0.74 | 5.27 |
| GROSS BUILDING AREA (SF) | 170,590 | 77,320 | 39,737 | 51,978 | 47,800 | 81,610 |
| GBA per UNIT/BED | 1015 | 859 | 497 | 666 | 123 | 716 |
| SALE DATE | - - - | Feb-26 | Sep-25 | Jan-25 | Dec-25 | Jun-24 |
| SALE PRICE | - - - | $11,375,000 | $8,500,000 | $6,955,000 | $55,000,000 | $8,650,000 |
| PRICE PER DENSITY | - - - | $126,389 | $106,250 | $89,167 | $141,388 | $75,877 |
| **TRANSACTIONAL ADJUSTMENT SUMMARY** | | | | | | |
| *Interst* | | 0% | 0% | 0% | 0% | 0% |
| *Financing/Conditions of Sale* | | 0% | 0% | 0% | 0% | 0% |
| *Market Conditions* | | 0% | 0% | 0% | 0% | 0% |
| **ADJUSTMENT SUMMARY** | | | | | | |
| *Concluded Size Adjustment* | | 0% | 0% | 0% | -20% | 0% |
| *Concluded Location Adjustment* | | 0% | 15% | 5% | 20% | -5% |
| *Concluded Quality Adjustment* | | -25% | -20% | -5% | -35% | -20% |
| *Concluded Economic Adjustment* | | 0% | 10% | 0% | 0% | 10% |
| OTHER | | 0% | 0% | 0% | 0% | 0% |
| **NET ADJUSTMENT** | | **-25%** | **5%** | **0%** | **-35%** | **-15%** |
| **INDICATED VALUE** | | **$94,792** | **$111,563** | **$89,167** | **$91,902** | **$64,496** |

| **INDICATORS:** | | | **VALUATION SUMMARY** | |
|---|---|---|---|---|
| AVERAGE SIZE OF ADJUSTMENT: | -14% | | **168** | DENSITY |
| MINIMUM: | $64,496 | | **$92,000** | TIMES $/UNIT |
| MAXIMUM: | $111,563 | | **$15,456,000** | EQUALS |
| MEDIAN: | $91,902 | | **$15,500,000** | ROUNDED |
| AVERAGE: | $90,384 | | | |
| STD. DEVIATION: | $16,896 | | | |
| RECONCILED VALUE: | **$92,000** | | | |
| Source: HealthTrust | | | | |

**Sales Comparison Approach Conclusion**

The reconciled value via the sales comparison approach is presented in the following table:

## SALES COMPARISON CONCLUSION

**Sales Grid Analysis**

| Total Density | | Value/Density | | Value |
|---|---|---|---|---|
| Matrix Grid | | | | |
| 168 | X | $92,000 | = | $15,456,000 |

**Reconciled Value**

| | |
|---|---|
| Indicated Value Reconciled to: | $15,500,000 |
| Less Deferred Maintenance | -$1,064,263 |
| Plus Excess Land/CON | $0 |
| Less Rent Loss | $0 |
| Total | $14,435,737 |
| | |
| Final Value Conclusion | $14,400,000 |

Source: HealthTrust

## RECONCILIATION AND FINAL VALUE ESTIMATES

The purpose of this appraisal is to provide a third-party opinion of the market value of the subject of the fee simple interest in the subject. We have applied two approaches to estimate the subject's value. The value estimates provided by these approaches are:

| VALUATION SUMMARY | |
|---|---|
| **Value Indication(s)** | |
| | As-Is |
| | 10-Mar-2026 |
| The Cost Approach  - Fee Simple | N/A |
| The Income Approach - Fee Simple | $15,700,000 |
| The Sales Approach  - Fee Simple | $14,400,000 |
| **Value Conclusion(s)** | |
| Market Value of the Going Concern | $15,700,000 |

The subject property was constructed in 1930 and is operated as a going concern. We find that investors rarely rely on the cost approach and given the subject's age, lack of market support for depreciation estimates and the fact that the property is income producing, we have not included the Cost Approach in our estimates. Further, we find that investors place more weight on replacement cost indications, as it provides a more relevant data point to juxtapose to the sustainability of the income approach conclusion. We note that we have considered the subject's replacement cost in our insurable value estimate. For this we have relied on the Marshall and Swift Manual as well as cost comparables from our database, HealthComps.

We used the Income Approach to estimate the present value of the cash flows generated by the subject's operation. Our estimates of revenues and expenses reflect the performance of numerous comparable properties and are well supported. The going-in/terminal capitalization and discount rates used are extracted from the market and reflect the subject's financing terms. This approach has the most support from the market and best reflects the way the probable purchaser would examine the subject; that is, because senior housing and healthcare assets are income-producing properties, a buyer will most strongly consider the cash flows that an asset can generate. The income approach is thus the most reliable and has been accorded the most weight for our valuation analysis. We typically employ direct capitalization and discounted cash flow methods, weight the strengths of each, and reconcile accordingly.

The Sales Comparison Approach includes five sales of senior housing/healthcare assets that have transferred recently. Unlike other asset types, this sector generally has few arms' length transactions in any given year and rarely do those occur in the subject's state, never mind market. Other differences would include the level of care, the quality and condition of the improvements and the competitive market's balance of supply and demand. We find that investors only use comparable sales as a rough gauge of reasonableness. Ultimately, they are buying cash flows, not buildings, and there are insufficient sales to derive market-supported adjustments for all the variances that exist. Consequently, this approach is used as a sensitivity against the income approach but receives no weight in our reconciliation.

**Asset Value Allocation**

According to the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation, it is necessary to identify any personal property, trade fixtures or intangible items that are not real property but are included in the appraisal. Business value or "intangible assets" is generally created when a property such as the subject has achieved stabilized operations.

An Assisted Living/Memory Care Residence is a unique property because it contains elements of all three types of values. It is often very difficult to separate the going concern business value from the real estate value, for example, because neither can exist without the other. However, we have attempted to allocate the relative contribution values of the real property, personal property and intangible assets as a going concern.

Several schools of thought exist about how these components are allocated. Hotel appraisers will typically deduct a franchise fee paid for the use of a brand name (i.e., Marriott, Ritz Carlton, Hilton, etc.), and a passive management fee of say 3.0% to 5.0% from gross revenue to derive NOI that is capitalized into a business value. Others have advocated numerous other deductions for work force in place, original cost to hire and train the work force, and other intangibles that should be deducted from the going concern to isolate the value of the real estate only. We understand this methodology has had very limited success in the courts thus far. A course offered by the Appraisal Institute (Course 800) was based on similar theories. However, it was so controversial that the Appraisal Institute suspended teaching the course in 2007. We have attempted to allocate the values to each of the components through a combination of methods (Lease Coverage, Management Residual), thus reconciling to a final allocation for each component.

**Personal Property Allocation:** First, we have derived the allocation for personal property via a Cost Approach method. A summary of replacement cost new of the subject's personal property and forecasted depreciation is as follows:

| PERSONAL PROPERTY ALLOCATION | |
|---|---|
| Personal Property New | $2,520,000 |
| Effective Age | 6 |
| Economic Life | 12 |
| Depreciation % | 50.00% |
| Depreciation $ | $1,260,000 |
| Net Value of Personal Property | $1,260,000 |
| Rounded | $1,260,000 |
| Source: HealthTrust | |

**Lease Coverage Method:** In this case, we begin with the total estimated NOI of the going concern, as estimated in our valuation analysis. From this, we apply a market lease coverage ratio to allocate the cash flows specific to the real estate component of the subject property. Please note that this analysis assumes the subject is currently an unencumbered property, and entering into a NNN lease agreement as of the respective date of value. Market lease coverage will vary dependent on several factors, including level of care, lease term, escalations, etc.

Due to the infrequency of arm's length leases in the subject's regional location, our search was expanded to seniors housing communities throughout the United States. These leases are summarized as follows:

| SENIORS HOUSING LEASES | | | | |
|---|---|---|---|---|
| **Name** | **Property Type** **Density** | **Start Date** | **Initial Rent** | **Coverage** |
| **Location** | **(Units/Beds)** | **Initial Term (Yrs.)** | **EBITDAR** | **Rent/Density** |
| **McArthur Manor Assisted Living** | AL | 21-Jun | $487,500 | 1.13 |
| Manchester, TN | 48 | 12 | $550,000 | $10,156 |
| **Sabra, Legacy Living sale-leaseback** | IL/AL | 21-Oct | $1,822,590 | 1.20 |
| OH, KY | 113 | Not known | $2,187,108 | $16,129 |
| **Mangrove Bay** | IL/AL/MC | 22-Feb | $5,992,000 | 1.25 |
| Jupiter, FL | 160 | Not known | $7,490,000 | $37,450 |
| **The Courtyard at Oshkosh** | AL/MC | 22-Apr | $964,250 | 1.10 |
| Oshkosh, WI | 53 | 15 | $1,064,000 | $18,193 |
| **Bickford of Virginia** | AL | 22-Nov | $1,376,000 | 1.63 |
| Virginia Beach, VA | 60 | Not known | $2,236,000 | $22,933 |
| **Robinwood Landing & Preserve at Beavercreek** | MC | 23-Jun | $1,785,000 | 2.20 |
| OH & MI | 100 | 15 | $3,926,000 | $17,850 |
| **Atria Encino Terrace** | AL | 24-Jul | $780,000 | 1.43 |
| Encino, CA | 73 | 5 | $1,117,000 | $10,685 |
| **Juniper Village at Paramus** | AL/MC | 25-Mar | $3,680,850 | 1.16 |
| Paramus, NJ | 120 | 15 | $4,260,000 | $30,674 |
| **6 MC Communities - CountryHouse** | MC | 25-Apr | $5,056,000 | 1.24 |
| Nebraska | 205 | 15 | $6,250,000 | $24,663 |
| **Montage Creek** | IL/AL/MC | 25-Jan | $1,680,000 | 1.16 |
| Montrose, CO | 108 | 10 | $1,950,000 | $15,556 |

| Coverage Indications | |
|---|---|
| Median | 1.22 |
| Average | 1.35 |
| **Rent/Density Indications** | |
| Median | $18,022 |
| Average | $20,429 |

Source: HealthTrust

| SKILLED NURSING LEASES | | | | |
|---|---|---|---|---|
| **Name** | **Property Type** Density | **Start Date** | **Initial Rent** | **Lease Coverage** |
| **Location** | **(Units/Beds)** | **Initial Term (Yrs.)** | **EBITDAR** | **Rent/Density** |
| **3 SNFs, VA & NC** | SNF | 19-Jul | $2,365,500 | 1.45 |
| VA & NC | 320 | Not known | $3,430,000 | $7,392 |
| **Cascadia of Nampa** | SNF | 19-Jul | $1,450,000 | 1.45 |
| Nampa, ID | 120 | 12 | $2,100,000 | $12,083 |
| **River Hills Health and Rehab** | SNF | 20-Apr | $900,000 | 2.24 |
| OH, KY | 150 | 20 | $2,012,462 | $6,000 |
| **Confidential SNF** | SNF | 20-May | $665,000 | 1.45 |
| Indiana | 130 | Not known | $965,000 | $5,115 |
| **Buena Vista Care Center** | SNF | 21-Mar | $1,500,000 | 1.40 |
| Santa Barbara, CA | 150 | 4 | $2,100,000 | $10,000 |
| **16 SNFs - GA, KS, IL - Mission Health** | SNF | 22-Jan | $5,000,000 | 1.93 |
| GA, KS, IL | 933 | Not known | $9,649,000 | $5,359 |
| **Ennis Care Center** | SNF | 22-Feb | $815,000 | 1.41 |
| Ennis, TX | 155 | Not known | $1,151,800 | $5,258 |
| **South IL SNFs (5)** | SNF | 22-Mar | $3,600,000 | 1.45 |
| IL | N/A | Not known | $5,220,000 | --- |
| **Bridgemoor Transitional Care (4)** | SNF | 22-Apr | $4,150,000 | 1.38 |
| Various, TX | 339 | 10 | $5,720,000 | $12,242 |
| **Millers' Merry Manor (19)** | AL/SNF | Nov-22 | $9,500,000 | 1.56 |
| Indiana | 1,790 | 7 | $14,801,699 | $5,307 |
| **SNF Katy, TX** | SNF | Jun-23 | $1,400,000 | 1.43 |
| Katy, TX | 125 | 15 | $1,995,000 | $11,200 |
| **3 skilled nursing facilities** | SNF | Mar-24 | $5,000,000 | 1.42 |
| Houston, TX & Columbia MO | 234 | Not known | $7,100,000 | $21,368 |
| **Hathorn Hill** | SNF | Aug-24 | $2,000,000 | 1.42 |
| Danvers, MA | 234 | 4 | $2,350,000 | $21,368 |

| Lease Coverage Indications | |
|---|---|
| Median | 1.45 |
| Average | 1.54 |
| **Rent/Density Indications** | |
| Median | $8,696 |
| Average | $10,224 |

Source: HealthTrust

While the leases report a range of rates on a lease coverage (EBITDAR/Rent) basis to an amount per unit, we find that most seniors housing lease coverage ratios fall typically between 1.10 to 1.25 with a mean of 1.35 and a median of 1.22. Skilled nursing facilities display a typical range of ratios of 1.30 to 1.60 with a mean and median of 1.54 and 1.45, respectively. Based on the foregoing, we have concluded to a market lease coverage rate of 1.30 to derive income attributable to the real estate.

Next, we have applied a leased fee capitalization rate to derive a real estate value allocation. Leased fee capitalization rates will generally vary from 6% to 11%, generally derived by a spread relative to the going concern capitalization rate, amounting to a 100 to 500 basis point reduction, dependent on asset type and lease coverage. Arm's length leased fee transactions are atypical in the market, though we have identified several national sales that have occurred over the last few years.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **SUMMARY OF LEASED FEE RATES** | | | | | | | |
| Property | Location | Property Type | Sale Date | Sale Price | Initial Lease Rate | Lease Coverage | LFee Cap Rate |
| Baxter Senior Living | Anchorage, AK | AL | 21-May | $32,500,000 | $2,437,500 | 1.14 | 7.50% |
| McArthur Manor Assisted Living | Manchester, TN | AL | 21-Jun | $6,500,000 | $487,500 | 1.13 | 7.50% |
| Sabra, Legacy Living sale-leaseback | Jasper, IN | IL/AL | 21-Oct | $26,300,000 | $1,822,590 | 1.20 | 6.93% |
| 16 SNFs - GA, KS - Mission Health | GA, KS | SNF | 22-May | $59,000,000 | $5,000,000 | 1.93 | 8.47% |
| Mangrove Bay | Jupiter, FL | IL/AL/MC | 22-Feb | $107,000,000 | $5,992,000 | 1.25 | 5.60% |
| Ennis Care Center | Ennis, TX | SNF | 22-Feb | $8,860,000 | $815,000 | 1.41 | 9.20% |
| Imboden Creek Living Center | Decatur, IL | IL/AL/SNF | 22-Mar | $13,020,000 | $1,240,000 | 1.26 | 9.52% |
| South IL SNFs (5) | IL | SNF | 22-Mar | $26,100,000 | $3,600,000 | 1.45 | 13.79% |
| Bridgemoor Transitional Care (4) | Various, TX | SNF | 22-Apr | $52,000,000 | $4,150,000 | 1.38 | 7.98% |
| The Courtyard at Oshkosh | Oshkosh, WI | AL/MC | 22-Apr | $13,300,000 | $964,250 | 1.10 | 7.25% |
| Bickford of Virginia | Virginia Beach, VA | AL | 22-Nov | $17,200,000 | $1,376,000 | 1.63 | 8.00% |
| SNF Katy, TX | Katy, TX | SNF | 23-Jun | $14,250,000 | $1,400,000 | 1.43 | 9.82% |
| 3 skilled nursing facilities | Houston, TX | SNF | 24-Mar | $55,540,000 | $5,000,000 | 1.42 | 9.00% |
| Atria Encino Terrace | Encino, CA | AL | 24-Jul | $10,000,000 | $780,000 | 1.43 | 7.80% |
| CareTrust REIT 46-Property Portfolio | Midwest | AL/SN | 24-Dec | $97,000,000 | $10,670,000 | N/A | 11.00% |
| Strawberry Fields MO 8 | Missouri | SNF | 24-Dec | $87,500,000 | $8,900,000 | N/A | 10.17% |
| Strawberry Fields KS 5 SNF 1 AL | Kansas | AL/SN | 24-Dec | $24,000,000 | $2,400,000 | N/A | 10.00% |
| Juniper Village at Paramus | Paramus, NJ | AL/MC | 25-Mar | $46,300,000 | $3,680,850 | N/A | 7.95% |
| 9 SNFs | United States | SNF | 25-May | $59,000,000 | $6,100,000 | N/A | 10.34% |
| 10 SNFs | ID, OR & WA | SNF | 25-Jun | $146,000,000 | $13,140,000 | N/A | 9.00% |

| Indications | | |
|---|---|---|
| Min | 1.10 | 5.60% |
| Max | 1.93 | 13.79% |
| Median | 1.40 | 8.74% |
| Average | 1.37 | 8.84% |
| SNF Average | 1.50 | 9.88% |
| SH Average | 1.27 | 7.32% |

Source: HealthTrust

Lastly, we find it appropriate to view other asset classes in commercial real estate to identify current spreads and relative risk rates. Accordingly, multifamily provides a valid basis for which to make comparisons to seniors housing. Multifamily can be easily juxtaposed to seniors housing, with the primary differences being the absence of the more intensive FF&E and Business/Hospitality components. CBRE's Multifamily Cap Rate Report (H2 2025) notes the following cap rate indications for multifamily:



Additionally, NIC MAP reports the following spreads of seniors housing relative to multifamily (most recent available):



Finally, NIC MAP reports the following spreads of seniors housing and care properties (rolling four quarters through Q4 2025):



Source: NIC MAP® Monitor Q4 2025

Based on the foregoing, we have used a real estate capitalization rate of 8.00%. Finally, we will deduct the resulting real estate value indication and the personal property value (which was derived in our Cost Approach) to conclude to an indicated Business Value allocation for this method.

**Management Residual Method:** This is a simplistic version of the Income Residual Method whereby we use and assume the management fee reflects the revenue attributable to the business entity. We thus apply a revenue multiple to the management fee to derive a value. The shortfall to the methodology is due to the lack of management company-only transactions occurring in the market. However, there have been a few transactions that have occurred over the last several years, consisting of portfolio companies and including some partial interest sales. A summary of portfolio transactions and the resulting terms is summarized below:

| MANAGEMENT COMPANY TRANSACTIONS | | | | | |
|---|---|---|---|---|---|
| **Target** | **Acquirer** | **Sale Date** | **Sale Price** | **Interest** | **Revenue Multiplier** |
| Greystone Senior Living | Sunrise | Jun-05 | $46,000,000 | 100% | N/A |
| ManorCare | HCP | Dec-10 | $95,000,000 | 10% | 1.96 |
| Genesis | Health Care REIT | Mar-11 | $47,000,000 | 10% | 2.64 |
| Horizon Bay | Brookdale | Sep-11 | $47,000,000 | 10% | 1.77 |
| Premiera Care | West Living | Apr-12 | $1,200,000 | 100% | 1.56 |
| Sun Healthcare | Gensis | Jun-12 | $270,000,000 | 100% | 1.72 |
| Sunrise (KKR) | KKR/Beecken Petty/Coastwood/HCN | Sep-12 | $130,000,000 | 100% | 1.00 |
| Sunrise (Revera) | Revera/HCN | Apr-14 | $400,000,000 | 75% | 3.91 |
| Trilogy Health Services LLC | Griffin-American Healthcare REIT III/NorthStar | Dec-15 | $1,125,000,000 | N/A | 1.66 |
| HCR ManorCare | ProMedica | Jul-18 | $3,300,000,000 | N/A | N/A |
| Diversicare Healthcare Services | DAC Acquisition | 4Q2021 | $70,000,000 | 100% | N/A |
| Cadence Living | Cogir Management | Nov-22 | $39,200,000 | 100% | N/A |
| Sunrise Senior Living | Revera | 3Q2023 | $28,708,000 | 34% | N/A |
| AlerisLife | Seven Separate Operators | Dec-25 | $62,000,000 est | N/A | N/A |
| Source: HealthTrust | | | | | |

In addition, we have also reviewed sales of Home Health Agencies, which we view to reflect a business-only healthcare operation that lacks the significant real estate component found in seniors housing. A summary of Home Health Care transfers and resulting multiples are as follows:

| HOME HEALTHCARE AGENCY TRANSACTIONS | | | | |
|---|---|---|---|---|
| **Target** | **Sale Date** | **Sale Price** | **Revenue** | **Price/Rev** |
| Oklahoma home care business | Aug-21 | $1,100,000 | $2,300,000 | 0.48 |
| CareLinx Inc. | Aug-21 | $65,000,000 | $20,000,000 | 3.25 |
| Summit Home Health, LLC | Oct-21 | $8,100,000 | $7,000,000 | 1.16 |
| Undisclosed Home Health Care Organization | Nov-21 | $4,750,000 | $4,100,000 | 1.16 |
| Illinois business | Nov-21 | $2,200,000 | $2,500,000 | 0.88 |
| Accredited Home Care | Dec-21 | $180,000,000 | $114,800,000 | 1.57 |
| Optum purchase of LHC Group | Mar-22 | $5,400,000,000 | $2,219,600,000 | 2.43 |
| LHC Group, Inc. | Mar-22 | $6,000,000,000 | $2,220,000,000 | 2.70 |
| Quipt acquires Good Night Medical | Apr-22 | $7,000,000 | $7,500,000 | 0.93 |
| Good Night Medical, LLC | Apr-22 | $7,000,000 | $7,500,000 | 0.93 |
| Signify Health | Sep-22 | $8,000,000,000 | $773,000,000 | 10.35 |
| Great Elm Healthcare, LLC | Jan-23 | $80,000,000 | $60,000,000 | 1.33 |
| Home Medical Products, Inc. | Apr-23 | $31,750,000 | $28,000,000 | 1.13 |
| Amedisys, Inc. | May-23 | $3,600,000,000 | $2,100,000,000 | 1.71 |
| Tennessee Quality Care | Jun-23 | $106,000,000 | $40,000,000 | 2.65 |
| 1 home care services company in Massachusett | Apr-24 | $250,000 | $800,000 | 0.31 |
| Rotech Healthcare | Jul-24 | $1,360,000,000 | $750,000,000 | 1.81 |
| Gentiva's personal care operations | Jun-24 | $350,000,000 | $280,000,000 | 1.25 |
| home care services business in Florida | Oct-24 | $1,636,000 | $3,100,000 | 0.53 |
| Signature Healthcare at Home | Jan-25 | $80,000,000 | $75,000,000 | 1.07 |
| Lehan Drugs, Inc. | May-25 | $26,000,000 | $25,700,000 | 1.01 |
| Helping Hands Home Care Service | Aug-25 | $21,200,000 | $17,000,000 | 1.25 |
| Hart Medical Equipment | Aug-25 | $29,166,666 | $60,000,000 | 0.49 |
| Quipt Home Medical Corp. | Dec-25 | $260,000,000 | $245,900,000 | 1.06 |
| | | | | |
| Average | | | | 1.73 |
| Median | | | | 1.16 |
| Source: HealthTrust and *The Health Care M & A Report* | | | | |

Overall, we would anticipate multiple in between the two sets of indications. Generally, we view Home Healthcare Agencies providing the low end of a reasonable range, as the subject's captive audience with respect to the community's residents lessens the risk associated with the resulting management. Thus, we have reconciled to a multiple in between the two sets of comparables.

**Conclusions:** Each approach presents differing advantages and shortcomings in the allocation of the various components of the going concern. Further, we note that none of the allocations are viewed as being the singular methodology in allocating business value.

| VALUE ALLOCATION SUMMARY | | |
|---|---|---|
| | | **As-Is** |
| **Market Lease Coverage** | | |
| (1) Estimated NOI (Going Concern) | = | $1,505,342 |
| (2) Market Lease Coverage | | 1.30 |
| Income Attributable to Real Estate | = | $1,157,955 |
| Real Estate/Personal Property OAR | | 8.00% |
| Value of Real Estate/Personal Property @ | = | $14,474,438 |
| | Rounded: | $14,500,000 |
| Total Property Value Concluded via Appraisal Less Excess Land | = | $15,700,000 |
| Less: Personal Property (FF&E) Value and Excess CON | @ | -$1,260,000 |
| Less: Residual Real Estate Value Indication | @ | -$13,240,000 |
| Remainder (Indicated Business Value) | = | $1,200,000 |
| **Management Residual Method** | | |
| Management Fee, or revenue to business | = | 515,518 |
| (3) Application of revenue multiple           2.00 | = | $1,031,036 |
| Indicated Business Value | Rounded: | $1,000,000 |
| Reconciled Business Allocation | @ | $1,100,000 |
| Reconciled Personal Property Allocation | @ | $1,260,000 |
| Remainder Real Estate Allocation | @ | $13,340,000 |
| (1) NOI of going concern including intangible assets, or TAB | | |
| (2) Assumes unencumbered property entering into NNN lease agreement on date of value | | |
| (3) Management fee will ultimately be a revenue line item to third party management company | | |
| Source: HealthTrust | | |

Overall, in concluding to our respective values, we have considered the various risk rates that are implied with each component as a test of reasonableness. Identifying risk rates in the value components is a method that was published by Franz H. Ross and Adam A. Alessi, MAI in The Appraisal Journal (Summer 2011 edition). They noted the following benchmarks on the table below of capitalization rates for the various components of a going concern value.

| GENERAL RANGES FOR CAPITALIZATION RATES BY ASSET CLASS | | | | | |
|---|---|---|---|---|---|
| | **Cash** | **Land** | **Land & Building** | **FF&E/PP** | **Intangible Assets** |
| General Ranges for Capitalization Rates | 0.1 - 2% | 3-8% | 7-12% | 12-20% | 15-40% |
| Typical Life of Asset (in years) | Unlimited | Unlimited | 30-50 Years | 5-10 Years | Highly Variable |
| Source: "Using TEEM-Work to Extend Your Reach on the Real Estate/Business Value Continuum," The Appraisal Journal, Summer 2011 | | | | | |

We do note that the preceding was published in 2011 and we have seen a compression of risk rates across all asset types since that time, as demonstrated above. Accordingly, we find the benchmarks to be somewhat dated, but nonetheless provide a reasonable range for comparison on a relative basis. Given the variance in indications above, we have ultimately reconciled based on the weighted average cost of capital method, but have used the above indications as a reference point. Thus, utilizing the risk rates and allocations, we have allocated the going concern cash flow and residual rates of return as follows:

| SUMMARY OF ALLOCATIONS | | | | |
|---|---|---|---|---|
| | | **Concluded Value** | **Required Rate** | **Allocated Cash Flow** |
| As-Is | Real Estate | $13,340,000 | 7.34% | $979,000 |
| | Personal Property | $1,260,000 | 15.00% | $189,000 |
| | Business | $1,100,000 | 30.67% | $337,342 |
| | Overall | $15,700,000 | 9.59% | $1,505,342 |

Source: HealthTrust

Accordingly, we find that adequate risk has been ascribed to each component of value and our conclusions reasonable.

**Marketability Analysis**

The definition of "market value" incorporates the assumption that the subject of the appraisal has been exposed on the market for a reasonable period. The Appraisal Standards Board (ASB) made the following comment to Standard 6 of USPAP:

Reasonable exposure time is one of a series of conditions in most market value definitions. Exposure time is always presumed to precede the effective date of the appraisal.

Exposure time may be defined as follows: The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based on an analysis of past events assuming a competitive and open market.

The statement continues with remarking that this exposure time is not a prediction of a date of sale and should not be confused with a marketing period. The Appraisal Standards Board distinguishes marketing time as the period required to sell a property immediately after the effective date of appraisal. This estimate is not part of the appraisal process and has no impact on market value. Because we are estimating market value, we have made an estimate of the subject's exposure time that is presumed to have occurred prior to the effective date of the appraisal.

In accordance with our conclusion of highest and best use, we believe that the most probable purchaser of the subject property would be a nursing home/seniors housing community owner/operator or possibly a limited partnership with specialized expertise in elderly or residential care.

Financing for the subject property would most likely be obtained through a commercial bank with strong local ties, life insurance company or through tax-exempt bond issues. In the current market, lenders now place much more underwriting emphasis on the financial position and creditworthiness of the borrower and less weight on the real estate as security collateral. We understand this to hold true in the seniors housing and care industry as well.

Routinely, we contact well-known brokerage firms that specialize in marketing healthcare properties nationally, namely BluePrint, Senior Living Investment Brokerage, Cushman & Wakefield and JLL. The consensus is that current marketing periods range from up to twelve months from listing to closing. Since these firms are focused on this product type, we are confident that if the subject were actively marketed to this group of potential buyers at a price near our estimates of market value, it would sell within twelve months.

Therefore, based on our estimate of market value, we conclude that marketing time is likely to be up to 12 months as the shortage of product for sale coupled with anticipated supply shortfalls entice more outsiders to invest in seniors housing. Additionally, the exposure time that occurred prior to our date of value would be six to 12 months.

ADDENDA

**Subject Photographs and Exhibits**



PROJECT NO. 034-22096

ALTA/ASCM LAND TITLE SURVEY

SAUCON VALLEY MANOR

1050 MAIN STREET
BOROUGH OF HELLERTOWN
NORTHAMPTON COUNTY, PENNSYLVANIA
PENNSYLVANIA

JENA ENGINEERING CORP.
CONSULTING ENGINEERS & SURVEYORS

2301 SUNSHINE ROAD
SUITE 200
ALLENTOWN, PA. 18103
PHONE (610) 787-4300
FAX (610) 787-4803
EMAIL: jentitle@jenaengineering.com
WEB SITE: www.jenaengineering.com



Street Scene 1



Front View



Side View



Side View



Rear View



Lobby



Courtyard



Hallway

Hallway



Multi-Purpose Room



Kitchen



Laundry



Staff Breakroom



Business Office



BASEMENT PLAN
SCALE 1/8" = 1'-0"

N

D80  D82  D84  D86  D88

D79  D81  D83

COPYRIGHT GOUCK ARCHITECTS 2004
REPRODUCTION IN PARTIAL AND/OR IN WHOLE SHOWN OR DEPICTED ON PLANS OR IN SPECIFICATIONS WITHOUT THE PERMISSION OF GOUCK ARCHITECTS VIOLATES THE COPYRIGHT LAWS OF THE UNITED STATES AND WILL BE SUBJECT TO LEGAL PROSECUTION.

DO NOT SCALE DRAWINGS. IN ALL CASES WRITTEN DIMENSIONS SHALL TAKE PRECEDENCE OVER ALL OTHERS. SCALED DRAWINGS SHALL BE USED FOR REFERENCE ONLY. ALL DIMENSIONS ON THE JOB SITE PRIOR TO START OF WORK. CONTRACTORS SHALL VERIFY AND ANY VARIATIONS OR ERRORS SHALL BE NOTIFIED OF THE COLUMNS BEFORE INSTALLATION BEGIN.

Proposed:
**Saucon Valley Manor 1**
1050 Main Street
Hellertown, PA 18055

**GOUCK ARCHITECTS**
STEWART J. GOUCK
REGISTERED ARCHITECT

1304 Hamilton Street Allentown, PA 18102
(610) 439-6616     FAX (610) 439-8153

DRAWN
CHECKED
SCALE   1/8" = 1'-0"
JOB NO.
DATE   11/2004
BASEMENT PLAN
X-1
SHEETS   4   OF

REVISIONS

FIRST FLOOR PLAN
SCALE 1/8" = 1'-0"

Proposed
**Saucon Valley Manor 1**
1050 Main Street
Hellertown, PA 18055

**GOUCK ARCHITECTS**
STEWART J. GOUCK
REGISTERED ARCHITECT

1304 Hamilton Street, Allentown, PA 18102
(610) 439-8818     FAX (610) 439-8156

FIRST FLOOR PLAN

X-2



SECOND FLOOR PLAN
SCALE 1/8" = 1'-0"

BUILDING 2, BUILDING 1
CONST. TYPE 3B APPEAL GRANTED FOR
CONST. TYPE 2A

Proposed:
Saucon Valley Manor 1
1050 Main Street
Hellertown, PA 18055

GOUCK ARCHITECTS
STEWART J. GOUCK
REGISTERED ARCHITECT

1304 Hamilton Street, Allentown, PA 18102
(810) 438-9810     FAX (810) 439-8166

X-3
SECOND FLOOR PLAN



THIRD FLOOR PLAN

NOTE:

1. SEE THE SP-1 SHEET FOR A PROJECT NARRATIVE AND ALL CODE INFORMATION INCLUDING CONDITIONS OF OPERATION OF THE CONTROLLED EGRESS DOORS IN GROUPS I-1 AND I-2.

2. OWNER'S SPRINKLER SUB, ON A DESIGN-BUILD BASIS, SHALL UPDATE THE SPRINKLER SYSTEM TO MEET NFPA13, CONSIDERING THE FLOOR PLAN MODIFICATIONS.

3. OWNER'S ALARM SYSTEM SUB, ON A DESIGN-BUILD BASIS, SHALL UPDATE THE AUTOMATIC AND MANUAL FIRE ALARM SYSTEMS TO MEET NFPA72, CONSIDERING THE FLOOR PLAN MODIFICATIONS.

4. WORK AREAS ARE SHOWN IN BUBBLES

| ADDITIONAL EMERGENCY LIGHTS REQUIRED AT MAGLOCKED DOORS | |
|---|---|
| SYMBOL | DESCRIPTION |
| | ILLUMINATED EXIT SIGN WITH BATTERY PACK |
| | ILLUMINATED EXIT SIGN WITH DUAL HEAD EMERGENCY LIGHT AND BATTERY PACK |
| | DUAL HEAD EMERGENCY LIGHT WITH BATTERY PACK (SUPPORTS 2 UNITS) |
| | REMOTE DUAL HEAD EMERGENCY LIGHT |
| | REMOTE SINGLE HEAD EMERGENCY LIGHT |

COPYRIGHT  GOUCK ARCHITECTS  2023

REPRODUCTION OF MATERIAL AND OR QUOTATION SHOWN OR DEPICTED ON PLANS OR IN SPECIFICATIONS WITHOUT PERMISSION OF GOUCK ARCHITECTS VIOLATES THE COPYRIGHT LAWS OF THE UNITED STATES AND WILL BE SUBJECT TO LEGAL PROSECUTION.

GOUCK ARCHITECTS
STEWART J GOUCK
REGISTERED ARCHITECT
1104 Hamilton Street, Allentown, PA 18102
(610) 439-8818    FAX (610) 439-8105

Proposed Secured Wing Expansion at:
Saucon Valley Manor Senior Living
1072 Main Street
Hellertown, PA 18055

| REVISIONS | BY |
|---|---|
| BASE BLD SET 6-1-2023 | GG |

DRAWN    JG
CHECKED    SJG
DATE    6-1-2023
SCALE    1/8" = 1'-0"
JOB NO.    4474

THIRD FLOOR PLAN

A-1

OF    1    SHEETS

DO NOT SCALE DRAWINGS.!! IN ALL CASES WRITTEN DIMENSIONS SHALL TAKE PRECEDENCE OVER ALL OTHER SCALED DIMENSIONS. CONTRACTORS SHALL VERIFY AND BE FULLY RESPONSIBLE FOR ALL DIMENSIONS ON THE JOB SITE. GOUCK ARCHITECTS SHALL BE NOTIFIED OF ANY VARIATIONS ON THE SITE CONTRARY TO THESE DOCUMENTS BEFORE INSTALLATION BEGINS.

**Legal Description**

# COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



Book - 2020-1   Starting Page - 176363
*Total Pages -   16

Instrument Number - 2020020108
Recorded On 8/3/2020 At 10:47:06 AM

| NCGIS Registry UPI Certification |
| On July 31, 2020 By SRM |

* Instrument Type - AMENDMENT
Invoice Number - 957919
* Grantor - SAUCON VALLEY CONDOMINIUM ASSOCIATION
* Grantee - ATIYEH, ABRAHAM R
User - KABE
* Customer - OMEGA ABSTRACT

| * FEES | | *RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | OMEGA ABSTRACT |
| RECORDING FEES | $35.00 | 512 W HAMILTON STREET |
| COUNTY RECORDS IMPROVEMENT FEE | $2.00 | ALLENTOWN, PA 18101 |
| DEEDS RECORDS IMPROVEMENT FEE | $3.00 | |
| UPI CERTIFICATION FEE | $90.00 | I hereby CERTIFY that this document is recorded in the |
| TOTAL PAID | $130.50 | Recorder's Office Of Northampton County, Pennsylvania |

Andrea F. Suter
Recorder of Deeds

THIS IS A CERTIFICATION PAGE

## Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

00GDEE

## Book: 2020-1        Page: 176363

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

SVMI0000157

Prepared by
**Joel Wiener, Esq.**
**Wiener and Wiener LLP**
Suite 400 Commonwealth Building
Allentown, PA 18101
610-821-8600

Return to
**Omega Abstract Company**
512 W Hamilton St - Suite 400
Allentown, PA 18101
610-432-1671

# THIRD AMENDMENT TO DECLARATION OF CONDOMINIUM

## FOR CONDOS AT SAUCON VALLEY MANOR

### Tax Parcels

| | | |
|---|---|---|
| Q7SW2A-1-3-0715 | Unit 1 | 1050 Main Street, Hellertown, PA |
| Q7SW2A-1-3A-0715 | Unit 2 | Front Street, Hellertown, PA |
| Q7SW2A-1-3-1-0715 | Unit 3 | 1033-1063 Front St., Hellertown, PA |
| Q7SW2A-1-3C-0715 | Unit 4 | 1111 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-1-0715 | Unit 5 | 1001 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-2-0715 | Unit 6 | 1109 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-3-0715 | Unit 7 | 1007 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-4-0715 | Unit 8 | 1011 Front Street, Hellertown, PA |
| Q7SW2A-1-3D-0715 | Common Element | Front Street, Hellertown, PA |

*(Unit 2 and Common Element are combining to be Tax Parcel Q7SW2A-1-3D-0715)*

SVMI0000158

## THIRD AMENDMENT TO DECLARATION OF CONDOMINIUM

## FOR CONDOS AT SAUCON VALLEY MANOR

Effective as of the 29th day of July, 2020 by **SAUCON VALLEY CONDOMINIUM ASSOCIATION,** a Pennsylvania not for profit corporation, being the Condominium Association for **Condos At Saucon Valley Manor,** and **ABRAHAM R. ATIYEH,** with consent of the other Unit Owners as more fully set forth herein.

### *Witnesseth:*

The Condominium Association, pursuant to authority granted in the Declaration of Condominium and such other authority as may exist by law, agreement or otherwise, and Abraham R. Atiyeh, each intending to be legally bound and for other good and valuable consideration, do hereby amend the Declaration of Condominium of Condos at Saucon Valley Manor, and agree as follows:

1.      The Declaration of Condominium was recorded on December 8, 2006 in Northampton County, Pennsylvania Recorder of Deeds Record Book 2006-1 at Page 507467.

2.      The Declaration of Condominium was amended by recording the First Amendment to Declaration of Condominium For Condos At Saucon Valley Manor, which was effective on December 1, 2012 and recorded on December 14, 2012 in Northampton County, Pennsylvania Recorder of Deeds Record Book 2012-1 at Page 302493.

3.      The Declaration of Condominium was further amended by recording the Second Amendment to Declaration of Condominium For Condos At Saucon Valley Manor, which was effective on November 13, 2017 and recorded on January 5, 2018 in Northampton County, Pennsylvania Recorder of Deeds Record Book 2018-1 at Page 3001.

4.      The Declaration Plan for the Condos at Saucon Valley Manor Condominium was recorded in Northampton County, Pennsylvania Recorder of Deeds Map Book Volume 2006-5 at page 759, and was amended by the Amended Declaration Plan for the Condos at Saucon Valley Manor Condominium which was recorded in Northampton County, Pennsylvania Recorder of Deeds Map Book Volume 2017-5 at page 536.

5.      The Declaration Plan, as amended, was further revised and amended by the Amended Declaration Plan for the Condos at Saucon Valley Manor Condominium which was recorded in Northampton County, Pennsylvania Recorder of Deeds Map Book Volume 2020-5 at page 289, which is herein called the "2020 Amended Declaration Plan".

SVMI0000159

6.     As of the time of execution of this Third Amendment to Declaration of Condominium, the only owners of Units comprising the Condos at Saucon Valley Manor are as follows, with the designations of Units as exist following the Second Amendment of Declaration of Condominium:

- a.  Unit 1 – Saucon Trust
- b.  Unit 2 – Abraham Atiych
- c.  Unit 3 – Abra Development 4, L.P.
- d.  Unit 4 – Abraham Atiyeh.
- e.  Unit 5 – Saucon Residential LLC

7.     This Third Amendment to Declaration of Condominium has no effect upon Unit 1 of the Condos At Saucon Valley Manor; and does not make any change affecting Unit 1 or allocation of expense or obligation upon Unit 1 or the Unit 1 Owner and does not impose any new restriction or limitation upon Unit 1 or the Unit 1 Owner.

8.     The purpose of this Third Amendment to Declaration of Condominium for Condos At Saucon Valley Manor is to:

- a.  Revise the location, included improvements and dimensions of Unit 4, such that the lands and improvements which formerly constituted Unit 4 shall become:
  - i.  a single building pad site which will now be identified as Unit 4; and
  - ii.  a single building pad site which will now be identified as Unit 7; and
  - iii.  a single building pad site which will now be identified as Unit 8; and
  - iv.  a single building pad site which will now be identified as Unit 6, (although such area is identified as currently intended to not be developed, the same is not restricted in any manner by the Declaration of Condominium or otherwise subject to any limitation upon use, and need not remain open or undeveloped); and
  - v.  Parking areas which are becoming part of the Common Elements/Common Area; and
  - vi.  The bed of former Front Street, as vacated, which is becoming part of the Common Elements/Common Area (such that all of Front Street, as vacated, is now part of the Common Elements/Common Area); and all of Front Street remains subject to potential required dedication to the Borough of Hellertown.

- b.  Cause Unit 2 to become part of the Common Elements/Common Area, subject to the rights and obligations in favor of the other Units as previously agreed and/or a part of land development plans, and subject to rights of use reserved to the current Unit 2 owner.

SVMI0000160

9.     The right to create a new Unit from within an existing Unit is consistent with the original Declaration, especially Section 3.4 thereof, and the Condominium Declaration Plan; and such changes are agreed by all other Unit Owners, and deemed by them to be beneficial.

10.     Abraham Atiyeh, as owner of Unit 2, does hereby agree to and with the Condominium Association and the other Unit Owners that the surface area improvements of Unit 2 are hereby made, and agreed to be, a Common Element/Common Area, so as to allow parking and pedestrian passage as now laid out and as shall hereafter be agreed upon the surface of Unit 2. The Condominium Association hereby accepts the surface area of Unit 2 for common use of the Unit Owners and their permitted users, subject to easements and obligations of record and retained air rights and rights of support of Abraham Atiyeh, his heirs, successors and assigns.

11.     This Amendment hereby amends the Declaration of Condominium for the Condos at Saucon Valley Manor, as made on December 8, 2006 and recorded on December 8, 2006 in the Office of the Recorder of Deeds in and for Northampton County, Pennsylvania in Deed Book 2006-1 at page 507467, and does also amend the Declaration Plan for the Condos at Saucon Valley Manor as was recorded in Northampton County, Pennsylvania Recorder of Deeds Map Book Volume 2006-5 at page 759, and the First Amendment to Declaration of Condominium For Condos At Saucon Valley Manor, which was effective as of December 1, 2012 and recorded on December 14, 2012 in Northampton County, Pennsylvania Recorder of Deeds Record Book 2012-1 at Page 302493, and the Amendment to Declaration Plan of Condominium For Condos At Saucon Valley Manor, which was recorded in Northampton County, Pennsylvania Recorder of Deeds Record Book 2017-5 at Page 536and the Second Amendment to Declaration of Condominium For Condos At Saucon Valley Manor, which was effective as of November 13, 2017, and recorded on January 5, 2018 in Northampton County, Pennsylvania Recorder of Deeds Record Book 2018-1 at Page 3001, by addition of the following:

   a. *The area of "Proposed Building "B" and the strips of land abutting it as depicted on the aforesaid Condominium Declaration Plan for Condos at Saucon Valley Manor, is hereby Declared by Abraham R. Atiyeh, owner of Unit 4, to be a separate Unit, which Unit shall henceforth be known as Unit 8, as depicted on the 2020 Amended Declaration Plan.*
   b. *The area of "Proposed Building "D" and the strips of land abutting it as depicted on the aforesaid Condominium Declaration Plan for Condos at Saucon Valley Manor, is hereby Declared by Abraham R. Atiyeh, owner of Unit 4, to be a separate Unit, which Unit shall henceforth be known as Unit 7, as depicted on the 2020 Amended Declaration Plan.*
   c. *The area of "Proposed Building "E" and the strips of land abutting it as depicted on the aforesaid Condominium Declaration Plan for Condos at Saucon Valley Manor, is hereby Declared by Abraham R. Atiyeh, owner of Unit 4, to be a separate Unit, which Unit shall henceforth be known as Unit 6, as depicted on the 2020 Amended Declaration Plan.*

d. *The area of "Proposed Building "F" and the strips of land abutting it as depicted on the aforesaid Condominium Declaration Plan for Condos at Saucon Valley Manor, is hereby Declared by Abraham R. Atiyeh, owner of Unit 4, to be a separate Unit, which Unit shall henceforth be known as Unit 4, as depicted on the 2020 Amended Declaration Plan.*

e. *The parking lots and access roads which were formerly a part of Unit 4 are agreed to be a Common Element of the Condominium; and the land immediately abutting each Building is a limited common element for the Unit in which it is situate.*

f. *Voting for Units 3, 4, 5, 6, 7 and 8 shall each be as set forth on Exhibit "F" annexed hereto and made a part hereof, as depicted on the 2020 Amended Declaration Plan.*

g. *Allocation of expenses for Units 3, 4, 5, 6, 7 and 8 shall each be as set forth on Exhibit "F" annexed hereto and made a part hereof.*

h. *The Amended Declaration Plan, attached hereto as Exhibit "1", is hereby adopted, ratified and accepted by all parties hereto, including all Joining Parties, and amends and supersedes all prior Plans.*

i. *All references to the area of a Unit shall be made by reference to the Amended Declaration Plan attached as Exhibit "1" which supersedes prior plans.*

12. Units 3, 4, 5, 6 and 7 and 8, and the ownership of each Unit shall be subject to the terms and conditions set forth in the Declaration of Condominium and Bylaws as exist at this time, and the within change does not make any adverse change or effect upon Unit 1; and the owners of each said Unit shall abide by the requirements of the Declaration and the First, Second and Third Amendment thereof; and acknowledge the rights and conditions applicable to HUD concerning the mortgage loan affecting Unit 1.

13. Abraham Atiyeh, for himself as the current Owner of the lands which are becoming Units 4, 6, 7 and 8, and on behalf of his successors in title to each Unit, does further acknowledge and accept title under and subject to the rights and benefits set forth in the Declaration of Condominium and First Amendment for the benefit of Unit 1 and Declarant, and concerning Unit 1 and the Declarant.

a. By the acceptance of a deed from Abraham Atiyeh or a successor in title, each future owner of any of Unit 4, Unit 6, Unit 7 and Unit 8 shall be deemed to each acknowledge and accept title under and subject to the rights and benefits set forth in the Declaration of Condominium and First Amendment and Second Amendment for the benefit of Unit 1 and Declarant, and concerning Unit 1 and the Declarant.

SVMI0000162

14.     The Declaration of Condominium and the Declaration Plan, and the First Amendment (inclusive of its changes to the Declaration Plan), and the Second Amendment (inclusive of its changes to the Declaration Plan), are ratified and affirmed, except as specifically amended herein or as amended by the 2020 Amended Declaration Plan, a copy of which is attached as Exhibit "1" hereto, and made a part hereof.

[remainder of page is blank – signatures on following page ]

SVMI0000163

IN WITNESS WHEREOF, and intending to be legally bound, the Saucon Valley Manor Condominium Association has caused its President to execute this Third Amendment to Declaration of Condominium as and for the act and deed of the said Saucon Valley Condominium Association intending that it, the premises comprising the Condos at Saucon Valley Manor and the owners, mortgagees and others interested therein, be bound hereby, on this, the date and year first above set forth; and  Abraham R. Atiyeh, the owner of the lands comprising Unit 2 and Unit 4 (and being the owner of lands becoming Unit 6 and 7 and 8) has joined in this Third Amendment to Declaration of Condominium, evidencing his agreement with the same and the changes herein agreed concerning Unit 2 and Unit 4 and Unit 6 and Unit 7 and Unit 8, all parties intending that they and the properties be legally bound hereby.

**SAUCON VALLEY CONDOMINIUM ASSOCIATION**

By: _____

Abraham Atiyeh, President

**Abraham R. Atiyeh**

**I hereby certify that the address of the Declarant is:**
**1177 Sixth Street, Whitehall, PA 18052-5212**

_____
For the Grantee

SVMI0000164

COMMONWEALTH OF PENNSYLVANIA )
                                                                ) SS:
COUNTY OF LEHIGH                          )

On this 29th day of July, 2020 before me, the undersigned officer, personally appeared Abraham Atiyeh, to me known or satisfactorily proven, to be the person who executed the foregoing Third Amendment to Declaration of Condominium, who acknowledged himself to be the President of Saucon Valley Condominium Association, and acknowledged that he, as such officer acting for such corporation, executed the Third Amendment to Declaration of Condominium as such officer of Saucon Valley Condominium Association being duly authorized for the purpose therein contained and to bind the said Saucon Valley Condominium Association as of the Effective Date, such that the same might be recorded as such, according to law.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Tara S. Paletski, Notary Public
Lehigh County
My commission expires June 20, 2024
Commission number 1242943
Member, Pennsylvania Association of Notaries

COMMONWEALTH OF PENNSYLVANIA )
                                                                ) SS:
COUNTY OF LEHIGH                          )

On this 29th day of July, 2020 before me, the undersigned officer, personally appeared Abraham Atiyeh, to me known or satisfactorily proven, to be the person who executed the foregoing Third Amendment to Declaration of Condominium, who acknowledged that he, as owner of the Units aforesaid, executed the Third Amendment to Declaration of Condominium for the purpose therein contained and to bind himself and the Units owned by him as of the Effective Date, such that the same might be recorded as such, according to law.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

_____
Notary Public

Commonwealth of Pennsylvania - Notary Seal
Tara S. Paletski, Notary Public
Lehigh County
My commission expires June 20, 2024
Commission number 1242943
Member, Pennsylvania Association of Notaries

SVMI0000165

Tax Parcels Comprising the Condominium
All are located in the Borough of Hellertown, Northampton County. Pennsylvania

Prior to Amendment

| | | |
|---|---|---|
| Q7SW2A-1-3-0715 | Unit 1 | 1050 Main Street, Hellertown, PA |
| Q7SW2A-1-3A-0715 | Unit 2 | Front Street, Hellertown, PA |
| Q7SW2A-1-3-1-0715 | Unit 3 | 1033 Front St., Hellertown, PA |
| Q7SW2A-1-3C-0715 | Unit 4 | Front Street, Hellertown, PA |
| Q7SW2A-1-3C-1-0715 | Unit 5 | 1001 Front Street, Hellertown, PA |
| Q7SW2A-1-3D-0715 | Common Area, Front Street, Hellertown, PA | |

Following Amendment

| | | |
|---|---|---|
| Q7SW2A-1-3-0715 | Unit 1 | 1050 Main Street, Hellertown, PA |
| Q7SW2A-1-3-1-0715 | Unit 3 | 1033-1063 Front St., Hellertown, PA |
| Q7SW2A-1-3C-0715 | Unit 4 | 1111 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-1-0715 | Unit 5 | 1001 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-2-0715 | Unit 6 | 1109 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-3-0715 | Unit 7 | 1007 Front Street, Hellertown, PA |
| Q7SW2A-1-3C-4-0715 | Unit 8 | 1011 Front Street, Hellertown, PA |
| Q7SW2A-1-3D-0715 | Common Element | Front Street, Hellertown, PA |

SVMI0000166

EXHIBIT "F"

The allocation of expenses is amended to be as follows:

Unit 1 – 40%

Unit 2- no longer exists

Unit 3 – 15%

Unit 4 – 10%

Unit 5 - 10%

Unit 6 – 5%

Unit 7 – 10%

Unit 8 – 10%


The allocation of Voting Rights of the Units is amended to be as follows:

Unit 1 – 50%

Unit 2- no longer exists

Unit 3 – 10%

Unit 4 – 10%

Unit 5 - 10%

Unit 6 – 5%

Unit 7 – 10%

Unit 8 – 5%

SVMI0000167

EXHIBIT "1" – 2020 Amended Declaration Plan



SVMI0000168

Exhibit "1"

Page 2- Recording Information for 2020 Amended Declaration Plan

## COUNTY OF NORTHAMPTON

### RECORDER OF DEEDS
NORTHAMPTON COUNTY GOVERNMENT CENTER
669 WASHINGTON STREET
EASTON, PENNSYLVANIA 18042-7486
Area Code (610) 829-6210

Andrea F. Suter - Recorder
Dorothy J. Edelman - Lead Deputy
Barbara L. Manieri - Deputy



Book - 2020-5   Starting Page - 289
*Total Pages -  2

Instrument Number - 2020019449
Recorded On 7/28/2020 At 9:59:00 AM
* Instrument Type - SUBDIVISION MAP
Invoice Number - 957359
* Grantor - AMENDED CONDOS AT SAUCON VALLEY MANOR SUBDIVISION
* Grantee - AMENDED CONDOS AT SAUCON VALLEY MANOR SUBDIVISION
User - KSK
* Customer - JENA ENGINEERING CORP

| * FEES | | *RECORDED BY: |
|---|---|---|
| STATE WRIT TAX | $0.50 | JENA ENGINEERING CORP |
| RECORDING FEES | $29.50 | 2358 SUNSHINE RD |
| COUNTY RECORDS | $2.00 | STE 200 |
| IMPROVEMENT FEE | | ALLENTOWN, PA 18103 |
| DEEDS RECORDS | $3.00 | |
| IMPROVEMENT FEE | | |
| TOTAL PAID | $35.00 | I hereby CERTIFY that this document is recorded in the Recorder's Office Of Northampton County, Pennsylvania |



Andrea F. Suter
Recorder of Deeds

THIS IS A CERTIFICATION PAGE

# Do Not Detach

THIS PAGE IS NOW THE FIRST PAGE
OF THIS LEGAL DOCUMENT

00GCWZ

**Book: 2020-5          Page: 289**

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

SVMI0000169

<u>CONSENT OF UNIT OWNER</u>

**<u>Consent and Approval</u>**

KNOW ALL MEN BY THESE PRESENTS, that SAUCON TRUST, owner of Unit 1 of Condos At Saucon Valley Manor, a Condominium, does hereby consent to and approve the Third Amendment to Declaration of Condos At Saucon Valley Manor, a Condominium.

SAUCON TRUST
By: Saucon Management LLC

By: _____
Abraham R. Atiyeh, Manager

**COMMONWEALTH OF PENNSYLVANIA** :

: **SS:**

**COUNTY OF LEHIGH** :

On this, the __20th__ day of July, 2020, before the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be the Manager of Saucon Management LLC, the Trustee of the Saucon Trust, and that he as such Manager of the said Saucon Management LLC, in its capacity as Trustee of the Saucon Trust, executed the foregoing instrument for the purposes therein contained by signing the name of the Trust by its Trustee, having been duly authorized by Saucon Management LLC, Trustee.

**IN WITNESS WHEREOF**, I have hereunto set my hand and official seal.

_____
Notary Public
My commission expires June 20. 2024

> Commonwealth of Pennsylvania - Notary Seal
> Tara S. Paletski, Notary Public
> Lehigh County
> My commission expires June 20, 2024
> Commission number 1242943
> Member, Pennsylvania Association of Notaries

SVMI0000170

## CONSENT OF UNIT OWNER

### **Consent and Approval**

KNOW ALL MEN BY THESE PRESENTS, that ABRA DEVELOPMENT 4, LP, owner of Unit 3 of Condos At Saucon Valley Manor, a Condominium, does hereby consent to, approve, and agree to be bound by the Third Amendment to Declaration of Condos At Saucon Valley Manor, a Condominium.

ABRA DEVELOPMENT 4, LP,
By: Realty LLC,
Its General Partner.

By: _____

Abraham R. Atiyeh, Its Manager

**COMMONWEALTH OF PENNSYLVANIA** :

                                                    :    SS:

**COUNTY OF LEHIGH** :

On this, the $\underline{29^{th}}$ day of July, 2020, before the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be the Manager of Realty GP LLC the general partner of ABRA DEVELOPMENT 4, LP, and that he as such Manager of the general partner of said limited partnership, executed the foregoing instrument for the purposes therein contained having been duly authorized by the said limited partnership.

**IN WITNESS WHEREOF**, I have hereunto set my hand and official seal.

_____
Notary Public
My commission expires June 20, 2024

Commonwealth of Pennsylvania - Notary Seal
Tara S. Paletski, Notary Public
Lehigh County
My commission expires June 20, 2024
Commission number 1242943
Member, Pennsylvania Association of Notaries

SVMI0000171

## CONSENT OF UNIT OWNER

### Consent and Approval

KNOW ALL MEN BY THESE PRESENTS, that SAUCON RESIDENTIAL LLC, owner of Unit 5 of Condos At Saucon Valley Manor, a Condominium, does hereby consent to, approve, and agree to be bound by the Third Amendment to Declaration of Condos At Saucon Valley Manor, a Condominium.

SAUCON RESIDENTIAL LLC

By: _____
Abraham R. Atiyeh, Manager

**COMMONWEALTH OF PENNSYLVANIA** :

                                              : **SS:**

**COUNTY OF LEHIGH** :

On this, the ___29th___ day of July, 2020, before the undersigned officer, personally appeared Abraham R. Atiyeh, who acknowledged himself to be the Manager of Saucon Residential LLC, and that he as such Manager of the said limited liability company, executed the foregoing instrument for the purposes therein contained having been duly authorized by Saucon Residential LLC.

**IN WITNESS WHEREOF**, I have hereunto set my hand and official seal.

_____
Notary Public
My commission expires June 20, 2024

Commonwealth of Pennsylvania - Notary Seal
Tara S. Paletski, Notary Public
Lehigh County
My commission expires June 20, 2024
Commission number 1242943
Member, Pennsylvania Association of Notaries

SVMI0000172

**Provided Financial Statements**



**GOUCK**
**ARCHITECTS**
Stewart J. Gouck, AIA
Registered Architect

## Saucon Valley Manor 1- Total Reroof Cost Estimate
### 1050 Main Street
### Hellertown, PA 18055
### as of March 18, 2026

### General Notes:

($2/SF tear-off & disposal + $3/SF ½" Carlisle SecurShield HD High Density Polyisocyanurate Cover Board + $7/SF fully adhered .060" EPDM rubber = $12/SF total)

Note: Another option at the gym courtyard floor is to remove the concrete pavers and install heat welded vinyl Duradek Membrane, which is a tough, walkable membrane. For this option, add (1057SF)($6/SF add)=$6,342.

Note: 4-story Thomas Street Addition can be a roof re-cover rather than a complete tear-off. The existing tapered insulation can remain.

Note: Building is already insulated with 10" R-30 fiberglass batt insulation laid on top of the Chicago Grid suspended drywall, so thicker insulation is not necessary at the roof

### Rubber Roof Replacement:

At entire rubber roof including: 3rd Floor Roof, 2006 Addition, 2nd Floor prior Auditorium Roof, Cafeteria/Dining Room 1st Floor Roof, Front Porch Bus Canopy Roof, South Entry Roof off Sycamore Street, Porte Cochere Roof at Lower Level Offices, & Gym Courtyard Rubber floor membrane.

Tear-Off & Disposal, ½" SecurShield HD Polyiso, Fully Adhered .060 EPDM

| | |
|---|---|
| 53,729 SF of Rubber Roof x $12/SF = | $644,748 |
| Parapet Rubber Wrap over Copings: (2529 lin ft coping)(3 feet wrap)($12/SF)= | $91,044 |
| Replace Metal Copings at all roof edges (2529 lin. ft.)($20/lin ft coping)= | $50,580 |
| Termination Bar where low roofs terminate into rising walls: (813 lin. ft)($10/lin. ft term bar)= | $8,130 |

1304 Hamilton Street
Allentown PA 18102
610.439.8818
gouckarch@prodigy.net

SVMI0000308

Metal Roof Edges  
(82 lin ft)($15/lin ft metal roof edge)=          $1,230

Building Expansion Joint  
(213 lin ft)($40/lin ft roof expansion joint)=      $8,520

Roof Drains (following the pattern at the 4-story addition):  
(47 Roof Drains)($1000/drain)=        $47,000

(Replace 12 Velux skylights & curbs, reflash )($4,000 each)=    $48,000

HVAC Curbs & Kitchen Exhaust Fan Curbs:  
(15 HVAC Unit Curbs - Reflash w/ rubber, boots)($2,500)=    $37,500

Condensing Units:  
(Lift 24 condensing units & set on rubber walk pads, boots)($800)= $19,200

**<u>Shingled Roofs:</u>**  
10:12 slope shingled roofs (x1.3 slope multiplier calculated in area)  
$2/SF tearoff + $6/SF new shingled roof = $8/SF total  
1173 SF Front gabled Florida Room + 127 SF NW corner entrance  
+ 145 SF Cafeteria entrance

(1445 SF shingled roofs)($8/SF total)=         $11,560

Total Cost:                               $967,512  
10% Contingency for additional penetrations, deck rot & details    <u>+$96,751</u>

**Grand Total Saucon Valley Manor 1 Total Reroof Cost:**    $1,064,263

SVMI0000309

**Saucon Valley Manor Inc.**
## Operating Statement
**January through November 2025**

Accrual Basis

| Census | 193 | 190 | 188 | 192 | 190 | 187 | 191 | 192 | 196 | 200 | 200 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | TOTAL |
| **Ordinary Income/Expense** | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | |
| **Rental Income** | | | | | | | | | | | | |
| Monthly Rental | 816,020.27 | 823,554.43 | 783,563.87 | 814,050.19 | 788,338.20 | 781,811.19 | 771,734.38 | 815,346.44 | 794,213.56 | 823,551.98 | 832,884.00 | 8,845,068.51 |
| Respite | 0.00 | 1,627.50 | 12,404.50 | 6,796.00 | 6,177.00 | 3,897.00 | 4,123.00 | 6,070.00 | 10,990.00 | 10,982.00 | 10,982.00 | 74,049.00 |
| **Total Rental Income** | 816,020.27 | 825,181.93 | 795,968.37 | 820,846.19 | 794,515.20 | 785,708.19 | 775,857.38 | 821,416.44 | 805,203.56 | 834,533.98 | 843,866.00 | 8,919,117.51 |
| **Ancillary Charges** | | | | | | | | | | | | |
| Barber and Beauty | 2,485.00 | 2,289.00 | 2,369.00 | 2,618.00 | 2,485.00 | 2,348.00 | 2,958.00 | 2,564.00 | 3,207.00 | 2,729.00 | 2,609.00 | 28,661.00 |
| TV Cable Monthly | 7,060.00 | 7,135.00 | 6,799.00 | 6,775.00 | 6,500.00 | 6,660.00 | 6,650.00 | 7,100.00 | 6,830.00 | 7,050.00 | 6,625.00 | 75,184.00 |
| Miscellaneous | -85.00 | 1,857.82 | 870.00 | -1,109.00 | 2,451.48 | 1,560.80 | 616.82 | 600.00 | 1,230.00 | 250.00 | 0.00 | 8,242.92 |
| **Total Ancillary Charges** | 9,460.00 | 11,281.82 | 10,038.00 | 8,284.00 | 11,436.48 | 10,568.80 | 10,224.82 | 10,264.00 | 11,267.00 | 10,029.00 | 9,234.00 | 112,087.92 |
| **Physical Therapy Good Shepherd** | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 5,266.96 | 57,936.56 |
| **Total Income** | 830,747.23 | 841,730.71 | 811,273.33 | 834,397.15 | 811,218.64 | 801,543.95 | 791,349.16 | 836,947.40 | 821,737.52 | 849,829.94 | 858,366.96 | 9,089,141.99 |
| **Gross Profit** | 830,747.23 | 841,730.71 | 811,273.33 | 834,397.15 | 811,218.64 | 801,543.95 | 791,349.16 | 836,947.40 | 821,737.52 | 849,829.94 | 858,366.96 | 9,089,141.99 |
| **Expense** | | | | | | | | | | | | |
| **Facility Costs** | | | | | | | | | | | | |
| Furniture - Carpet Replacement | 0.00 | 1,908.00 | 2,007.20 | -657.20 | 0.00 | 0.00 | 0.00 | 6,230.14 | 1,784.79 | 0.00 | 0.00 | 11,272.93 |
| Cable TV | 5,309.65 | 5,405.77 | 5,373.97 | 5,392.37 | 5,613.81 | 5,606.78 | 5,506.36 | 5,506.36 | 5,550.64 | 5,652.15 | 5,552.15 | 60,470.01 |
| Electric | 16,594.82 | 14,098.19 | 12,074.21 | 12,385.71 | 14,973.40 | 18,533.01 | 28,367.21 | 22,082.70 | 18,022.35 | 17,872.16 | 13,195.06 | 188,198.82 |
| Gas | 11,107.08 | 15,301.56 | 9,308.38 | 12,151.33 | 8,112.04 | 8,517.65 | 7,504.22 | 3,948.99 | 6,711.61 | 9,100.50 | 11,930.74 | 103,694.10 |
| Rent (mininum) | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 110,000.00 |
| Rent- other | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 55,000.00 |
| Sanitation | 4,964.28 | 3,853.05 | 776.61 | 3,302.74 | 2,936.86 | 3,331.39 | 613.64 | 5,406.56 | 3,316.13 | 3,544.18 | 2,683.16 | 34,728.60 |
| Water/Sewer | 9,800.00 | 10,811.12 | 9,800.00 | 6,429.90 | 9,000.00 | 9,000.00 | 9,572.83 | 9,100.00 | 9,100.00 | 12,766.72 | 10,000.00 | 105,380.57 |
| Fire Appropriation | 0.00 | 1,622.28 | 0.00 | 658.50 | 1,191.00 | 0.00 | 0.00 | 0.00 | 0.00 | 264.00 | 0.00 | 3,735.78 |
| Miscellaneous | 1,713.69 | 364.00 | 630.97 | 1,404.11 | 751.56 | 893.66 | 288.59 | 643.60 | 360.43 | 0.00 | 0.00 | 7,050.61 |
| **Total Facility Costs** | 64,489.52 | 68,363.97 | 54,971.34 | 56,067.46 | 57,578.67 | 60,882.49 | 66,852.85 | 67,918.35 | 59,845.95 | 64,199.71 | 58,361.11 | 679,531.42 |
| **Maintenance** | | | | | | | | | | | | |
| Dental Insurance-Maintenance | 0.00 | 0.00 | -15.90 | -31.80 | -13.25 | 2.65 | 2.65 | 2.65 | 2.65 | -13.25 | -31.80 | -95.40 |
| Maintenance Wages | 9,194.44 | 11,367.17 | 13,177.77 | 12,155.21 | 12,992.31 | 12,795.29 | 15,974.55 | 13,718.54 | 12,979.45 | 14,740.02 | 14,554.67 | 143,649.42 |
| Maintenance Payroll Taxes | 1,027.57 | 1,609.61 | 1,137.93 | 969.68 | 1,428.51 | 935.44 | 1,067.05 | 1,180.22 | 864.32 | 1,488.52 | 1,095.88 | 12,804.73 |
| Health Insurance | 747.19 | 647.33 | 447.61 | 1,842.13 | 895.22 | 1,094.94 | 1,094.94 | 1,094.94 | 1,094.94 | 895.22 | 1,094.94 | 10,949.40 |
| Maintenance Supplies | 22.52 | 1,147.63 | 2,665.92 | 357.14 | 2,701.32 | 2,095.65 | 1,682.39 | 846.53 | 3,908.16 | 0.00 | 3,260.14 | 18,687.40 |
| **Repair & Maintenance** | | | | | | | | | | | | |
| Reimbursement - R&M | -1,240.00 | -1,120.00 | -1,240.00 | -1,200.00 | -1,240.00 | -1,200.00 | -1,240.00 | -1,240.00 | -1,200.00 | -1,240.00 | -1,200.00 | -13,360.00 |
| Repair & Maintenance - Other | 23,780.31 | 17,137.82 | 12,420.43 | 28,449.09 | 16,205.11 | 15,092.82 | 21,553.01 | 18,157.33 | 13,134.87 | 25,811.91 | 21,416.46 | 213,159.16 |
| **Total Repair & Maintenance** | 22,540.31 | 16,017.82 | 11,180.43 | 27,249.09 | 14,965.11 | 13,892.82 | 20,313.01 | 16,917.33 | 11,934.87 | 24,571.91 | 20,216.46 | 199,799.16 |
| Lawn Care & Snow Removal | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1,033.50 | 0.00 | 1,033.50 |
| Maintenance - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 540.20 | 540.20 | 540.20 | 540.20 | 540.20 | 2,701.00 |
| **Total Maintenance** | 33,532.03 | 30,789.56 | 28,593.76 | 42,541.45 | 32,969.22 | 30,816.79 | 40,674.79 | 34,300.41 | 31,324.59 | 43,256.12 | 40,730.49 | 389,529.21 |
| **Activities** | | | | | | | | | | | | |

| | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dental Insurance-Activities | 57.77 | 14.84 | 14.84 | -54.06 | -12.19 | 14.84 | 14.84 | 14.84 | 14.84 | -12.19 | -54.06 | 14.31 |
| Activities Wages | 7,242.76 | 17,310.83 | 20,818.89 | 20,500.19 | 21,781.71 | 19,408.92 | 19,285.78 | 19,117.56 | 19,822.86 | 17,422.36 | 19,576.20 | 202,288.06 |
| Activities Payroll Taxes | 1,473.14 | 2,385.48 | 2,044.56 | 1,873.09 | 2,493.01 | 1,434.88 | 1,341.92 | 1,359.16 | 1,345.29 | 1,985.41 | 1,521.67 | 19,257.61 |
| Health Insurance | 1,494.38 | 1,324.62 | 1,154.86 | 1,154.86 | 985.10 | 1,154.86 | 1,154.86 | 1,154.86 | 1,154.86 | 985.10 | 1,154.86 | 12,873.22 |
| Events | 924.80 | 660.00 | 458.47 | 799.28 | 450.00 | 425.00 | 737.54 | 718.04 | 408.47 | 585.00 | 575.00 | 6,741.60 |
| Activities Supplies | 492.85 | 983.37 | 753.73 | 524.53 | 1,203.39 | 196.59 | 1,055.33 | 1,838.98 | 682.06 | 1,361.68 | 877.52 | 9,970.03 |
| Total Activities | 11,685.70 | 22,679.14 | 25,245.35 | 24,797.89 | 26,901.02 | 22,635.09 | 23,590.27 | 24,203.44 | 23,428.38 | 22,327.36 | 23,651.19 | 251,144.83 |
| Dietary | | | | | | | | | | | | |
| Dietary Wages | 21,939.00 | 51,141.95 | 62,139.26 | 55,002.01 | 60,977.29 | 59,310.90 | 58,806.27 | 57,286.39 | 65,570.38 | 63,596.71 | 62,729.00 | 618,499.16 |
| Dietary Payroll Taxes | 5,776.70 | 6,693.73 | 5,755.00 | 5,441.72 | 7,417.76 | 4,808.38 | 4,543.93 | 4,233.59 | 4,284.55 | 7,392.14 | 5,038.98 | 61,386.48 |
| Health Insurance | 5,373.03 | 4,591.58 | 2,468.08 | 3,119.96 | 2,633.54 | 3,269.29 | 3,292.21 | 3,292.21 | 3,292.21 | 2,810.34 | 3,319.68 | 37,462.13 |
| Food Costs | | | | | | | | | | | | |
| Event/Holiday Food | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 59.76 | 0.00 | 0.00 | 0.00 | 59.76 |
| Activites Food | 1,066.92 | 248.15 | 0.00 | 160.72 | 696.21 | 146.28 | 101.38 | 304.72 | 886.13 | 345.92 | 1,088.05 | 5,044.48 |
| Icecream/Slushi | 4,050.33 | 2,717.54 | 2,672.04 | 3,387.55 | 4,252.57 | 3,360.49 | 4,705.93 | 3,184.15 | 3,390.27 | 3,896.17 | 2,400.88 | 38,017.92 |
| Reimburse Food Prep/Delivery | -14,370.00 | -13,440.00 | -14,100.00 | -13,785.00 | -13,874.00 | -13,530.00 | -13,607.00 | -14,103.00 | -14,010.00 | -15,076.00 | -14,955.00 | -154,850.00 |
| Food Costs - Other | 96,581.00 | 82,938.39 | 84,032.65 | 91,327.90 | 97,661.24 | 95,301.24 | 108,516.01 | 92,164.08 | 99,951.24 | 112,648.04 | 70,267.18 | 1,031,388.97 |
| Total Food Costs | 87,328.25 | 72,464.08 | 72,604.69 | 81,091.17 | 88,736.02 | 85,278.01 | 99,716.32 | 81,609.71 | 90,217.64 | 101,814.13 | 58,801.11 | 919,661.13 |
| Supplies | 10,969.33 | 6,848.23 | 7,419.34 | 7,045.01 | 7,601.79 | 8,000.83 | 16,440.93 | 3,778.75 | 7,702.81 | 8,233.92 | 4,703.15 | 88,744.09 |
| Total Dietary | 131,386.31 | 141,739.57 | 150,386.37 | 151,699.87 | 167,366.40 | 160,667.41 | 182,799.66 | 150,200.65 | 171,067.59 | 183,847.24 | 134,591.92 | 1,725,752.99 |
| Housekeeping | | | | | | | | | | | | |
| Reimbursement - Housekeeping | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -3,250.00 | -35,750.00 |
| Dental Insurance-Housekeeping | 136.88 | 136.88 | 68.90 | 0.00 | -34.45 | 34.45 | 34.45 | -137.80 | 0.00 | 0.00 | 0.00 | 239.31 |
| Housekeeping Wages | 26,852.01 | 30,849.37 | 34,793.20 | 38,680.99 | 34,923.83 | 35,276.88 | 38,232.53 | 40,672.19 | 40,045.00 | 44,433.65 | 43,122.08 | 407,881.73 |
| Hskg. Payroll Taxes | 3,781.03 | 4,101.39 | 3,833.41 | 3,674.54 | 4,714.48 | 2,784.11 | 2,888.39 | 2,866.87 | 3,094.14 | 4,832.26 | 3,312.74 | 39,883.36 |
| Health Insurance | 2,241.57 | 2,141.71 | -199.72 | -99.86 | -299.58 | 547.47 | 547.47 | 547.47 | 547.47 | 447.61 | 2,789.04 | 9,210.65 |
| Hskp. & Laundry Supplies | 24,267.11 | 20,638.76 | 21,237.45 | 21,700.93 | 24,065.70 | 13,473.30 | 23,213.15 | 18,554.40 | 21,116.98 | 22,929.75 | 13,837.90 | 225,035.43 |
| Total Housekeeping | 54,028.60 | 54,618.11 | 56,483.24 | 60,706.60 | 60,119.98 | 48,866.21 | 61,665.99 | 59,253.13 | 61,553.59 | 69,393.27 | 59,811.76 | 646,500.48 |
| Direct Care-Nursing | | | | | | | | | | | | |
| Auto & Travel | 89.80 | 497.76 | 65.87 | 0.00 | 0.00 | 117.48 | 435.94 | 320.61 | 187.18 | 227.68 | 460.67 | 2,402.99 |
| Reimbursement - Direct Care | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -8,250.00 | -90,750.00 |
| Dental Insurance-Direct Care | 575.05 | 375.30 | 408.10 | -540.60 | -111.30 | 487.60 | 431.95 | 312.70 | 278.25 | 283.55 | -477.00 | 2,023.60 |
| Workmans Compensation | 0.00 | 745.00 | 0.00 | -745.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| D.C. Wages | 214,913.15 | 257,210.86 | 277,199.37 | 277,151.59 | 282,875.01 | 276,167.66 | 279,823.62 | 281,883.00 | 281,204.60 | 279,422.26 | 286,195.38 | 2,994,046.50 |
| D.C. Payroll Taxes | 28,268.08 | 33,128.62 | 26,774.25 | 23,605.46 | 33,127.81 | 21,422.46 | 21,105.54 | 21,447.98 | 21,025.82 | 32,638.14 | 22,675.05 | 285,219.21 |
| Health Insurance | 18,679.75 | 16,482.83 | 15,880.15 | 15,232.82 | 6,106.30 | 14,075.97 | 13,927.94 | 8,360.08 | 14,337.60 | 10,945.88 | 5,918.79 | 139,948.11 |
| Medical Supplies | 5,303.44 | 2,749.54 | 1,165.21 | 1,571.76 | 5,262.53 | 1,577.91 | 7,199.79 | 1,846.13 | 707.25 | 508.84 | 5,039.02 | 32,931.42 |
| Direct Care-Nursing - Other | 591.00 | 245.00 | 245.00 | 490.00 | 677.00 | 686.00 | 352.20 | 1,060.54 | 784.00 | 0.00 | 822.00 | 5,952.74 |
| Total Direct Care-Nursing | 260,170.27 | 303,184.91 | 313,487.95 | 308,516.03 | 319,687.35 | 306,285.08 | 315,026.98 | 306,981.04 | 310,274.70 | 315,776.35 | 312,383.91 | 3,371,774.57 |
| Marketing | | | | | | | | | | | | |
| Health Insurance | 451.00 | 451.00 | 451.00 | 451.00 | 530.75 | 530.75 | 530.75 | 484.00 | 484.00 | 484.00 | 484.00 | 5,332.25 |
| Advertising | | | | | | | | | | | | |
| Advertising & Marketing | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 110,000.00 |
| Advertising Referral Company | 9,446.73 | 25,553.76 | 10,302.07 | 64,432.79 | 22,241.90 | 23,684.75 | 14,581.17 | 13,057.53 | 21,649.30 | 33,974.25 | 17,432.00 | 256,356.25 |
| Advertising - Other | 8,042.00 | 3,417.50 | 6,660.00 | 4,876.50 | 4,267.50 | 4,840.00 | 10,085.00 | 11,482.80 | 10,643.50 | 11,553.85 | 2,517.50 | 78,386.15 |

| | Jan 25 | Feb 25 | Mar 25 | Apr 25 | May 25 | Jun 25 | Jul 25 | Aug 25 | Sep 25 | Oct 25 | Nov 25 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Advertising | 27,488.73 | 38,971.26 | 26,962.07 | 79,309.29 | 36,509.40 | 38,524.75 | 34,666.17 | 34,540.33 | 42,292.80 | 55,528.10 | 29,949.50 | 444,742.40 |
| Supplies | 499.56 | 0.00 | 0.00 | 829.91 | 1,244.46 | 0.00 | 0.00 | 0.00 | 393.74 | 97.92 | 94.34 | 3,159.93 |
| Total Marketing | 28,439.29 | 39,422.26 | 27,413.07 | 80,590.20 | 38,284.61 | 39,055.50 | 35,196.92 | 35,024.33 | 43,170.54 | 56,110.02 | 30,527.84 | 453,234.58 |
| Administration | | | | | | | | | | | | |
| Adm. Wages | 8,493.46 | 43,668.13 | 42,930.04 | 43,612.03 | 46,433.52 | 43,730.02 | 46,551.90 | 54,111.19 | 48,412.56 | 44,896.21 | 45,746.40 | 468,585.46 |
| Adm. Payroll Taxes | 5,283.22 | 5,776.14 | 3,969.32 | 3,184.85 | 4,919.74 | 3,196.97 | 3,139.03 | 3,585.50 | 4,255.24 | 4,935.16 | 3,380.10 | 45,625.27 |
| Automobile Expense | 6,287.82 | 4,984.29 | 4,256.79 | 1,250.26 | 3,081.52 | 4,098.07 | 4,641.15 | 3,385.22 | 4,492.90 | 4,184.27 | 2,481.94 | 43,144.23 |
| Bank Service Charges | 512.64 | 600.21 | 454.47 | 462.87 | 456.92 | 522.89 | 437.22 | 526.38 | 450.18 | 419.49 | 588.92 | 5,432.19 |
| Computer/Software | 4,770.20 | 454.23 | 1,371.83 | 3,733.39 | 6,667.39 | 3,940.38 | 4,749.92 | 5,338.54 | 4,058.32 | 4,935.69 | 3,065.53 | 43,085.42 |
| Contract Labor | 7,124.38 | 2,775.92 | 2,864.80 | 3,084.16 | 2,309.71 | 3,017.17 | 2,788.40 | 3,498.48 | 3,218.80 | 1,372.50 | 1,354.76 | 33,409.08 |
| Donations/Contributions | 5,090.00 | 90.00 | 90.00 | 90.00 | 590.00 | 590.00 | 90.00 | 390.00 | 90.00 | 90.00 | 90.00 | 7,290.00 |
| Dues and Subscriptions | 1,154.19 | 40.26 | 0.00 | 817.53 | 131.26 | 1,658.97 | 1,545.50 | 522.12 | 26.49 | 1,667.96 | 595.97 | 8,160.25 |
| Employee Background Checks | 0.00 | 396.00 | 374.00 | 396.00 | 220.00 | 440.00 | 396.00 | 308.00 | 396.00 | 1,804.00 | 660.00 | 5,390.00 |
| Employee Training | 704.00 | 400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 440.00 | 0.00 | 0.00 | 200.00 | 1,744.00 |
| Health Insurance-Employees | 4,308.56 | 4,008.98 | 2,314.88 | 2,962.21 | 3,957.29 | 3,609.54 | 3,609.54 | 5,103.92 | 4,456.59 | 3,957.29 | 3,609.54 | 41,898.34 |
| Dental Insurance-Admin | 166.53 | 118.83 | 84.38 | -95.40 | 36.68 | 187.73 | 118.83 | 187.73 | 169.18 | 153.28 | -63.60 | 1,064.17 |
| Insurance- Auto | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,223.78 | 1,384.90 | 1,384.90 | 13,783.82 |
| Liability Insurance | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 17,637.20 | 18,334.31 | 18,334.31 | 195,403.42 |
| Legal/Professional Fees | 4,647.00 | 2,496.75 | 13,305.50 | 500.00 | 6,707.50 | 8,372.24 | 24,137.04 | 20,883.40 | 15,339.05 | 11,533.33 | 6,018.00 | 113,939.81 |
| Licenses and Permits | 60.00 | 80.27 | 0.00 | 0.00 | 6,421.21 | 0.00 | 0.00 | 135.00 | 48.00 | 0.00 | 560.00 | 7,304.48 |
| Management fee | 40,801.02 | 41,259.10 | 39,798.42 | 41,042.31 | 39,725.76 | 39,285.41 | 38,792.87 | 41,070.83 | 40,260.18 | 41,726.70 | 42,193.30 | 445,955.90 |
| Miscellaneous | 85.00 | 144.79 | 0.00 | 0.00 | -94.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 134.90 |
| Office Supplies | 4,198.37 | 4,882.82 | 1,032.05 | 1,646.77 | 311.92 | 2,539.82 | 508.61 | 373.95 | 200.36 | 842.71 | 2,901.38 | 19,438.76 |
| Postage and Delivery | 0.00 | 54.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 550.15 | 200.36 | 0.00 | 550.15 | 1,355.48 |
| Payroll Service Charge | 4,003.76 | 1,671.25 | 1,841.88 | 1,911.81 | 1,917.92 | 1,877.19 | 1,767.56 | 1,740.87 | 1,886.57 | 1,899.46 | 1,857.42 | 22,375.69 |
| Telephone | 570.90 | 853.32 | 570.90 | 3,498.27 | 3,891.73 | 3,373.17 | 3,474.39 | 3,572.05 | 3,388.52 | 3,581.50 | 2,267.46 | 29,042.21 |
| W/C Insurance | 8,703.67 | 8,703.67 | 8,703.67 | 8,703.67 | 7,115.67 | 8,703.67 | 8,703.67 | 8,703.67 | 8,203.42 | 8,203.42 | 8,203.42 | 92,651.58 |
| Total Administration | 125,825.70 | 142,320.76 | 142,823.91 | 135,661.71 | 153,661.83 | 148,004.22 | 164,312.61 | 173,287.94 | 158,413.70 | 155,922.18 | 145,979.90 | 1,646,214.46 |
| Total Expense | 709,557.42 | 803,118.28 | 799,404.99 | 860,581.21 | 856,569.08 | 817,212.79 | 890,120.07 | 851,169.29 | 859,079.04 | 910,832.25 | 806,038.12 | 9,163,682.54 |
| Net Ordinary Income | 121,189.81 | 38,612.43 | 11,868.34 | -26,184.06 | -45,350.44 | -15,668.84 | -98,770.91 | -14,221.89 | -37,341.52 | -61,002.31 | 52,328.84 | -74,540.55 |
| Other Income/Expense | | | | | | | | | | | | |
| Other Income | | | | | | | | | | | | |
| Interest Income | 0.00 | 0.15 | 0.31 | 0.29 | 0.27 | 41.70 | 4.82 | 4.60 | 4.39 | 4.52 | 4.36 | 65.41 |
| Total Other Income | 0.00 | 0.15 | 0.31 | 0.29 | 0.27 | 41.70 | 4.82 | 4.60 | 4.39 | 4.52 | 4.36 | 65.41 |
| Other Expense | | | | | | | | | | | | |
| Ask Accountant | 315.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 315.00 |
| Depreciation Expense | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 8,880.87 | 97,689.57 |
| Interest Expense | 652.26 | 764.56 | 843.90 | 709.46 | 652.26 | 968.05 | 121.88 | 78.84 | 98.05 | 66.64 | 223.42 | 5,179.32 |
| Total Other Expense | 9,848.13 | 9,645.43 | 9,724.77 | 9,590.33 | 9,533.13 | 9,848.92 | 9,002.75 | 8,959.71 | 8,978.92 | 8,947.51 | 9,104.29 | 103,183.89 |
| Net Other Income | -9,848.13 | -9,645.28 | -9,724.46 | -9,590.04 | -9,532.86 | -9,807.22 | -8,997.93 | -8,955.11 | -8,974.53 | -8,942.99 | -9,099.93 | -103,118.48 |
| Net Income | 111,341.68 | 28,967.15 | 2,143.88 | -35,774.10 | -54,883.30 | -25,476.06 | -107,768.84 | -23,177.00 | -46,316.05 | -69,945.30 | 43,228.91 | -177,659.03 |

## Saucon Valley Manor Inc.
## Operating Statements
### January 2023 through December 2024

| | Jan - Dec 23 | Jan - Dec 24 | Accrual Basis TOTAL |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| **Rental Income** | | | |
| Monthly Rental | 8,684,193.32 | 9,372,533.03 | 18,056,726.35 |
| Respite | 43,937.00 | 64,584.00 | 108,521.00 |
| Discounts & Coupons Issued | -108,315.00 | -2,225.00 | -110,540.00 |
| **Total Rental Income** | 8,619,815.32 | 9,434,892.03 | 18,054,707.35 |
| **Ancillary Charges** | | | |
| Barber and Beauty | 30,467.00 | 29,565.00 | 60,032.00 |
| Family Meals | 0.00 | 22.00 | 22.00 |
| TV Cable Monthly | 51,065.50 | 75,401.50 | 126,467.00 |
| Miscellaneous | 9,395.00 | 12,663.01 | 22,058.01 |
| **Total Ancillary Charges** | 90,927.50 | 117,651.51 | 208,579.01 |
| **Physical Therapy Good Shepherd** | 63,203.52 | 63,203.52 | 126,407.04 |
| **Total Income** | 8,773,946.34 | 9,615,747.06 | 18,389,693.40 |
| **Gross Profit** | 8,773,946.34 | 9,615,747.06 | 18,389,693.40 |
| **Expense** | | | |
| **Facility Costs** | | | |
| Furniture - Carpet Replacement | 7,096.42 | 5,658.14 | 12,754.56 |
| Cable TV | 95,045.21 | 63,239.35 | 158,284.56 |
| Electric | 168,789.80 | 193,670.07 | 362,459.87 |
| Gas | 99,410.06 | 123,183.97 | 222,594.03 |
| Pest Control | 6,622.75 | 2,732.71 | 9,355.46 |
| Rent (mininum) | 1,377,071.64 | 0.00 | 1,377,071.64 |
| Rent- other | 60,000.00 | 60,000.00 | 120,000.00 |
| Property Taxes | 184,750.56 | 60,124.74 | 244,875.30 |
| Sanitation | 32,853.92 | 31,849.26 | 64,703.18 |
| Water/Sewer | 109,784.32 | 113,826.14 | 223,610.46 |
| Fire Appropriation | 535.80 | 0.00 | 535.80 |
| Miscellaneous | 2,935.20 | 10,630.57 | 13,565.77 |
| **Total Facility Costs** | 2,144,895.68 | 664,914.95 | 2,809,810.63 |
| **Maintenance** | | | |
| Dental Insurance-Maintenance | 0.00 | -21.63 | -21.63 |
| Workmans Compensation | 3,763.87 | 2,660.30 | 6,424.17 |
| Maintenance Wages | 165,084.72 | 109,896.67 | 274,981.39 |
| Maintenance Payroll Taxes | 13,059.48 | 9,489.36 | 22,548.84 |
| Health Insurance | 190.24 | -2,142.25 | -1,952.01 |
| Maintenance Supplies | 30,749.98 | 59,153.40 | 89,903.38 |
| **Repair & Maintenance** | | | |
| Reimbursement - R&M | -14,600.00 | -14,640.00 | -29,240.00 |
| Repair & Maintenance - Other | 258,432.64 | 160,456.92 | 418,889.56 |
| **Total Repair & Maintenance** | 243,832.64 | 145,816.92 | 389,649.56 |
| Lawn Care & Snow Removal | 6,806.70 | 7,658.55 | 14,465.25 |
| **Total Maintenance** | 463,487.63 | 332,511.32 | 795,998.95 |
| **Activities** | | | |
| Dental Insurance-Activities | 263.13 | 528.17 | 791.30 |
| Workmans Compensation | 4,905.43 | 4,242.34 | 9,147.77 |
| Activities Wages | 208,600.40 | 175,983.83 | 384,584.23 |
| Activities Payroll Taxes | 18,888.00 | 15,646.13 | 34,534.13 |
| Health Insurance | 16,370.21 | 13,201.20 | 29,571.41 |
| Events | 7,357.15 | 7,298.12 | 14,655.27 |
| Activities Supplies | 11,273.96 | 12,620.61 | 23,894.57 |
| **Total Activities** | 267,658.28 | 229,520.40 | 497,178.68 |
| **Dietary** | | | |
| Workmans Compensation | 16,718.82 | 16,905.80 | 33,624.62 |
| Dietary Wages | 725,935.15 | 717,316.31 | 1,443,251.46 |
| Dietary Payroll Taxes | 63,403.60 | 62,197.14 | 125,600.74 |
| Health Insurance | 18,963.97 | 29,896.33 | 48,860.30 |
| **Food Costs** | | | |
| Event/Holiday Food | 7,457.70 | 5,976.31 | 13,434.01 |

| | Jan - Dec 23 | Jan - Dec 24 | TOTAL |
|---|---|---|---|
| Activites Food | 8,786.78 | 8,797.00 | 17,583.78 |
| Icecream/Slushi | 40,684.44 | 56,004.23 | 96,688.67 |
| Reimburse Food Prep/Delivery | -241,505.04 | -115,413.00 | -356,918.04 |
| Food Costs - Other | 1,110,377.72 | 961,680.68 | 2,072,058.40 |
| Total Food Costs | 925,801.60 | 917,045.22 | 1,842,846.82 |
| Supplies | 95,744.74 | 81,013.90 | 176,758.64 |
| Dietary - Other | 1,094.62 | 0.00 | 1,094.62 |
| Total Dietary | 1,847,662.50 | 1,824,374.70 | 3,672,037.20 |
| Housekeeping | | | |
| Reimbursement - Housekeeping | -39,000.00 | -39,000.00 | -78,000.00 |
| Outside Laundry Service | 0.00 | 10.00 | 10.00 |
| Dental Insurance-Housekeeping | 691.08 | 996.42 | 1,687.50 |
| Workmans Compensation | 10,051.93 | 11,020.14 | 21,072.07 |
| Housekeeping Wages | 437,349.52 | 461,359.28 | 898,708.80 |
| Hskg. Payroll Taxes | 37,170.73 | 40,396.76 | 77,567.49 |
| Health Insurance | 10,376.10 | 14,070.74 | 24,446.84 |
| Hskp. & Laundry Supplies | 202,291.73 | 223,416.49 | 425,708.22 |
| Housekeeping - Other | 0.00 | 105.00 | 105.00 |
| Total Housekeeping | 658,931.09 | 712,374.83 | 1,371,305.92 |
| Direct Care-Nursing | | | |
| Auto & Travel | 0.00 | 4,348.94 | 4,348.94 |
| Reimbursement - Direct Care | -99,000.00 | -99,000.00 | -198,000.00 |
| Direct Care -outside agency | 2,842.76 | 3,591.00 | 6,433.76 |
| Dental Insurance-Direct Care | 432.55 | 3,249.66 | 3,682.21 |
| Workmans Compensation | 68,359.27 | 74,074.70 | 142,433.97 |
| D.C. Wages | 2,944,231.40 | 3,146,538.36 | 6,090,769.76 |
| D.C. Payroll Taxes | 250,484.48 | 267,417.09 | 517,901.57 |
| Health Insurance | 89,818.80 | 119,657.21 | 209,476.01 |
| Medical Supplies | 17,986.19 | 16,637.80 | 34,623.99 |
| Direct Care-Nursing - Other | 2,072.00 | 5,386.00 | 7,458.00 |
| Total Direct Care-Nursing | 3,277,227.45 | 3,541,900.76 | 6,819,128.21 |
| Marketing | | | |
| Dental Insurance-Marketing | 5.31 | 0.00 | 5.31 |
| Workmans Compensation | 1,082.35 | 0.00 | 1,082.35 |
| Marketing Wages | 45,040.69 | 0.00 | 45,040.69 |
| Marketing Payroll Taxes | 3,648.78 | 0.00 | 3,648.78 |
| Health Insurance | 4,284.44 | 5,412.00 | 9,696.44 |
| Advertising | | | |
| Advertising & Marketing | 120,000.00 | 120,500.00 | 240,500.00 |
| Advertising Referral Company | 136,547.28 | 228,085.89 | 364,633.17 |
| Advertising - Other | 61,216.65 | 83,183.86 | 144,400.51 |
| Total Advertising | 317,763.93 | 431,769.75 | 749,533.68 |
| Supplies | 4,687.93 | 3,366.44 | 8,054.37 |
| Total Marketing | 376,513.43 | 440,548.19 | 817,061.62 |
| Administration | | | |
| Consulting | 4,510.00 | 0.00 | 4,510.00 |
| Adm. Wages | 547,843.40 | 644,745.67 | 1,192,589.07 |
| Adm. Payroll Taxes | 44,468.89 | 50,798.48 | 95,267.37 |
| Automobile Expense | 26,822.12 | 19,674.79 | 46,496.91 |
| Bank Service Charges | 5,356.82 | 5,688.97 | 11,045.79 |
| Computer/Software | 11,845.97 | 26,130.91 | 37,976.88 |
| Contract Labor | 34,106.72 | 34,621.86 | 68,728.58 |
| Donations/Contributions | 1,675.00 | 4,580.00 | 6,255.00 |
| Dues and Subscriptions | 41.30 | 751.67 | 792.97 |
| Employee Background Checks | 3,982.00 | 3,762.00 | 7,744.00 |
| Employee Bonus | 251.00 | 3,941.00 | 4,192.00 |
| Employee Training | 1,947.61 | 969.65 | 2,917.26 |
| Help Want Ads | 0.00 | 265.49 | 265.49 |
| Health Insurance-Employees | 43,519.96 | 45,727.15 | 89,247.11 |
| Dental Insurance-Admin | 1,258.62 | 1,619.19 | 2,877.81 |
| Insurance- Auto | 3,273.90 | 13,493.04 | 16,766.94 |
| Liability Insurance | 726,863.85 | 207,315.24 | 934,179.09 |
| Legal/Professional Fees | 58,166.17 | 52,357.71 | 110,523.88 |

|  | Jan - Dec 23 | Jan - Dec 24 | TOTAL |
|---|---|---|---|
| **Licenses and Permits** | 3,289.50 | 130.00 | 3,419.50 |
| **Management fee** | 437,138.32 | 472,793.00 | 909,931.32 |
| **Miscellaneous** | 12,193.24 | 1,966.59 | 14,159.83 |
| **Office Supplies** | 43,153.25 | 62,630.37 | 105,783.62 |
| **Postage and Delivery** | 886.12 | 1,352.90 | 2,239.02 |
| **Payroll Service Charge** | 22,087.47 | 21,545.97 | 43,633.44 |
| **Taxes** | 0.00 | 851.79 | 851.79 |
| **Telephone** | 39,524.16 | 6,745.41 | 46,269.57 |
| **Testing** | 85.00 | 0.00 | 85.00 |
| **Transport** | 6,203.44 | 0.00 | 6,203.44 |
| **Travel & Entertainment** | 0.00 | 886.54 | 886.54 |
| **Uniform Expense** | 1,011.00 | 1,617.00 | 2,628.00 |
| **W/C Insurance** | 15,734.37 | 14,958.04 | 30,692.41 |
| **Total Administration** | 2,097,239.20 | 1,701,920.43 | 3,799,159.63 |
| **Total Expense** | 11,133,615.26 | 9,448,065.58 | 20,581,680.84 |
| **Net Ordinary Income** | -2,359,668.92 | 167,681.48 | -2,191,987.44 |
| **Other Income/Expense** | | | |
| **Other Income** | | | |
| **Miscellaneous Income** | 111,811.81 | 0.00 | 111,811.81 |
| **Total Other Income** | 111,811.81 | 0.00 | 111,811.81 |
| **Other Expense** | | | |
| **Bad Debt expense** | 106,944.19 | 162,817.85 | 269,762.04 |
| **Finance Charge** | 0.00 | 103.56 | 103.56 |
| **Depreciation Expense** | 116,882.13 | 114,183.52 | 231,065.65 |
| **Interest Expense** | 8,304.28 | 5,225.94 | 13,530.22 |
| **Total Other Expense** | 232,130.60 | 282,330.87 | 514,461.47 |
| **Net Other Income** | -120,318.79 | -282,330.87 | -402,649.66 |
| **Net Income** | **-2,479,987.71** | **-114,649.39** | **-2,594,637.10** |

## Saucon Valley Manor Inc.
## Operating Statements
Tax year 2022 & 2021

Preliminary
(not reviewed or audited)

Accrual Basis

| | Jan - Dec 22 | Jan - Dec 21 | $ Change | % Change |
|---|---|---|---|---|
| Ordinary Income/Expense | | | | |
| Income | | | | |
| Rental Income | | | | |
| Monthly Rental | 8,614,549.34 | 8,475,473.01 | 139,076.33 | 1.64% |
| Respite | 77,224.00 | 48,602.00 | 28,622.00 | 58.89% |
| Discounts & Coupons Issued | -217,530.00 | -406,181.50 | 188,651.50 | 46.45% |
| Total Rental Income | 8,474,243.34 | 8,117,893.51 | 356,349.83 | 4.39% |
| Ancillary Charges | | | | |
| Barber and Beauty | 32,068.00 | 29,375.00 | 2,693.00 | 9.17% |
| TV Cable Monthly | 56,419.00 | 62,602.50 | -6,183.50 | -9.88% |
| Miscellaneous | 13,675.73 | 6,522.46 | 7,153.27 | 109.67% |
| Total Ancillary Charges | 102,162.73 | 98,499.96 | 3,662.77 | 3.72% |
| Physical Therapy Good Shepherd | 63,203.52 | 61,727.72 | 1,475.80 | 2.39% |
| Total Income | 8,639,609.59 | 8,278,121.19 | 361,488.40 | 4.37% |
| Gross Profit | 8,639,609.59 | 8,278,121.19 | 361,488.40 | 4.37% |
| Expense | | | | |
| Facility Costs | | | | |
| Furniture - Carpet Replacement | 14,762.74 | 13,398.04 | 1,364.70 | 10.19% |
| Cable TV | 80,562.34 | 81,136.13 | -573.79 | -0.71% |
| Electric | 154,669.96 | 136,684.44 | 17,985.52 | 13.16% |
| Gas | 82,574.33 | 87,725.77 | -5,151.44 | -5.87% |
| Pest Control | 10,232.02 | 7,616.10 | 2,615.92 | 34.35% |
| Rent | 1,705,421.04 | 2,271,171.04 | -565,750.00 | -24.91% |
| Rent- other | 65,000.00 | 0.00 | 65,000.00 | 100.0% |
| Property Taxes | 348.31 | 46,079.93 | -45,731.62 | -99.24% |
| Sanitation | 16,829.69 | 26,004.23 | -9,174.54 | -35.28% |
| Security | 456.00 | 2,435.28 | -1,979.28 | -81.28% |
| Water/Sewer | 120,361.81 | 148,029.95 | -27,668.14 | -18.69% |
| Fire Appropriation | 4,527.51 | 0.00 | 4,527.51 | 100.0% |
| Total Facility Costs | 2,255,745.75 | 2,820,280.91 | -564,535.16 | -20.02% |
| Maintenance | | | | |
| Workmans Compensation | 0.00 | 4,280.58 | -4,280.58 | -100.0% |
| Maintenance Wages | 163,744.65 | 170,528.52 | -6,783.87 | -3.98% |
| Maintenance Payroll Taxes | 14,676.11 | 13,864.74 | 811.37 | 5.85% |
| Health Insurance | 1,126.41 | 9,400.66 | -8,274.25 | -88.02% |
| Maintenance Supplies | 19,361.94 | 38,467.90 | -19,105.96 | -49.67% |
| Repair & Maintenance | | | | |
| Reimbursement - R&M | -14,660.00 | -35,516.25 | 20,856.25 | 58.72% |
| Repair & Maintenance - Other | 239,259.69 | 361,744.98 | -122,485.29 | -33.86% |
| Total Repair & Maintenance | 224,599.69 | 326,228.73 | -101,629.04 | -31.15% |
| Lawn Care & Snow Removal | 784.82 | 11,658.90 | -10,874.08 | -93.27% |
| Total Maintenance | 424,293.62 | 574,430.03 | -150,136.41 | -26.14% |
| Activities | | | | |
| Dental Insurance-Activities | -19.77 | 0.06 | -19.83 | -33,050.0% |
| Workmans Compensation | 0.00 | 5,921.05 | -5,921.05 | -100.0% |
| Activities Wages | 242,300.34 | 230,735.07 | 11,565.27 | 5.01% |
| Activities Payroll Taxes | 21,173.60 | 19,293.01 | 1,880.59 | 9.75% |
| Health Insurance | 6,916.83 | 6,501.89 | 414.94 | 6.38% |
| Events | 6,410.00 | 3,845.00 | 2,565.00 | 66.71% |
| Activities Supplies | 14,267.73 | 15,324.79 | -1,057.06 | -6.9% |
| Total Activities | 291,048.73 | 281,620.87 | 9,427.86 | 3.35% |
| Dietary | | | | |
| Workmans Compensation | 0.00 | 15,448.68 | -15,448.68 | -100.0% |
| Dietary Wages | 659,684.13 | 604,210.77 | 55,473.36 | 9.18% |
| Dietary Payroll Taxes | 59,012.49 | 52,860.93 | 6,151.56 | 11.64% |
| Health Insurance | 5,367.62 | 4,805.60 | 562.02 | 11.7% |
| Food Costs | | | | |
| Event/Holiday Food | 15,000.75 | 13,306.52 | 1,694.23 | 12.73% |
| Activites Food | 34,748.48 | 11,248.72 | 23,499.76 | 208.91% |
| Icecream/Slushi | 36,792.71 | 35,881.53 | 911.18 | 2.54% |
| Reimburse Food Prep/Delivery | -313,324.90 | -173,353.70 | -139,971.20 | -80.74% |
| Food Costs - Other | 1,052,961.50 | 774,027.61 | 278,933.89 | 36.04% |
| Total Food Costs | 826,178.54 | 661,110.68 | 165,067.86 | 24.97% |
| Supplies | 92,113.20 | 77,278.27 | 14,834.93 | 19.2% |
| Total Dietary | 1,642,355.98 | 1,415,714.93 | 226,641.05 | 16.01% |
| Housekeeping | | | | |
| Reimbursement - Housekeeping | -39,000.00 | -35,516.25 | -3,483.75 | -9.81% |
| Workmans Compensation | 0.00 | 7,160.05 | -7,160.05 | -100.0% |
| Housekeeping Wages | 371,268.40 | 283,061.17 | 88,207.23 | 31.16% |
| Hskg. Payroll Taxes | 32,856.58 | 25,234.22 | 7,622.36 | 30.21% |
| Health Insurance | 10,684.13 | 5,527.86 | 5,156.27 | 93.28% |
| Linens | 2,217.94 | 50,026.50 | -47,808.56 | -95.57% |
| Hskp. & Laundry Supplies | 257,796.38 | 122,182.50 | 135,613.88 | 110.99% |
| Total Housekeeping | 635,823.43 | 457,676.05 | 178,147.38 | 38.92% |
| Direct Care-Nursing | | | | |

(not reviewed or audited)

| | Jan - Dec 22 | Jan - Dec 21 | $ Change | % Change |
|---|---|---|---|---|
| Reimbursement - Direct Care | -99,267.41 | -118,387.50 | 19,120.09 | 16.15% |
| Direct Care -outside agency | 220,815.68 | 52,446.25 | 168,369.43 | 321.03% |
| Dental Insurance-Direct Care | 1,462.33 | 99.68 | 1,362.65 | 1,367.02% |
| Workmans Compensation | 0.00 | 65,590.65 | -65,590.65 | -100.0% |
| D.C. Wages | 2,719,326.92 | 2,569,791.81 | 149,535.11 | 5.82% |
| D.C. Payroll Taxes | 231,348.08 | 217,248.81 | 14,099.27 | 6.49% |
| Health Insurance | 98,493.26 | 91,427.33 | 7,065.93 | 7.73% |
| Medical Supplies | 20,173.00 | 32,472.09 | -12,299.09 | -37.88% |
| **Total Direct Care-Nursing** | 3,192,351.86 | 2,910,689.12 | 281,662.74 | 9.68% |
| Marketing | | | | |
| Dental Insurance-Marketing | 0.00 | 0.12 | -0.12 | -100.0% |
| Workmans Compensation | 0.00 | 1,662.50 | -1,662.50 | -100.0% |
| Marketing Wages | 63,469.99 | 65,379.37 | -1,909.38 | -2.92% |
| Marketing Payroll Taxes | 4,949.84 | 5,076.49 | -126.65 | -2.5% |
| Health Insurance | 8,400.10 | 4,073.16 | 4,326.94 | 106.23% |
| Advertising | | | | |
| Advertising Referral Company | 77,475.88 | 177,482.59 | -100,006.71 | -56.35% |
| Advertising - Other | 176,520.17 | 300,429.16 | -123,908.99 | -41.24% |
| **Total Advertising** | 253,996.05 | 477,911.75 | -223,915.70 | -46.85% |
| Events | 47.31 | 174.95 | -127.64 | -72.96% |
| Supplies | 1,875.70 | 2,500.54 | -624.84 | -24.99% |
| **Total Marketing** | 332,738.99 | 556,778.88 | -224,039.89 | -40.24% |
| Administration | | | | |
| Consulting | 5,579.75 | 5,103.25 | 476.50 | 9.34% |
| Adm. Wages | 570,508.91 | 530,955.42 | 39,553.49 | 7.45% |
| Adm. Payroll Taxes | 49,345.85 | 42,286.28 | 7,059.57 | 16.7% |
| Automobile Expense | 47,210.13 | 31,714.72 | 15,495.41 | 48.86% |
| Bank Service Charges | 5,422.33 | 7,245.03 | -1,822.70 | -25.16% |
| Computer/Software | 8,026.17 | 10,874.63 | -2,848.46 | -26.19% |
| Contract Labor | 30,999.10 | 27,161.32 | 3,837.78 | 14.13% |
| Contributions | 1,681.28 | 2,227.50 | -546.22 | -24.52% |
| Dues and Subscriptions | 672.82 | 682.95 | -10.13 | -1.48% |
| Employee Background Checks | 2,904.00 | 3,190.00 | -286.00 | -8.97% |
| Employee Bonus | 1,140.00 | 1,551.15 | -411.15 | -26.51% |
| Employee Training | 5,019.00 | 1,257.97 | 3,761.03 | 298.98% |
| Health Insurance-Employees | 33,601.85 | 39,057.21 | -5,455.36 | -13.97% |
| Dental Insurance-Admin | 911.88 | 1,143.87 | -231.99 | -20.28% |
| Liability Insurance | 18,853.54 | 24,956.14 | -6,102.60 | -24.45% |
| Legal/Professional Fees | 32,516.52 | 98,144.54 | -65,628.02 | -66.87% |
| Licenses and Permits | 2,294.44 | 1,255.51 | 1,038.93 | 82.75% |
| Management fee | 434,932.45 | 0.00 | 434,932.45 | 100.0% |
| Miscellaneous | 982.40 | 2,982.60 | -2,000.20 | -67.06% |
| Office Supplies | 45,094.23 | 35,712.35 | 9,381.88 | 26.27% |
| Postage and Delivery | 2,716.88 | 4,911.81 | -2,194.93 | -44.69% |
| Payroll Service Charge | 20,441.74 | 22,152.81 | -1,711.07 | -7.72% |
| Taxes | 0.00 | 2,592.72 | -2,592.72 | -100.0% |
| Telephone | 10,000.98 | 27,865.95 | -17,864.97 | -64.11% |
| Testing | 815.00 | 206.00 | 609.00 | 295.63% |
| Transport | 2,086.55 | 514.59 | 1,571.96 | 305.48% |
| Travel & Entertainment | 5,159.19 | 1,899.87 | 3,259.32 | 171.56% |
| W/C Insurance | 123,606.32 | 13,405.17 | 110,201.15 | 822.08% |
| **Total Administration** | 1,462,523.31 | 941,051.36 | 521,471.95 | 55.41% |
| **Total Expense** | 10,236,881.67 | 9,958,242.15 | 278,639.52 | 2.8% |
| Net Ordinary Income | -1,597,272.08 | -1,680,120.96 | 82,848.88 | 4.93% |
| Other Income/Expense | | | | |
| Other Income | | | | |
| Other Income | 127,145.84 | 0.00 | 127,145.84 | 100.0% |
| **Total Other Income** | 127,145.84 | 0.00 | 127,145.84 | 100.0% |
| Other Expense | | | | |
| Bad Debt expense | 0.00 | 125,304.26 | -125,304.26 | -100.0% |
| Depreciation Expense | 106,570.40 | 121,660.39 | -15,089.99 | -12.4% |
| Interest Expense | 7,568.76 | 2,354.40 | 5,214.36 | 221.47% |
| **Total Other Expense** | 114,139.16 | 249,319.05 | -135,179.89 | -54.22% |
| Net Other Income | 13,006.68 | -249,319.05 | 262,325.73 | 105.22% |
| Net Income | -1,584,265.40 | -1,929,440.01 | 345,174.61 | 17.89% |

| | SAUCON VALLEY MANOR - MAIN BUILDING | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **1/12/2026** | | | SAUCON VALLEY MANOR- MAIN BUILDING | | | | |
| | | | | HIGHLIGHTED RESIDENTS NEED TO BE VACATED | | | | |
| | | | | | | | | |
| **ROOM #** | **RESIDENT NAME** | **PRIV/SHRD** | **CARE LVL** | **ORIG ADMIT** | **ADMISSION** | **2025** | **2026 Incrs** | **CBL** |
| A-1 | | Shared | PC | | 12/27/2025 | $2,995.00 | NO | YES |
| A-1 | | Shared | PC | | 11/3/2025 | $4,200.00 | $3,000.00 | no |
| A-2 | | Shared | PC | | 12/24/2024 | $2,795.00 | $2,935.00 | |
| A-2 | | Shared | PC | | 12/24/2024 | $2,595.00 | $2,725.00 | |
| A-3 | | Private | PC | | 5/3/2025 | $3,995.00 | $4,195.00 | |
| A-5 | | Private | PC | | 10/16/2023 | $4,075.00 | $4,279.00 | yes |
| A-8 | | Private | PC | | 2/17/2024 | $3,876.00 | $4,070.00 | Yes |
| A-9 | | Private | PC+ | | 3/1/2024 | $2,673.00 | $2,807.00 | YES |
| A-10 | | | | | | | | |
| A-11 | | Private | PC | | 5/29/2020 | $3,032.00 | $3,184.00 | yes |
| A-13 | | Shared | PC | | 7/17/2023 | $3,496.00 | $3,671.00 | no |
| A-14 | | Private | PC | | 11/9/2024 | $3,295.00 | $3,460.00 | YES |
| A-15 | | Private | PC | | 6/27/2025 | $3,295.00 | $4,195.00 | NO |
| A-17 | | Private | PC | | | $3,995.00 | $4,195.00 | no |
| A-18 | | | | | | | | |
| A-19 | | Private | PC | | 12/2/2013 | $2,934.00 | $3,081.00 | YES |
| A-20 | | Private | PC | | 12/9/2020 | $3,158.00 | $3,316.00 | yes |
| A-21 | | Private | PC | | 12/6/2024 | $4,195.00 | $4,405.00 | yes |
| A-22 | | Shared | PC | | 10/20/2025 | $3,795.00 | NO | yes |
| A-22 | | Shared | PC | | 10/14/2025 | $3,295.00 | NO | yes |
| A-24 | | Private | PC | 5/30/2024 | 10/22/2024 | $3,264.00 | $3,427.00 | Yes |
| A-26 | | Shared | PC | | 1/9/2025 | $2,200.00 | $2,310.00 | no |
| A-26 | | Shared | PC | | 1/13/2016 | $3,295.00 | $3,460.00 | YES |
| A-28 | | Private | PC | | 12/29/2024 | $2,895.00 | $3,040.00 | yes |
| A-29 | | Shared | PC | | 7/7/2024 | $2,647.00 | $2,779.00 | |
| A-29 | | Shared | PC | | 7/7/2024 | $2,647.00 | $2,779.00 | |
| A-30 | | Shared | PC | | 4/29/2024 | $2,495.00 | $2,605.00 | Yes |
| A-30 | | | | | | | | |
| A-31 | | Private | PC | | 3/17/2018 | $3,213.00 | $3,374.00 | YES |
| A-33 | | Private | IL | | 7/2/2022 | $2,699.00 | $2,834.00 | yes |
| A-34 | | Private | PC | | 9/26/2025 | $3,795.00 | $3,845.00 | yes |
| A-35 | | Private | PC | | 10/30/2024 | $3,795.00 | $3,985.00 | Yes |
| A-36 | | Private | PC | 9/14/2011 | 7/15/2024 | $4,202.00 | $4,412.00 | yes |
| A-75 | | Shared | MIP-H+ | | 1/7/2026 | | $4,595.00 | no |
| A-75 | | Shared | MIP-H+ | | 7/5/2025 | $3,995.00 | $4,195.00 | no |
| A-77 | | | | | | | | |
| A-77 | | | | | | | | |
| A-79 | | Shared | MIP-H+ | | 2/8/2017 | $2,810.00 | $2,951.00 | no |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LEVEL | Orig Date | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| A-79 | | Shared | MIP-H+ | | 7/5/2022 | $3,785.00 | $3,974.00 | yes |
| A-80 | | Shared | MIP-H+ | | 10/11/2024 | $4,100.00 | $4,305.00 | yes |
| A-80 | | Shared | MIP-H+ | | 4/11/2024 | $3,909.00 | $4,104.00 | NO |
| A-81 | | Private | MIP-H+ | | 10/17/2023 | $5,454.00 | $5,727.00 | YES |
| A-82 | | Private | MIP-H+ | 1/27/2023 | 8/20/2024 | $5,154.00 | $5,412.00 | NO |
| A-83 | | Shared | MIP-H+ | | 10/13/2025 | $3,995.00 | NO | yes |
| A-83 | | Shared | MIP-H+ | | 7/16/2025 | $3,995.00 | $4,195.00 | yes |
| A-84 | | Shared | MIP-H+ | | 4/28/2025 | $3,995.00 | $4,195.00 | YES |
| A-85 | | Shared | MIP-H+ | | 12/24/2020 | $3,676.00 | $3,860.00 | no |
| A-85 | | | | | | | | |
| A-86 | | Private | MIP-H+ | | 4/4/2025 | $4,995.00 | $5,245.00 | yes |
| A-87 | | Private | MIP-H+ | | 9/22/2020 | $5,586.00 | $5,865.00 | no |
| A-88 | | | | | | | | |
| A-88 | | Shared | MIP-H+ | | 4/1/2025 | $2,995.00 | $3,145.00 | yes |

| | | | |
|---|---|---|---|
| Personal Care | PC | 28 | |
| Personal Care Plus | PC+ | 1 | |
| Care Plus | CR+ | 0 | |
| MIP-H | MIP-H | 0 | |
| MIP-H+ | MIP-H+ | 15 | |
| INDEPENDENT | IL | 1 | |
| **Total A Floor Residents** | | **45** | |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LEVEL | Orig Date | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| B-1 | | Private | MIP-M | | 10/23/2023 | $5,101.00 | $5,356.00 | no |
| B-2 | | Private | MIP-M | 11/7/2022 | 9/25/2024 | $4,753.00 | $4,991.00 | yes |
| B-3 | | Shared | MIP-M | | 11/3/2025 | $3,995.00 | $4,995.00 | no |
| B-4 | | Private | MIP-M | | 2/9/2025 | $5,995.00 | $6,295.00 | no |
| B-5 | | Private | MIP-M | | 12/30/2021 | $5,570.00 | $5,849.00 | NO |
| B-6 | | Shared | MIP-M | | 2/12/2025 | $4,595.00 | $4,825.00 | no |
| B-6 | | | | | | | | |
| B-7 | | Shared | MIP-M | | 9/10/2020 | $4,650.00 | $4,883.00 | YES |
| B-7 | | | | | | | | |
| B-9 | | Private | MIP-M | | 2/9/2021 | $5,269.00 | $5,532.00 | YES |
| B-11 | | Private | MIP-H | | 8/8/2024 | $5,000.00 | $5,250.00 | yes |
| B-12 | | Private | PC | | 7/26/2024 | $3,230.00 | $3,493.00 | Yes |
| B-14 | | Private | PC | 1/31/2023 | 9/28/2024 | $3,703.00 | $3,800.00 | no |
| B-16 | | Private | PC | | 4/1/2024 | $3,142.00 | $3,299.00 | yes |
| B-17 | | Private | PC | 2/27/2019 | 3/1/2023 | $3,995.00 | | yes |
| B-18 | | Shared | PC | | 1/2/2026 | | $3,295.00 | yes |
| | | | | | | | | |
| B-19 | | Private | PC | | 8/9/2024 | $3,395.00 | $3,565.00 | Yes |
| B-20 | | Shared | PC | | 7/11/2025 | $4,995.00 | $5,245.00 | yes |
| B-21 | | Private | PC | | 9/28/2024 | $3,995.00 | $4,195.00 | Yes |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B-22 | | Private | PC+ | | 12/13/2025 | $6,095.00 | | yes |
| B-23 | | Shared | PC | | 9/23/2025 | $3,100.00 | $3,255.00 | yes |
| B-23 | | Shared | PC | | 12/19/2025 | $3,495.00 | no | Yes |
| B-24 | | Private | PC | | 5/2/2024 | $3,394.00 | $3,564.00 | Yes |
| B-25 | | Private | PC | | 1/29/2025 | $4,595.00 | $4,825.00 | yes |
| B-26 | | Shared | PC | | 1/30/2024 | $2,625.00 | $2,756.00 | YES |
| B-26 | | Shared | PC+ | | 7/20/2022 | $4,537.00 | $4,764.00 | yes |
| B-27 | | Private | PC | | 2/8/2023 | $4,512.00 | $4,738.00 | yes |
| B-29 | | Private | PC | | 2/11/2023 | $4,841.00 | $5,083.00 | yes |
| B-30 | | Private | PC | | 7/30/2012 | $4,015.00 | $4,216.00 | YES |
| B-32 | | | | | | | | |
| B-34 | | Private | PC | | 12/18/2024 | $4,195.00 | $4,405.00 | Yes |
| B-36 | | Private | PC | | 1/31/2017 | $4,066.00 | $4,269.00 | YES |
| B-37 | | Private | PC | | 9/16/2024 | $3,567.00 | $3,745.00 | Yes |
| B-38 | | Private | PC | | 4/24/2024 | $4,483.00 | $4,707.00 | Yes |
| B-39 | | Private | PC | 12/14/2023 | 11/26/2024 | $4,195.00 | $4,405.00 | Yes |
| B-40 | | Private | PC | 8/22/2024 | 11/13/2024 | $3,995.00 | $4,195.00 | Yes |
| B-41 | | Private | PC+ | | 12/6/2024 | $4,595.00 | $4,825.00 | YES |
| B-42 | | Private | PC | | 9/7/2025 | $4,295.00 | $4,510.00 | yes |
| B-43 | | Private | PC | | 9/2/2025 | $4,295.00 | $4,395.00 | no |
| B-44 | | Private | PC | | 6/21/2018 | $3,992.00 | $4,192.00 | YES |
| B-45 | | Private | PC | | 3/6/2024 | $2,982.00 | $3,131.00 | Yes |
| B-46 | | Shared | PC | | 7/18/2025 | $3,100.00 | $3,255.00 | no |
| B-46 | | Shared | PC | | 7/18/2025 | $3,100.00 | $3,255.00 | yes |
| B-47 | | Private | PC | | 12/22/2024 | $3,300.00 | $3,465.00 | yes |
| B-49 | | Private | PC | | 2/16/2023 | $4,197.00 | $4,407.00 | yes |
| B-51 | | Shared | PC | | 6/28/2025 | $2,600.00 | $2,730.00 | yes |
| B-51 | | Shared | PC | | 6/28/2025 | $2,600.00 | $2,730.00 | no |
| B-53 | | Private | PC | | 6/4/2025 | $3,670.00 | $3,854.00 | yes |
| B-55 | | Private | PC | | 7/24/2025 | $4,995.00 | $5,245.00 | yes |
| B-57 | | Private | PC | | 12/5/2024 | $4,995.00 | $5,245.00 | Yes |
| B-58 | | Private | PC | | 7/23/2025 | $3,995.00 | $4,195.00 | yes |
| B-59 | | Private | PC+ | | 2/16/2022 | $4,606.00 | $4,836.00 | YES |
| B-60 | | Private | PC | 9/30/2022 | 7/30/2023 | $4,026.00 | $4,227.00 | yes |
| B-61 | | Shared | PC | | 10/24/2025 | $2,895.00 | NO | NO |
| B-61 | | Shared | PC | | 10/24/2025 | $4,000.00 | NO | YES |
| B-62 | | Private | PC | | 3/21/2025 | $4,595.00 | $4,825.00 | NO |
| B-63 | | | | | | | | |
| B-63 | | Shared | PC+ | | 10/19/2023 | $4,515.00 | $4,741.00 | yes |
| B-65 | | Private | PC | | 7/25/2025 | $4595..00 | $4,825.00 | yes |
| B-67 | | Private | PC | | 3/31/2020 | $4,424.00 | $4,645.00 | YES |
| B-69 | | Shared | PC | | 5/28/2025 | $2,600.00 | $2,730.00 | no |
| B-69 | | Shared | PC | | 5/28/2025 | $2,600.00 | $2,730.00 | yes |
| B-71 | | Private | PC | | 8/1/2025 | $4,995.00 | $5,245.00 | no |

| Room # | Resident Name | PRIV/SHRD | CARE LVL | ORIG ADMIT | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| B-72 | | Private | PC | | 9/26/2025 | $4,995.00 | NO | yes |
| B-74 | | Private | PC | | 2/9/2016 | $3,195.00 | $3,355.00 | YES |
| B-75 | | Private | MIP-M | | 1/8/2026 | | $5,295.00 | yes |
| B-77 | | | | | | | | |
| B-77 | | Shared | MIP-M | 9/26/2024 | 10/8/2024 | $3,595.00 | $3,775.00 | No |
| B-79 | | Shared | MIP-M | | 9/24/2025 | $3,500.00 | NO | yes |
| B-79 | | Shared | MIP-M | 8/31/2018 | 8/6/2024 | $3,394.00 | $3,564.00 | Yes |
| B-80 | | Shared | MIP-M | 4/10/2024 | 6/13/2024 | $3,150.00 | $3,308.00 | Yes |
| B-80 | | Shared | MIP-M | | 4/25/2024 | $3,605.00 | $3,785.00 | Yes |
| B-81 | | Shared | MIP-M | | 6/8/2025 | $3,850.00 | $4,005.00 | no |
| B-81 | | Shared | MIP-M | | 12/15/2025 | $5,295.00 | NO | yes |
| B-82 | | Shared | MIP-M | | 6/7/2014 | $5,150.00 | $5,408.00 | no |
| B-82 | | Shared | MIP-M | | 2/21/2025 | $3,995.00 | NO | no |
| B-83 | | Private | MIP-M | | 10/15/2025 | $4,295.00 | $5,295.00 | yes |
| B-84 | | Private | MIP-M | 3/15/2021 | 6/24/2024 | $4,451.00 | $4,674.00 | YES |
| B-85 | | Private | MIP-M | 10/23/2024 | 11/4/2024 | $3,995.00 | $4,195.00 | Yes |
| B-86 | | Private | MIP-M | | 2/4/2023 | $4,557.00 | $4,785.00 | no |
| B-87 | | Private | MIP-M | | 4/2/2021 | $5,269.00 | 5,532.00 | no |
| B-88 | | Private | MIP-M | | 5/31/2023 | $5,727.00 | $6,013.00 | yes |

| Independent Residents | IL | 0 |
|---|---|---|
| Personal Care Residents | PC | 46 |
| Personal Care + Residents | PC+ | 6 |
| MIP-HIGH + | MIP-H+ | 0 |
| Care Plus Residents | CR+ | 0 |
| MIP Residents - MID | MIP-M | 25 |
| MIP Residents LOW | MIP-L | |
| **TOTAL B Floor Residents** | | **77** |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LVL | ORIG ADMIT | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| C-1 | | Private | MIP-H | | 11/20/2025 | $5,295.00 | | YES |
| C-2 | | Private | MIP-H | | 12/22/2017 | $4,685.00 | $4,919.00 | YES |
| C-3 | | Private | MIP-H | | 6/19/2025 | $4,895.00 | $5,140.00 | yes |
| C-4 | | Private | MIP-H | | 6/16/2023 | $5,454.00 | $5,727.00 | yes |
| C-5 | | Private | MIP-H | | 10/15/2022 | $4,875.00 | $5,119.00 | NO |
| C-6 | | Private | MIP-H | | 4/8/2025 | $4,995.00 | $5,245.00 | YES |
| C-7 | | Private | MIP-H | | 8/4/2025 | $4,995.00 | $5,245.00 | YES |
| C-9 | | Private | MIP-H | | 7/20/2025 | $5,295.00 | $5,560.00 | yes |
| C-11 | | Private | MIP-H | | 9/5/2017 | $5,095.00 | $5,350.00 | no |
| C-12 | | Private | MIP-H | | 6/16/2022 | $5,095.00 | $5,350.00 | yes |
| C-14 | | Private | MIP-H | | 8/28/2024 | $5,295.00 | $5,560.00 | Yes |
| C-16 | | Shared | PC | | 12/10/2025 | | $3,895.00 | no |
| C-16 | | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **C-18** | | Private | MIP-H | | 9/2/2025 | **$5,595.00** | **$5,763.00** | no |
| **C-20** | | Private | MIP-H | | 11/27/2024 | **$5,995.00** | **$6,295.00** | |
| **C-22** | | Private | MIP-H | | 4/17/2025 | **$4,895.00** | **$5,140.00** | yes |
| **C-24** | | Private | MIP-H | | 11/2/2023 | **$4,973.00** | **$5,222.00** | Yes |
| C-35 | | Private | CR+ | | 1/31/2024 | **$5,095.00** | **$5,350.00** | Yes |
| C-36 | | | | | | | | |
| C-37 | | Shared | CR+ | | 6/4/2025 | **$5,295.00** | **$5,560.00** | YES |
| C-38 | | Private | CR+ | 3/4/2022 | 3/9/2023 | **$3,925.00** | **$4,121.00** | YES |
| C-39 | | Private | PC+ | | 3/3/2025 | **$2,595.00** | **$2,725.00** | yes |
| C-40 | | Private | CR+1 | | 5/5/2021 | **$5,904.00** | **$6,199.00** | YES |
| C-41 | | Private | CR+ | | 4/15/2015 | **$4,785.00** | **$5,024.00** | YES |
| C-42 | | Shared | PC | | 10/3/2025 | **$3,295.00** | **NO** | yes |
| C-42 | | Shared | PC+ | | 12/16/2024 | **$3,995.00** | **$4,195.00** | no |
| C-43 | | Private | CR+ | | 3/28/2025 | **$5,995.00** | **$6,295.00** | no |
| C-44 | | Private | CR+ | 6/16/2020 | 7/16/2024 | **$3,675.00** | **$3,859.00** | YES |
| C-45 | | Shared | CR+ | | 1/2/2025 | **$3,995.00** | **$4,195.00** | yes |
| C-45 | | Shared | IL | | 1/2/2025 | **$2,336.00** | **$2,453.00** | no |
| C-47 | | Private | CR+ | | 10/20/2025 | **$6,295.00** | **NO** | yes |
| C-49 | | Shared | PC | | 4/24/2025 | **$2,795.00** | **$2,935.00** | yes |
| C-49 | | Shared | CR+ | | 10/22/2025 | **$4,995.00** | **NO** | no |
| C-50 | | Shared | PC+ | | 3/21/2024 | **$3,460.00** | **$3,633.00** | YES |
| C-50 | | Shared | CR+ | | 8/28/2024 | **$4,595.00** | **$4,825.00** | no |
| **C-51** | | **Shared** | **CR+** | | **6/28/2022** | **$4,451.00** | **$4,674.00** | **Yes** |
| C-51 | | Shared | CR+ | | 11/17/2025 | **$3,995.00** | **NO** | yes |
| C-51 | | Shared | CR+ | | 6/29/2022 | **$6,067.00** | **no** | Yes |
| C-52 | | | | | | | | |
| C-52 | | Shared | CR+ | | 9/24/2025 | **$4,995.00** | **NO** | no |
| C-53 | | Shared | CR+ | | 9/17/2025 | **$3,495.00** | **$4,595.00** | yes |
| C-53 | | | | | | | | |
| C-54 | | Private | CR+ | | 11/13/2025 | **$5,995.00** | **NO** | yes |
| C-55 | | Private | CR+ | | 7/2/2025 | **$5,995.00** | **$6,295.00** | yes |
| C-57 | | Private | CR+ | | 5/6/2024 | **$5,195.00** | **$5,455.00** | Yes |
| C-59 | | Shared | CR+ | | 5/22/2025 | **$5,000.00** | **$5,250.00** | yes |
| C-59 | | Shared | CR+ | | 11/3/2025 | **$4,000.00** | **NO** | |
| C-61 | | Private | CR+ | | 4/12/2024 | **$6,115.00** | **$6,421.00** | Yes |
| C-63 | | Shared | PC | | 7/6/2024 | **$2,935.00** | **$3,082.00** | Yes |
| C-63 | | Shared | CR+ | | 11/24/2025 | **$4,995.00** | | NO |
| C-65 | | Shared | CR+ | | 5/1/2023 | **$3,178.00** | **$3,337.00** | yes |
| C-65 | | Shared | CR+ | | 5/1/2023 | **$3,178.00** | **$3,337.00** | no |
| C-66 | | Private | CR+ | | 5/22/2025 | **$5,795.00** | **$6,085.00** | yes |
| C-68 | | Shared | PC+ | | 9/9/2025 | **$3,000.00** | **$3,150.00** | yes |
| C-68 | | Shared | CR+ | | 12/29/2025 | **$5,295.00** | **no** | yes |
| C-70 | | Private | CR+ | | 3/31/2025 | **$5,995.00** | **$6,295.00** | yes |
| **C-75** | | Private | MIP-H | | 9/18/2024 | **$4,995.00** | **$4,195.00** | Yes |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LVL | ORIG ADMIT | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| C-77 | | | | | | | | |
| C-77 | | Shared | MIP-H | | 6/30/2023 | $4,238.00 | $4,450.00 | yes |
| C-79 | | | | | | | | |
| C-80 | | Private | MIP-H | | 8/26/2025 | $5,595.00 | NO | no |
| C-81 | | Private | MIP-H | | 11/11/2024 | $4,895.00 | $5,140.00 | no |
| C-82 | | Private | MIP-H | | 3/29/2024 | $4,095.00 | $4,300.00 | Yes |
| C-83 | | | | | | | | |
| C-83 | | Shared | MIP-H | respite | 8/21/2025 | $177/day | $4,380.00 | no |
| C-84 | | Private | MIP-H | | 10/7/2025 | $4,795.00 | NO | yes |
| C-85 | | Private | MIP-H | | 12/26/2022 | $5,154.00 | $5,412.00 | Yes |
| C-86 | | Private | MIP-H | | 6/2/2022 | $4,358.00 | $4,576.00 | yes |
| C-87 | | Private | MIP-H | | 8/25/2025 | $5,495.00 | NO | YES |
| C-88 | | Private | MIP-H | | 5/2/2024 | $4,321.00 | $4,537.00 | yes |

| | | | |
|---|---|---|---|
| Independent Residents | IL | 1 | |
| Personal Care Residents | PC | 2 | |
| Personal Care + Residents | PC+ | 2 | |
| Care Plus Residents | CR+ | 30 | |
| Care Plus 1 Residents | CR+1 | 1 | |
| MIP-HIGH | MIP-H | 27 | |
| MIP-HIGH LEVEL ONE | MIP-H+ | 0 | |
| MIP-MEDIUM | MIP-M | 0 | |
| MIP-LOW | MIP-L | 0 | |
| TOTAL C-Floor Residents | | 63 | |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LVL | ORIG ADMIT | ADMISSION | 2025 Incrs | 2026 Incrs | CBL |
|---|---|---|---|---|---|---|---|---|
| D-79 | | Private | MIP-L | | 11/14/2024 | $4,995.00 | $5,245.00 | yes |
| D-80 | | Shared | MIP-L | | 2/14/2022 | $3,178.00 | $3,337.00 | no |
| D-80 | | Shared | MIP-L | | 6/1/2023 | $4,238.00 | $4,450.00 | no |
| D-81 | | Private | MIP-L | | 12/2/2025 | $5,995.00 | | Yes |
| D-82 | | | | | | | | |
| D-82 | | Shared | MIP-H | | 5/2/2018 | $3,250.00 | $3,400.00 | YES |
| D-83 | | Shared | MIP-L | | 7/13/2022 | $3,100.00 | $3,255.00 | no |
| D-83 | | Shared | MIP-L | 2/8/2019 | 11/12/2024 | $3,937.00 | $4,134.00 | no |
| D-84 | | Private | MIP-L | | 3/18/2023 | $6,277.00 | $6,591.00 | no |
| D-86 | | Private | MIP-L | | 8/21/2024 | $5,245.00 | $5,507.00 | no |
| D-88 | | Private | MIP-L | | 10/8/2024 | $4,600.00 | $4,830.00 | yes |

| | | | |
|---|---|---|---|
| MIP-LOW | MIP-L | 10 | |
| TOTAL D-Floor Residents | | 10 | |

| ROOM # | RESIDENT NAME | PRIV/SHRD | CARE LVL | ORIG ADMIT | ADMISSION | | RATE |
|---|---|---|---|---|---|---|---|
| | | | | RESPITES | | | |
| SU C-83 | | Private | MIP-H | 12/1/2025 | to 12-30-25 | | 146.50/day |

| | | | |
|---|---|---|---|
| Independent | IL | 0 | |
| Personal Care | PC | 0 | |
| Personal Care + Residents | PC+ | 0 | |
| Care Plus | CR+ | | |
| Care Plus 1 | CR+1 | 0 | |
| MIP - HIGH | MIP-H | 1 | |
| MIP- MEDIUM | MIP-M | 0 | |
| MIP-HIGH LEVEL ONE | MIP-H+ | 0 | |
| MIP-LOW | MIP-L | 0 | |
| RESPITE TOTAL | | 1 | |

| TOTAL ALL SVM FLOORS | | |
|---|---|---|
| IL | | 2 |
| PC | | 76 |
| PC+ | | 9 |
| CR+1 | | 1 |
| CR+ | | 30 |
| MIP-H | | 27 |
| MIP-H+ | | 15 |
| MIP-M | | 25 |
| MIP-L | | 10 |
| RESPITE( Added in C-54 | | |
| | | |
| TOTAL OF SVM FLOORS Main Bldg. | | 195 |

Red Increase changed to BLACK = Signed & Returned



**GOUCK ARCHITECTS**

Stewart J. Gouck, AIA
Registered    Architect

Mr. Abraham Atiyeh
Saucon Valley Manor 1
1050 Main Street
Hellertown, PA 18055

March 18, 2026

RE: Saucon Valley Manor 1 Complete Re-Roof

Abe,

The modified bitumen and rubber roofs at Saucon Valley Manor 1 are alligator-cracked and pinholed, seams and details are delaminating, the roofs are leaking, and these roofs have reached the end of their life.

We recommend a complete tear-off and replacement of the entire roof at Saucon Valley Manor 1, with one exception: A roof re-cover can be done at the 4-story secured Alzheimer's wing (2006 addition), allowing the tapered insulation to remain intact at this location.


Best Regards,



Eugene Berg, Jr., AIA
Registered Architect
Gouck Architects
1304 Hamilton Street
Allentown, PA 18102

SVMI0000307

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made this 1st day of January, 2006 between ABRAHAM R. ATIYEH ("**Landlord**"), and the Tenant named below.

**Tenant:**                             SAUCON VALLEY MANOR, INC., a Pennsylvania corporation

**Tenant's Address for**               1177 N. 6th Street,
**Notices:**                            Whitehall, PA 10852

**Landlord's Address for**             1177 N. 6th Street,
**Notices and Payments:**              Whitehall, PA 10852

**Premises:**                           Property located at 1050 Main Street, Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, more specifically described on Exhibit A.

**Term:**                               The term of the Lease begins on January 1, 2006 and ends on July 31, 2012.

**Base Rent:**                          $5,748,000 for the Term, payable in monthly installments of $95,800 each in accordance with Section 4 hereof.

**Additional Rent:**                    All other amounts due under this Lease by Tenant to Landlord, which amounts shall be computed as incurred during the Term of the Lease.

**Exhibits:**                           A. Description of Premises

1. **Granting Clause.** In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Term, subject to the terms, covenants and conditions of this Lease.

2. **Acceptance of Premises.** Tenant shall accept the Premises in its "As Is" condition as of the first day of the Term, subject to all applicable laws, ordinances, regulations, covenants and restrictions. Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes. In no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use. The taking of

- 1 -

possession of the Premises shall be conclusive evidence that Tenant accepts the Premises and that the Premises were in good condition at the time possession was taken.

3.    **Use; Zoning.** The Premises shall be used only for the purpose of a residential assisted living facility. Landlord does not warrant or represent that Tenant shall be able to obtain a permit under any zoning or other ordinance or regulation for such use as Tenant intends to make of the Premises, and nothing in this Lease shall obligate Landlord to assist Tenant in obtaining such permit. Landlord and Tenant further agree that in case the Tenant is unsuccessful in obtaining a permit under any zoning ordinance or regulation, that this Lease will not terminate without Landlord's consent and, should such consent be withheld by Landlord, Tenant agrees to use the Premises only in a manner permitted under such zoning ordinance or regulation. Tenant will use the Premises in a careful, safe and proper manner and will not commit waste, or subject the Premises to use that would damage the Premises.   Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, if applicable, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "**Legal Requirements**"). Tenant shall, at its expense, make any alterations or modifications, within or without the Premises, that are required by Legal Requirements related to Tenant's use or occupation of the Premises. Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Tenant's or Landlord's insurance, violate its conditions or increase the insurance risk. If any increase in the cost of any insurance on the Premises is caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the amount of such increase to Landlord.

4.    **Base Rent.** Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent in the amount of $137,500 each, commencing on the date hereof and continuing thereafter on or before the first day of each calendar month of the Term. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder shall be sent to Landlord's address for notices and payments, as set forth above, or at such other place as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or Additional Rent for more than 5 days, Tenant shall pay to Landlord on demand a late charge equal to ten percent (10%) of such delinquent sum, plus interest on any delinquent sum not paid within thirty (30) days after the due date therefor at the rate of 1½% per month (the "**Default Rate**"), which interest shall accrue from the due date to the date of payment. The provision for such late charge and interest shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. Tenant shall pay to Landlord on demand a charge of $30.00 (or such higher sum as may be charged to Landlord by its bank) for any returned checks.

5.    **Net Lease.** This is a net lease, and, except as the contrary is otherwise expressly herein provided, all costs of taxes, insurance, improvements, maintenance, repairs, alterations, additions, and replacements relating to the Premises shall be at the sole cost and expense of Tenant, and Landlord shall not be obligated to make any improvements, maintenance, repairs, alterations, additions, or replacements to the Premises.

6.    **Utilities and Services.** Tenant shall supply and pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises. Landlord may cause, at Tenant's expense, any utilities to be charged directly to Tenant by the provider; and otherwise Tenant shall pay such charges to Landlord as Additional Rent. No interruption or failure of utilities shall be deemed to be the responsibility of Landlord, or shall result in the termination of this Lease or the abatement of rent.

7.    **Insurance.**

(a)    Tenant, at its expense, shall maintain during the Term: all risk property insurance covering the full replacement cost of all building(s) and other improvements on the Premises (excluding coverage of Tenant's personal property), and such other insurance as Landlord may reasonably deem appropriate or as any mortgagee of Landlord may require, including, without limitation, rent loss coverage and business personal property coverage including, without limitation, any Tenant-Made Alterations; and

(b)    Tenant, at its expense, shall maintain during the Term, commercial general liability insurance, including blanket contractual liability insurance, covering Tenant's use of the Premises, with such coverages and limits of liability as Landlord may reasonably require, but not less than combined single limits of $2,000,000 per occurrence and in the aggregate for bodily injury or property damage (together with such umbrella coverage as Landlord may reasonably require); however, such limits shall not limit Tenant's liability hereunder. Landlord may from time to time require reasonable increases in any such limits. Tenant agrees to name Landlord as the insured party and loss payee in the policy for all risk property insurance. The commercial liability policies shall name Landlord as an additional insured and loss payee, and shall insure on an occurrence or a claims-made basis. The insurance policies shall be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless not less than 30 days' prior written notice shall have been given to Landlord, contain a hostile fire endorsement and a contractual liability endorsement and provide primary coverage to Landlord (any policy issued to Landlord providing duplicate or similar coverage shall be deemed excess over Tenant's policies). Such policies or certificates thereof shall be delivered to Landlord by Tenant upon commencement of the Term and upon each renewal of said insurance.

The all risk property insurance obtained by Tenant shall include a waiver of subrogation by the insurers of all rights based upon an assignment from its insured, against Landlord, its officers, directors, employees, managers, agents, invitees and contractors, in

- 3 -

connection with any loss or damage thereby insured against. Neither Landlord nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to Tenant for loss or damage caused by any risk coverable by all risk property insurance, and Tenant waives any claims against Landlord, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage. The failure of Landlord to insure its property shall not void this waiver. Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises from any cause whatsoever, including without limitation, damage caused in whole or in part, directly or indirectly, by the negligence of Landlord or its agents, employees or contractors.

8.      **Landlord's Repairs.** Except as provided in Section 12 of this Lease, Landlord shall have no obligation to inspect or maintain the Premises, or to make repairs or replacements to the Premises of any kind or nature, including those to the roof, foundation, or exterior walls of any building on the Premises (the "**Building**").

9.      **Tenant's Maintenance and Repairs.** Tenant agrees to maintain the Premises, at Tenant's expense, in a good, clean, sanitary and safe condition, including, without limitation, maintenance of the lawn, shrubbery, sidewalks, driveways and other exterior areas of the Premises, snow and ice removal, yearly heater maintenance contract, sewage cost and maintenance, and trash removal. Tenant, at its expense, shall make all necessary repairs and replacements to all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including, without limitation: the roof, foundation, and exterior walls of the Building; plumbing, water and sewer lines serving the Premises; heating, ventilation and air conditioning systems; fire sprinklers, fire protection systems, security systems and all other systems existing on the Premises for the safety of the Premises and the occupants thereof; and all entries, doors, ceilings, windows, and interior walls. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Term. Tenant agrees to enter into and maintain, at Tenant's expense, maintenance service contracts for heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may, but shall have no obligation to, perform such work and be reimbursed by Tenant within 10 days after demand therefor.

10.     **Tenant-Made Alterations, Removal of Fixtures and/or Personal Property.** Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its approval.

-4-

Landlord may monitor construction of the Tenant-Made Alterations. Tenant shall reimburse Landlord for its costs in reviewing plans and specifications and in monitoring construction. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with applicable laws, codes, rules and regulations. Tenant shall provide Landlord with the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall furnish security or make other arrangements satisfactory to Landlord to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by such removal. Tenant agrees not to remove any fixtures or significant personal property from the Premises during the Term.

11. **Signs.** Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent. Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facia surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval and conform in all respects to Landlord's requirements. Landlord may erect a suitable sign on the Premises stating the Premises are available to let or for sale.

12. **Restoration.** If at any time during the Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within 30 days after receipt of at least 75% of the insurance proceeds relating to the casualty as to whether or not Landlord has elected to restore the Premises or to terminate the Lease. If this Lease is terminated under this Section, all rent shall be apportioned as of the date of the casualty. If Landlord elects not to terminate this Lease, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises excluding any improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant at Tenant's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in

- 5 -

accordance with this Lease. Base Rent shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

13.     **Condemnation.** If any part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or in Landlord's judgment would materially interfere with or impair its ownership of the Premises, then upon written notice by Landlord this Lease shall terminate and Base Rent shall be apportioned as of said date. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

14.     **Assignment and Subletting.** Without Landlord's prior written consent, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. For purposes of this Section, a transfer of more than 25% of the ownership interests controlling Tenant or a change in the management of the Premises by Tenant shall be deemed an assignment of this Lease. Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease. Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof, Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings). In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as Additional Rent hereunder all such excess rental and other excess consideration within 10 days following receipt thereof by Tenant.

- 6 -

If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

15.    **Release and Indemnity.**

(a)    Release. Tenant agrees that Landlord and its agents, employees, officers, directors, shareholders and partners shall not be liable to Tenant and Tenant hereby releases said parties from any liability, for any personal injury, loss of income or damage to or loss of persons or property, or loss of use of any property, in or about the Premises from any cause whatsoever, even if such damage, loss or injury results from the negligence or willful misconduct of Landlord, its officers, employees or agents. The release contained in this Section 15 shall apply, by way of example and not limitation, to damage, loss or injury resulting directly or indirectly from any existing or future condition, matter or thing in the Premises, the Building or any part thereof, or from equipment or appurtenances becoming out of repair, or from accident, or from the flooding of basements or other subsurface areas or from refrigerators, sprinkling devices, air conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors, or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply equally whether any such damage, loss or injury results from the act or omission of Tenant or any other persons, and whether such damage be caused by or result from any thing or circumstance, whether of a like or wholly different nature.

(b)    Indemnity. Tenant shall defend, indemnify, save and hold harmless ("Indemnify") Landlord and its agents, employees, officers, directors, shareholders, and partners from and against all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses, including reasonable attorneys' fees, court costs, administrative costs, and costs of appeals which may be imposed upon or incurred by or asserted against Landlord or its Agents and arising out of or in connection with loss of life, personal injury or damage to property in or about the Premises or arising out of the occupancy or use of the Premises by Tenant or its Agents or occasioned wholly or in part by any act or omission of Tenant or its Agents, whether prior to, during or after the Term. The obligation of Tenant to Indemnify contained in this Section 15 shall not be limited by any limitation on the amount or type of damages, compensation or benefits payable by or for Tenant, its agents or contractors under workers' or workman's compensation acts, disability benefit acts or other employee benefits acts, or under any other insurance coverage Tenant may obtain. Tenant's obligations pursuant to this subsection are intended to survive the expiration or termination of this Lease. As used in the Section 12, "Agents" of a party means such party's employees, agents, representatives,

-7-

contractors, licensees, invitees, and, with regard to Tenant's Agents, shall include all residents and occupants of the Premises.

16.     **Inspection and Access.** Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make repairs, to the extent Landlord elects to do so, and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective lenders, tenants or purchasers. Landlord may grant easements, make public dedications, and create restrictions on or about the Premises, provided that no such easement, dedication, or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

17.     **Quiet Enjoyment.** If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

18.     **Surrender.** Upon termination of the Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Sections 12 and 13 excepted. Any Tenant-Made Alterations and property not so removed by Tenant as permitted or required herein shall be deemed abandoned and may be stored, removed, and disposed of by Landlord at Tenant's expense, and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property. All obligations of Tenant hereunder not fully performed as of the termination of the Term shall survive the termination of the Term, including without limitation, indemnity obligations and obligations concerning the condition and repair of the Premises.

19.     **Holding Over.** If Tenant retains possession of the Premises after the termination of the Term of this Lease, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to double the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over. No holding over by Tenant, with or without consent of Landlord, shall operate to extend this Lease, except as otherwise expressly provided, and this Section 19 shall not be construed as consent for Tenant to retain possession of the Premises. For purposes of this Section 19, "possession of the Premises" shall continue until, among other things, Tenant has delivered all keys to the Premises to Landlord, Landlord has complete and total dominion and control over the Premises, and Tenant has completely fulfilled all obligations required of it upon termination of the Lease as set forth in this Lease, including, without limitation, those concerning the condition and repair of the Premises.

- 8 -

20. **Events of Default.** Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a) Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 days from the date such payment was due.

(b) Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within 60 days of its filing or entry; or (iv) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(c) Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease.

(d) Tenant shall not occupy or shall vacate the Premises or shall remove its personal property and/or fixtures from the Premises, whether or not Tenant is in monetary or other default under this Lease.

(e) Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease.

(f) Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after any such lien or encumbrance is filed against the Premises.

(g) Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Section 20.

21. **Landlord's Remedies.**

(a) <u>Cumulative Remedies.</u> In the event Tenant commits an event of default or otherwise breaches the terms of this Lease, Landlord shall have the following rights and remedies which shall be distinct, separate and cumulative and shall not operate to exclude or deprive Landlord of any other right or remedy allowed it by law or equity:

(i) To declare due and payable and sue for recovery, all unpaid Base Rent for the unexpired Term of the Lease (and also all Additional Rent as the amounts of same

- 9 -

can be determined or reasonably estimated) as if by the terms of this Lease the same were payable in advance, together with all reasonable legal fees and other expenses incurred by Landlord in connection with the enforcement of any Landlord's rights or remedies hereunder; and/or

(ii)    To distrain, collect or bring action for such Base Rent and Additional Rent as being rent in arrears, or may enter judgment therefore in an action as herein elsewhere provided for in case of rent in arrears, or may file a Proof of Claim in any bankruptcy or insolvency proceeding for such Base Rent and Additional Rent, or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof; and/or

(iii)    If Landlord has not elected to accelerate rent under clause (i) above, to terminate this Lease by giving written notice thereof to Tenant and, upon the giving of such notice, this Lease shall expire and terminate with the same force and effect as though the date of such notice was the date hereinabove fixed for the expiration of the Lease, and all rights of Tenant hereunder shall expire and terminate, but Tenant shall remain liable as hereinafter provided; and/or

(b)    Repossession of Premises. If any event of default shall have occurred and be continuing, Landlord may, whether or not the Lease has been terminated as herein provided, re-enter and repossess the Premises or any part thereof by force, summary proceedings, ejectment or otherwise and Landlord shall have the right to remove all persons and property therefrom. Landlord shall be under no liability for or by reason of any such entry, repossession or removal and no such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate the Lease unless a written notice of such intention be given to Tenant or unless the termination of this Lease be by a court of competent jurisdiction. At any time or from time to time after the repossession of the Premises or any part thereof whether or not the Lease shall have been terminated, Landlord may (but shall be under no obligation to) relet all or any part of the Premises for the account of Tenant for such term or terms (which may be greater or less in the period which would otherwise have constituted the balance of the term) and on such conditions and for such uses as Landlord, in its absolute discretion, may determine and Landlord may collect and receive any rents payable by reason of such reletting. Landlord shall not be required to exercise any care or diligence with respect to such reletting or to the mitigation of damages. For the purpose of such reletting, Landlord may decorate or make repairs, changes, alterations or additions in or to the Premises or any part thereof to the extent deemed by Landlord desirable or convenient, and the cost of such decoration, repairs, changes, alterations or additions and any reasonable brokerage and legal fees expended by Landlord shall be charged to and payable by Tenant as Additional Rent hereunder. No expiration or termination of this Lease, by operation of law or otherwise, and no repossession of the Premises or any part thereof pursuant to this section, or otherwise, and no reletting of the Premises or any part thereof pursuant to this section shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, repossession or reletting.

(c)    Payment of Damages.

(i)      In the event of any expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of Tenant's default, and if Landlord has not elected to accelerate rent, Tenant shall pay to Landlord the Base Rent, Additional Rent and all other sums required to be paid by Tenant to and including the date of such expiration, termination, repossession and, thereafter, Tenant shall, until the end of what would have been the expiration of the term in the absence of such expiration, termination, repossession and whether or not the Premises or any part thereof shall have been relet, be liable to Landlord for, and shall pay to Landlord, as liquidated and agreed current damages, the Base Rent, Additional Rent and other sums which would be payable under this Lease by Tenant in the absence of such expiration, termination or repossession, less the net proceeds, if any, of any reletting effective for the account of Tenant, after deducting from such proceeds all of Landlord's reasonable expenses in connection with such reletting (including, without limitation, all related repossession costs, brokerage commissions, attorneys' fees, alterations costs and expenses for preparation of such reletting). Tenant shall pay such current damages on the days on which the rent would have been payable under this Lease in the absence of such expiration, termination, repossession and Landlord shall be entitled to recover the same from Tenant on each such day.

(ii)     At any time after such expiration or termination of this Lease or repossession of the Premises or any part thereof by reason of the occurrence of Tenant's default, whether or not Landlord shall have collected any current damages, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord on demand, unless Tenant has paid the whole or accelerated rent, as and for liquidated and agreed final damages for Tenant's default and in lieu of all current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (A) Base Rent, Additional Rent and other sums which would be payable under this Lease for the remainder of the term from the date of such demand for what would have been the unexpired term of this Lease in the absence of such expiration, termination or repossession, discounted at the rate of six (6%) percent per annum, over (B) the then fair rental value of the Premises for the same period, discounted at a like rate. If any statute or rule of law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such statute or rule of law.

(iii)    Tenant further hereby expressly the authorizes and empowers Landlord, upon the occurrence of Tenant's default and so long as the same is continuing, to enter upon the Premises, distrain upon and remove therefrom all inventory, equipment, machinery, trade fixtures and personal property of whatsoever kind or nature, whether owned by Tenant or others, and to proceed, without judicial decree, writ of execution or assistance of constables, to conduct a private sale, by auction or sale bid, of such personal property, at which sale Landlord may bid without restriction. Tenant hereby waives the benefit of all laws, whether now in force or hereafter enacted, exempting any personal property on the Premises from sale or levy, whether execution thereon is had by order of any Court of through private sales herein authorized. Tenant waives the right to issue a Writ of Replevin under the Pennsylvania Rules of Civil Procedure, under the laws of the Commonwealth of Pennsylvania or under any law previously enacted and now in force or which hereinafter may be enacted for the recovery of any articles of any nature

- 11 -

whatsoever seized under a distress for rent, or levy upon an execution for rent, liquidated damages or otherwise.

(d) CONFESSION OF JUDGMENT. TENANT HEREBY EMPOWERS ANY PROTHONOTARY OR ATTORNEY FOR ANY COURT OF RECORD TO APPEAR FOR TENANT IN ANY AND ALL ACTIONS WHICH MAY BE BROUGHT FOR RENT HEREUNDER AND TO SIGN FOR TENANT AN AGREEMENT FOR ENTERING INTO ANY COMPETENT COURT AN ACTION OR ACTIONS FOR THE RECOVERY OF RENT, AND IN SAID SUITS OR IN SAID ACTION OR ACTIONS TO CONFESS JUDGMENT AGAINST TENANT FOR ALL OR ANY PART OF THE RENT INCLUDING, AT LANDLORD'S OPTION, THE RENT FOR THE ENTIRE UNEXPIRED BALANCE OF THE TERM OF THIS LEASE, AND ANY CHARGES, PAYMENTS, COSTS AND EXPENSES RESERVED AS RENT OR AGREED TO BE PAID BY THE TENANT, AND FOR INTEREST AND COSTS TOGETHER WITH AN ATTORNEY'S COMMISSION OF TEN (10%) PERCENT THEREOF. SAID AUTHORITIES SHALL NOT BE EXHAUSTED BY ONE EXERCISE THEREOF, BUT JUDGMENT MAY BE CONFESSED AS AFORESAID FROM TIME TO TIME AND AS OFTEN AS ANY OF THIS SAID RENT OR OTHER CHARGES RESERVED AS RENT OR LIQUIDATED DAMAGES SHALL FALL DUE OR BE IN ARREARS, AND SUCH POWERS MAY BE EXERCISED AS WELL AFTER THE EXPIRATION OF THE ORIGINAL TERM OR DURING ANY EXTENSION OR RENEWAL OF THIS LEASE.

(e) ACTION FOR EJECTMENT. UPON TERMINATION OF THIS LEASE OR EXPIRATION OF THE TERM OR ANY EXTENSION THEREOF, IT SHALL BE LAWFUL FOR ANY ATTORNEY AS ATTORNEY FOR TENANT TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT, WITHOUT ANY STAY OF EXECUTION OR APPEAL AGAINST TENANT AND ALL PERSONS CLAIMING UNDER TENANT FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE HEREIN PREMISES, WITHOUT LIABILITY ON THE PART OF THE SAID ATTORNEY, WHICH THIS LEASE SHALL BE A SUFFICIENT WARRANT, WHEREUPON, IF LANDLORD SO DESIRES A WRIT OF POSSESSION WITH CLAUSES FOR COST MAY ISSUE FORTHWITH WITHOUT ANY PRIOR WRIT OR PROCEEDINGS WHATSOEVER. IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED THE SAME SHALL BE DETERMINED AND THE POSSESSION OF THE PREMISES HEREBY DEMISED REMAIN IN OR BE RESTORED TO TENANT, THE LANDLORD SHALL HAVE THE RIGHT IN ANY SUBSEQUENT DEFAULT OR DEFAULTS TO BRING ONE OR MORE FURTHER ACTIONS IN THE MANNER AND FORM HEREIN BEFORE SET FORTH, TO RECOVER POSSESSION OF SAID PREMISES FOR SUCH SUBSEQUENT DEFAULT. NO SUCH TERMINATION OF THIS LEASE NOR TAKING, NOR RECOVERING POSSESSION OF THE PREMISES SHALL DEPRIVE LANDLORD OF ANY REMEDIES OR ACTION AGAINST TENANT FOR RENT OR DAMAGES DUE OR TO BECOME DUE FOR THE BREACH OF ANY CONDITION OR COVENANT HEREIN CONTAINED, NOR SHALL THE BRINGING OF ANY SUCH ACTION FOR RENT, OR BREACH OF COVENANT OR CONDITION NOR THE RESORT TO ANY OTHER REMEDY HEREIN PROVIDED FOR THE RECOVERY OF RENT OR

- 12 -

DAMAGES FOR SUCH BREACH BE CONSTRUED AS A WAIVER OF THE RIGHT TO INSIST UPON THE NATURE AND TO OBTAIN POSSESSION IN THE MANNER HEREIN PROVIDED.

(f) Landlord's Affidavit. In any action in ejectment or for rent in arrears, Landlord shall first cause to be filed in such action, an affidavit made by it or someone acting for it setting forth the facts necessary to authorize the entry of judgment, of which facts such affidavit shall be conclusive evidence, and if a true copy of this Lease be filed in such action, it shall not be necessary to file the original as a warrant of attorney, any rule of court, custom or practice to the contrary notwithstanding.

(g) Judgment Final. Any judgment, order or decree entered against Tenant by or any court or Magistrate by virtue of the powers of attorney contained in this Lease, or otherwise, shall be final, and Tenant will not take an appeal, certiorari, writ of error, exception or objection to same, or file a motion or rule to strike off or open or to stay execution of the same. Tenant releases Landlord and any and all attorneys who may appear for Tenant all errors in the said proceedings. Tenant expressly waives the benefits of law, now or hereafter in force, exempting any goods on the Premises, or elsewhere, from the distraint, levy or sale in any legal proceedings taken by the Landlord to enforce any rights under this Lease. Tenant further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord and Tenant Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days notice shall be sufficient in any case where a longer period may be statutorily specified.

(h) WAIVER. IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF SAID PREMISES, ANY CLAIM OF INJURY OR DAMAGE, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE. IT IS FURTHER MUTUALLY AGREED THAT IN THE EVENT THAT LANDLORD COMMENCES ANY SUMMARY PROCEEDING FOR NON-PAYMENT OF RENT, TENANT WILL NOT INTERPOSE ANY COUNTERCLAIM OF WHATEVER NATURE OR DESCRIPTION IN ANY SUCH PROCEEDING.

(i) Injunction. In the event of a breach or threatened breach by Tenant of any of the agreements, conditions, covenants or terms hereof, Landlord shall have the right of injunction to restrain the same and the right to invoke any remedy allowed by law or in equity whether or not other remedies, indemnity or reimbursements are herein provided.

(j) Interest and Costs. All amounts owed by Tenant to Landlord under this Lease, other than the Base Rent, shall be deemed Additional Rent and, unless otherwise provided, shall be paid within ten (10) days from the date Landlord renders a statement of account. All Base Rent and Additional Rent shall bear interest from the date due until the date

- 13 -

paid at the Default Rate. Tenant shall pay upon demand all of Landlord's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Landlord, incurred in enforcing Tenant's obligations hereunder or incurred by Landlord in any litigation, negotiation or transaction which Tenant causes Landlord, without Landlord's fault, to become involved or concerned.

       (k)    Removal of Tenant's Property. All property removed from the Premises by Landlord pursuant to any provision of this Lease or of law may be handled, removed or stored by Landlord at the cost and expense of the Tenant, and the Landlord shall in no event be responsible for the value, preservation or safekeeping thereof. Tenant shall pay Landlord for all expenses incurred by Landlord in such removal and storage charges against such property while the same shall be in Landlord's possession or under Landlord's control. All property not removed from the Premises or not retaken from storage by Tenant within thirty (30) days after the end of the term, however terminated, shall be conclusively deemed to be conveyed by Tenant to Landlord as by bill of sale without further payment or credit by Landlord to Tenant.

       22.    **Bankruptcy.** If at any time during the term of this Lease there shall be filed by or against Tenant or Guarantor in any court pursuant to any statute either of the United States or of any State (or Canada, as to Guarantor) a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's or Guarantor's property, or if a receiver or trustee takes possession of any of the assets of Tenant or Guarantor, or if the leasehold interest herein passes to a receiver, or if Tenant or Guarantor makes an assignment for the benefit of creditors or petitions for or enters into an arrangement (any of which are referred to herein as "a bankruptcy event"), then such bankruptcy event shall be an event of default under this Lease, and the following provisions shall apply:

       Any receiver or trustee in bankruptcy or Tenant as debtor in possession ("debtor") shall either expressly assume or reject this Lease within sixty (60) days following the earlier of the entry of an "Order for Relief", or an order confirming a Plan of Reorganization.

       In the event of an assumption of the Lease by a debtor, receiver, or trustee, such debtor, receiver, or trustee shall immediately after such assumption (1) cure any default or provide adequate assurances that defaults will be promptly cured; and (2) compensate Landlord for actual pecuniary loss or provide adequate assurances that compensation will be made for actual pecuniary loss; and (3) provide adequate assurance of future performance.

       Where a default exists under the Lease, the party assuming the Lease may not require Landlord to provide services or supplies incidental to the Lease before its assumption by such trustee or debtor, unless Landlord is compensated under the terms of the Lease for such services and supplies provided before the assumption of such Lease.

       Landlord specifically reserves any and all remedies available to Landlord in Section 22 hereof or at law or in equity in respect of a bankruptcy event by Tenant to the extent such remedies are permitted by law.

DOCS_PH 1867164v.2

23. **Limitation of Liability.** All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. Landlord shall have no liability for consequential damages, nor for punitive or exemplary damages. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord; and in any proceeding or in the case of any judgment against Landlord, Tenant shall request that the judgment index be noted to reflect such limitation of liability.

24. **Subordination.** This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder. Tenant hereby appoints Landlord attorney in fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument and instruments for and in the name of the Tenant and to cause any such instrument to be recorded. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

25. **Mechanic's Liens.** Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against

- 15 -

DOCS_PH 1867164v.2

the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within 30 days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such 30 day period.

26.    **Estoppel Certificates.**    Tenant agrees, from time to time, within three (3) business days after request of Landlord, to execute and deliver to Landlord, or Landlord's designee, any estoppel certificate requested by Landlord, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney in fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within three (3) business days after Landlord's written request thereof.

27.    **Environmental Requirements.**    Except for Hazardous Material contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, Tenant shall not permit or cause any party to bring any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquified natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by

- 16 -

Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Section 27, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 27 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Section 27 shall survive any termination of this Lease.

Landlord shall have access to, and a right (but not an obligation) to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Section 27, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

28.    **Security Service.**    Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

29.    **Force Majeure.**    Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

30.    **Entire Agreement.**    This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements,

- 17 -

promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

31. **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

32. **Brokers.** Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the broker, if any, set forth on the first page of this Lease, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

33. **Miscellaneous.** (a) Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b) If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c) All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses as set forth at the beginning of this Lease. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or attempted delivery.

(d) Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(e) At Landlord's request from time to time Tenant shall furnish Landlord with true and complete copies of its most recent annual and quarterly financial statements prepared by Tenant or Tenant's accountants and any other financial information or summaries that Tenant typically provides to its lenders or shareholders.

(f) Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

- 18 -

(g)    The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(h)    The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(i)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(j)    It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease. If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k)    Construction and interpretation of this Lease shall be governed by the laws of the state in which the Premises is located, excluding any principles of conflicts of laws.

(l)    Time is of the essence as to the performance of Tenant's obligations under this Lease.

(m)    All riders and addenda now or hereafter attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such riders or addenda and the terms of this Lease, such riders or addenda shall control.

(n)    In the event either party hereto initiates litigation to enforce the terms and provisions of this Lease, the non-prevailing party in such action shall reimburse the prevailing party for its reasonable attorney's fees, filing fees, and court costs.

(o)    Each person executing this Lease on behalf of Tenant certifies that he or she has the authority to do so.

(p)    This Lease shall be binding upon and shall inure to the benefit of Landlord and Tenant, and their respective heirs, personal representatives, principals, successors and assigns, except that no rights shall inure to the benefit of any assignee of Tenant unless the

- 19 -

assignment of the Lease has previously been approved in writing by Landlord and the assignee or successor to Tenant has executed a consent and authorization for Confession of Judgment and to be otherwise bound hereby.

(q)    Landlord and Tenant both acknowledge that this is a commercial transaction.

(r)    If Landlord accepts the rent at any time after the rent is due, or Landlord fails to enforce any of its rights under this Lease or any of the penalties, forfeitures or conditions contained in this Lease, such forbearance shall not in any way be considered as a waiver of the right to enforce the same; and thereafter Landlord may enforce such rights, penalties or forfeitures against Tenant without any notice whatsoever; and any attempt to collect the rent by one proceeding shall not be considered as a waiver of the right of Landlord to collect the same by any other proceeding.

34.    **Landlord's Lien/Security Interest.**  Tenant hereby grants Landlord a security interest, and this Lease constitutes a security agreement, within the meaning of and pursuant to the Uniform Commercial Code of the state in which the Premises are situated as to all of Tenant's property situated in, or upon, or used in connection with the Premises (except merchandise sold in the ordinary course of business) as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay rent.  Such personalty thus encumbered includes specifically all trade and other fixtures for the purpose of this Section and inventory, equipment, contract rights, accounts receivable and the proceeds thereof.  In order to perfect such security interest, Tenant shall execute such financing statements and file the same at Tenant's expense at the state and county Uniform Commercial Code filing offices as often as Landlord in its discretion shall require; and Tenant hereby irrevocably appoints Landlord its agent for the purpose of executing and filing such financing statements on Tenant's behalf as Landlord shall deem necessary.

35.    **Limitation of Liability of Trustees, Shareholders, and Officers of Landlord.**  Any obligation or liability whatsoever of Landlord which may arise at any time under this Lease, or any obligation or liability which may be incurred by Landlord pursuant to any other instrument, transaction, or undertaking contemplated hereby, shall not be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of the trustees, directors, shareholders, officers, employees or agents of Landlord, regardless of whether such obligation or liability is in the nature of contract, tort, or otherwise.

**SECTION 21 OF THIS LEASE PROVIDES FOR THE CONFESSION OF JUDGMENT AGAINST TENANT FOR MONEY AND FOR EJECTMENT.  IN CONNECTION THEREWITH, TENANT, KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND UPON ADVICE OF SEPARATE COUNSEL, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. WITHOUT LIMITATION OF THE FOREGOING, TENANT HEREBY SPECIFICALLY WAIVES ALL RIGHTS TENANT HAS OR MAY HAVE TO NOTICE AND OPPORTUNITY FOR**

- 20 -

A HEARING PRIOR TO EXECUTION UPON ANY JUDGMENT CONFESSED AGAINST TENANT BY LANDLORD HEREUNDER.

TENANT FURTHER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS SAID PROVISIONS WITH TENANT'S INDEPENDENT LEGAL COUNSEL AND THAT THE MEANING AND EFFECT OF SUCH PROVISIONS HAVE BEEN FULLY EXPLAINED TO TENANT BY SUCH COUNSEL, AND AS EVIDENCE OF SUCH FACT AN AUTHORIZED OFFICER OF TENANT SIGNS HIS OR HER INITIALS IN THE SPACE PROVIDED BELOW.

(Initials)

IN WITNESS WHEREOF, Landlord and Tenant, intending to be legally bound hereby, have executed this Lease as of the day and year first above written.

ABRAHAM R. ATIYEH

SAUCON VALLEY MANOR, INC.

By:
Name: Ramis Atiyeh
Title:

(Corporate Seal)

-21-

DOCS_PH 1867164v.2

## EXHIBIT A

### Description of Premises

**ALL THAT CERTAIN** tract or parcel of land situate in the Township of Lower Saucon, County of Northampton, Commonwealth of Pennsylvania, bounded and described as follows:

**BEGINNING** at a railroad spike (bench mark, elevation 480.00) in Wassergass Road (Legislative Route T-391) and running in an easterly direction M. 82° 43' 30" E. 255.53' to a spike; N 78° 50' 30" E. 354.75' to a spike; N 70° 49' 30" E. 45.54' to a spike; thence in a southerly direction along the property now or late of Jarcu Petran, S 9° 58' E. 580.24' to a pin; S. 77° 31' 30" W. 8.25' to a pin; S. 12° 28' 30" E. 533.26' to a point; thence in a westerly direction along property of the School District of the Township of Lower Saucon (now Saucon Valley School District) S. 81° 26' W. 552.23' to a pin; thence continuing S. 81° 28' W. 210.11' along property now or late of Louis Fortley to an iron pin; thence in a northerly direction bordering the property now or later of George Mar N. 5° 45' W. 464.72' to a pin; thence N. 4° 53' W. 631.24' bordering the property now or late of Ronald J. Sweeney to the point of **BEGINNING**. **CONTAINING** 16.25 acres, more or less.

**BEING THE SAME PREMISES** which Saucon Valley School District, successors in interest to Hellertown-Lower Saucon School Authority, by Indenture dated October 1, 1999, did grant and convey unto Abraham R. Atiyeh, said deed being recorded in the Office for the Recording of Deeds in and for Northampton County, at Easton, Pennsylvania, in Deed Book Volume 1999-1, at Page 153214, reference thereunto had, the same will therein more fully and at large appear.

**UNDER AND SUBJECT** to the right-of-way contained in the foregoing deed.

## Certification

The undersigned, SAUCON VALLEY MANOR, INC., a Pennsylvania corporation (the "**Tenant**") in connection with the Lease Agreement dated January 1, 2006 (the "**Lease**") entered with ABRAHAM R. ATIYEH, an individual (the "**Landlord**") hereby certifies the following:

1.    Tenant has been represented by legal counsel in connection with the Lease.

2.    Tenant has received advice as to the meaning and consequences of the provisions in the Lease authorizing confession of judgment, execution and attachment, confession of judgment in ejectment, waiver of errors, waiver of the right to appeal, all other waivers provided for under the Lease and have executed the Lease following receipt of such advice of counsel.

3.    Tenant, in furtherance of the above, hereby certifies that it has elected to execute the Lease with full understanding of the consequences of such election.

4.    If Tenant is a Corporation, then signatory certifies that he/she has been authorized to execute the Lease.

5.    Tenant acknowledges that the Lease constitutes a commercial transaction.

Tenant has caused this Certification to be executed this _____ day of January, 2006.

SAUCON VALLEY MANOR, INC.

By: _____
Name: Ramis Atroods
Title: VP

(Corporate Seal)

- 23 -

## Lease Amendment Agreement

MADE as of the 8th day of December, 2006 by and between ABRAHAM R. ATIYEH, an adult individual, herein called Landlord, having an office at 1177 Sixth Street, Whitehall, PA 18052;

### AND

SAUCON VALLEY MANOR, INC., a Pennsylvania corporation, herein called Tenant, having an office at 1050 Main Street, Hellertown, Pennsylvania.

### *Witnesseth:*

WHEREAS, Landlord and Tenant entered into a Lease for the property known as 1050 Main Street, Hellertown, Northampton County, Pennsylvania, (the "Lease"), which lease included the main building and parking lots and open space, consisting of Northampton County tax parcels Q7SW2A-1-3 and Q7SW2A-1-5, (the Property); and

WHEREAS, pursuant to the agreement and understandings between Landlord and Tenant, Landlord was permitted to redevelop the open space and allow use of some of the parking in common with Tenant; and

WHEREAS, Landlord has declared a condominium for the Property; and

WHEREAS, Landlord and Tenant desire to amend the Lease to reflect the revision of the leased area and the reduced obligations of Tenant concerning the Property, as follows.

NOW, THEREFORE, the parties hereto, intending to be legally bound, and for other good and valuable consideration, do hereby agree as follows:

1.      The Lease is hereby amended to modify the Leased Premises to be Unit 1 of the Condos at Saucon Valley Manor, a Condominium.

2.      The Leased Premises under the Lease shall also include all of the parking rights allowed on Unit 2 for Unit 1 owners, residents, guests, tenants and invitees.

3.      The Leased Premises under the Lease shall also include all easements, encroachment and other rights of Unit 1 as exist or as are allowed

in the future under the Declaration of Condominium for the Condos at Saucon Valley Manor.

4. Landlord, and not Tenant, shall be responsible for the maintenance and lawn cutting and other actions concerning the area known as Unit 4 of the Condos at Saucon Valley Manor.

5. Landlord, and not Tenant, shall be responsible for the taxes due upon Unit 4 of the the Condos at Saucon Valley Manor; and the successor(s) to Landlord in ownership of Unit 3 shall be responsible for its taxes and related charges.

6. In the event of any failure of Landlord to exercise the voting rights of the Unit 1 Owner in a manner consistent with the Lease, the Tenant is authorized and empowered to vote for Landlord as the Unit 1 Owner to fulfill the obligations of Landlord, as amended by this Lease Amendment Agreement. This right is granted with an interest so long as Tenant is not in default under the Lease and no event which would be a default with the passage of time or giving of notice, or both, exists.

7. Landlord acknowledges that the business of Tenant involves the keeping or dealing with medical records and information, and that any entry by Landlord is made with the understanding that the same will not intentionally expose medical records.

8. The Lease, except as specifically modified herein, is ratified and affirmed, including the rights of Landlord to confession of judgment and other allowances of summary procedures or waivers of rights by Tenant.

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Lease Addendum Agreement intending to be legally bound as of the date and year first above set forth.

SAUCON VALLEY MANOR, INC.

By: _____
Its (Vice) President

_____
Abraham R. Atiyeh
(Landlord)

ADDENDUM TO LEASE AGREEMENT

MADE October 1, 2007, by and between, Saucon Trust hereinafter, sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh as Landlord (the "Assignor") did enter into an Agreement of Lease with Tenant effective January 1, 2006 as more fully described in the above Assignment of Lease (the "Lease") which Lease was assigned to Landlord by the above Assignment of Lease; and

WHEREAS Landlord and Tenant have agreed to amend the description of the Premises and add and delete certain terms and conditions set forth in this Addendum to Lease Agreement with all terms of the Lease not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1. The above Recitals do form a part of this Addendum to Lease Agreement.

2. Section 14 of Lease is deleted in its entirety.

3. The parties acknowledge that the rent set forth on page 1 of the lease (monthly installments of $95,800.) is correct and do correct and modify the amount set forth in Section 4 to read "monthly installments if Base Rent in the amount of $95,800."

4. The Premises is amended to read "Unit 1 of the Condos at Saucon Valley Manor, Lower Saucon Township, Northampton County, Pennsylvania" as more fully described on Exhibit A to this Addendum to Lease.

5. In addition to the Base Rent and other rent or charges set forth in the Lease, Tenant shall pay all common charges for the Premises pursuant the condominium documents of Condos at Saucon Valley ("The Condo Documents") and shall abide by all rules, regulations, terms, covenants and conditions of the Condominium Documents.

6. All other terms, covenants and conditions of the aforementioned Lease not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as

3

if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

Saucon Trust (Landlord)

_____
Abraham R. Atiyeh, Trustee

Saucon Valley Manor, Inc. (Tenant)

By: _____

Title: _____

4

## SECOND ADDENDUM TO LEASE AGREEMENT

MADE this 29th day of August 2008, by and between, The Saucon Trust, by and through ABRAHAM R. ATIYEH as Trustee of the Saucon Trust, hereinafter sometimes referred to as Landlord;

AND

Saucon Valley Manor Inc., hereinafter sometimes referred to as Tenant.

WITNESSETH:

WHEREAS Abraham R. Atiyeh, individually, as Landlord, did enter into an Agreement of Lease with Tenant effective January 1, 2006 (the "Lease"); and the Lease was assigned to Landlord effective October 1, 2007; and

WHEREAS, Landlord and Tenant entered in the Addendum to Lease Agreement dated October 1, 2007, (the "First Addendum"), which modified the Lease as therein set forth; and

WHEREAS, Landlord and Tenant did agree with National Penn Bank concerning the Assignment of Rents and Leases under date of October 1, 2007 (the "ALR"); and

WHEREAS Landlord and Tenant have agreed to further amend the Lease to change the Base Rental due by Tenant to Landlord effective September 1, 2008, and intend that all terms of the Lease and the First Addendum not inconsistent herewith to continue to remain in full force and effect.

NOW, THEREFORE, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.      The above Recitals do form a part of this Second Addendum to Lease Agreement.

2.      Effective as of September 1, 2008, Base Rent, as defined and/or otherwise stated in Section 4 of the Lease, is amended to be the sum of One Hundred Thirty Two Thousand Five Hundred ($132,500.00) Dollars per month.

3.      The aforesaid increased amount of Base Rent shall be payable monthly starting September 1, 2008 in addition to the continued payment of all amounts due as Additional Rent or otherwise due pursuant to the Lease.

3. Tenant certifies to Landlord and National Penn Bank that there is no Default of Landlord existing under the Lease and that it has no knowledge of any event which, with the passage of time or giving of notice would be a default of Landlord under the Lease.

4. All other terms, covenants and conditions of the aforementioned Lease (as amended by the First Addendum) not inconsistent herewith are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

5. All terms, covenants and conditions of the aforementioned ALR are hereby ratified and confirmed by the parties hereto the same as if set forth herein at length.

IN WITNESS WHEREOF the parties have hereunto affixed their hands and seals to this Addendum to Lease Agreement as of the day and year above first written, intending to be legally bound hereby.

**The Saucon Trust (Landlord)**

By: _____
Abraham R. Atiyeh, Trustee of
The Saucon Trust

**Saucon Valley Manor, Inc. (Tenant)**

By: _____
Abraham Atiyeh, President

THIRD AMENDMENT
Dated and Effective As Of January 1, 2010
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## THIRD AMENDMENT TO LEASE AGREEMENT

This THIRD AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of January 1, 2010, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Abraham R. Atiyeh, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

### A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the terms of this Addendum shall be effective as of the date shown above, subject to the obtaining approval as required by the terms of the Mortgage encumbering the Leased Premises.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

> "A.        The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month. "A. The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the sum of Two Million Four Hundred Thousand ($2,400,000.00) per year. Payments of Rent shall be due (a) in advance in equal monthly installments of One Hundred Thousand Dollars ($100,000.00) on the first day of each month, each due without setoff and without prior notice or demand, and (b) the remainder of $1,200,000.00 to be paid on or before December 31 of the then current calendar year, in one or more partial installments, as Lessee shall elect, provided however that the full Base Rental of $2,400,000.00 is paid in full by December 31 of each year.

> "A.1        Additionally, all other items set forth as Rent or Additional Rent under the Lease and all obligations of the Lessee are herein considered to be Rent and those additional items are due as set forth

in the Lease. If the Lessee fails to make any monthly payment of Rent within fifteen (15) days after the due date thereof, the Owner may, at its option, impose a late charge upon the Lessee in an amount not to exceed ten percent (10%) of the Rent so delinquent for each calendar month of delinquency.

2. The parties acknowledge that the new areas being added to the Building on Unit 1 form a part of the Premises, and that the Lessee shall take possession of the same when occupancy is allowed by applicable ordinance and inspection(s) and certification(s) as may be required. Lessee acknowledges that it is observing the construction and that it shall bear all risk from failure of the premises to comply with requirements for its intended use. Lessee hereby waives all obligations or warranties of Owner with respect to the construction being made for the benefit of Lessee on the Premises.

3. No other portions of the Lease are amended or modified.

4. Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5. Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Third Amendment to Lease Agreement effective as of January 1, 2010.

SAUCON TRUST

By: _____
Abraham Atiyeh, Trustee

SAUCON VALLEY MANOR, INC.

By: _____
(Vice) President

FOURTH AMENDMENT
Dated and Effective As Of November 1, 2012
To The
LEASE AGREEMENT
Dated and Effective As Of January 1, 2006
By and Between
SAUCON TRUST,
a Pennsylvania Trust, as Owner and Lessor
and
SAUCON VALLEY MANOR, INC.,
a Pennsylvania corporation, as Lessee

## FOURTH AMENDMENT TO LEASE AGREEMENT

This FOURTH AMENDMENT TO LEASE AGREEMENT, (the "First Amendment") , is made and dated as of November 1, 2012, by and between SAUCON TRUST, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

AND

SAUCON VALLEY MANOR, INC., (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

WHEREAS, the Owner and Lessee desire to amend the Lease dated January 1, 2006 between Owner and Lessee (the "Lease") for those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises") on the terms and conditions set forth herein; and

WHEREAS, the Lease has been amended prior to the date hereof; and

WHEREAS, Owner is obtaining a mortgage loan from M&T Realty Capital Corporation, its successors and/or assigns which will be insured or endorsed by the Secretary of Housing and Urban Development ("HUD"), which is herein called the "HUD Mortgage"; and

WHEREAS, the HUD Mortgage requires certain additional lease terms and other amendments, and the parties desire to amend the Lease as herein set forth.

NOW THEREFORE, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease is amended and restated as follows:

"A.      The Lessee agrees to pay to the Owner during the Lease Term, as Rent for the Leased Premises, the greater of:
  (i)      The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
  (ii)      During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
        a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
        b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and

c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

e. Annual Property Taxes for the Leased Premises.

(iii) The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv) Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

2. Owner agrees that it, or the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3. Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4. The HUD Rider, attached hereto as Exhibit "A" is incorporated herein by reference and forms a part hereof. Lessee agrees that it shall abide by all terms of the HUD Rider.

5. Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

6. Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

7. Lessee acknowledges and agrees that it shall execute and deliver a Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD.

8. Lessee shall cause its subtenants, Lehigh Valley Health Network and Good Shepherd Rehabilitation Hospital to execute Subordination, Nondisturbance and Attornment Agreement in form and content satisfactory to HUD. The said subleases are subordinate to the terms of this Lease, and shall be subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fourth Amendment to Lease Agreement effective as of November 1, 2012.

SAUCON TRUST
By: Saucon Management LLC, Trustee

By: _____
Abraham Atiych,
Manager of Trustee

SAUCON VALLEY MANOR, INC.

By: _____
(Vice) President

## FIFTH AMENDMENT TO LEASE AGREEMENT

This FIFTH AMENDMENT TO LEASE AGREEMENT, (the "Fifth Amendment") is effective as of July 1, 2018, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

### AND

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS*, the Lease has been amended four (4) times prior to the effective date hereof; and

*WHEREAS*, Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS*, Owner and Tenant desire to extend the Term of the Lease.

*NOW, THEREFORE*, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02(A) of the Lease ratified and Rent shall continue to be calculated as follows:

"A. The Lessee agrees to pay to the Owner during the Lease Term, starting on January 1, 2013, as Rent for the Leased Premises, the greater of:
   (i) The sum of One Million Seven Hundred Five Thousand Four Hundred Twenty One ($1,705,421.00) Dollars, due in 12 annual installments; or
   (ii) During each calendar year, in 12 equal installments, an Amount equal to One Hundred Five Percent (105%) of the sum of :
      a. Annual Principal and Interest Payments due by Owner under the HUD Mortgage; and
      b. Annual Mortgage Insurance Premium relating to the HUD Mortgage; and
      c. Annual Deposit for Reserve for Replacement as required by the HUD Mortgage; and

<div style="margin-left:2em">

        d. Annual Property Insurance Premiums for coverages for the Leased Premises required to be maintained by Owner under the HUD Mortgage; and

        e. Annual Property Taxes for the Leased Premises.

(iii)    The obligations of Lessee to pay, as Rent or Additional Rent, any of the items set forth in subsection (ii), above, are satisfied by the payment of rental as set forth in subsection (ii), above.

(iv)    Lessee acknowledges that the foregoing Rent will be variable due to the potential change in payments required for the items comprising rental due by subsection (ii), above.

(v)    The foregoing does not include those obligations, fees or other expenses and reimbursements as are due by Tenant under the Lease.

</div>

2.       Owner agrees that the holder of any escrow relating to items within the scope of 1 A (ii), will cause the timely payment of insurance premiums and taxes.

3.       Lessee or Owner may seek reimbursement or funding from the Replacement Reserve to fund costs, provided that any sums disbursed to them or for the use of the Premises are limited by the terms of the Replacement Reserve and the documents by which it was created or otherwise exists

4.       Lessee hereby acknowledges the validity of the Lease and confirms that there are no defenses, setoffs or other claims which it has or could assert under the Lease.

5.       Lessee hereby ratifies and reaffirms the rights to confess judgment against Lessee as set forth in the Lease as if fully set forth herein at length.

6.       Lessee acknowledges and agrees that this Lease, and all rights of Lessee and anyone claiming by, through or under Lessee, are, and shall be, subordinate to the HUD Mortgage and all subsequent mortgages now or hereafter upon the Premises.

7.       The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the "Termination Date").

8.       The Term shall automatically extend on the Termination Date for three (3) periods of three (3) years, each, (and the Termination Date shall be modified automatically thereby) unless (i) a Default by Lessee occurs, (in which event the rights and remedies of Owner shall be immediately applicable, and no further extension shall automatically occur) or (ii) Owner gives notice of nonrenewal to Lessee at least six (6) months prior to the end of the then-current Term, (in which event no further automatic extensions shall be available), or (iii) Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 9 months prior to the end of the then-current Term.

9.         Lessee certifies that there is no default of Owner under the Lease.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Fifth Amendment to Lease Agreement intending to be legally bound effective as of July 1, 2018.

**SAUCON TRUST**
By: Saucon Management LLC, Trustee

By: _____
       Abraham Atiyeh,
       Manager of Trustee

**SAUCON VALLEY MANOR, INC.**

By: _____
     Nammita Kapoor Atiyeh, President

## SIXTH AMENDMENT TO LEASE AGREEMENT

This SIXTH AMENDMENT TO LEASE AGREEMENT, (the "Sixth Amendment") is effective as of September 21, 2023, by and between **SAUCON TRUST**, (the "Owner"), a Pennsylvania Trust, by and through its Trustee, Saucon Management LLC, having its principal office at 1177 Sixth Street, Whitehall, PA 18052;

### A N D

**SAUCON VALLEY MANOR, INC.**, (the "Lessee"), a Pennsylvania corporation, having its principal office at 1177 Sixth Street, Whitehall, PA., 18052.

*WHEREAS*, the Owner and Lessee are parties to a Lease, originally dated and effective as of January 1, 2006 (the "Lease"), for the lease by Lessee from Owner of those certain premises known as Unit 1 of Saucon Valley Manor Condominium, (the "Leased Premises"); and

*WHEREAS,* the Lease has been amended five (5) times prior to the effective date hereof; and

*WHEREAS,* Owner and Lessee desire to amend the Lease to extend the term thereof upon the terms and conditions set forth herein; and

*WHEREAS,* Owner and Tenant desire to extend the Term of the Lease and to grant extensions to Tenant as hereinafter set forth; and

*NOW, THEREFORE*, in consideration of the foregoing Recitals and other good and valuable consideration, and intending to be legally bound, the Owner and Lessee hereby agree as follows:

1. Section 4.02 of the Lease (and all other parts of the Lease setting forth Base Rent, Additional Rent or other tenant payment obligations) are as follows:

     a. Base Rental
          i. For the period through December 31, 2024, no Base Rental shall be due.
          ii. For the remainder of the current renewal Term (i.e. calendar years 2025, 2026, 2027 and 2028) Base Rent shall be the greater of (i) One Hundred Twenty Thousand ($120,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment

1

for any real property obligation which Tenant may elect to pay, and by uncollected accounts receivable or bad debt] for each calendar year of the Term, limited to the sum of Three Hundred Thousand ($300,000.00) per annum, to be paid on April 30 of the year following the calendar year for which the calculation shall be made; and

iii. Base Rental for each calendar year of the Renewal Terms (i.e. Calendar years starting after December 31, 2028 shall be the greater of (i) Two Hundred Forty Thousand ($240,000.00) Dollars or (ii) Twenty-five (25%) percent of the net operating profit of Tenant from the operation of a personal care home at the Premises [reduced by all capital expenditures and by payment for any real property obligation which Tenant may elect to pay and by uncollected accounts receivable or bad debt] during a calendar year, limited to the sum of Five Hundred Thousand ($500,000.00) per annum. Base Rental shall be due on April 30 of the year following the calendar year for which the calculation shall be made; and

b. Tenant shall pay all charges for electric, water and sewer services provided to the Premises prior to the same being made a lien upon the Premises; and

c. Tenant shall pay the premiums for one or more insurance policies to provide (i) property casualty insurance for the Premises and (ii) general liability insurance for the Premises; and

d. Repairs to the Premises as are required to maintain the Premises in the condition required for lawful operation of a personal care home.

2. The Term is hereby extended to December 31, 2028 (which date shall hereafter be called the Termination Date, unless extended as per subsection (a), below).

a. The Term shall automatically extend on the Termination Date for three (3) periods of five (5) years, each, (and the Termination Date shall be modified automatically thereby) unless Lessee notifies Owner of the intent of Lessee not to renew by notice given at least 90 days prior to the end of the then-current Term.

3. Landlord and Tenant also have agreed to waive all past due rental and any obligations of Tenant or Landlord not performed by one or both through September 21, 2023, and hereby waive and release all unpaid sums and all performance not fully and timely provided.

a. Tenant waives any rights to refund or for calculation of overpayment previously made.

2

4.     Landlord acknowledges that Tenant has made repairs and replacements and betterments for the Premises. Tenant hereby waives obligation of Landlord to reimburse or perform such repairs, replacements or betterments, other than such funds are are now or hereafter due from insurers or loss payment sources other than Landlord.

5.     This Sixth Amendment is a full waiver and release of all defaults, deficient performance and any other obligation of Landlord or of Tenant which has arisen or could have been asserted at any time through and including the date hereof.

6.     The obligations of Landlord and/or Tenant under any Regulatory Agreement and all agreements, security interests and other rights, privileges, obligations or performance required under any Regulatory Agreement or other agreement made with the United States Department of Housing and Urban Development ("USHUD") or anyone required by, for or concerning USHUD or arising under any obligation with, concerning or associated with USHUD (collectively "HUD Obligations"), are hereby terminated and void as of September 20, 2023. Any past violations or continuing violation of the terms or conditions of any HUD Obligations are hereby waived and released.

7.     All other terms and conditions of the Lease (as amended through and including the Fifth Amendment and the oral amendment memorialized herein), are ratified and affirmed.

8.     This Agreement is effective as of September 21, 2023 notwithstanding a later date of execution.

    IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties have executed this Sixth Amendment, intending to be legally bound effective as of September 21, 2023.

**SAUCON TRUST ("Landlord")**

By: Saucon Management LLC, its Trustee

By: _____
    Abraham Atiyeh, its Manager

**SAUCON VALLEY MANOR, INC. ("Tenant")**

By: _____
    Nimita Kapoor Atiyeh, President

3

**Improved Sales**



## Improved Sale #1

| | |
|---|---|
| **Record ID:** | 8185150 |
| **Property Type:** | Independent, Assisted and Memory Care Community |
| **Name:** | Confidential Pending IL/AL/MC |
| **Address:** | N/A |
| | N/A, PA N/A |
| **Verified With:** | Broker (Broker) at Broker |
| **By:** | Jena Olivieri on 2/20/2026 |

### Key Indicators

| | | | |
|---|---|---|---|
| **Sale Price** | $11,375,000.00 | **Price per Unit:** | $126,389 |
| **Adjusted Sale Price:** | $11,375,000.00 | **Price per NRA:** | --- |
| **Sale Date:** | 2/2026 | **Price per GBA:** | $147.12 |
| **Cap Rate:** | 12.23% | **Occupancy:** | 85% |
| **EGIM:** | 2.03 | **Expense Ratio** | 75.2% |

| SALE DATA | |
|---|---|
| **Grantor:** | --- |
| **Grantee:** | --- |
| **Property Rights:** | Fee Simple |
| **Financing:** | --- |
| **Occupancy at sale:** | 85% |
| **Private Pay Census:** | 100% |
| **Medicaid Census:** | 0% |
| **Effective Gross Income:** | $5,602,773 |
| **Operating Expenses:** | $4,211,661 |
| **NOI:** | $1,391,112 |
| **Exp per Density:** | $46,796 |

| PHYSICAL PLANT DATA | |
|---|---|
| **Year Opened:** | 2001 |
| **Major Renovation:** | --- |
| **Gross Building Area:** | 77,320 |
| **Net Rentable Area:** | --- |
| **Number of Buildings:** | --- |
| **Number of Stories:** | --- |
| **Elevators:** | No |
| **Construction:** | --- |
| **Quality:** | Good |
| **Condition:** | Above Average |
| **Parking Garage:** | No |
| **Parking Spaces:** | --- |

| PROPERTY MIX | |
|---|---|
| **Level** | **Density** |
| IL Units | 32 |
| AL Units | 49 |
| ALZ Units | 9 |
| **Total Density** | **90** |

| LAND DATA | |
|---|---|
| **Land Area:** | --- |
| **Parcel / Legal:** | --- |

**REMARKS:**

Pending IL/AL/MC property in Pennsylvania for a purchase price of $11,000,000. The buyer is planning to put in $375,000 in capex, which we have included in the purchase price above. The property was marketed to a select group of buyers. The seller wants to keep managing the property; therefore, they selected a buyer group that will be less operationally involved and was willing to keep current management in place.

Proforma indications above are based on the 2025 budget inclusive of 5% management fee and $350/unit in reserves. The LOI was signed in Fall 2024 and there was a delay in signing the PSA which was signed in June 2025. Performance has improved since the purchase price was agreed upon.



## Improved Sale #2

| | |
|---|---|
| **Record ID:** | 8180794 |
| **Property Type:** | Assisted Living/Memory Care Residence |
| **Name:** | Walden Place |
| **Address:** | 839 Bennie Road |
| | Cortland, NY 13045 |
| **Verified With:** | Broker/Public Records (Broker/Public Records) at Broker/Public Records |
| **By:** | Jena Olivieri on 9/30/2025 |

### Key Indicators

| | | | |
|---|---|---|---|
| **Sale Price** | $8,500,000.00 | **Price per Unit:** | $106,250 |
| **Adjusted Sale Price:** | $8,500,000.00 | **Price per NRA:** | --- |
| **Sale Date:** | 9/2025 | **Price per GBA:** | $213.91 |
| **Cap Rate:** | 9.68% | **Occupancy:** | 73% |
| **EGIM:** | 1.89 | **Expense Ratio** | 81.7% |

| SALE DATA | |
|---|---|
| **Grantor:** | --- |
| **Grantee:** | --- |
| **Property Rights:** | Fee Simple |
| **Financing:** | --- |
| **Occupancy at sale:** | 73% |
| **Private Pay Census:** | 0% |
| **Medicaid Census:** | 0% |
| **Effective Gross Income:** | $4,487,809 |
| **Operating Expenses:** | $3,664,959 |
| **NOI:** | $822,851 |
| **Exp per Density:** | $45,812 |

| PHYSICAL PLANT DATA | |
|---|---|
| **Year Opened:** | 2001 |
| **Major Renovation:** | --- |
| **Gross Building Area:** | 39,737 |
| **Net Rentable Area:** | --- |
| **Number of Buildings:** | 1 |
| **Number of Stories:** | 1 |
| **Elevators:** | No |
| **Construction:** | Wood Frame |
| **Quality:** | Above Average |
| **Condition:** | Above Average |
| **Parking Garage:** | No |
| **Parking Spaces:** | --- |

| PROPERTY MIX | |
|---|---|
| **Level** | **Density** |
| AL Units | 60 |
| ALZ Units | 20 |
| **Total Density** | **80** |

| LAND DATA | |
|---|---|
| **Land Area:** | 4.88 Acres |
| **Parcel / Legal:** | --- |

### REMARKS:

In recent years, the community has undergone significant renovations, with over $1.4 million invested. The subject is located a high-barrier to entry state and is licensed for 86 Enhanced Assisted Living Residence beds, allowing the community to provide higher-acuity care. The property was marketed by Blueprint and was offered without a defined asking price.

The subject was generating approximately $800,000 based on the T3A March 2025 and occupancy was trending upward. Occupancy above is based on the April 2025 rent roll. The buyer elected to keep Senior Lifestyle as the operator even though the offering was free and clear of a management contract. There was no additional planned cap ex at the time of the sale.

We were not provided with the buyer's projections; therefore, given the current operator is staying in-place, we utilized in-place financials trended forward for a prospective NOI.





## Improved Sale #3

| | |
|---|---|
| **Record ID:** | 8179370 |
| **Property Type:** | Assisted Living/Memory Care Residence |
| **Name:** | Legacy at Maiden Park |
| **Address:** | 749 Maiden Lane |
| | Rochester, NY 14615 |
| **Verified With:** | Broker/Levin Pro (Broker/Levin Pro) at Broker/Levin Pro |
| **By:** | Jena Olivieri on 7/16/2025 |

### Key Indicators

| | | | |
|---|---|---|---|
| Sale Price | $6,955,000.00 | Price per Unit: | $89,167 |
| Adjusted Sale Price: | $6,955,000.00 | Price per NRA: | --- |
| Sale Date: | 1/2025 | Price per GBA: | $133.81 |
| Cap Rate: | 4.97% | Occupancy: | 79% |
| EGIM: | --- | Expense Ratio | --- |

| SALE DATA | |
|---|---|
| **Grantor:** | N/A |
| **Grantee:** | N/A |
| **Property Rights:** | Fee Simple |
| **Financing:** | --- |
| **Occupancy at sale:** | 79% |
| **Private Pay Census:** | 0% |
| **Medicaid Census:** | 0% |
| **Effective Gross Income:** | $0 |
| **Operating Expenses:** | $0 |
| **NOI:** | $345,489 |
| **Exp per Density:** | --- |

| PHYSICAL PLANT DATA | |
|---|---|
| **Year Opened:** | 2016 |
| **Major Renovation:** | --- |
| **Gross Building Area:** | 51,978 |
| **Net Rentable Area:** | --- |
| **Number of Buildings:** | 1 |
| **Number of Stories:** | 1 |
| **Elevators:** | No |
| **Construction:** | Wood Frame |
| **Quality:** | Above Average |
| **Condition:** | Average |
| **Parking Garage:** | No |
| **Parking Spaces:** | --- |

| PROPERTY MIX | |
|---|---|
| **Level** | **Density** |
| AL Units | 78 |
| **Total Density** | **78** |

| LAND DATA | |
|---|---|
| **Land Area:** | 6.22 Acres |
| **Parcel / Legal:** | 075.05-2-3.2 |

**REMARKS:**

The property is licensed for 98 beds and was operating 88 beds at the time of the sale. We were only provided with the overall total number of units (78) which have been listed under the AL units above.

The Legacy at Maiden Park community presented several advantages for the new owner-operator, including positive in-place cash flow, upside potential to increase occupancy, and a lack of new construction in the local market. The offering was marketed in the summer of 2024 with multiple offers from both national investors as well as regional buyers. The deal was brokered by SLIB.

The seller was a public, non-listed REIT focused on seniors housing properties throughout the United States. The buyer is a private real estate investment company, engaging a New York based operator.

The financials provided were based on the annualized period ending May 2024. We were not privy to the buyer's proforma; therefore, we have trended the provided in-place financials forward by 3%. Occupancy provided was as of July 2024.

Additionally, the broker noted there was no planned capex needed and mentioned since the sale has occurred the buyer has since improved the NOI to over $100,000/month.

The sale is not yet reported on the local assessor's site.



## Improved Sale #4

| | |
|---|---|
| **Record ID:** | 8183239 |
| **Property Type:** | Independent, Assisted and Memory Care Community |
| **Name:** | Four IL/AL/MC PA-NJ |
| **Address:** | 404 East Harford Street |
| | Milford, PA 18337 |
| **Verified With:** | Buyer |
| **By:** | Alicia Lewis on 10/21/2025 |

### Key Indicators

| | | | |
|---|---|---|---|
| **Sale Price** | $55,000,000.00 | **Price per Unit:** | $141,388 |
| **Adjusted Sale Price:** | --- | **Price per NRA:** | $3,957.40 |
| **Sale Date:** | 12/2025 | **Price per GBA:** | $1,150.63 |
| **Cap Rate:** | 9.34% | **Occupancy:** | 96.69% |
| **EGIM:** | 1.95 | **Expense Ratio** | 81.8% |

### SALE DATA

| | |
|---|---|
| **Grantor:** | Invesque |
| **Grantee:** | Logos Living Capital |
| **Property Rights:** | Fee Simple |
| **Financing:** | --- |
| **Occupancy at sale:** | 96.69% |
| **Private Pay Census:** | 96.32% |
| **Medicaid Census:** | 0.04% |
| **Effective Gross Income:** | $28,185,521 |
| **Operating Expenses:** | $23,050,929 |
| **NOI:** | $5,134,592 |
| **Exp per Density:** | $59,257 |

### PHYSICAL PLANT DATA

| | |
|---|---|
| **Year Opened:** | 1977 |
| **Major Renovation:** | 2021 |
| **Gross Building Area:** | 47,800 |
| **Net Rentable Area:** | 13,898 |
| **Number of Buildings:** | 4 |
| **Number of Stories:** | 3 |
| **Elevators:** | Yes |
| **Construction:** | Concrete Block Stucco |
| **Quality:** | Good |
| **Condition:** | Good |
| **Parking Garage:** | No |
| **Parking Spaces:** | 30 |

### PROPERTY MIX

| Level | Density |
|---|---|
| IL Units | 101 |
| AL Units | 217 |
| ALZ Units | 71 |
| **Total Density** | **389** |

### LAND DATA

| | |
|---|---|
| **Land Area:** | 0.74 Acres |
| **Parcel / Legal:** | 113.17-01-34- |

### REMARKS:

The sale was off-market and the seller (Invesque)/buyer (Logos Living Capital) have had successful transactions previously.





## Improved Sale #5

| | |
|---|---|
| Record ID: | 8174593 |
| Property Type: | Assisted Living/Memory Care Residence |
| Name: | Brandywine Living at Senior Suites |
| Address: | 2101 New Hope Street |
| | Norristown, PA 19401 |
| Verified With: | Buyer/Public Records (Buyer/Public Records) at (610) 278-3761 |
| By: | Jena Olivieri on 11/18/2024 |

### Key Indicators

| | | | |
|---|---|---|---|
| Sale Price | $8,650,000.00 | Price per Unit: | $75,877 |
| Adjusted Sale Price: | $8,650,000.00 | Price per NRA: | $187.55 |
| Sale Date: | 6/2024 | Price per GBA: | $105.99 |
| Cap Rate: | 21.66% | Occupancy: | 70.78% |
| EGIM: | 1.13 | Expense Ratio | 75.6% |

| SALE DATA | |
|---|---|
| Grantor: | AB EAST NORRITON OWNER LLC |
| Grantee: | BRANDYWINE PA HEALTHCARE REALTY LLC |
| Property Rights: | Fee Simple |
| Financing: | --- |
| Occupancy at sale: | 70.78% |
| Private Pay Census: | 100% |
| Medicaid Census: | 0% |
| Effective Gross Income: | $7,669,471 |
| Operating Expenses: | $5,795,814 |
| NOI: | $1,873,657 |
| Exp per Density: | $50,840 |

| PHYSICAL PLANT DATA | |
|---|---|
| Year Opened: | 1988 |
| Major Renovation: | 2019 |
| Gross Building Area: | 81,610 |
| Net Rentable Area: | 46,120 |
| Number of Buildings: | 1 |
| Number of Stories: | 3 |
| Elevators: | Yes |
| Construction: | Masonry |
| Quality: | Above Average |
| Condition: | Above Average |
| Parking Garage: | No |
| Parking Spaces: | 50 |

| PROPERTY MIX | |
|---|---|
| Level | Density |
| IL Units | --- |
| AL Units | 73 |
| ALZ Units | 41 |
| SN Beds | --- |
| Total Density | 114 |

| LAND DATA | |
|---|---|
| Land Area: | 5.27 Acres |
| Parcel / Legal: | 33-00-05938-00-5 |

**REMARKS:**

Artemis Real Estate Partners acquired the property from Welltower in 2018. From late 2018 to 2020, the community underwent an approximate $3.5MM renovation project to update the interior and exterior of the building. This included FF&E and repair of deferred maintenance items.

The property sold in June 2024 for a purchase price of $8.5MM. Upon closing, approximately $150,000 is planned in capital expenditures. As the buyer will be investing this after the closing, we have included this amount in the purchase price above.

The community was being offered for sale by Blueprint Brokerage without a defined asking price, but the target price range was set at around $10M. The deal was offered unencumbered by mortgage debt, and free and clear of a management contract or lease agreement. Brandywine, the in-place operator, was interested in retaining operations under a new forward-looking arrangement. We were not privy to additional background, but typically these types of properties are not openly marketed and are instead relationship-based transactions. The buyer put in an "aggressive offer with a quick timeline along with certainty of execution"; which helped with the reduced pricing to secure the deal.

The buyer was, The Rosdev Group, a real estate group with over 50 years of experience in acquisitions, development, construction, leasing and management. It invests in the hotel, industrial, office, retail and assisted living/skilled nursing industries. Its affiliate Comprehensive Care Capital made the acquisition.

Demographic Data

Remove Formulae
(Removes from all Reports)



| Senior Life | 20260124 1050 Main St - 5 mi. | | | | | |
|---|---|---|---|---|---|---|
| | 2020 Census | % | 2026 Estimate | % | 2031 Projection | % |
| **Population** | **114,526** | | **119,615** | | **122,600** | |
| **Percent Growth (2010 to 2031)\*\*\*** | 2.98% | | 4.44% | | 2.50% | |
| | | | | | | |
| **Population by Age** | | | | | | |
| **Total Population** | **114,526** | | **119,615** | | **122,600** | |
| Age 45 to 54 | 13,210 | 11.53% | 13,143 | 10.99% | 14,208 | 11.59% |
| Age 55 to 64 | 15,097 | 13.18% | 13,707 | 11.46% | 12,944 | 10.56% |
| Age 65 to 74 | 11,657 | 10.18% | 12,774 | 10.68% | 13,601 | 11.09% |
| Age 75 to 84 | 6,059 | 5.29% | 7,749 | 6.48% | 9,631 | 7.86% |
| Age 85 and over | 2,955 | 2.58% | 3,061 | 2.56% | 3,433 | 2.80% |
| | | | | | | |
| Age 65 and over | 20,671 | 18.05% | 23,584 | 19.72% | 26,665 | 21.75% |
| | | | | | | |
| **Households by HH Income by Age of Householder** | | | | | | |
| **Householder Age 45 to 54** | **7,476** | | **7,440** | | **7,980** | |
| Income Less than $15,000 | | | 382 | 5.13% | 330 | 4.14% |
| Income $15,000 to $24,999 | | | 309 | 4.15% | 253 | 3.17% |
| Income $25,000 to $34,999 | | | 294 | 3.95% | 253 | 3.17% |
| Income $35,000 to $49,999 | | | 486 | 6.53% | 423 | 5.30% |
| Income $50,000 to $74,999 | | | 781 | 10.50% | 749 | 9.39% |
| Income $75,000 to $99,999 | | | 867 | 11.65% | 841 | 10.54% |
| Income $100,000 to $124,999 | | | 816 | 10.97% | 832 | 10.43% |
| Income $125,000 to $149,999 | | | 848 | 11.40% | 884 | 11.08% |
| Income $150,000 to $199,999 | | | 901 | 12.11% | 1,102 | 13.81% |
| Income $200,000 or more | | | 1,756 | 23.60% | 2,315 | 29.01% |
| **Median Household Income** | | | **$118,424** | | **$133,593** | |
| | | | | | | |
| **Households by HH Income by Age of Householder** | | | | | | |
| **Householder Age 55 to 64** | **8,831** | | **7,962** | | **7,407** | |
| Income Less than $15,000 | | | 659 | 8.28% | 515 | 6.95% |
| Income $15,000 to $24,999 | | | 537 | 6.74% | 416 | 5.62% |
| Income $25,000 to $34,999 | | | 403 | 5.06% | 313 | 4.23% |
| Income $35,000 to $49,999 | | | 618 | 7.76% | 490 | 6.62% |

Copyright © 2024 by Environics Analytics (EA). Source/2026 and ©Claritas, LLC 2024

| | | | | | |
|---|---|---|---|---|---|
| Income $50,000 to $74,999 | | | 866 | 10.88% | 726 | 9.80% |
| Income $75,000 to $99,999 | | | 935 | 11.74% | 810 | 10.94% |
| Income $100,000 to $124,999 | | | 826 | 10.37% | 754 | 10.18% |
| Income $125,000 to $149,999 | | | 763 | 9.58% | 701 | 9.46% |
| Income $150,000 to $199,999 | | | 780 | 9.80% | 831 | 11.22% |
| Income $200,000 or more | | | 1,574 | 19.77% | 1,852 | 25.00% |
| **Median Household Income** | | | **$98,963** | | **$114,169** | |
| | | | | | | |
| **Households by HH Income by Age of Householder** | | | | | | |
| **Householder Age 65 to 74** | **7,232** | | **7,863** | | **8,261** | |
| Income Less than $15,000 | | | 567 | 7.21% | 542 | 6.56% |
| Income $15,000 to $24,999 | | | 552 | 7.02% | 530 | 6.42% |
| Income $25,000 to $34,999 | | | 514 | 6.54% | 459 | 5.56% |
| Income $35,000 to $49,999 | | | 1,088 | 13.84% | 950 | 11.50% |
| Income $50,000 to $74,999 | | | 1,172 | 14.91% | 1,189 | 14.39% |
| Income $75,000 to $99,999 | | | 1,141 | 14.51% | 1,145 | 13.86% |
| Income $100,000 to $124,999 | | | 794 | 10.10% | 832 | 10.07% |
| Income $125,000 to $149,999 | | | 523 | 6.65% | 572 | 6.92% |
| Income $150,000 to $199,999 | | | 596 | 7.58% | 725 | 8.78% |
| Income $200,000 or more | | | 917 | 11.66% | 1,318 | 15.95% |
| **Median Household Income** | | | **$75,814** | | **$84,656** | |
| | | | | | | |
| **Households by HH Income by Age of Householder** | | | | | | |
| **Householder Age 75 to 84** | **3,788** | | **4,753** | | **5,850** | |
| Income Less than $15,000 | | | 456 | 9.59% | 516 | 8.82% |
| Income $15,000 to $24,999 | | | 480 | 10.10% | 569 | 9.73% |
| Income $25,000 to $34,999 | | | 431 | 9.07% | 458 | 7.83% |
| Income $35,000 to $49,999 | | | 758 | 15.95% | 799 | 13.66% |
| Income $50,000 to $74,999 | | | 707 | 14.87% | 851 | 14.55% |
| Income $75,000 to $99,999 | | | 597 | 12.56% | 721 | 12.32% |
| Income $100,000 to $124,999 | | | 387 | 8.14% | 489 | 8.36% |
| Income $125,000 to $149,999 | | | 237 | 4.99% | 309 | 5.28% |
| Income $150,000 to $199,999 | | | 263 | 5.53% | 391 | 6.68% |
| Income $200,000 or more | | | 435 | 9.15% | 747 | 12.77% |
| **Median Household Income** | | | **$57,244** | | **$66,146** | |
| | | | | | | |
| **Households by HH Income by Age of Householder** | | | | | | |
| **Householder Age 85 and over** | **1,788** | | **1,787** | | **1,943** | |
| Income Less than $15,000 | | | 264 | 14.77% | 273 | 14.05% |
| Income $15,000 to $24,999 | | | 261 | 14.61% | 283 | 14.57% |
| Income $25,000 to $34,999 | | | 195 | 10.91% | 187 | 9.62% |
| Income $35,000 to $49,999 | | | 291 | 16.28% | 277 | 14.26% |
| Income $50,000 to $74,999 | | | 247 | 13.82% | 277 | 14.26% |
| Income $75,000 to $99,999 | | | 179 | 10.02% | 203 | 10.45% |
| Income $100,000 to $124,999 | | | 89 | 4.98% | 107 | 5.51% |

Copyright © 2024 by Environics Analytics (EA). Source/2020 and ©Claritas, LLC 2024

| | | | | | | |
|---|---|---|---|---|---|---|
| Income $125,000 to $149,999 | | | 60 | 3.36% | 66 | 3.40% |
| Income $150,000 to $199,999 | | | 73 | 4.09% | 83 | 4.27% |
| Income $200,000 or more | | | 126 | 7.05% | 186 | 9.57% |
| **Median Household Income** | | | **$43,490** | | **$47,089** | |
| | | | | | | |
| **Households by HH Income** | | | | | | |
| **Total Household** | 44,422 | | 46,140 | | 47,608 | |
| Income Less than $15,000 | | | 3,530 | 7.65% | 3,217 | 6.76% |
| Income $15,000 to $24,999 | | | 2,630 | 5.70% | 2,482 | 5.21% |
| Income $25,000 to $34,999 | | | 2,803 | 6.07% | 2,432 | 5.11% |
| Income $35,000 to $49,999 | | | 4,973 | 10.78% | 4,372 | 9.18% |
| Income $50,000 to $74,999 | | | 6,859 | 14.87% | 6,636 | 13.94% |
| Income $75,000 to $99,999 | | | 6,017 | 13.04% | 5,921 | 12.44% |
| Income $100,000 to $124,999 | | | 4,767 | 10.33% | 4,937 | 10.37% |
| Income $125,000 to $149,999 | | | 3,878 | 8.40% | 4,034 | 8.47% |
| Income $150,000 to $199,999 | | | 4,218 | 9.14% | 5,018 | 10.54% |
| Income $200,000 to $249,999 | | | 2,163 | 4.69% | 2,882 | 6.05% |
| Income $250,000 to $499,999 | | | 2,520 | 5.46% | 3,257 | 6.84% |
| Income $500,000 or more | | | 1,781 | 3.86% | 2,419 | 5.08% |
| **Average Household Income** | | | **$119,151** | | **$133,973** | |
| | | | | | | |
| **Median Household Income** | | | **$83,968** | | **$94,362** | |
| **Age 55+ Median Household Income** | | | **$75,954** | | **$84,258** | |
| **Age 65+ Median Household Income** | | | **$64,636** | | **$73,402** | |
| | | | | | | |
| **Owner Occupied Housing Units by Value** | | | | | | |
| **Total Owner-Occupied Housing Units** | 27,551 | | 28,380 | | 29,139 | |
| Value Less than $20,000 | | | 370 | 1.30% | 340 | 1.17% |
| Value $20,000 to $39,999 | | | 267 | 0.94% | 248 | 0.85% |
| Value $40,000 to $59,999 | | | 108 | 0.38% | 107 | 0.37% |
| Value $60,000 to $79,999 | | | 98 | 0.35% | 98 | 0.34% |
| Value $80,000 to $99,999 | | | 132 | 0.47% | 81 | 0.28% |
| Value $100,000 to $149,999 | | | 1,024 | 3.61% | 663 | 2.28% |
| Value $150,000 to $199,999 | | | 1,991 | 7.02% | 1,063 | 3.65% |
| Value $200,000 to $299,999 | | | 7,848 | 27.65% | 6,043 | 20.74% |
| Value $300,000 to $399,999 | | | 5,873 | 20.69% | 6,122 | 21.01% |
| Value $400,000 to $499,999 | | | 3,830 | 13.50% | 4,541 | 15.58% |
| Value $500,000 to $749,999 | | | 3,439 | 12.12% | 4,839 | 16.61% |
| Value $750,000 to $999,999 | | | 1,781 | 6.28% | 2,321 | 7.97% |
| Value $1,000,000 or more | | | 1,620 | 5.71% | 2,674 | 9.18% |
| Value $1,000,000 to $1,499,999 | | | 979 | 3.45% | 1,609 | 5.52% |
| Value $1,500,000 to $1,999,999 | | | 284 | 1.00% | 552 | 1.89% |
| Value $2,000,000 or more | | | 357 | 1.26% | 513 | 1.76% |
| **Median All Owner-Occupied Housing Unit Value** | | | **$336,119** | | **$396,485** | |
| | | | | | | |
| **Group Quarters by Population Type** | 6,355 | | 8,248 | | 8,274 | |
| Correctional Institutions | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |

Copyright © 2024 by Environics Analytics (EA). Source: EA and ©Claritas, LLC 2024

| | | | | | | |
|---|---|---|---|---|---|---|
| Nursing Homes | 811 | 12.76% | 982 | 11.91% | 986 | 11.92% |
| Other Institutions | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| College Dormitories | 5,165 | 81.27% | 6,773 | 82.12% | 6,793 | 82.10% |
| Military Quarters | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Other Noninstitutional Quarters | 379 | 5.96% | 493 | 5.98% | 495 | 5.98% |
| | | | | | | |
| **Occupied Housing Units by Tenure** | **44,422** | | **46,140** | | **47,608** | |
| Owner-Occupied | 27,551 | 62.02% | 28,380 | 61.51% | 29,139 | 61.21% |
| Renter-Occupied | 16,871 | 37.98% | 17,760 | 38.49% | 18,469 | 38.79% |
| | | | | | | |
| **Households by Tenure by Age of Householder** | | | | | | |
| Total Households | 44,422 | | 46,140 | | 47,608 | |
| | | | | | | |
| **Owner-Occupied** | **27,551** | | **28,380** | | **29,139** | |
| Householder 55 to 64 years | 6,314 | 22.92% | 5,684 | 20.03% | 5,247 | 18.01% |
| Householder 65 to 74 years | 5,481 | 19.89% | 5,977 | 21.06% | 6,256 | 21.47% |
| Householder 75 to 84 years | 2,752 | 9.99% | 3,420 | 12.05% | 4,201 | 14.42% |
| Householder 85 years and over | 1,166 | 4.23% | 1,088 | 3.83% | 1,178 | 4.04% |
| | | | | | | |
| **Renter-Occupied** | **16,871** | | **17,760** | | **18,469** | |
| Householder 55 to 64 years | 2,517 | 14.92% | 2,278 | 12.83% | 2,161 | 11.70% |
| Householder 65 to 74 years | 1,752 | 10.38% | 1,887 | 10.63% | 2,005 | 10.86% |
| Householder 75 to 84 years | 1,035 | 6.13% | 1,333 | 7.51% | 1,649 | 8.93% |
| Householder 85 years and over | 622 | 3.69% | 699 | 3.94% | 765 | 4.14% |

Copyright © Claritas, LLC 2026. All rights reserved.
***Percent growth figures are as follows: 2020 (2010-2020), 2026 (2020-2026), and 2031 (2026-2031).

Copyright © 2024 by Environics Analytics (EA). Sources/2026and ©Claritas, LLC 2024

**Appraiser Qualifications**



Seniors Housing & Healthcare Real Estate Advisory Services

6801 Energy Court, Suite 200, Sarasota, FL 34240  T: 941.363.7500

# Alan C. Plush, MAI

## EXPERIENCE

Mr. Plush specializes exclusively in Healthcare and Retirement valuation throughout the United States. He is currently CEO/Partner of HealthTrust, LLC following its spin-off from PricewaterhouseCoopers, where he was the national director of the Healthcare Valuation group for over three years. Prior to this, Mr. Plush was the owner and president of Gulf/Atlantic Valuation Services, Inc., which was purchased by PricewaterhouseCoopers in August 1999. In 1986, Mr. Plush began specializing in the appraisal of a large number of healthcare properties. With a foundation in the appraisal of adult congregate living facilities and nursing homes, his specialized expertise has grown substantially. To date, he has participated in the appraisal of thousands of nursing homes, congregate care facilities, continuing care retirement centers, and hospitals throughout the U.S.

Mr. Plush holds an MAI designation and a seat on the Executive Board of ASHA. He has written a variety of articles on industry topics, regularly serves as an expert witness in court proceedings and is often a guest speaker at banks and industry conferences such as NIC, ALFA, and ASHA.

## EDUCATION

Mr. Plush is a graduate of the University of Florida where he received a Bachelor of Science in Business Administration in 1981. Since then, Mr. Plush has completed numerous Appraisal Institute courses and attended related seminars for continuing education.

## LICENSES

Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

## SPEAKING ENGAGEMENTS

National Medicaid/Medicare Conference, Sarasota, FL (Contributor/Sponsor)
National Investment Conference (NIC), Washington DC (Contributor/Sponsor)
2b Alive Mexico IL/AL Industry Summit & Expo, La Jolla, CA ("Valuation of Healthcare/Senior Housing Assets")
N.C. Healthcare Association ("Market Trends for Healthcare and Senior Housing Assets")
NIC Western Regional Conference, Las Vegas, NV ("Valuation Trends of Healthcare/Senior Housing Assets")
IAAO annual conferences, Miami Beach, FL ("Valuation Issues for Assessment of Senior Housing/Healthcare Facilities")
IAAO, Florida Chapter, Clearwater, FL ("Valuation Issues for Assessment of Senior Housing/Healthcare Facilities")
Commercial Property News, New York, NY ("Seniors Housing Symposium")

## CEO / Partner

**HealthTrust**
6801 Energy Court, Suite 200
Sarasota, FL 34240
941.363.7501 T
941.363.7525 F
alan.plush@healthtrust.com





**HEALTH**TRUST
Seniors Housing & Healthcare Real Estate Advisory Services

## SPEAKING ENGAGEMENTS (Continued)

Information Management Network, New York, NY ("Seniors Housing Finance Symposium")
National Association of Real Estate Financial Intermediaries Annual Meeting ("Transaction Overview...")
Massachusetts ALFA, Boston, MA ("Development Trends in the Assisted Living Industry")
Essex County Assessor's Meeting, Danvers, MA (""Valuation Techniques for Assisted Living Properties")
ALFA Spring Conference, Phoenix, AZ ("Transaction Survey of Congregate and Assisted Living Industries")
Appraisal Institute, Boston Chapter, Boston, MA ("Healthcare and Retirement Property Appraisal Seminar")
Plymouth County Assessor's Meeting, Duxbury, MA ("Assessing Healthcare and Retirement Properties")
IAAO annual conferences, Seattle, WA ("Methods Used to Appraise Healthcare and Retirement Properties")

## PUBLISHED ARTICLES

Seniors Housing Business, 2014 ("No Sign of Development Bubble, Only Pockets of Trouble")
Seniors Housing Business, 2013 ("A Roadmap to Valuing CCRCs")
Co-author and contributor to The State of Seniors Housing, published by ASHA, NIC, AAHSA, 2000 - Current
Co-author with ASHA of the annual survey of transactions and economic indicators, 2002
Co-author with ASHA of the Seniors Housing Absorption Study, 2000
Co-author with ALFA and ASHA for 1997, 1998 and 1999 survey of transactions and economic indicators
The Appraisal Journal, Appraisal Institute, July 1995 ("USPAP Competency Provision and the Appraisal of
Healthcare/Retirement Facilities")
Force Financial, Quarterly Newsletter, 1995 ("The Impact of Assisted Living on CCRCs")

## APPEARANCE AS AN EXPERT WITNESS

Bama Oaks IL/AL Federal Bankruptcy Court, Southern District, Mobile, AL 2021
Brightview v Teeters, Maryland - 2020
Riverview Senior Resort, Florida - 2020
ILC, Federal Bankruptcy Court, Chicago, Illinois - 2010
SNF, U.S. District Court of Eastern District of Pennsylvania - 2009
CCRC, Tax appeal case, Atlanta, Georgia - 2008
SNF, Federal Bankruptcy Court, Tampa, Florida - 1999
IL/AL, Superior Court, Lansing, Michigan - prior to 2000
SNF, Circuit Court, Polk County, Florida - prior to 2000
Circuit Court, Duval County, Florida - prior to 2000

## MEMBERSHIPS/AFFILIATIONS

MAI designation by the Appraisal Institute (#8701)
State of Florida Building Contractor Class B (Inactive) CB C035068
Investment Committee, SHP Investments (on behalf of CalPers Investment Fund), 2002-2007
American Seniors Housing Association (ASHA), 2001-present



# Commonwealth of Pennsylvania- Department of State
# Bureau of Professional and Occupational Affairs

Mailing Address P.O. Box 2649, Harrisburg, PA 17105          Toll Free: 1-833-DOS-BPOA

---

## *ALAN C PLUSH*

---

| | | |
|---|---|---|
| **License Number** | : GA001255L          Initial License Date : 06/07/1994 | **Expiration Date**          : 06/30/2027 |
| **License Type** | : Certified General Appraiser | **License Status as of 6/25/2025 : Active** |
| **Issued By** | : State Board of Certified Real Estate Appraisers | |
| **Address** | : 6801 ENERGY COURT, SUITE 200 SARASOTA, FL 34240 | |



*Arion R. Claggett*

**Acting Commissioner Arion R. Claggett**

**Signature of Licensee**



Please verify the license by visiting https://www.pals.pa.gov/verify or by scanning the QR Code          20250624706