**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Whitehall Manor, Inc., *Debtor*. | : | Case No. 25-15245 (PMM) (Jointly Administered) |

**SECURED CREDITOR LEHIGH VALLEY 1, LLC'S OBJECTION TO: (1) JOINT MOTION TO MODIFY ADEQUATE PROTECTION PENDING CONFIRMATION OF A CHAPTER 11 PLAN AND (2) AMENDED JOINT MOTION PURSUANT TO 11 U.S.C. § 363 FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER USE AND OCCUPANCY AGREEMENTS; WITH CROSS-MOTION FOR ADEQUATE PROTECTION**

Secured Creditor Lehigh Valley 1, LLC ("Lender") hereby objects to: (1) the Joint Motion to Modify Adequate Protection Pending Confirmation of a Chapter 11 Plan (ECF 206, the "AP Reduction Motion"); and (2) Amended Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors to Enter into and Perform Under Use and Occupancy Agreements (ECF 216, the "Amended U&O Motion") (collectively, the "Motions"), which were each filed jointly by Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (collectively, the "Manor Debtors") and by Whitehall Trust and Saucon Trust (collectively, the "Trusts"). In addition, the Lender cross-moves for appropriate adequate protection of its interest in the collateral. In support of this objection, Lender states as follows:

## I. Introduction

1. The Motions are part and parcel of the Manor Debtors' and the Trusts' ongoing efforts to reduce their payments to the Lender – for the sole benefit of the Atiyeh Family – and to deprive the Lender of adequate protection of its interests in its collateral.

The Lender has a security interest in, *inter alia,* both the real estate owned by the Trusts and the rents that the Manor Debtors owe to the Trusts for the use of those properties, including the current rent that is accruing post-petition.

2. The pending Motions together seek to reduce the payments made to the Trusts to approximately $69,000 total per month for each of the properties. This amount is far below the established rent due for the Manor Debtors' use of the Trusts' properties under applicable non-bankruptcy law, and also well below the fair market rent for the properties.

3. The Motions should be denied for four reasons.

4. *First,* the Motions are the Manor Debtors' and the Trusts' latest attempt – in approximately the sixth month of these cases, after three full hearings with testimony and rulings by two courts – to relitigate the adequate protection payment and the rent due. The Manor Debtors and the Trusts should not get yet another bite at the apple.

5. *Second*, the proposed adequate protection payments and U&O Agreements impermissibly alter the status quo that this Court's April 2, 2026 Stay Order and the automatic stay preserve. While the dismissal of the Trusts' bankruptcy cases is on appeal, everything is stayed and the status quo governs: just as the Lender may not pursue its foreclosure remedies under the parties' contracts while the appeal is pending, the Debtors may not rewrite the protections afforded to the Lender—above all the rent, which Mr. Atiyeh himself set and which was part of the consideration required for the Trusts' $30+ million HUD-insured loan.

6. *Third,* the proposed agreements improperly seek to impose an unduly low rental rate, one that is well below the fair market rate, let alone the rate due under applicable law. Under Pennsylvania law, a holdover tenant is generally obligated to pay

rent at the rate due under the last applicable lease. Here, that is approximately $140,000 per month for each of the properties. Further, the actual fair market rent established in the appraisals the Lender has obtained, though somewhat lower, is well above the amount proposed to be paid under the Motions – pursuant to Mr. Atiyeh's agreement with himself – and supports the reasonableness of the amounts due as set forth under the prior leases which he made.

7. *Fourth*, the Motions do nothing to address the significant deferred maintenance at the Trusts' properties to ensure that they do not cause additional damage and further impair the Lender's collateral. Among other things, the Manor Debtors and Trusts have now disclosed that the properties require roof repairs costing more than $1.7 million, as well as an emergency HVAC repair. Indeed, the Manor Debtors (and the non-bankrupt Trusts) are relying on the deferred maintenance to the roofs to reduce the value of the properties for purposes of their proposed plan of reorganization. At the same time, the Manor Debtors and the Trusts lack the financial means to address these problems and do not appear otherwise to have any plans for obtaining the funds necessary to properly maintain the collateral properties. The result of the Manor Debtors' and the Trusts' inaction is that there is an ongoing risk to the Lender's collateral, for which the Manor Debtors and Trusts are providing no protection.

8. For all these reasons, the Court should deny the Motions.

9. Moreover, in order to protect the Lender's interest in the collateral, the Court should require the Manor Debtors and Trusts to: (1) pay the full amount of rent due currently to the Lender; (2) adequately protect the Lender's interest in the collateral real properties; and (2) make additional appropriate payments (separate from the required

rent) or establish and fund appropriate reserves to address the substantial deferred maintenance at each of the properties.

## II. Relevant Background

10. Lender incorporates by reference the detailed Factual Background set forth in the First Objection of Secured Creditor Lehigh Valley 1, LLC to Motion for (1) Interim and Final Orders (A) Authorizing Debtors to Use Cash Collateral of Existing Secured Party and Granting Adequate Protection for Use and (B) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing and (2) Expedited Hearing on the Relief Sought Herein (ECF 41).

11. The Manor Debtors lease the collateral real properties owned by the Trusts and operate personal care homes at those properties.

12. The Whitehall Manor property is governed by an Operating Lease Agreement originally dated August 14, 2008, amended by the First through Third Amendments. *See* Ex. A, Whitehall Lease Agreement[1]. With the Fourth Amendment voided by the District Court's December 19 Order, the Third Amendment is the governing Amendment, dated and effective as of August 31, 2018. Under the most recently operative version of the Whitehall Lease, the monthly rent due was $139,000.

13. The Whitehall Lease Agreement is a triple net lease, meaning the lease requires Whitehall Manor to pay – separate from and in addition to the stated amount of

[1] Exhibits A-H referenced herein are attached to Secured Creditor Lehigh Valley 1, LLC's Objection to Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtors To Enter Into and Perform Under Use and Occupancy Agreements, ECF 215.

monthly rent – all taxes, insurance, maintenance, and other operating expenses of the property. *See id.* at § 4.05.

14. Section 2 of the Third Amendment to the Whitehall Lease Agreement provides that: "Tenant has exercised the privilege to extend the Term for 5 years, such that the original termination date of August 31, 2018 is now agreed to be August 31, 2023." Ex. A, Whitehall Lease Agreement. The Whitehall Lease Agreement was not renewed or extended thereafter.

15. The Saucon Manor property is governed by a Lease Agreement originally dated January 1, 2006, subsequently amended by the First through Fifth Amendments. *See* Ex. B, Saucon Lease Agreement. With the Sixth Amendment voided by the December 19 Order, the terms established by the Fifth Amendment, dated and effective as of July 1, 2018, govern. Under the most recently operative version of the Saucon Lease Agreement, the monthly rent due was $142,118.

16. The Saucon Lease Agreement, like the Whitehall Lease Agreement, is a triple net lease. *See id.* at § 5. Thus, Saucon Manor is required to pay all taxes, insurance, maintenance, and other operating expenses of the property in addition to the stated monthly rent amount. *See id.*

17. The Fifth Amendment to the Saucon Lease Agreement provides: "The parties acknowledge that the term of the existing lease extended to July, 2018; and the parties hereto extend the Term of the Lease through August 31, 2023, (which hereby becomes the 'Termination Date')." *Id.* at § 7. The Saucon Lease Agreement was not renewed or extended thereafter.

18. As this Court held, "no one disputes here that the Leases expired by their terms pre-petition." ECF 11, Order at 3; *see also* ECF 182, U&O Motion ¶ 13.

19. Accordingly, Whitehall Manor and Saucon Manor have been operating their personal care homes on the respective Trusts' properties without valid leases since August 31, 2023, when the Leases expired.

20. Lender has a security interest in all rents owed by or to the Manor Debtors. ECF 41, at ¶ 27 (Case No. 25-15241); Mortgages, Security Agreements, and Lessee Security Agreements attached hereto as Exhibits C through H.

21. Lender's collateral package is more extensive than a typical mortgage. Lender holds by assignment:

- **Mortgages**: Against real property, improvements, equipment, personal property, and "rents, profits and other attributes."
- **Security Agreements (Trusts)**: Security Agreement, with filed UCC-1s against all personal property, accounts receivable, cash, and rents of Debtor Whitehall Trust and of Debtor Saucon Trust.
- **Lessee Security Agreements (Manor Debtors)**: Lender also holds signed Lessee Security Agreements with filed UCC-1's providing Lender with perfected, first-priority security interests in all personal property, accounts receivable, and rents of both of the Manor Debtors.

*See* ECF 41, at ¶ 27 (Case No. 25-15241).

22. Accordingly, Lender has a security interest in all rent the Manor Debtors owe to the Trusts, including all post-petition rent.

## III. Incorporation of Objection to Original U&O Motion

23. Lender incorporates by reference, as if fully set forth herein, its Objection to Joint Motion Pursuant to 11 U.S.C. § 363 for Entry of an Order Authorizing the Debtor to Enter into and Perform Under Use and Occupancy Agreements, ECF 215. Lender notes, in addition, that because the proposed U&O Agreements are transactions between entities

under common control on both sides, they are subject to heightened scrutiny – not ordinary business-judgment deference – as set forth more fully in that objection.

## IV. The Motions Improperly Seek to Relitigate Adequate Protection for at Least the Fifth Time

24. The Motions are the latest installment in the Manor Debtors' and the Trusts' serial efforts to reduce the rent and the adequate protection payments protecting the Lender's interests – efforts now in approximately their sixth consecutive month. The rent and adequate protection issues have been the subject of three full hearings before this Court, with testimony as to the rent due and what is necessary to adequately protect the Lender's interests. The rents were also reviewed in the District Court, where Judge Henry struck Mr. Atiyeh's 2023 attempts to amend the rents as null, void, and of no legal effect. ECF 164 (Case No. 24-cv-02627). And this Court has repeatedly fixed the payments due while these cases are pending – most recently in its May 26, 2026 Order, which requires monthly payments matching the debt service due to the Lender plus $35,000 per Debtor in additional adequate protection.

25. Collateral estoppel or issue preclusion bars relitigation of issues a court has already decided. "Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *In re Continental Airlines, Inc.,* 279 F.3d 226, 232 (3d Cir. 2002) (quotations and citations omitted). Collateral estoppel has the "purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Id.* (quotation omitted).

26. "Collateral estoppel … applies when each of the following four elements is satisfied: (1) An issue decided in a prior action is identical to one presented in a later action; (2) the prior action resulted in a final judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action; and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." *In re Nat'l Med. Imaging, LLC,* 439 B.R. 837, 844-45 (E.D. Pa. 2009) (citations and quotations omitted).

27. This Court has already reviewed and decided repeatedly the amount of adequate protection and rent the Manor Debtors and the Trusts are obligated to pay. That decision has been implemented and is no longer subject to appeal or further review. Nonetheless, the same parties are yet again asking the Court to revisit this issue even though they had – and have exercised – a full and fair opportunity to litigate the issue in previous hearings. Collateral estoppel plainly bars the relief sought in the Motions.

28. Moreover, nothing has changed that would justify the Court revisiting this issue. At a minimum, the Court's prior determinations are the law of the case, and an adequate protection determination under Section 363(e) should be revisited only upon a showing of materially changed circumstances – a showing the Motions do not even attempt to make.

29. The Manor Debtors and the Trusts cannot continue to seek the same relief month after month – after it has been fully reviewed by two judges through significant motion practice, numerous hearings, and testimony in both the District Court and this Court. The Manor Debtors and the Trusts should not get yet another bite at the apple. Collateral estoppel bars the serial relitigation of the rent and adequate protection. The Motions should be denied on this independent ground as well.

## V. The Motions Seek to Alter Impermissibly the Status Quo Preserved by the Stay Order and the Automatic Stay

30. On March 19, 2026, this Court dismissed the Trusts' bankruptcy cases, and on April 2, 2026, this Court stayed the dismissal of the Trusts' bankruptcy cases pending appeal. ECF 264 (Case No. 25-15241); ECF 274 (Case No. 25-15241) (the "Stay Order"). A stay pending appeal "suspend[s] judicial alteration of the status quo." *Nken v. Holder*, 556 U.S. 418, 429 (2009). Applying *Nken*, this Court has already held that, while the Trusts' appeal is pending, "the status quo ante prevails": the Trusts "retain the rights and responsibilities they had on March 18, 2026," and the Manor Properties "remain property of the Trusts' estates, subject to the protection of the automatic stay." ECF 124, May 15 Order at 5–7.

31. The status quo cuts both ways. Because everything is stayed, the Lender cannot presently pursue its foreclosure remedies under the contracts entered into by the parties; this Court denied relief from the automatic stay for precisely that reason. ECF 124, May 15 Order at 10–12. By the same token, the Manor Debtors and the Trusts cannot use Sections 361, 362, and 363 of the Bankruptcy Code to change the underlying terms of the relationship between the Manor Debtors and the Trusts to benefit the Atiyehs. While the Trusts' appeal is pending before the District Court and the Third Circuit Court of Appeals, the underlying payment terms are part of the status quo that is stayed and preserved. Neither side may proceed, and neither side may change the terms. The status quo is to leave the rent where the parties' agreements put it and ensure the Lender receives adequate protection.

32. That is especially so because the rents at issue are not incidental terms. The rent payable by the Manor Debtors to the Trusts was among the contractual arrangements

required for the Trusts to obtain their $30+ million HUD-insured loan: Mr. Atiyeh set those rent figures and submitted them in support of the loan, and the original lender and HUD required and relied upon them – and upon the supporting appraised valuation of approximately $32 million – in underwriting and funding the loan. The Lender's perfected security interest in those rents is part of the collateral package securing that loan. An insider agreement that cuts the contractual rent in half is not a preservation of the status quo; it is a unilateral alteration of the status quo at the direct expense of the Lender's collateral.

33. Indeed, the Manor Debtors and the Trusts themselves purport to invoke "the interests of all of the Debtors in preserving the status quo pending the resolution of these chapter 11 cases (including the appeals)." ECF 206, AP Reduction Motion ¶ 59. But the proposed payments change exactly one substantive term of the parties' relationship: the rent. If the status quo is to be preserved – and, under the Stay Order and the automatic stay, it must be – the Motions should be denied.

34. The Amended U&O Motion's own arithmetic confirms the point. The Debtors assert that the total proposed to be paid to the Lender "remains equal to … the amount ordered by this Court pursuant to the May 26 Order." ECF 216, Amended U&O Motion ¶ 22. It does not. As the Amended U&O Motion elsewhere concedes, the May 26 Order required total payments of $209,423.43 for June 2026. *Id.* ¶ 29. The Motions propose to reduce that to $139,423.43 per month – eliminating the two $35,000 monthly adequate protection payments this Court ordered. A $70,000 per month reduction does not preserve the status quo.

## VI. The Proposed Reduced Payments Will Not Adequately Protect Lender

35. The total amount that the Motions to propose to pay – equal to the original monthly debt service due under the Loans when the Manor Debtors and Trusts were keeping them current[2] – will not adequately protect the Lender.

### A. Standards for adequate protection

36. Under 11 U.S.C. § 363(c)(2), a debtor-in-possession may use cash collateral only with the consent of the secured creditor or court authorization after notice and a hearing. Section 363(e) mandates that the court "shall prohibit or condition such use... as is necessary to provide adequate protection" of the secured creditor's interest. 11 U.S.C. § 363(e).

37. In addition, "the lack of adequate protection" is cause for relief from the automatic stay. 11 U.S.C. § 362(d)(1).

38. Section 361 provides three non-exclusive examples of adequate protection: (1) periodic cash payments to the extent use results in a decrease in the value of the creditor's interest, (2) replacement liens to the extent use results in a decrease in value, or (2) other relief resulting in the "indubitable equivalent" of the creditor's interest. 11 U.S.C. § 361.

39. Critically, the burden of proof on adequate protection lies with the party opposing relief from stay—namely, the Debtors. *See* 11 U.S.C. § 363(p); *Resolution Trust Corp. v. Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).

[2] The Motions repeatedly refer to this amount as the monthly debt service. It is not. The loans are in default – and have been since 2021. The current debt service due is the entire balance of the Loans.

40. The Third Circuit Court of Appeals has established that adequate protection must provide the secured creditor with "the value for which [it] bargained prebankruptcy" and "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Swedeland*, 16 F.3d at 562-63 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987), and *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985)).

41. The reduced payments for which approval is sought in the Motions will deprive the Lender of adequate protection of its collateral for two reasons

42. *First,* the Lender has a security interest in the current rents the Manor Debtors owe the Trusts. The Motions seek to reduce payments to the Trusts far below market rent. This would put the Lender's ability to recover on its interest in the current rents at great risk.

43. *Second,* the Trusts' properties have substantial deferred maintenance that creates a significant risk of further depletion of the collateral value. The Manor Debtors should be required to address the deferred maintenance in order to protect the Lender's interest in the collateral.

### B. The Motions seek to deprive Lender of adequate protection of its interest in the rents the Manor Debtors owe to the Trusts

44. As the Lender has already established repeatedly in these cases, it has a security interest in the rents the Manor Debtors owe to the Trusts. The Motions seek to reduce the rent and adequate protection to half of that rent, and well below the fair market rent for the properties. Doing so would ensure that the Lender's interests are not adequately protected, and the Motions should therefore be denied.

### 1. The Lender has a security interest in the rent the Manor Debtors owe the Trusts, including the currently accruing post-petition rents

45. As the Court is well aware, the Manor Debtors lease the real properties owned by the Trusts and contractually owe the Trusts rent for the use of the properties. Along with its mortgage on the properties, the Lender holds security interests in the rents themselves. *See* ECF 41, at ¶ 27 (Case No. 25-15241).

46. Under Section 552(b) of the Bankruptcy Code, the Lender's liens extend to rents generated from post-petition use of the properties. 11 U.S.C. § 552(b)(2) ("[I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement...."); *see also* 11 U.S.C. § 552(b)(1) (same principle applies to "proceeds, products, offspring, or profits of such property").

47. The Lender's interest in the rents provides collateral separate from and in addition to Lender's liens on the value of the properties themselves. *See In re Union Meeting Partners*, 178 B.R. 664, 674-75 (Bankr. E.D. Pa. 1995) ("It stands to reason, then, that an undersecured creditor's secured claim increases as 'proceeds, product, offspring, rents, [and] profits' accrue post-petition.") (citing 11 U.S.C. § 552; alteration in original); *see also In re Lichtin/Wade, LLC*, 486 B.R. 665, 681 (Bankr. E.D.N.C. 2013) ("Therefore, as held by the majority of courts, adding the amount of the adequate protection payments

to the secured portion of the claim and correspondingly reducing the unsecured portion of the claim is the only appropriate mechanism to comply with § 506(b).”); *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, 686 (D. Mass. 2000) (“In cases involving undersecured creditors, I am persuaded that the better approach is that collateral consists of the sum of the creditor’s separate security interests in the buildings *and* the accumulated post-petition rents.” (emphasis in original) (citing *Union Meeting Partners*, 178 B.R. 664)).

48. In other words, the amount of the Lender’s secured claim is the value of its interest in the real property ***plus*** the separate value of any accrued, unpaid rent.[3]

**2. The combined payment the Manor Debtors and Trusts propose will not adequately protect the Lender**

49. Here, the Motions propose to have the Manor Debtors and the Trusts pay the Lender adequate protection payments of $41,953.58 and $34,907.35 for the Whitehall and Saucon properties, respectively, as well as $27,625.00 and $34,937.50 in rent under the proposed U&O Agreements. *See* ECF 206, AP Reduction Motion ¶¶ 3, 4. In other words, the Manor Debtors and the Trusts propose to pay the Lender a total of $69,578.58 and $ 69,844.85 per month, respectively. These amounts are far below the actual rent due for the properties, and far below any realistic fair market rent for the properties, and would specifically deprive the Lender of adequate protection.

50. Where a lease has expired and the tenant holds over – as is the case here – under Pennsylvania law the rent is ordinarily the same as what was due under the prior

[3] More precisely, the Lender’s secured claim includes the value to be received on account of any accrued, unpaid rent, such as the bankruptcy distributions on account of any pre-petition rent and the full amount of post-petition rent that must be paid as an administrative expense, in addition to the current value of the real properties subject to the mortgage.

lease. "[W]here a tenant holds over after the expiration of his term, and no different arrangement has been made between the landlord and tenant, a tenancy for another year is created." *Clairton Corp. v. Geo-Con, Inc.,* 635 A.2d 1058, 1060 (Pa. Super. Ct. 1993) (citing *Harvey v. Gunzberg,* 148 Pa. 294, 195-96, 23 A. 1005, 1005 (1892)); *see also Penn Ctr. Harrisburg, L.P. v. T-Mobile Ne., LLC,* No. 1306 MDA 2012, 2013 WL 11266340, at *5 (Pa. Super. Ct. Apr. 26, 2013) ("When a tenant becomes a holdover tenant he is subject to all of the covenants and stipulations within the original lease as far as they are compatible with the yearly holding." (citing *Routman v. Bohm,* 168 A.2d 612, 615 (Pa. Super. Ct. 1961))).

51. As the Lender has demonstrated time and again, the most recently effective leases required monthly rental payments of $139,000 from Whitehall Manor and $142,118 from Saucon Manor.

52. Generally, the prior rental rate is controlling to determine the amount of rent due post-petition in the absence of clear evidence that that amount is unreasonable. *In re F.A. Potts & Co., Inc.,* 137 B.R. 13, 18 (E.D. Pa. 1992) ("It is nonetheless clear that the rental value fixed in the lease will control, unless there is convincing evidence that such rental rate is unreasonable."); *In re Sportsman's Warehouse, Inc.,* 436 B.R. 308, 315 (Bankr. D. Del. 2009) ("The amount of the benefit to the estate is presumed to be the contract rate of rent.").

53. The Manor Debtors and the Trusts have not presented convincing evidence that the rent under the prior leases is unreasonable. The amounts set forth in the Leases were amounts to which the Manor Debtors agreed, and to which Mr. Atiyeh himself agreed. The appraisals the Manor Debtors and the Trusts have provided are

unconvincing. Further, neither of the Manor Debtors' and the Trusts' appraisals actually provide for a fair market rent estimate based on the actual market.

54. Indeed, the Lukens "market rent" figures on which the Manor Debtors and the Trusts rely cannot bear any weight, because they are not derived from market rents at all. Lukens did not base its conclusion on rents actually paid for comparable facilities. Instead, it back-calculated a "rent" by multiplying its own depressed "real estate only" value conclusion by a 6.50% capitalization rate of its own selection – a rate it derived by "compressing" its own going-concern capitalization rate based on published commentary about skilled nursing lending. *See* ECF 216, Amended U&O Motion exs. D & E. The Lukens appraisals say nothing meaningful about what a willing landlord and a willing tenant would actually agree to in the market.

55. The provenance of the Lukens reports confirms that it did not consider actual market rent. The appraisals were not prepared for the Debtors or their estates: the client and the only intended users are "Mr. Abraham Atiyeh and his legal counsel," and the reports' value conclusions are retrospective to a valuation date selected by the client. The Motions' description of the "fair market rental value for each facility," ECF 206, AP Reduction Motion ¶ 4, is counsel's characterization, not the appraisers' opinion.

56. To the extent evidence of fair market rent is necessary, it supports requiring the Manor Debtors to continue paying rent at the prior lease rates. The Lender previously submitted appraisals of the market value of the properties, including fair market rent, prepared by HealthTrust (the "HealthTrust Appraisals"). Copies of the HealthTrust Appraisals for the Saucon and Whitehall properties were attached to the Praecipe to Attach Exhibits, ECF 217, as Exhibits I and J, respectively.

57. The Lender's HealthTrust appraisals do precisely what the Debtors' appraisals do not: at the Lender's request, they expressly develop ***fair market rent*** – derived from actual arm's-length leases of comparable senior housing communities using a lease-coverage analysis – together with a current "as is" market net operating income for the properties. The HealthTrust appraisals conclude a fair market rent of **$96,667 per month** for the Saucon property and **$88,333 per month** for the Whitehall property. The only fair market rent evidence before the Court thus confirms that the proposed total reduced adequate protection and monthly U&O charges are far below fair market rent.

58. In fact, the Debtors' new appraisals impeach the Manor Debtors' and the Trusts' own valuation narrative.

59. The Trusts obtained their $30+ million HUD-insured loan on the strength of an appraised valuation of approximately $32 million – a valuation Mr. Atiyeh knew of, relied upon, and submitted in support of the loans. The Debtors now proffer appraisals valuing the same collateral at a fraction of that amount. Both cannot be true.

60. Having borrowed more than $30 million on the strength of the higher valuation, Mr. Atiyeh cannot now sponsor – and the Court should not credit – appraisals premised on the proposition that those earlier representations were wrong. The new appraisals do not justify a lower rent; they impeach the reliability of the Debtors' valuation evidence altogether.

61. Moreover, the Debtors' own submissions admit that substantial deferred maintenance exists at the properties, and that there is a complete absence of reserves. Pursuant to the Debtors' submissions, each facility's roof needs to be replaced at an estimated total cost of more than $1.7 million, as discussed below. The Manor Debtors

are obligated under the triple-net Leases to maintain the properties, and they have no reserves with which to do so. And this deterioration is occurring now, during these cases: the roof and HVAC repairs are unfunded and worsening while the Manor Debtors occupy the properties. The Debtors' admissions regarding the deferred maintenance and failure to create financial reserves are, if anything, grounds for a higher rent – sufficient to fund reserves for these admitted capital needs – not grounds for a lower rent.

62. As demonstrated in the HealthTrust Appraisals, fair market rent for the Saucon and Whitehall properties is $96,667 and $88,333 per month, respectively. While those amounts are somewhat lower than the amount due under the prior leases, they do not suggest that the prior contract rate was unreasonable.[4]

63. Accordingly, Lender respectfully submits that the Manor Debtors should be required to pay rent at the rates established in the most recently effective amendments to the prior leases or, alternatively, at the fair market rent specified in the HealthTrust Appraisals, not the reduced U&O charges and adequate protection payments the Motions propose.[5]

---

[4] The Motions make much of the claim that the Manor Debtors and the Trusts have already paid more than $900,000 to the Lender during the bankruptcy case, roughly the equivalent of seven months' payments at the reduced rate they now propose. However, the actual amount of rent due under the prior leases for those seven months is almost $2 million, and the rent due under HealthTrust's fair market rate is $1,295,000. Thus, the amount paid is far lower than both the amounts due under applicable non-bankruptcy law and the fair market value of the rents available for the properties. In either case, the Manor Debtors and the Trusts are several months behind in adequately protecting the Lender's interest in the rents.

[5] The AP Reduction Motion contends that no additional adequate protection is needed because the contractual debt service proposed in the Motions purportedly satisfies the requirement of the automatic stay relief provision governing single asset real estate cases: 11 U.S.C. § 362(d)(3)(B)(ii). *See* ECF 206, AP Reduction Motion at 3 n.5. But that provision only sets a minimum floor that a single asset real estate debtor must meet to

### 3. The Manor Debtors' operating expenses do not have priority over their obligation to pay rent or provide adequate protection

64. The AP Reduction Motion asserts that "payment of operating expenses was required before debt service." ECF 206, AP Reduction Motion ¶ 80. The Motion cites a provision of the HUD Regulatory Agreements to support this contention. This argument is plainly wrong for numerous reasons.

65. As an initial point, as the Manor Debtors and the Trusts have pointed out several times, the HUD Lean Rider by its terms, was terminated when the loans were no longer insured by HUD, i.e., when HUD repurchased them in 2023. The HUD Lean Rider – on which the AP Reduction Motion bases this argument – has no current force and effect.

66. In any event, the provisions in the HUD Lean Rider – and the other loan documents – are plainly intended to benefit the Lender, not the Trusts nor the Manor Debtors. Indeed, provisions like this – requiring a borrower to pay operating expenses and maintain operating certificates, licenses and permits required to stay in business – are common in loans and are intended protect ***the lender's interest*** in the collateral. Such provisions give rise to a default if the borrower violates them; they do not somehow imply that the operating expenses that must be paid to retain the certificates, licenses, permits, and other authorities necessary to operate have priority over the secured debt.

67. The AP Reduction Motion's contention that Lender is bound by this ludicrous reading of the HUD Regulatory Agreement is equally nonsensical, even if the HUD Regulatory Agreement could be stretched to mean that. At the time Lender acquired

---

avoid automatic relief from the automatic stay. It says nothing about what a debtor needs to do to ensure that a secured creditor's interests are adequately protected.

the loans, they were no longer subject to the HUD Regulatory Agreement. Even if the HUD Regulatory Agreement could be read as the Motion suggests, the Regulatory Agreements no longer apply to this matter.

#### 4. The equities-of-the-case exception to Section 552(b) of the Bankruptcy Code does not support the AP Reduction Motion

68. In the Conclusion, the AP Reduction Motion asserts that "the equities of the case exception under § 552(b) supports denial of further adequate protection payments." ECF 206, AP Reduction Motion ¶ 85. Other than asserting that this exception applies in the Conclusion, the Motion provides no argument, legal support, or other explanation for applying it here. That assertion is both obviously waived and plainly wrong.

69. *First,* because the AP Reduction Motion does not make any argument in support of applying the equities-of-the-case exception, that contention has been waived. Section 552(b)(2) itself requires that the exception can only be applied "after notice and a hearing." 11 U.S.C. § 552(b)(2). The Motion does not provide notice of grounds for such a request or provide notice of any hearing on such grounds.

70. The Motion furthermore makes no effort, let alone a minimally thorough one, to argue this issue. *See In re Busby,* 647 B.R. 660, 671 (E.D. Pa. 2022) ("A party waives an argument before us [if] she fails to adequately raise it with a minimum level of thoroughness in the bankruptcy court." (citations and quotations omitted)). The equities-of-the-case exception argument is obviously waived.

71. *Second,* the case law concerning the equities-of-the-case exception demonstrates that it has no application in a case like this. The Third Circuit Court of Appeals has noted that the exception is intended "to strike 'an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy

Code.'" *In re Tower Air, Inc.,* 397 F.3d 191, 205 (3d Cir. 2005) (quoting *United Va. Bank v. Slab Fork Coal Co.,* 784 F.2d 1188 (4th Cir. 1986)). It is intended "to prevent an oversecured lender from receiving a windfall by taking assets that would otherwise go to rehabilitating the debtor," and "prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate." *Tower Air,* 397 F.3d at 205 (citations and quotations omitted); *see also In re Muma Servs., Inc.,* 322 B.R. 541, 558–59 (Bankr. D. Del. 2005) ("The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." (citations omitted)). None of these factors are present here.

72. Enforcing Lender's lien on rents, including current post-petition rents, would not provide Lender a windfall. It would simply recognize the Lender's security interest in the properties and right to receive the benefits of those properties.

73. Nor are the rents the result of the use of other estate assets, which would normally go to general creditors. To the contrary, these rents precisely are the proceeds of the properties that are the collateral for the Lender's interests. There are no circumstances under which general creditors would have a priority claim to the rents.

74. Nor does carving the rents out of the Lender's security interest serve to appropriately tip the balance in favor of the rehabilitative purposes of the Bankruptcy Code. If the Manor Debtors are not able to continue to operate without paying appropriate rent on the properties they are using, there is little point in affording them a hypothetical chance at financial rehabilitation.

75. In short, there is no basis to apply in this case the equities-of-the-case exception under Section 552(b) of the Bankruptcy Code.

**C. Lender is entitled to adequate protection to ensure its security is not lost or impaired as a result of the Manor Debtors' and the Trusts' failure to perform deferred maintenance**

76. The Motions also ignore a separate critical aspect of adequate protection: ensuring that the collateral securing the Lender's claims does not decrease in value. Although the Motions ignore it, the Manor Debtors and the Trusts are, in fact, relying on their substantial deferred maintenance to now seek to reduce the value of the properties for purposes of determining rent and supporting their proposed plan of reorganization.[6]

77. The Manor Debtors' and the Trusts' own submissions admit substantial deferred maintenance and a complete absence of reserves:

- The roof at both properties is damaged and must be replaced, according to the Manor Debtors and the Trusts. The cost of the roof replacement is estimated to be $1,064,263 for the Saucon property and $716,232 for the Whitehall property.

- The HVAC equipment at the Saucon property needs to be replaced, at a cost of at least $60,000 plus labor and other expenses of installation.

78. The Manor Debtors are obligated under the triple-net Leases pursuant to which they leased the properties to maintain the roof and the HVAC equipment.

79. Yet neither the Manor Debtors nor the Trusts have any reserves with which to perform that maintenance, they require a variance from their established cash collateral to pay for the HVAC replacement, and they do not appear to have any plan to deal with the roof replacement.

---

[6] The Motions repeatedly assert that the value of the properties is appreciating during the bankruptcy cases. *See, e.g.,* ECF 216, Amended U&O Motion at 10 n.7; ECF 206, AP Reduction Motion ¶¶ 2, 7. The Manor Debtors and the Trusts identify no evidence to support this claim, and it is plainly incorrect.

80. The proposed U&O Agreements make matters worse. Each expressly provides that "nothing herein shall compel payment or creation of a Reserve Fund, Impound or other capital cost fund or for advance deposits for any insurances or repairs or maintenance." ECF 216, Amended U&O Motion Exs. A & B, § 10. Far from protecting the Lender's interests, the proposed agreements contractually disclaim the very reserves and protections that adequate protection requires here.

81. Moreover, these problems are continuing to damage the property and to create a significant risk of even worse damage. Already, as the Court is aware, the properties have suffered significant water damage, which required emergency repairs. This sort of damage is likely to continue and worsen – and further impair the value of the properties – until the roofs are repaired.

82. Likewise, the delays in repairing the HVAC system at the Saucon property are continuing to impair the use of the property.

83. The Manor Debtors and Trusts are relying on deferred maintenance to support reducing property values by more than $1.7 million in an effort to make it easier to confirm a plan of reorganization, but they have no plan for actually addressing the deferred maintenance.

84. In order to provide adequate protection of the Lender's interest in the properties, the Court should require the Manor Debtors and the Trusts to: (1) make additional rent payments – separate from and beyond the amounts identified above – in order to protect against any decrease in the value of the properties resulting from the failure to perform deferred maintenance; and/or (2) establish and fund reserves sufficient to pay for the deferred maintenance in a reasonable amount of time.

## VII. Reservation of Rights

85. Lender reserves all rights with regard to its interests in the real property collateral securing its claims, the rent the Manor Debtors owe to the Trusts, the use of cash collateral, and adequate assurance for the use of cash collateral or any other property of the Manor Debtors or the Trusts.

86. Lender reserves all of its present and future rights, claims, and remedies with respect to its liens and security interests in the Manor Debtors' and the Trusts' properties, including, without limitation, (i) its right to challenge the validity, extent, perfection, and priority of any liens or interests asserted by the Manor Debtors or the Trusts or any other party in interest in such property; (ii) its right to contest the Manor Debtors' proposed use of cash collateral and to seek appropriate adequate protection, including additional or replacement liens, additional adequate protection payments, or superpriority claims; (iii) its right to require valuations, object to any valuation methodologies, and present evidence and argument concerning the value of any property in which it has an interest; (iv) its right to seek modification, expansion, or termination of the use of cash collateral if protections are inadequate; (v) its right to seek relief from the automatic stay on any applicable grounds or to seek other relief as permitted by the Bankruptcy Code; (vi) its right to seek to dismiss the Manor Debtors' bankruptcy cases on any available grounds; (vii) any arguments, issues, or evidence arising in or related to proceedings related to the approval of any proposed disclosure statement or the confirmation of any proposed plan; and (viii) any other rights and remedies available under applicable law, equity, or contract.

WHEREFORE, the Lender respectfully requests that this Court enter an Order denying the AP Reduction Motion and the Amended U&O Motion, and instead require

the Debtors to provide adequate protection of the Lender's interest: (a) in the appropriate amount of the rent for each of the properties; (b) in the collateral real properties themselves; and (b) to appropriately remedy the deferred maintenance.

Respectfully Submitted,

HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER

Dated: July 17, 2026

By: /s/ *Matthew A. Hamermesh*
Matthew A. Hamermesh
Sara E. Smith
One Logan Square, 27th Floor
Philadelphia, PA 19103-6933
(215) 568-6200
mhamermesh@hangley.com

BERGER LAW GROUP, P.C.
Phillip D. Berger
919 Conestoga Road, Building 3, Suite 114
Bryn Mawr, PA 19010
(610) 668-0800
Berger@BergerLawPC.com

*Attorneys for Secured Creditor Lehigh Valley 1, LLC*