**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| Whitehall Manor, Inc., et al., | : | Case No. 25-15245 (PMM) |
| *Debtors.* | : | Jointly Administered[1] |

**DECLARATION OF ABRAHAM ATIYEH IN FURTHER SUPPORT OF DEBTORS' JOINT MOTION PURSUANT TO 11 U.S.C. § 363 FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER USE AND OCCUPANCY AGREEMENTS; DEBTORS' JOINT MOTION TO MODIFY ADEQUATE PROTECTION PENDING CONFIRMATION OF A CHAPTER 11 PLAN; AND CONTINUED USE OF CASH COLLATERAL**

Abraham Atiyeh declares and states as follows:

1. I am the Manager and main Member of Whitehall Fiduciary LLC ("Whitehall Fiduciary"), the Trustee of Whitehall Trust u/t/a dated August 1, 2007 ("Whitehall Trust"), a Pennsylvania Trust, now registered as a Pennsylvania Business Trust and known as Whitehall Trust for Senior Care, and Saucon

D91

[1] The Debtors and debtors-in-possession in these Chapter 11 Cases and the last four digits of their respective taxpayer identification numbers are as follows: (i) Whitehall Trust (4229); (ii) Saucon Trust (4229); (iii) Whitehall Manor, Inc. (5606); and (iv) Saucon Valley Manor, Inc. (2894). The Debtors' mailing address is 1177 6th Street, Whitehall, PA 18052. The Memorandum Opinion and Order Granting Motion to Dismiss [the "Dismissal Order," D.I. 263, 264], entered on March 19, 2026, dismissed the cases of debtor Whitehall Trust, Case No. 25-15241-PMM, and debtor Saucon Trust, Case No. 25-15243-PMM. Prior to the Dismissal Order, the docket of Debtor Whitehall Trust, Case No. 25-15241-PMM, served as the main docket for the jointly-administered bankruptcies.

Management LLC ("Saucon Management"), the Trustee of Saucon Trust u/t/a October 7, 2007 ("Saucon Trust"), now registered as a Pennsylvania Business Trust. I am the primary beneficiary of Whitehall Trust and Saucon Trust (collectively the "Trusts"). I am also the primary beneficiary of Manor Trust, which owns Whitehall Manor, Inc. ("Whitehall") and Saucon Valley Manor, Inc. ("SVM") (collectively the "Manors"). Whitehall Trust, Saucon Trust, Whitehall, and SVM are the debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Debtors"). As a family run business, I am involved in and generally familiar with the Debtors' day-to-day operations, organization, financial affairs, books and records. I am also personally familiar with construction, layout and maintenance at both properties.

2. I have been involved in the senior health care business since 1997. I am involved with the management of five (5) senior health care businesses. Because of my experience and involvement with running the Manors, I am also familiar with market conditions and trends, my nearby competitor operations and amenities, and necessary steps to remain competitive.

3. I have also owned and operated a successful construction company, Brookside Commercial Construction Company ("Brookside") for more than 20 years. Based on this experience and working with the contractors at the inception of each of the Manors, I have personal knowledge of costs, time, and processes

necessary to maintain, to improve and to convert the properties on which the Manors operate.

4. If called to testify in this matter, I would testify to the matters set forth herein.
5. Unlike nearby competitors, the buildings housing the Manors were adapted into personal care homes. Whitehall Manor was a former warehouse and Saucon Valley Manor was a former school. Each of the Buildings has been modified over time. Based on my experience, the required improvements needed for each of the properties to match revisions which are contemplated by HealthTrust ("HT") (or would be required for the facilities to meet the HT assumptions) would be expensive, and are not accounted for in the initial costs of the HT Appraisal (which also does not make allowance for the disruptions of such construction).

**A. Healthtrust Receipt of Correct Floor plans**

6. Healthtrust's *March 10, 2026* Whitehall Appraisal Report ("HT Whitehall Report") appears to utilize outdated floorplans to support the position that Whitehall has 148 rooms. HT Whitehall Report, pp 149-152.
7. Moreover, these floor plans, used by HT in its appraisal of Whitehall, do not show the improvements made by Brookside and subcontractors, which reduced the number of available resident rooms to 130 and made necessary facilities and common rooms available for residents. This also resulted in the

number of licensed beds being reduced from 148 to 130. The improvements were made to add various amenities to enable Whitehall to market its facility to individuals in need of independent living facilities and make Whitehall more competitive with other facilities in the area trying to attract independent living residents.

8. I am advised that the correct and current floor plans, showing all improvements, were provided to Lehigh and HT multiple times during the appraisal process.

9. The correct and current floor plans are not new. The Debtors' Dietrick *March 3, 2025* Whitehall Appraisal, which was provided to Lehigh as part of its foreclosure proceeding, included these correct floor plans as well. D39, pp 69-71.

10. On April 10, 2026, I was copied on email correspondence between Raymond Lahoud, Esquire (my personal attorney) and Marissa Cassman, HT director at Marissa.cassman@healthtrust.com with the correct floor plans attached. D92.

11. The correct floor plans were also attached to an email from Attorney Lee to Attorney Hamermesh, albeit I recently learned as part of my review of documents provided to HealthTrust that one page of the Whitehall floor plans was mistakenly missing in that email. D93. On May 27, 2026,

Attorney Berger forwarded this email to HealthTrust. D95. I am not aware that anyone raised the issue of the missing page.

12. On June 7, 2026, Attorney Lee forwarded bates stamped copies of the correct floor plans to Attorney Hamermesh.

13. The correct floor plans, including Mr. Lahoud's emails, were included in documents considered by HealthTrust to conduct its appraisals that were produced by HealthTrust to the Debtors just after 5:00 p.m. on July 21, 2026.

14. The changes in the facilities were obvious at time of visit by HT's representative for the purpose of the 2026 appraisal.

**B. Whitehall Improvements**

15. High acuity residents need to be hand fed with mechanical and pureed diets. To address their needs and in consideration of those that do not require such assistance, Whitehall converted units A35, A37, A89, and A41 on the A-floor into a separate dining room.

16. The resident impact was positive and immediate. The separate dining room helped with marketing and increased resident satisfaction.

17. Whitehall converted multiple rooms in the lobby area. Units C17, C22, and C25 were converted into admissions and administration offices. Unit C23 was converted into a conference room. These changes were necessary, as space was needed for care meetings, meetings with prospective clients, and

staff meetings. This has helped assist in smoother admissions and building operations and places these important functions near the main entrance.

18. Based on view of the local market, the comments reported by marketing staff and contractors and discussions of marketers with placement agencies, and years of personal experience, it was determined that Whitehall needed to increase spaces available for independent living residents and reduce capacity of acuity care residents to meet the market needs and compete with competitors and allow for a viable and more profitable future operations.

19. In the basement, Whitehall converted units C112, C110, C108, C106, C104, C102, C100 into a conference room, family social room, fitness room, wellness room, yoga room, massage therapy room, and theatre respectively for independent living residents. Open space in the basement was also converted to space now used by Good Shepherd Rehabilitation, Whitehall's on-site physical therapy provider. Whitehall converted a room in Upper C to a common area space for the more independent living residents to gather to enjoy activities and each other's company. Whitehall converted three studio rooms in Upper C to true one-bedroom apartments and added a whole kitchen and washer dryer in a unit.

20. These improvements significantly improved resident quality of life and helped Whitehall develop a new product line of amenities to market to independent living residents. This has benefited marketing and the residents

by helping to grow the independent living census, which is often the initial step toward greater need services as persons age (and is required for Whitehall to be competitive with the so-called "life care" or progressions facilities).

21. Due to changes in the marketplace and prior resident dissatisfaction with being in the basement, Whitehall would not now consider putting resident rooms in the basement. Prior residents complained about the space, because it is still partially below grade and its windows only look out to a small excavated area. Whitehall has found that prospective residents similarly do not want to live in a basement. The space is darker and has less natural lighting and is significantly isolated from many of the common areas, dining and other services offered at Whitehall. The basement is also colder because of the concrete floor. Moreover, the space is needed for the amenities to compete with newer buildings in the area that provide these amenities to their independent living residents. If the rooms were re-converted into resident living, then the rooms would need to meet current code requirements and assure full residential safety standards are met for any residents placed in the basement as well as assuring staffing for a "stand-alone" group of rooms. I believe that we would also need to find other areas to convert to offer the necessary amenities, causing even more construction costs and disruption. Whitehall would also have to notify the independent

residents that moved in after the improvements that removing amenities, which increases the potential that they would move.

22. HT's 2026 appraisal included basement floor plans, which indicate that space is being used for an adult daycare. Whitehall tried to open a day care, but the business was not successful. Instead, that space is now reserved for storage.

23. All of the referenced conversion work was performed by my company, Brookside and its subcontractors. Therefore, Whitehall was able to make the improvements below market rate.

24. Based on my experience, a conservative estimate to reconvert would cost upwards of $400,000 plus permits (and any other changes that could be compelled by reason of making such changes) and time. Moreover, resident satisfaction would diminish. I also believe residents would leave, because they moved into the property based on the current amenities.

**C. Saucon Improvements**

25. Saucon converted one room on A floor into a seating common area with natural light for residents and families. Prior to conversion, Saucon struggled to fill rooms around that area.

26. The change significantly improved the lives of the residents and enhanced marketing.

**D. Bankruptcy Repairs and Maintenance**

27. The properties have not diminished in value post-petition.

28. Since the petition date, Whitehall has installed a new HVAC unit at Whitehall serving a zone (being one of several large HVAC units serving the facility) that replaced an older unit that ceased operating. New HVAC units were also installed at Saucon. Lehigh was informed and did not oppose the installation of these replacement HVAC units. As mentioned, these units are only a few of the numerous units serving the buildings, of various age, but generally similar in scope. It is my belief that, by replacing HVAC units that had reached the end of their useful life or stopped functioning efficiently, both Manors have increased the value of their facilities by installing new HVAC units and systems in place of the prior dated systems.

29. Further, since the petition date, property and casualty insurance has been maintained on each property, generally consistent with pre-bankruptcy limits and deductibles and with quality insurers.

30. Lehigh had notice as of the Petition Date that the properties had deferred maintenance needs, having received recommendations that the roofs may need to be replaced within the next 3 to 5 years. The deferred maintenance is not an issue that arose during the bankruptcy cases and is a result only of the estimated life span of the roofing materials as to which recommendations were made that Whitehall and Saucon each undertake roof replacement.

31. This deferred maintenance was noted in HT's appraisals as well as those that the Debtors' obtained from Valbridge and was also noted in HT's 2023 appraisals of these facilities.

32. Importantly, Lehigh has not cited an instance where the Debtors have not taken immediate steps to maintain their properties during their bankruptcy cases, including the roofs. Conversely, the Manors have successfully demonstrated that the properties are well maintained and repairs are timely performed. Both sets of appraisals reflect that the facilities are in good condition.

33. During its bankruptcy case, the roof at Saucon suffered winter damage because of ice dams, which caused leaks. However, the damage was repaired once the ice thawed. To my knowledge, there have been no additional issues related to the roof since the repairs were made. No leaks were mentioned in HT's March 10, 2026 appraisals.

34. If subcontractors are needed, I review the required work with the Manors' staff and Brookside management to approve it and get the best available price within the parameters of required time for repair. For example, the Manors had issues with the HVAC systems this summer. I approved the third party contractors and directed the Manors to pay pending approval from opposing counsel and trustee. There was no objection.

35. The appraisers agree with my opinion. The properties are in good shape.

**E. Use and Occupancy and Adequate Protection**

36. The census and revenue for each of the Debtors' facilities have remained stable since the Petition Date.

37. The proposed Whitehall Monthly U&O Charge of $27,625 and Saucon Monthly U&O Charge of $34,937.50, plus modified adequate protection payments of $41,953.58 and $34,907.35 (or whatever amount will enable Lehigh to receive full debt service payments), respectively, is within the Manors' budgets and consistent with the fair rental values determined by the appraisers retained by the Debtors to value their operations. D98 and D99.

38. The Manors have been paying for all repairs, all maintenance costs, and all insurance costs ensuring that the Trusts' properties are properly maintained until the Debtors can confirm a plan.

39. I believe that I have complied with my fiduciary duty to each of the Debtors determine that the amounts sought and paid for U&O and adequate protection is consistent with the market and fair to the creditors of each bankruptcy estate.

40. I reviewed the Monthly Operating Reports from December through June to show the impact of the adequate protection payments on operations, incorporated hereto.

41. I incorporate my May 22, 2026 Declaration in support of the joint adequate protection and use and occupancy motions, and cash collateral motion being heard at the July 22 and July 23, 2026 hearings. D78.

42. I further incorporate the chart that details the amount Lehigh has received between adequate protection, rent, and Good Shephard payments since the Petition Date to support my opinion that the current adequate protection payment is too high given that the value of the facilities and their revenue is stable and at least at the level that existed on December 26, 2025. D96.

Date: 7/21/2026 /s/ Abraham Atiyeh

Abraham Atiyeh