IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| Whitehall Manor, Inc., et al., | § | Case No. 25-15245 (PMM) |
| *Debtors*. | § | Jointly Administered |

**MEMORANDUM OPINION**

I. INTRODUCTION

This is the latest battle between factions warring for control over two (2) personal care homes ("PCHs") serving the elderly in Lehigh Valley Pennsylvania. On one side are the four (4) Debtors. These include Whitehall Manor, Inc. and Saucon Valley Manor, Inc. (the "Manors"). Respectively, the Manors operate PCHs located at 1177 6th Street, Whitehall, Pennsylvania (the "Whitehall Facility") and 1050 Main Street, Unit #1, Hellertown, Pennsylvania (the "Saucon Facility" and together with the Whitehall Facility, the "Facilities"). The other two (2) Debtors are Whitehall Trust for Senior Care ("Whitehall Trust") and Saucon Trust (the "Trusts"). Whitehall Trust owns the Whitehall Facility. Saucon Trust owns the Saucon Facility. The Trusts leased the Facilities to their namesake Manors pre-petition (the "Leases"). On the other side is Lehigh Valley 1, LLC ("Lehigh"), the Trusts' mortgagee.

Presently at issue are the Debtors' motions for: (1) Adequate Protection Modification, doc. #206 (the "AP Motion"); and (2) Authorization to Enter Into and Perform Under Use and Occupancy Agreements (the "U&O Agreements"), doc. #216 (the "U&O Motion," and together with the AP Motion, the "Motions"). Lehigh is the sole objector to the Motions, which were heard on July 22, 2026 (the "Hearing"), argued on July 23, 2026, and then taken under advisement. After

review of the relevant facts and law, the Motions were granted on July 27, 2026. Doc. # 250. Lehigh appealed from the associated Orders, which this Opinion supports. See Loc. Bankr. R. 8003-1.

## II. BACKGROUND AND PROCEDURAL POSTURE

Historically, the Trusts' sole source of income has been rent collected from the Manors (the "Upstream Rent") per the Leases, which were last amended in 2023 (the "2023 Amendments"). The Manors' primary source of income is rent collected from residents of the Facilities (the "Downstream Rent"). Early in 2021, the Manors stopped paying all the Upstream Rent due under the Leases. Accordingly, the Trusts were unable to voluntarily service their mortgages, which the existing mortgagee accelerated and assigned to their guarantor: the United States Department of Housing and Urban Development ("HUD"). HUD eventually auctioned the loans and associated security interests to Lehigh's parent company, which assigned them to Lehigh. Lehigh then filed what became consolidated foreclosure suits against the Trusts in the United States District Court for the Eastern District of Pennsylvania (the "District Court"). The District Court appointed a receiver of the Facilities (the "Receiver") and later voided the 2023 Amendments. The Debtors filed these bankruptcies shortly thereafter.

Lehigh asserts liens on the Upstream Rent, the Downstream Rent, and the Facilities. Lehigh has often agitated for adequate protection of its interests in those assets. And the Court has ordered the Debtors to pay Lehigh fluctuating amounts of cash as a result. Lehigh also moved to dismiss the Trusts on "business trust" ineligibility grounds under 11 U.S.C. §§109(b), (d) and 101(9)(A)(v). That motion was granted on March 19, 2026 (the "Dismissal Order"). The Court later stayed the Dismissal Order pending the Trusts' appeals therefrom (the "Stay Order"), which were certified to the Court of Appeals under 28 U.S.C. §158(d).

Between the Dismissal and Stay Orders, Lehigh and the Receiver jointly moved, *inter alia*, to lift the automatic stay and evict the Manors from the Facilities (the "Motion for Relief"). The movants argued a lift-stay was warranted because the Leases expired pre-petition after the 2023 Amendments were voided by the District Court. Then, as now, the Debtors conceded that the Leases expired by their terms pre-petition. Even so, the Motion for Relief was denied because the movants lacked standing to prosecute it. That decision is currently on appeal in the District Court.

Thus, suffice it to say, these bankruptcies are in flux. Key unresolved issues include: the Trusts' eligibility; the status of the Leases; the parties' rights thereunder; the basis for the Manors' ongoing use and occupancy of the Facilities; the value of Lehigh's asserted collateral interests; and the proper amount of associated adequate protection payments—if any. The Motions are aimed at addressing the latter three uncertainties, which stem from another question that needs resolving. And that is: what are the Facilities worth? Accordingly, the Hearing presented competing valuations of the Facilities and the rents they can generate in the market.

## III. ARGUMENTS AND ISSUES PRESENTED

### A. The Parties' Arguments

The Debtors submit that their adequate protection payments are adjustable at any time. Naturally, the Debtors support a downward adjustment in those payments. The Debtors contend that such an adjustment is warranted because the current payments overprotect Lehigh's interests in the Debtors' assets. This contention rests primarily on the proposition that there has been no post-petition decline in the value of Lehigh's collateral because: (1) the value of the Facilities is not declining as the physical plants are operable and well maintained while post-petition taxes and insurance thereon are current; (2) the value of the Downstream Rent is not declining as the

residents' rental rates have increased post-petition while resulting income is funding operations and being replenished monthly; and (3) any diminution in the Upstream Rent is addressable by the occupancy charges contemplated in the U&O Agreements (the "U&O Fees"), which the Manors propose to pay Lehigh on the Trusts' behalf.

Indeed, the Debtors question whether Lehigh is entitled to adequate protection payments vis-à-vis its interests in the Upstream Rent. Accordingly, the Debtors submit that the U&O Fees may reduce Lehigh's secured claim against the Trusts. And the Debtors stress that the U&O Fees are reasonable because they are based on third-party appraised fair market rent values. Therefore, the Debtors urge the Court to approve the U&O Agreements as sound exercises of the Debtors' business judgement under 11 U.S.C. §363(b)(1). Despite all this, the Debtors propose to continue making adequate protection payments to Lehigh to protect the value of its interest in the Facilities. The sum of those payments and the U&O Fees (the "Combined Payments") is the amount of pre-default debt service due on the loans.

Lehigh objects to the Motions on four (4) grounds. First, Lehigh argues that the Debtors are estopped from relitigating the issues raised in the Motions because this Court and the District Court have entered final judgments regarding the amount of rent due under the Leases and the payments required to protect Lehigh's interest in those rents. Second, Lehigh submits that the U&O Agreements alter its rights under the Leases, thereby altering the status quo ante reimposed under the Stay Order. Third, Lehigh contends that the Combined Payments inadequately protect its collateral because: (1) these Payments are roughly half the value of the Upstream Rent due under the Leases, which the Manors are required to pay as holdover tenants under federal and state law; (2) Lehigh has not been fully compensated for the risk that it will be unable to collect outstanding administrative rent if these cases collapse; (3) the U&O Fees do not reflect fair market

rent—rather, the Leases and/or Lehigh's commissioned appraisal do; and (4) the value of the Facilities is declining while the Manors defer substantial maintenance (i.e., roof replacement) without funding sufficient replacement reserves. Fourth, the Combined Payments do not satisfy the heightened standard for insider dealings under §363(b)(1), not least because the associated reduction in occupancy costs runs entirely to the Manors' benefit. The Court does not understand Lehigh to argue that its interest in the Downstream Rent is inadequately protected.

The Debtors agree that heightened scrutiny of the U&O Agreements is appropriate. But the Debtors contend that the U&O Agreements withstand such scrutiny. Moreover, the Debtors stress that the Motions do not require adjudication of Lehigh's right to administrative rent under the expired Leases. Finally, the Debtors submit that the Stay Order did not render these cases un-administrable. Instead, the Stay Order simply stayed the effect of the Dismissal Order: while that Order remains on appeal, all interested parties are free to pursue their rights under the Bankruptcy Code. And the Debtors submit that the Motions exemplify such pursuit.

B. The Issues Presented

The Debtors have the better frame of the issues presented. Lehigh cites administrative rent cases in support of its argument that the Manors are holdover tenants required to pay the rent due under the Leases as Lehigh construes them. See e.g., In re Sportsman's Warehouse, Inc., 436 B.R. 308, 315 (Bankr. D. Del. 2009). But the Court is not presently faced with a claim for administrative rent under 11 U.S.C. §503(a). Rather, the Motions are grounded mainly in 11 U.S.C. §§363(b)(1) and 363(e). Broadly speaking then, the Motions present three issues: (1) whether the Motions are justiciable; (2) whether the U&O Agreements should be approved under 11 U.S.C. §363(b)(1); and (3) whether Lehigh is currently entitled to adequate protection of its interests in the Facilities and Upstream Rent. Only the first two (2) issues are resolvable in the affirmative.

## IV. DISCUSSION

### A. The Motions Are Justiciable

#### 1. The Debtors Are Not Collaterally Estopped from Prosecuting the Motions

A party asserting the preclusive effect of a prior federal ruling must establish that: (1) the issue to be precluded is identical to one involved in the prior action; (2) the issue to be precluded was previously litigated; (3) the issue to be precluded was resolved by a final judgment on the merits; (4) resolution of the issue to be precluded was essential to the prior judgment; (5) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior action; and (6) the party against whom collateral estoppel is asserted had a fair opportunity in the prior action to litigate the issue. In re Cowden, 337 B.R. 512, 530 (Bankr. W.D. Pa. 2006) (collecting cases). Cf. In re Nat'l Med. Imaging, LLC, 439 B.R. 837, 844–45 (Bankr. E.D. Pa. 2009) (applying a similar formulation to a ruling in Florida state court).

Lehigh argues that the Debtors cannot relitigate the rent and adequate protection payments owed post-petition because the Court already settled those issues by final judgments. For support, Lehigh points to the Court's May 26, 2026 Order denying the Debtors' prior motion for downward adjustment of their adequate protection payments. Lehigh submits that this denial affirmatively settled the related valuation issues now before the Court. Lehigh is incorrect.

The May 26, 2026, Order denied the Debtors' then-pending adequate protection motion "for the reasons stated at" the May 26, 2026 hearing. Doc. # 161. There, the Court viewed the adequate protection and cash collateral issues in these cases as flip sides of the same coin. May 26, 2026, Hr'g Tr. 8:6-10. The Manors' counsel agreed, id. 8:25-9:2, and clarified that the Debtors were not seeking a determination regarding the fair market rent for use of the Facilities. Id. 9:23-

24. The Court also clarified that it ordered escrow of the May Upstream Rent—as the Court understood it to be due under the Leases after HUD sold them—because the Court "did[ not] have any fair market rent valuation at that time." Id. 26:12-18. Finally, after hearing testimony and argument, the Court ordered adequate protection payments in the amount ultimately reflected in the Sixth *Interim* Cash Collateral Order. Id. 85:4-10.

That oral ruling accords with an earlier one, in which the Court signaled that the issue of adequate protection would remain open until the Facilities received current valuations. E.g., Jan. 27, 2026, Hr'g. Tr. 81:2-3 (opining that the Court was "having a hard time with [the issue of adequate protection] because [the Court did not] know . . . the value . . . of the collateral"); id. 81:6-9 ("split[ting] the difference [in debt service payments] and requir[ing] a total of $70,000[.00] . . . to be paid for adequate protection, at least for this *interim*" period until the next cash collateral hearing (emphasis added)); id. 81:10-19 (indicating that adequate protection may be adjusted once the Court was presented with appraised values of the Facilities).

Given the breadth of Lehigh's collateral package, the absence of related valuations creates uncertainty: without a clear picture of the Facilities' value, the Upstream Rent and cash collateral values are obscured; so too the requisite amount of adequate protection payments. That is why all cash collateral Orders in these cases have been entered on interim bases—including the most recent one, which will be revisited. Doc. # 250 ¶ k. This is standard procedure in a Chapter 11. It could hardly be otherwise when courts rarely have a full grasp of collateral values in the early throes of a reorganization. Even when such values are known, adequate protection may need adjusting if, for example, the collateral begins to depreciate.

Thus, it is easy to see why this Court held long ago that "under the [Bankruptcy] Code *res judicata* and collateral estoppel are generally inapplicable to preclude redeterminations of the

value of property." In re Vacuum Cleaner Corp. of Am., 33 B.R. 701, 704–05 (Bankr. E.D. Pa. 1983). Accordingly, the Court adopts that holding and extends it to the law-of-the-case doctrine—which Lehigh also raised, but which is discretionary in any event. Centennial Plaza Prop., LLC v. Trane U.S. Inc., 771 F. Supp. 3d 481, 487 n.10 (D.N.J. 2025). Lehigh cites no contrary authority. Nor does Lehigh point to a District Court Order determining the fair market value of the Manors' tenancies at the Facilities. Rather, the District Court's voiding of the 2023 Amendments helped set the table for precisely such a determination. Therefore, the Motions are neither collaterally estopped nor barred by the law-of-the-case doctrine.

2. The Stay Order Does Not Bar the Debtors from Prosecuting the Motions

Staying a final order "suspend[s] judicial alteration of the status quo[.]" Ohio Citizens for Responsible Energy, Inc. v. Nuclear Regul. Comm'n, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers). But a stay does not make time stand still. Nken v. Holder, 556 U.S. 418, 421 (2009). Rather, "a stay operates upon the judicial proceeding itself. It does so either by halting or postponing *some portion* of the proceeding, or by temporarily divesting an *order* of enforceability." Id. at 428 (emphasis added). See also id. at 429 n.1 ("The relief sought here is properly termed a 'stay' because it suspends the effect of the removal *order*." (emphasis added)).

Here, the Stay Order temporarily divested the Dismissal Order of enforceability. No more, no less. Lehigh has been understandably loath to accept this reality. Initially Lehigh's position was that the Stay Order only prevented foreclosure on the Facilities. Now Lehigh contends that everything is stayed, including the Debtors' ability to prosecute the Motions. This contention conflicts with the Court's holding (in a final judgment on the merits) that "the Trusts remain [single asset real estate] debtors in possession while their dismissals are on appeal." Doc. # 124 at 5. So perhaps Lehigh is collaterally estopped from relitigating the stay issue.

For the sake of clarity, let it be understood that the Stay Order has not in any way frozen the administration of these cases. All four (4) Debtors may assert their rights under the Bankruptcy Code as they would have if Lehigh's motion to dismiss the Trusts had been denied. That is what the status quo means here. Absent a contrary order from this Court, that is what the status quo will continue to mean during the initial phase of the Trusts' appeals from the Dismissal Order. Thereafter, if the Trusts are unsuccessful, or if only one succeeds, they will need to move the first order appellate tribunal for any further stay of their dismissal(s). See Fed. R. Bankr. Proc. 8025(b)(1). Accord In re Kendall, 510 B.R. 356, 361 (Bankr. D. Colo. 2014) ("A Rule [8007] stay pending appeal should not extend to an appeal of the district court or bankruptcy appellate panel to the court of appeals.").

Lehigh's view that these cases are indefinitely backdated to March 18, 2026, is untenable. Indeed, by that logic, the Court should direct Lehigh to return the "Good Shepherd rents," see doc. # 70 (entered on April 6, 2026), along with the heightened adequate protection payments received under the Fifth and Sixth Interim Cash Collateral Orders. Perhaps by the same logic parties in interest would be unable to pursue certain administrative expense claims. Surely Lehigh opposes such a deep freeze of these cases. Accordingly, the Stay Order is no impediment to the Debtors' prosecution of the Motions.

B. The U&O Agreements Withstand Heightened Scrutiny Under §363(b)(1)

The U&O Agreements license tenancies at sufferance, allowing the Manors to continue their use and occupancy of the Facilities until the Agreements are terminated by any party thereto on thirty days' written notice. The U&O Agreements also obligate the Manors to cover all carrying costs for the Facilities, including insurance, tax, and maintenance, consistent with triple-net provisions in the Leases. But the primary sticking point is the U&O Fees; these are monthly

license fees of $27,625.00 and $34,937.50, respectively payable to Lehigh by Whitehall Manor and Saucon Valley Manor, on behalf of the Trusts. Lehigh construes the Leases to require post-assignment rent of roughly $140,000.00 per month, per Manor, net of carrying costs. Alternatively, the appraisal Lehigh commissioned fixes monthly fair market rent at $88,333.00 for the Whitehall Facility and $96,667.00 for the Saucon Facility. At the very least, Lehigh submits that its appraised values should control. The Court disagrees.

1. The Legal Standard Governing Insider Transactions Under §363(b)(1)

Extraordinary pre-confirmation transactions involving estate property are governed by §363(b)(1), which, in relevant part, simply states that: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. §363(b)(1). The relevant standard has been fleshed out in case law. The resulting guideposts in this Circuit are: (1) adequate consideration; (2) sound business purpose; (3) reasonable notice; and (4) good faith. In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987) (citing In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986)); In re Exaeris, Inc., 380 B.R. 741, 744 (Bankr. D. Del. 2008).

The same formulation applies when the proposed transaction is between insiders. However, transactions between insiders "must withstand heightened scrutiny before they can be approved under §363(b)." In re Enron Corp., 335 B.R. 22, 28 (S.D.N.Y. 2005). Accord In re AIG Fin. Prods. Corp., 651 B.R. 463, 476 n.81 (Bankr. D. Del. 2023) aff'd sub nom. In re AIG Fin. Prods. Corp., 2024 WL 3967465 (D. Del. Aug. 28, 2024). In the case of such transactions, "the purchaser has a heightened responsibility to show that the [transaction] is proposed in good faith and for fair value." In re Med. Software Sols., 286 B.R. 431, 445 (Bankr. D. Utah 2002) (citing Indus. Valley Refrigeration, 77 B.R. at 17).

2. Consideration

At the Hearing, the parties presented dueling valuations of the Facilities.. Richard F. Wolf, MAI ("Mr. Wolf")—of Lukens & Wolf, an affiliate of Valbridge Property Advisors ("Lukens")—testified in support of valuations commissioned by the Debtors' principal (the "Lukens Appraisals"). Alan C. Plush, MAI ("Mr. Plush")—of Health Trust, LLC ("Health Trust")—testified in support of the valuations commissioned by Lehigh (the "Health Trust Appraisals"). Upon review of these testimonies and Appraisals, the Court renders the following factual findings and legal conclusions regarding the adequacy of the U&O Fees:

a. Findings of Fact

i. The Lukens Appraisals

Mr. Wolf has about thirty years' experience appraising real estate; he has appraised seventy-six senior living properties over the last thirteen (13) years. Mr. Wolf believes that the highest and best use for the Facilities is continued senior housing. In valuing the Facilities, Lukens employed the income capitalization and sales comparison approaches. Mr. Wolf's analysis resulted in appraised going concern and real estate only values pegged to the petition date. Mr. Wolf testified that the income capitalization approach is well suited to valuing income-producing properties like the Facilities because it effectively captures the income potential of the real estate.

Income capitalization involves projecting the subject's effective gross income, or its gross income net of collection loss and vacancy. Then the appraiser adjusts—or "stabilizes"—operating expenses. For example, Lukens averaged the Facilities' historical utilities costs before converting them to stabilized (in this case elevated) expense estimates, which built on historic averages by incorporating, *inter alia*, fuel inflation projections. Once stabilized in this way, the Manors'

expenses were tallied and subtracted from each Facility's effective gross income figure, resulting in stabilized net operating income ("*s*NOI") of $790,920.00 and $609,863.00 for the Saucon and Whitehall Facilities, respectively. This corresponds to respective expense ratios for the Facilities of 91% and 93%: roughly 15% higher than the national average for senior living facilities operating in Cushman & Wakefield's lowest cost-efficiency decile.

Expense stabilization methods bear heavily on the appraised value of the subject real estate. By way of illustration, Lukens divided each Facility's *s*NOI by an 8% market capitalization rate derived from national surveys of investors in senior living facilities. The result is respective preliminary going concern values of $7,623,288.00 and $9,886,500.00 for the Whitehall and Saucon Facilities. Thus—all things being equal—the larger the *s*NOI, the larger the going concern values; and the inverse is true of capitalization rates.

Both Facilities' roofs must be replaced. So, Mr. Wolf deducted the associated deferred maintenance costs from the Facilities' preliminary going concern values, thereby concluding final going concern values of $6,900,00.00 and $8,800,000.00 for the Whitehall and Saucon Facilities, respectively. Corresponding real estate only values of $5,100,000.00 and $6,450,000.00 could then be derived net of the Manors' businesses and their furniture, fixtures, and equipment. Lukens next calculated per-unit real estate values of roughly $53,000.00 per Facility. These values are about $36,000.00 below the lowest relevant decile for majority assisted living facilities. However, Lukens also conducted sales comparison analyses, which developed separate real estate-only values of $5,200,000.00 and $6,350,000.00 for the Whitehall and Saucon Facilities, respectively. These data were derived from sales of comparative Pennsylvania facilities and closely correspond to the Lukens Appraisals' income capitalization values.

Finally, Lukens derived market rent values for the Facilities. Relevant to this derivation is Lukens's assumption that the market lease type is absolute net (i.e., one where the tenant pays base rent plus carrying costs). Lukens determined that national lease data for skilled nursing facilities with net leases implies a going concern-to-leased-fee compression of approximately 100 to 200 basis points for the Facilities. Lukens thereby concluded a leased-fee capitalization rate of 6.5% for the Facilities. This rate was multiplied by the Facilities' real estate only values, resulting in the monthly rental values on which the U&O Fees are predicated.

Lukens utilized a leased-fee capitalization rate instead of market comparisons to determine fair market rent because the Facilities are unique; one was converted from a school, the other from a warehouse. Consequently, whereas most senior housing is purpose built, the retrofitted Facilities feature an anomalous amount of functional obsolescence. Mr. Wolf testified that this distinction helped explain the disparity in the Lukens Appraisals' expense and per-unit values on the one hand, versus Cushman & Wakefield's nationwide deciles on the other. Mr. Wolf also attributed such a disparity to above-average care and cleanliness levels at the Facilities.

In light of the Facilities' relative obsolescence, Mr. Wolf assessed that although value could be achieved by raising rents, occupancy levels would drop at those price levels.. Indeed, the Debtors' principal testified that the Manors must price aggressively because they face direct competition from twenty (20) new purpose built senior living facilities. Essentially, the Manors' business model is to attract residents by charging less for more services.

ii. <u>The Health Trust Appraisals</u>

March 10, 2026 is the valuation date for the Health Trust Appraisals; these, too, were grounded exclusively in the income capitalization and comparable sales approaches. Mr. Plush is

the CEO of Health Trust, which specializes in healthcare (e.g., hospitals) and senior housing appraisal. Health Trust typically appraises about 1,600 such facilities a year—60% to 70% of these are senior housing. Mr. Plush has been a certified appraiser for forty years; he also develops and invests in senior housing. Mr. Plush visited both Facilities on their valuation dates, spending roughly forty-five minutes at each—ten to fifteen minutes canvassing the exteriors, and thirty to thirty-five minutes walking the interiors. Like Mr. Wolf, Mr. Plush concluded that the Facilities' highest and best use is senior housing.

Although Mr. Plush testified that Health Trust's income capitalization technique is similar to Lukens's, there is a critical difference between them: Health Trust stabilized expenses with an eye toward efficiencies achieved by senior housing operators elsewhere in the United States. Thus, Health Trust downwardly stabilized the Manors' expenses to a greater extent than did Lukens. After stabilizing expenses, Health Trust fixed Saucon's *s*NOI and expense ratio at $1,505,342.00 and 85.4%, respectively. Meanwhile, Whitehall's *s*NOI and expense ratio were fixed at $1,378,471 and 80.8%, respectively. Although these ratios are lower than those Lukens calculated, Mr. Plush testified that they were higher than the national average given the age and functional obsolescence of the Facilities. Health Trust applied a 9% capitalization rate, which is slightly higher than Lukens's. Health Trust also deducted the cost of the Manors' deferred replacement of the Facilities' roofs. The result is direct capitalization values of $14,500,000.00 and $15,700,000.00 for the Whitehall and Saucon Facilities, respectively.

Like Lukens, Health Trust conducted comparable sales analyses. Unlike Lukens, Health Trust's comps are grounded in going concern (as opposed to real estate) value. But Health Trust ultimately concluded that its direct capitalization approach was the most appropriate measure of value. Health Trust also conducted fair market rent analyses for the Facilities. These hinged on

application of reconciled coverage ratios to *s*NOI. In both cases, the ratios were derived from lease data associated with ten operators from outside Pennsylvania. Higher coverage ratios indicate higher operational cash flows, lower risk to the landlord, and thus lower leased fees. The Manors were assigned ratios at the ceiling for the lower end of the spectrum. Thus, Health Trust concluded respective annualized fair market rent figures of $1,060,000.00 and $1,160,000.00 for the Whitehall and Saucon Facilities.

Mr. Plush testified on cross-examination that Health Trust's Whitehall appraisal was founded on the erroneous belief that the Whitehall Facility has 148 units. In other words, Health Trust concluded values for that Facility based on eighteen phantom independent living units located in the basement—which Mr. Plush walked and testified was inconducive to senior living. Mr. Plush believes that his firm's Whitehall appraisal should stand despite this error because the Facility's valuation-date census (139 residents) is consistent with his firm's projected occupancy rate (90%). But that rate assumes no shared units, and Mr. Plush was not sure whether the unit miscount was material.

Health Trust projects revenue for the Whitehall Facility that exceeds historic performance. In fact, Health Trust's appraisal of that Facility is premised on the assumption that its respective assisted living and memory care unit occupancy rates will increase by roughly 15% and 30% above those achieved in recent years. Meanwhile, Health Trust projects a roughly 15% rise in memory care unit occupancy at the Saucon Facility. Mr. Plush testified that it was reasonable to pair these projections with downwardly stabilized administrative, housekeeping, and nursing expenditures. For instance, Health Trust stabilized administrative expenses for the Saucon Facility at about 36% below the national median for such expenses. Furthermore, Health Trust nearly halved the Saucon

Facility's housekeeping expense budget relative to the last three years. And the Facility's stabilized nursing expense was slightly below the actual figure for the prior year.

b. Conclusions of Law

Property valuation is a commonsense exercise. In re Swartz, 670 B.R. 750, 758 (Bankr. E.D. Pa. 2025). It "is not an exact science, and a court has broad discretion in determining value." In re Lewisberry Partners, LLC, 664 B.R. 398, 400 (Bankr. E.D. Pa. 2024) (citing In re 210 Ludlow St. Corp., 455 B.R. 443, 447 (Bankr. W.D. Pa. 2011)). Moreover, "when faced with conflicting appraisal testimony, a court should consider 'the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented.'" Swartz, 670 B.R. at 758 (quoting In re Gurnari, 664 B.R. 104, 111 (Bankr. M.D. Pa. 2024)).

There is no dispute that Mr. Wolf and Mr. Plush qualify as experts under Federal Rule of Evidence 702. The Court finds both appraisers to be well qualified; their testimony was credible and elucidating. Moreover, the Appraisals are both state of the art. Each employs similar industry-standard valuation methodologies grounded in sophisticated datasets.

However, Health Trust's appraisal of the Whitehall Facility is deficient; it miscalculates the number of licensed independent living units. Although Health Trust accounted for 148 total units, there are just 130. Mr. Plush testified that this miscalculation may be immaterial because there were 139 residents at the Facility on Health Trust's valuation date; this figure tracks with Health Trust's 90% projected occupancy rate for the Facility. Yet Mr. Plush also testified that the Health Trust Appraisals assumed single occupancy across all units, which is not the case. Most

importantly, Mr. Plush was unable to assess the impact of this discrepancy on the veracity of his firm's Whitehall appraisal.

The Lukens Appraisals, on the other hand, are persuasive. Both experts testified to the functional obsolescence of the Facilities. Mr. Wolf accounted for this in stabilizing expenses by careful reference to cost efficiencies actually achieved by the Manors despite that obsolescence. Still, the Lukens Appraisals do consider outside data. Utilities, for example, were stabilized by reference to fuel inflation expectations. Lukens also incorporated national data into its coverage ratios and capitalization rates. Indeed, Lukens's direct capitalization rate is slightly lower (and thus—all equal—more supportive of a higher valuation) than that which Health Trust applied.

Health Trust relied on what operators have achieved at other facilities in other states. The result is expense ratios which are higher than the national average, yet consistent with those achieved by operators in the lowest national expense efficiency decile. But the Court is unaware of evidence that operators in the lowest efficiency decile disproportionately face similar headwinds to those faced by the Manors. For instance, the Court is unaware of evidence that operators in that decile are disproportionately saddled with functionally obsolescent facilities, relative to other deciles. Even if there were such evidence, functional obsolescence surely varies within deciles by degree. And the Court has no sense of whether such variation might render the lowest decile inapposite. Likewise, there is no doubt that the Manors face stiff competition from purpose-built competitors within their draw areas. Nor is there debate whether the Manors compete in those areas by offering more services at lower prices; this helps explain their low margins.

The Lukens Appraisals better account for the Facilities' obsolescence and competition because Lukens stabilized expenses to more closely reflect those the Manors have traditionally borne in spite of those headwinds. True, the result is above average expense ratios. Perhaps this

indicates that other operators could wring higher margins out of the Facilities. But the Court is concerned about what this would mean in practice. It is implausible that the Facilities—Saucon in particular—could substantially increase their memory care rolls while cutting what seem to be critical expenses (e.g., nursing, housekeeping, dietary, and administration) without sacrificing the depth, breadth, and quality of services delivered.

Affected by the consideration of the appraisals and the outcome of the web of litigation these cases have produced are vulnerable, elderly residents. These individuals are not accounting abstractions. They are veterans, spouses, parents, and grandparents, whose family members invest a great deal of their money and trust in caretakers like the Manors. In exchange, the Manors are expected to provide relatively high levels of care. The Court is unwilling to sanction appraised values that might disincentivize such a bargain—which the Lukens Appraisals best capture. Therefore, the Court holds that the U&O Fees constitute fair consideration for use and occupancy of the Facilities.

3. Business Purpose

"For a court to approve [a proposed transaction] under § 363(b), it must 'expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application.'" Enron Corp., 335 B.R. at 27–28 (second alteration in original) (quoting In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983)). Several factors may help ballast the "business purpose" inquiry under §363(b)(1). These include: (1) the value of the asset relative to the estate as a whole; (2) when the transaction was proposed in relation to the petition date; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the transaction on future plans of reorganization; (5) the proceeds to be obtained relative to any appraisal(s) of the property; and (6) whether the asset is increasing in value. Indus. Valley Refrigeration, 77 B.R. at

19–21 (citing Lionel Corp., 722 F.2d at 1071). This is a fact-specific inquiry entrusted to the sound discretion of the bankruptcy court. Enron Corp., 335 B.R. at 32 ("The Bankruptcy Court's tailoring of its decision to the peculiar facts of the case in determining whether a good business reason existed to approve the transaction is entitled to deference.").

Lehigh argues that there is no business justification for the Trusts joining a Motion to diminish the Upstream Rent. This argument fails for at least three (3) reasons. First, Lehigh discounts the peculiar posture of these cases. Unlike the sale in Abbotts Dairies, the U&O Motion was not suspiciously timed. To the contrary, the Motion was filed months after the petition date. By then the Court had signaled that the Leases are likely not "unexpired" within the meaning of 11 U.S.C. §365(d)(2). Days later, the District Court identified an actual conflict of interest between the Debtors and required them to retain separate counsel (whose signature is atop the block at the bottom of the U&O Motion). Then this Court began extending the Debtors' deadlines to file Chapter 11 plans, which may require unwinding if the Dismissal Order is upheld.[1] Thus, before the Court are four (4) affiliated, yet conflicted, Debtors; two (2) may be unable to reorganize if the other two are ineligible. It follows that plan confirmation is not in the immediate offing.. And the Leases likely expired pre-petition. Given the uncertainty, it makes sense for the Trusts to seek approval of interim occupancy agreements with their jointly administered tenants.

Second, the U&O Fees undergirding the proposed Agreements were not plucked from thin air. Rather, those fees are predicated on the Lukens Appraisals, which this Court has determined conclude fair market values of the Facilities and rents they can command at arm's length; this helps alleviate concerns about the insider nature of the deal. See In re Garbinski, 465 B.R. 423, 425

[1] The appeal of the Dismissal Order is pending in District Court, the Third Circuit having denied direct appeal. See Order in re Whitehall Trust & In re Saucon Trust, nos. 26-8020 and 26-8021 (3d Cir. Aug. 21, 2026).

(Bankr. W.D. Pa. 2012) ("[A] sale with . . . an insider, raises a red flag. But even under these conditions a sale might be approved . . . if the Court were assured that [the proposed consideration] is a fair price for the interests being sold[.]").

Third, Lehigh's administrative rent cases support the conclusion that the Trusts have sound business reasons for joining in the U&O Motion. Lehigh cites those cases for the proposition "that the rental value fixed in the lease will control, *unless* there is convincing evidence that such rental rate is unreasonable." In re F.A. Potts & Co., Inc., 137 B.R. 13, 18 (E.D. Pa. 1992) (emphasis added). The Lukens Appraisals evidence the unreasonableness of rental rates fixed in the Leases. Thus, the Trusts cannot demand payment in such amounts. Zagata Fabricators, Inc. v. Superior Air Prods., 893 F.2d 624, 627 (3d Cir. 1990) ("[T]he landlord's right to collect monetary relief is somewhat curtailed: a debtor is generally required to pay only a reasonable value for the use and occupancy of the landlord's property, which may or may not equal the amount agreed upon in the terms of the lease."). It would be absurd to deny the U&O Motion on a holding that the Trusts' sounder course of business is to demand Upstream Rent in impermissible amounts. Accordingly, the Court holds that the Trusts' business purposes are sound.

4. Notice

Section 363(b)(1) also requires accurate, fulsome notice of the proposed transaction. Indus. Valley Refrigeration, 77 B.R. 15, 21–22 (Bankr. E.D. Pa. 1987). The adequacy of such notice turns on several factors, "including the exigency of the circumstances and the effort to identify and communicate with potential bidders." Exaeris, 380 B.R. at 745. See also In re Scimeca Found., Inc., 497 B.R. 753, 776 (Bankr. E.D. Pa. 2013) ("[T]he fact that trustee proposes to sell the debtor's property for less than . . . appraised value does not demonstrate that the sale price is unreasonable, so long as the trustee undertakes reasonable marketing efforts[.]").

Here, the Trusts' principal testified that he did not actively market the leaseholds. This would likely prove fatal for the U&O Motion if the Trusts were seeking thereby to sell substantially all of their assets. But this is not a free-and-clear sale. Instead, the Trusts only seek approval of interim use and occupancy agreements, subject to immediate, unilateral termination by this Court. E.g., doc. # 216-2 §§2, 13. Furthermore, the U&O Motion was served in accordance with the applicable notice procedures. The proposed U&O Agreements were attached. They accurately convey all material terms of the Agreements. Lehigh had ample opportunity to inspect and oppose the Agreements, the initial versions of which were filed forty-three days in advance of the Hearing. Nothing more is required on these facts. Therefore, the Court holds that the U&O Motion was adequately noticed.

5. Good Faith

"[W]hen a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." Abbotts Dairies, 788 F.2d at 149–50. Good faith concerns typically arise when the proposed transaction contemplates lucrative sweetheart deals with insiders. See id. at 148 (remanding for finding of good faith where debtor's principal had bargained for lucrative employment agreement with proposed buyer); Indus. Valley Refrigeration, 77 B.R. at 22 (disapproving sale of debtor's assets because its principal and his wife respectively received substantial pay raise and rental subsidy, the values of which totaled more than half the proposed purchase price); Exaeris, Inc., 380 B.R. at 746 (refusing to find good faith where proposed buyer contracted for release of the debtor's claims against him).

The U&O Agreements clear this last hurdle. There is no indication that the Debtors' principal is profiting directly from the Agreements. Nor will approval of the Agreements occasion the release of claims against him. And the same holds for the other members of his family. For

these reasons, in addition to those discussed above, the Court holds that the U&O Agreement was proposed in good faith.

C. Lehigh Is Not Currently Entitled to Adequate Protection Payments

1. The Legal Standard Governing Adequate Protection

Adequate protection of a creditor's interest in the debtor's property is required to maintain the automatic stay of acts against such property. 11 U.S.C. §362(d)(1). Likewise, the debtor's use, sale, or lease of estate property is conditional upon the adequate protection of a creditor's interest in such collateral. Id. §363(e). Adequate protection is also required on behalf of an entity whose lien is primed by another of equal or senior priority. Id. §364(d). The Bankruptcy Code lists three (3)examples of adequate protection: (1) periodic cash payments; (2) replacement liens; or (3) the "indubitable equivalent" of the creditor's interest in its collateral. Id. §361. "The last possibility is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party. Therefore, a determination of whether there is adequate protection is made on a case by case basis." In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994).

However, it is hornbook law that replacement liens on post-petition rents generally do not adequately protect a lender holding a lien on pre-petition rents. Collier on Bankruptcy ¶ 361.03 (16th 2026). Provision of such replacement liens is statutorily prescribed, subject to a contrary order "based on the equities of the case." 11 U.S.C. §552(b)(2). And a lender whose cash collateral is decreasing in value is not adequately protected by the provision of security to which the lender is already entitled. Swedeland, 16 F.3d at 565 (holding that a lender whose lien was primed under §364 was not adequately protected from the attendant loss in value by the payment of sale proceeds on which the court had already granted the lender replacement liens).

Thus, adequate protection requires new consideration to offset post-petition diminution in the petition-date value of a secured lender's interest in collateral. See id. at 564–65 (agreeing that "the bankruptcy court's findings were clearly erroneous because [the Debtor] offered no new consideration to [the secured lender] to offset its diminution of interest as a result of the superpriority lien."). See also In re Sears Holdings Corp., 51 F.4th 53, 58 (2d Cir. 2022) (defining adequate protection as "a statutory right designed to preserve the Petition-Date value of a secured creditor's collateral."); In re Heritage Highgate, Inc., 679 F.3d 132, 142 (3d Cir. 2012) ("[B]ankruptcy courts are best situated to determine when is the appropriate time to value collateral in the first instance. We, therefore, defer to their considered judgment.").

That said, the post-petition diminution to be offset under §361 by periodic cash payments must result from one (1) of three (3) things: (1) the continuation of the automatic stay under §362; (2) the use, sale, or lease of collateral under §363; or (3) the grant of a priming lien under §364 (which is not at issue here). See 11 U.S.C. §361(1). Put simply, there must be a statutory basis for a court to require adequate protection. Neither non-use/sale/lease-based diminution, nor the mere *potential* for a related motion for relief, provides such a basis. Accord In re Gerke, 634 B.R. 104 109–111 (Bankr. D. Colo. 2021). Moreover, a secured lender is not entitled to adequate protection of its interest in the lost pre-confirmation use value of collateral occasioned by the automatic stay of acts against it. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("[T]he 'interest in property' protected by § 362(d)(1) does not include a secured party's right to immediate foreclosure[.]").

Regardless of how adequate protection is provided, or under which Code section the need for it purportedly arises, the debtor bears the burden of proving that its secured lender's interests in collateral are adequately protected. See e.g., In re GVM, Inc., 605 B.R. 315, 325 (Bankr. M.D.

Pa. 2019) ("The burden of proof is on the debtor to demonstrate that the secured creditor is adequately protected for the purpose of using its cash collateral.").

2. There is Presently no Basis for Adequate Protection Under §362(d)(1)

Lehigh is only partially correct that "the burden of proof on adequate protection lies with the party opposing relief from stay—namely, the Debtors." Doc. # 219 ¶ 39 (citing see 11 U.S.C. §363(p) and Swedeland, 16 F.3d at 564). The burden would lie with the Debtors if they opposed relief grounded in §362(d)(1).. But no such motion has been filed. Rather, the Motion for Relief, in which Lehigh and the Receiver joined, was grounded in one of §362(d)(1)'s non-enumerated causes for relief: namely, the pre-petition expiration of the Leases and the Manors' resulting inability to assume or reject them under 11 U.S.C. §365(d)(2). See e.g., In re Turner, 326 B.R. 563, 575–76, 78 (Bankr. W.D. Pa. 2005).

Yet the Manors' ability to assume or reject the Leases has nothing to do with the diminution of Lehigh's interest in rents, nor the related question of whether that interest is being adequately protected.

Relatedly, the Court is unwilling to order adequate protection payments on the basis that Lehigh is not being fully compensated for the risk that it will be unable to collect outstanding administrative rent—presumably the Upstream Rent—if these cases collapse. This argument fails for two (2) reasons. First, it rings of the lost-use-value variety, which has no basis in law. Timbers of Inwood, 484 U.S. at 371. Second, the only vehicle for such an argument would seem to be §362(d)(1). And Lehigh has not moved thereunder on the ground that it has some kind of cognizable interest in administrative rent apart from that which arises under 11 U.S.C. §503.

Consequently, moving forward, unless it is presented with a motion for relief on adequate protection grounds under §362(d)(1)—or until the Debtors move for approval of super-priority financing under §364—the Court will only entertain adequate protection requests specifically predicated on asserted uses, sales, and/or leases of collateral under §363(e). And because Lehigh has not moved for relief on adequate protection grounds, the Court holds that Lehigh is not now entitled to adequate protection under §362(d)(1).

3. <u>There is Presently no Basis for Adequate Protection Under §363(e)</u>

To reiterate, the Court understands Lehigh only to be asserting a lack of adequate protection of its interests in the Facilities and Upstream Rent. Recall also that Lehigh construes the Leases to require Upstream Rent payments of roughly $140,000.00 per month, per Manor. Even assuming that this figure is correct, Lehigh is not entitled to adequate protection of its interest in the Upstream Rent unless and until there is some indication that those rents are being used, sold, or leased. In fact, Lehigh has argued for months that adequate protection is required because the Upstream Rent is not being paid. Meanwhile, Lehigh has not specified which Code section requires adequate protection in these circumstances.

Surely, §363(e) cannot do the work. After all, which of the Debtors could be said to use, sell, or lease the Upstream Rent apart from the Trusts contractually entitled to receive it? Yet no one is suggesting that the Trusts have sold or otherwise assigned the Upstream Rent (at least not to an entity other than Lehigh). And how could they have used that which they cannot even collect? The Trusts are the emptiest of shells. They have no employees. They have no officers. They do not even have bank accounts. In fact, when the Upstream Rent was being paid, it was collected and apportioned by non-debtor affiliates. Even now, the Manors propose to make the Combined

Payments on the Trusts' behalf. Thus, the Court holds that §363(e) currently provides no basis for adequate protection of Lehigh's interest in the Upstream Rent.

That leaves only Lehigh's interest in the Facilities. This presents differently because the Facilities are currently being used and leased. So, the burden falls squarely on the Debtors to prove that the Facilities are not diminishing in value relative to the petition date. The Debtors meet that burden. Mr. Wolf testified at the Hearing that he had no reason to believe that the value of the Facilities was diminishing. In fact, Mr. Wolf's impression was that the Whitehall Facility, which he walked, was very clean. And Mr. Plush echoed this sentiment, which comports with other testimony the Court has heard regarding the physical shape of the Facilities. For example, the health care ombudswoman appointed for these cases testified that the Facilities were in good condition. To be sure, this was after she filed a report indicating otherwise (the "Ombuds Report"). Indeed, the Ombuds Report detailed, *inter alia*, roof leakage at the Saucon Facility. But the Court was subsequently presented with evidence that the leak—which resulted from an ice dam after a particularly harsh winter—had been repaired by maintenance staff at the Facility. And there has been additional evidence that all other issues identified in the Ombuds Report have since been resolved. Accordingly, the Court recently denied the United States Trustee's associated Motion to Dismiss the Manor Debtors.

Nevertheless, Lehigh contends that its interest in the Facilities is inadequately protected because their roofs need to be replaced while the Manors' cash reserves are insufficient to fund the projected cost of such replacement. This argument fails for two (2) reasons. First, as the Lukens Appraisal confirms, the Facilities' roofs needed to be replaced on the petition date. Thus, the fact that such a need remains is not evidence of post-petition-date diminution in the value of the Facilities. Were it otherwise, every debtor that deferred pre-petition repairs of encumbered estate

property (e.g., real estate, vehicles, etc.) would be required to provide their secured lender(s) with adequate protection until the repairs were completed. Such a rule would sweep in most, if not all, Chapter 11 debtors and discourage reorganization. Not unsurprisingly, Lehigh cites no authority supporting such a conclusion. Second, there is no evidence that the Manors' cash reserves are depreciating. If anything, the Manors' reserves are appreciating. Compare Bankr. E.D. Pa. Case No. 25-15241, doc. # 69-1 with Bankr. E.D. Pa. Case No. 25-15245, doc. # 249. Therefore, the Court holds that §363(e) currently provides no basis for adequate protection of Lehigh's interest in the Facilities.

It follows that Lehigh is not currently entitled to adequate protection.. Of course, this does not prevent the Debtors from voluntarily arranging to send Lehigh so-called "adequate protection" payments equaling the pre-default debt service due on the Trusts' mortgages. In other words, while the Court will not require the Debtors to make payments aimed at staving off another motion for relief, it may nonetheless be prudent for such payments to accrue.

## IV. CONCLUSION

To summarize, the Debtors are not collaterally estopped from prosecuting the Motions. Nor did the Stay Order prevent their prosecution. The U&O Agreements are approvable because: (1) the U&O Fees are predicated on third-party appraised values of the Facilities and the rents they can command in the market; (2) there are sound businesses justifications for the Agreements; (3) the U&O Motion was properly noticed and describes these interim Agreements in sufficient detail; and (4) there is no evidence that the Debtors' principal will be unjustly enriched by the U&O Agreements. Last, Lehigh is not entitled to adequate protection of its interests in the Upstream Rent or Facilities because there is no statutory basis for such relief.

The Motions were granted for all these reasons.

Dated: August 26, 2026

Hon. Patricia M. Mayer
United States Bankruptcy Judge