IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| Whitehall Manor, Inc., et al., | § | Case No. 25-15245 (PMM) |
| *Debtors*. | § | Jointly Administered |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Before the Court is the fee application (the "Amended application") of law firm Dilworth Paxson ("Dilworth") seeking $1,293,392.50 in compensation and expense reimbursements for legal services rendered as joint counsel to Chapter 11 Debtors Whitehall Manor, Inc., Saucon Manor, Inc., Whitehall Trust, and Saucon Trust, alongside the formal objection ("the Objection") of secured creditor Lehigh Valley 1, LLC. ("Lehigh") seeking an $821,540.00 fee reduction.

As set forth below, the Court holds that Section 328(c) confers flexible authority to allow compensation for actual, necessary, and beneficial services rendered during court-approved employment even where the employment order has been reversed on appeal. In doing so, the Court declines to deny or reduce Dilworth's fee application, and the Court will award the requested fees under Section 330.

## II. BACKGROUND

On December 26, 2025, four related Chapter 11 voluntary bankruptcy petitions were filed in the Bankruptcy Court for the Eastern District of Pennsylvania. The Debtors consisted of two operating companies—Whitehall Manor and Saucon Manor (the "Manors")—which operate two

personal care facilities located in the Lehigh Valley Area, and two Trusts—Whitehall Trust and Saucon Trust (the "Trusts")—which own and lease the underlying real estate to their respective Manors. One day after the four Debtors filed their petitions, the law firm Dilworth Paxson ("Dilworth") filed an application seeking authorization from our Court pursuant to 11 U.S.C. § 327 to act as counsel for all four Debtors.[1]

Secured Creditor Lehigh and the U.S. Trustee's Office filed formal objections opposing Dilworth's employment for all four Debtors, alleging a conflict of interest between the Trusts and the Manors regarding leasing terms and rent payment obligations. On January 27, 2026, this Court entered an order approving Dilworth's joint retention. Lehigh subsequently appealed that decision. During the pendency of the retention appeal, litigation continued across multiple fronts. On March 19, 2026, this Court granted Lehigh's motion to dismiss the bankruptcy cases of Whitehall Trust and Saucon Trust under 11 U.S.C § 109, finding that the Trusts were not eligible business trusts. An emergency stay of the dismissal order pending appeal was sought and granted.

Then on May 18, 2026, the District Court issued an order reversing and vacating this Court's retention order. The District Court explained that there was an actual conflict of interest that existed between the Manor Debtors and the Trust Debtors regarding the lease obligations. Essentially, the obligation of the Trust Debtors was to maximize the rent payments which are to the detriment of the Manors. Immediately following the District Court's order, Dilworth ceased representation of the Trust Debtors and helped facilitate the quick transfer of representation. Two days later, the Trust Debtors retained substitute counsel in Robinson & Cole. Dilworth continues

[1] Nunc Pro Tunc to the petition date of December 26, 2025.

to counsel the Manor Debtors. Since the change of counsel, both the Trusts and the Manors position on the leases have not changed.

Fast forward to August 4, 2026. Dilworth filed its original fee application for the period of December 26, 2025, to May 31, 2026, covering the period where the firm had represented all four Debtors. In its original application, Dilworth requested $1,301,020.50 in fees and $22,927.64 in expenses bringing its total claim to $1,323,948.14. After discussions with the United States Trustee (the "UST"), Dilworth agreed to a voluntary reduction of $7,628.00 to resolve the U.S. Trustee's inquiry. The reduction brought the new total Dilworth seeks from the Court to $1,293,392.50 (the "Amended Application").

Dilworth breaks these fees down into the following categories: (a) Case Administration: $136,834.00; (b) Asset Disposition: $1,943.50; Relief from Stay: $3,440.00; (c) Meeting of Creditors: $9,051.50; (d) Fee/Employment Applications: $24,827.50; (e) Fee/Employment Objections: $2,429.50; (f) Assumption and Rejection of Leases: $5,268.00; (g) Other Contested Matters: $792,007.00; (h) Business Operations: $22,500; (i) Tax Issues: $5,717.00; (j) Real Estate: $4,540.00; (k) Cash Collateral: $81,367.00; (k) Claims Administration: $4,290.50; (l) Plan & Disclosure Statements: $206,805.00.

On August 18, 2026, Lehigh formally objected to the amended fee application filed by Dilworth. Lehigh objects to the entire "Other Contested Matters" portion of Dilworth's fee application alongside specific fees in other categories. In total, Lehigh is seeking a fee reduction of $821,540.00 which Lehigh claims is the representation of the work Dilworth completed for the Trust Debtors.

A hearing was held on September 29, 2026, at 11:00 a.m. via Zoom. During the proceeding, counsel for Lehigh presented two demonstrative exhibits. One exhibit color-coded each of Dilworth's billing entries to isolate Dilworth's time spent working on trust-specific work and potential conflict related issues. The second exhibit presented an AI-generated, attorney-verified, summary chart for the billing entries. Neither of the exhibits were formally entered into evidence—the underlying time records were already in evidence—but the Court permitted them to remain as demonstrative exhibits. At the conclusion of the arguments outlined in more detail in the next section, this Court ruled that Dilworth acted in good faith, that its work benefited the estate of both sets of debtors, and that Section 328(c) confers discretion to award the fees in the amended application. The Court overruled Lehigh's objection and approved the amended fee application in full. Doc. # 307.

## III. ARGUMENTS AND ISSUES PRESENTED

### A. The Parties Arguments

The parties' arguments to the Court are straightforward. Dilworth asserts that under Section 328(c), the bankruptcy court retains statutory discretion to award fees and expenses for actual and necessary legal services rendered in good faith reliance on a court order. Dilworth emphasizes that it made full, candid initial disclosures without concealment or bad faith and conferred a benefit to each bankruptcy estate. Dilworth further argues there has been no injury to the estate since substitute counsel has adopted and maintained the exact same legal strategy regarding intercompany leases and that any fee reduction should be limited to the voluntary agreement between Dilworth and the UST.

Lehigh advances a three-tiered argument. First, Lehigh contends that because the District Court vacated Dilworth's joint retention approval due to a conflict of interest between the Trust

and Manor Debtors regarding rent obligations, Dilworth was never validly employed under Section 327(a) as to the Trust Debtors. This, in turn, effectively bars Dilworth in toto from compensation under Section 330(a). Second, Lehigh argues if the Court holds that Section 328(c) applies, the Court does not have the discretion to award Dilworth's application because the conflict of interest existed at the start of the debtors' bankruptcy. Hr'g Tr, 10:13Line 4-14 of transcript doc. 305. Third, Lehigh argues that, in the alternative, if the Court has discretion under Section 328(c), the Court should exercise its discretion to enforce a fee reduction of $821,540.00. Lehigh's logic is simple: the intercompany lease conflict existed at the start of the bankruptcy tainted all Trust-related representation by Dilworth.

**B. The Issues Presented**

The core legal issues presented to the Court regarding Dilworth's amended fee application and Lehigh's objection center on the interplay between Sections 327(a), 328(c) and 330(a) of the Bankruptcy Code. Here, the Court confronts the following issues:

(1) Whether a vacated retention order under Section 327(a) creates a bar to analyze fee applications under Section 328(c) and fee awards under Section 330(a);

(2) Whether this Court possesses permissive discretion under Section 328(c) to deny or reduce attorneys' fees to a law firm with a conflict of interest that existed at the outset of its employment;

(3) Whether, assuming this Court retains permissive discretion under 328(c), it should exercise its authority to deny or reduce those fees;

(4) Whether the requested fees constitute reasonable compensation for actual, necessary, and beneficial legal services.

## IV. LEGAL STANDARD AND DISCUSSION

### *A. Reaching Section 328*

Section 327 of the Bankruptcy Code acts as the initial hurdle governing the employment of attorneys and other professionals by a trustee. 11 U.S.C. § 327. The trustee, with the court's approval, may employ one or more attorneys… or other professional persons, that (1) do not hold or represent an interest adverse to the estate, and (2) that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties. 11 U.S.C. § 327(a). When a professional is not engaged pursuant to Section 327(a), that professional falls outside of the class of professionals eligible for compensation under Section 330. Lamie v. U.S. Trustee, 540 U.S. 526 (2004); In re NNN 400 Capitol Center 16 LLC., 632 B.R. 243 (D. Del 2021).

Lehigh contends that the Court cannot even reach Section 328(c) because, under Lamie and NNN, valid Section 327(a) employment is an indispensable prerequisite to fee allowance under Section 330(a)(1). In Lehigh's view, because the District Court vacated the retention order on appeal, the vacated order is treated as though it never existed. Thus, Dilworth was legally never employed under Section 327(a) with respect to the Trust Debtors creating a categorical bar to compensation that completely bypasses Section 328(c) analysis.

However, this argument misapprehends Lamie's factual applicability to our case. Lamie involved a corporate debtor's attorney initially involved in a Chapter 11 case that was subsequently converted to Chapter 7. 540 U.S. at 529. After conversion, the same attorney, without obtaining Section 327(a) approval from the court or the Chapter 7 trustee, continued to provide Chapter 7 services to the Debtor. Id. The attorney was never approved under Section 327(a) to represent the Chapter 7 estate, so the attorney was barred from compensation under Section 330. Id. at 538–39. Contrast Lamie's facts with the facts in this case. The facts are different in at least two meaningful

ways. First, Dilworth sought and obtained Section 327 authorization one day after the petitions were filed to represent all four Debtors. Second, the Court approved the joint representation and Dilworth acted under that judicial approval for nearly six months. Because Lamie's bar applied to never approved counsel acting without judicial authorization, it has no application to legal services rendered under an active court order.

Reliance on NNN for the same proposition is similarly misplaced. The court in NNN explicitly recognized that the bankruptcy court possessed discretion under Section 328(c) when evaluating professional fee applications. 632 B.R. at 273–74. NNN reinforces the discretionary powers given to the court.

Moreover, the objection fails to distinguish between an erroneous judgment and one that is void. A judgment is void *ab initio* when the rendering court lacked subject matter jurisdiction, personal jurisdiction over a party, or if the court acted in manner inconsistent with due process. In re Crivello at 134 F.3d 831, 837–38 (7th Cir. 1998). By contrast, an erroneous judgment occurs when the court makes a mistake of law or fact but nonetheless has authority over the subject matter and the parties. Id. The practical difference rests in their force. While a void judgment carries no legal weight from the outset, an erroneous order remains active and legally binding until it is reversed. Id.

Here, none of the elements for a void *ab initio* judgment are present. The Court had, and continues to have, subject-matter jurisdiction over the Chapter 11 bankruptcy estates of both the Manor Debtors and the Trust Debtors under 28 U.S.C. §§ 1334, 157(b)(2). It also maintains personal jurisdiction over the Debtors. When the district court vacated Dilworth's retention order, it did not hold that the Bankruptcy Court lacked jurisdiction or violated due process. Rather, the district court reached a different legal conclusion over whether an intercompany lease constituted

a disqualifying conflict of interest. Thus, the order issued by this Court is not void *ab initio* and carried legal weight until the district court's ruling.

Further, rigidly applying a legal fiction in this context produces inequitable and unworkable outcomes. First, it undermines the integrity of, and the reliance on, judicial orders. Chapter 11 depends on the immediate, reliable effect of bankruptcy court orders. The parties in the case, and the professionals they employ, must be able to rely on issued court orders. Second, it may confer an unearned benefit upon the bankruptcy estate. Here, Dilworth rendered legal services to the Trust Debtors. Allowing the Trust Debtors' estates to retain the tangible benefits of that labor results in unjust enrichment for the Trust Debtors in the form of months of, at best, heavily discounted legal work or, at worst, legal work for free.

Consequently, the Court must reject Lehigh's threshold challenge and analyze Dilworth's fee request under the framework of Section 328(c).

### ***B. Discretionary Trigger***

Analysis under Section 328(c) naturally divides into two distinct inquiries. First is the statutory question of the bankruptcy court's authority: Is Section 328(c) discretionary authority triggered when a court approves a professional who is non-disinterested at the outset of the employment? Second is a more practical question of equity. Assuming the Court possesses discretion under Section 328(c), should it exercise that discretion to deny a fee application? The Court will take these questions in turn.

In statutory interpretation, we begin "with the language of the statute." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002). When the statute's language is plain, the "sole function of the

courts…is to enforce it according to its terms." Caminetti v. U.S., 242 U.S. 470, 485 (1917). Section 328(c) reads, in relevant part, as follows:

> The court ***may*** deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327…if, ***at any time*** during such professional person's employment under section 327…, such professional person ***is*** not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.
>
> 11 U.S.C. § 328(c) (emphasis added).

Whether Section 328(c)'s discretionary authority is triggered turns on two textual anchors in the statute — "may" and "if, at any time during…employment under Section 327…such professional person is not a disinterested person."

**i. *The Permissive Meaning of "May"***

The distinction between "may" and "shall" in statutory text is a well-established canon of statutory construction. Anderson v. Yungkau, 329 U.S. 482, 485 (1947); Kingdomware Techs., Inc.v. United States, 579 U.S. 162 (2016). The Supreme Court explained the core principle in Anderson, holding that the normal inference is that both "may" and "shall" are used in their usual sense. 329 U.S. at 485. By its plain terms, the use of "may" denotes both permission and discretion, and the use of "shall" connotes a requirement. Id. Further, the Court in Kingdomware Techs., analyzing three separate statutes under 38 U.S.C. § 8127, discussed that, when a legislature uses both "may" and "shall" in the same statutory scheme, a court should presume the legislature knew the difference and intended each word to carry its ordinary meaning. 579 U.S. 162, 171–72 (2016).

Sections 327, 328, and 330 form, in large part, the statutory scheme for professional retention and compensation. Both "may" and "shall" appear in statutory language across all three sections: Section 327(a) states the trustee "*may* employ" professionals; Section 327(c) states that

the court "*shall* disapprove" employment if there is an actual conflict; Section 328(c) states the court "*may* deny allowance of compensation" for non-disinterested professionals; and Section 330(a)(4) states the court "*shall* not allow compensation" for unnecessary duplication or unnecessary services. 11 U.S.C. §§ 327(a)–(c), 328(c), 330(a)(4) (emphasis added). This is precisely the "may" and "shall" juxtaposition within the same statutory scheme that Kingdomware Techs held signals deliberate Congressional intent. Each Section uses "shall" where Congress intended a mandatory command and "may" where Congress intended to vest discretion with the court.

Thus, by using "may" in Section 328(c), Congress intended to grant to bankruptcy courts discretion to deny fees for non-disinterested professionals rather than create a mandatory penalty. The Court finds no compelling reason to question this intent.

**ii. *The Reach of "At Any Time"***

> "…if, ***at any time*** during such professional person's employment…such professional person ***is*** not a disinterested person..."
>
> 11 U.S.C. § 328(c) (emphasis added).

Two circuit courts remain divided on whether employment of a non-disinterested professional under Section 327(a) at the outset of employment is within the temporal reach of the Section 328(c). In re Crivello, 134 F.3d 831, 837 (7th Cir. 1998) (holding that fee denials are discretionary in cases where the professional was non-disinterested at the outset of the employment); In re Federated Dept. Stores, Inc., 44 F.3d 1310 (6th Cir. 1995) (holding that fee denials were mandatory in cases where the professional was non-disinterested at the outset of the employment).

In Crivello, the Chapter 11 debtor-in-possession (the "DIP") filed an employment application seeking court authorization to retain a law firm as bankruptcy counsel. 134 F.3d at 833. The law firm filed an affidavit stating that it held no interests adverse to the estate. Id. at 834. The bankruptcy court approved the law firm's retention. Id. at 833. But the law firm omitted extensive prepetition connections and conflicts with the debtor, including criminal defense representation of the DIP and prepetition legal claims against the DIP. Id. at 834. Following an objection from the UST that the law firm was not disinterested, the bankruptcy court revoked the retention order and denied its final fee application in its entirety. Id. at 834–35. On appeal, the Seventh Circuit held under Section 328(c) that bankruptcy courts hold discretionary authority to deny fees to improperly appointed professionals. Id. at 839. They reversed and remanded the bankruptcy court's ruling because unsupported factual findings of willful concealment may have tainted its exercise of discretion. Id. at 839–41.

The Seventh Circuit explained that to restrict Section 328(c) only to post-appointment conflicts, the UST had to interpret the word "is" to mean "becomes" and insert the word 'valid' before employment. The court rejected this reading stating that there is no "textual or structural evidence to support these limitations." Because the statute uses the present tense "is," Section 328(c) naturally encompasses a professional who is non-disinterested at any point, including from the inception of employment.

The Sixth Circuit reached the opposite conclusion. In re Federated Dept. Stores, 44 F.3d at 1312. In Federated, debtor entered into a retention agreement to hire an investment banking firm as its financial advisor. Id. at 1312. Debtor applied under Section 327(a) for court approval of the retention of the banking firm. Id. The UST objected to the appointment, arguing that the banking firm was disqualified as a non-disinterested person due to holding substantial amounts of the

debtor's debt. Id. at 1313. The bankruptcy court applied an equitable balancing test that weighed conflict risks against potential harm to the estate to approve the banking firm's retention. Id. at 1313–14. The UST appealed the order. Id. at 1314. The Sixth Circuit reversed the bankruptcy court's approval holding that "valid" employment under Section 327(a) is a prerequisite to receiving compensation under Section 330(a). Id. at 1320. Since the banking firm was a non-disinterested person at the commencement of the case, the banking firm was never validly employed. Id. Thus, Section 328(c) cannot control analysis. Id.

The Third Circuit has not squarely addressed the issue of "outset" conflicts in the context of Section 328(c), but it has provided relevant guidance in dicta. U.S. Trustee v. Price Waterhouse, 19 F.3d 138 (3rd Cir. 1994). Then-Judge Alito, writing for our Circuit in Price Waterhouse, affirmed that "we interpret Section 328(c) to mean that if a non-disinterested professional person is *improperly employed*…the court *may* deny compensation and reimbursement." 19 F.3d at 142 (emphasis added).

But our sister court in the Western District has directly confronted whether it had discretion and applied Price Waterhouse's guidance nonetheless. In re Authorized Factory Service, Inc., 283 B.R. at 689. In Authorized Factory Service, debtor retained a management consultant to assist with severe cash flow difficulties and an unpaid IRS obligation prior to filing for Chapter 11 bankruptcy. Id. at 686. When debtor filed bankruptcy, it owed the consultant roughly $3,000 for prepetition services. Id. at 688. Debtor applied for court approval seeking retention of the consultant. Id. But the application omitted the debtor's prepetition debt. Id. Further, the debtor omitted the consultant from the bankruptcy schedules. Id.

In grappling with whether the language in Price Waterhouse was binding, the court concluded that the Third Circuit would embrace the Seventh Circuit's discretionary interpretation over the bar the Sixth Circuit created in Federated Department Stores:

> We adopt this position in this case even if…Price Waterhouse does not so bind us. In our estimation, the argument set forth…that a court has discretion under 328(c) to award compensation to a professional person whose appointment was improper from the outset is far more persuasive than the argument in support of the opposite conclusion set forth in Federated Department Stores.
>
> In re Authorized Factory Service, Inc., 283 B.R. at 690.

Ultimately, the bankruptcy court, following the Third Circuit's logic in Price Waterhouse, held that its charge under Section 328(c) was discretionary. Id. at 689–90.

This Court agrees with the holding in Authorized Factory Service that Section 328(c) and Price Waterhouse confer discretion on the bankruptcy court to deny fees to professionals whose appointment was improper at the outset because the professional was not disinterested at the time of their employment. The Court also finds the statutory analysis in Crivello both persuasive and applicable. Under Lehigh's interpretation, Section 328(c)'s discretionary power is triggered only if Dilworth became non-disinterested during the progression of the case. But to accept Lehigh's position would require the Court to accept the same statutory interpretation that the Seventh Circuit aptly rejected: that "is" means "becomes" and "validly" is inserted before "employment." This Court similarly finds the statutory text imposes no such limitation. Section 328(c) requires only that the professional be "employed under Section 327."

Dilworth was employed under Section 327(a) from December 16, 2026 until May 18, 2027. Therefore, the Court retains discretion under Section 328(c) to deny its application. The conflict of interest at the outset of the employment does not make denial mandatory. It is the only faithful reading of the plain language of the statute.

### C. Exercising Discretion

The Court now must decide whether to exercise its discretion under Section 328(c) to deny or reduce Dilworth's amended application.

> Being on the front line, a bankruptcy judge is in the best position to gauge the ongoing interplay of factors and to make the delicate judgment calls which such a decision entails. Section 328(c) requires this discretion in deciding whether the court should deny in whole or in part the fee request of an erroneously employed professional. In re Crivello, 134 F.3d at 839.

The Court declines to deny or reduce the amount sought in the amended application. The Court's decision to neither deny nor reduce fees is informed by the unique facts of this case and a review of similar decisions in joint representation cases in the bankruptcy context.

Bankruptcy courts have approved joint representation in a wide range of factual settings involving commonly owned debtors. In re Renfrew Ctr. Of Fla. Inc., 195 B.R. 335 (Bankr. E.D. Pa. 1996); In re M&P Collections, Inc., 599 B.R. 7 (Bankr. W.D. Ky. 2019); In re KLE Equip. Leasing, LLC., 672 B.R. 756 (Bankr. E.D. Wis. 2025). For example, in Renfrew, our Court approved joint representation of two Chapter 11 debtors despite the existence of a large intercompany claim between the two debtors. 195 B.R. at 342. In KLE, the bankruptcy court approved joint representation of five related entities and their owner in jointly administered Chapter 11 cases. The court found no actual conflict even though the debtors made prepetition transfers that could give rise to avoidance claims between the debtors. 672 B.R. at 763–67. In M&P Collections, the bankruptcy court approved joint representation where inter-debtor claims were unlikely to yield distributions. 599 B.R. at 11–13.

The court in Easterday Ranches provides some detailed insight into the court's modern treatment in joint-debtor cases. 647 B.R. 236 (Bankr. E.D. Wash. 2022). This Chapter 11 case involved two affiliated family-owned entities—Easterday Ranches and Easterday Farms. The two

estates faced intercompany disputes over the allocation of hundreds of millions of dollars in asset sale proceeds and intercompany claims. At the outset of the case, the UST objected to joint counsel, arguing that intercompany claims created an inherent conflict. The bankruptcy court overruled the objection and authorized the firm to act as common counsel. The law firm successfully negotiated a confirmed plan which contained a comprehensive global settlement that resolved all the allocation issues. The court emphasized that a consensual resolution was in the collective interests of the debtors. Therefore, the bankruptcy court denied the subsequent UST's objection to fees, holding that *no penalty* was warranted. Id. at 254–55.

In its discussion, Chief Judge Holt explored several lines of analysis: (1) whether the conflict was inherently disqualifying; (2) whether the firm acted in good faith; (3) whether both estates ultimately benefited from the work, and (4) whether there is actual injury or prejudice to the estate. *See generally* In re Easterday Ranches, 647 B.R. at 250–55. This approach is similar, in part, to earlier decisions in other courts that scrutinize the good faith and openness of conflict disclosures. In re CIC Inv. Corp., 192 B.R. 549, 553 (B.A.P. 9th Cir. 1996) ("[Law firm] fully disclosed its connections with the debtor and provided services in reliance upon the bankruptcy court's Employment Order."); In re Diamond Mortgage Corp of Illinois, 135 B.R. at 97 ("The disclosure in the application to employ…is grossly deficient. [Attorney] did not disclose [conflicts of interest]. He must now live with the consequence of that failure to disclose.")

Each of these prongs will be discussed in the context of our facts below.

### i. *Inherently Disqualifying Conflict*

As discussed above, joint representation in a bankruptcy case is not summarily precluded. In this instant case, all four entities are ultimately owned by the same family: the Atiyehs. Hr'g Tr.

88:22-24, Jan. 30, 2026. Abraham Atiyeh testified under oath that he developed, opened and currently exercises full management control and ownership over both the Trust Debtors and the Manor Debtors. Hr'g Tr. 88:22-24, Jan. 30, 2026. Mr. Atiyeh's wife serves as the President of both Manor Debtors. Hr'g Tr. 108:19, Jan. 30, 2026. The paramount interest of the Atiyeh family in their bankruptcy, from the outset, has been to save the entities from foreclosure and sale. The family wanted to keep the personal care facilities open for their 200 senior residents, pay what the facilities could afford, and secure replacement financing to pay off the lender. Hr'g Tr. 11:24-25, 110:14-20, Jan. 30, 2026.

Although Lehigh has repeatedly argued that the Trusts' interest in collecting rent creates a clear conflict with the Manors' interest in reducing its operating expenses, the ultimate determination of what the goals for reorganizing are for each of the entities is decided by the Atiyehs. Much like the dual representation in Easterday, where counsel sought to mediate intercompany alignment and reach a consensus resolution, evaluating potential conflicts here requires consideration of whether joint representation advances the goals of Chapter 11. Because all four entities are interrelated and under common ownership with common debts, Debtors' counsel argued that the overarching reorganization goals between the estates of keeping the facilities open for its 200 residents and paying creditors what the estates could afford were fully aligned. *See* Case 25-15241, doc. # 109 at 6. Ultimately, the District Court disagreed. *See* Case 25-15241, doc. # 291. But at a minimum, the decision on whether the strategic aims of the entities are at odds and present an actual conflict for counsel was a close call for this Court.

**ii. *Good Faith***

Black's Law defines "good faith" as a state of mind consisting in part of: (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, and (3) the absence of intent to

defraud or to seek unconscionable advantage. Good Faith Definition, Black's Law Dictionary (12th ed. 2024), *available* at Westlaw.

Lehigh urges the Court to rely on NNN and Harris Agency to direct its discretionary power towards fee denial. But analysis of these cases falls neatly in line with an inquiry under Easterday because the courts in both exercised their discretion to deny fees to firms acting in bad faith. In NNN, the debtors were 32 tenant-in-common entities created to acquire an ownership interest in an office building. 632 B.R. at 249. The law firm retained by those 32 tenant-in-common debtors failed to disclose its pre-petition legal representation of the debtors' property manager, one of the debtors' largest unsecured creditors. Id. at 264. It also repeatedly submitted sworn declarations under Bankruptcy Rule 2014 claiming it had no connections to creditors. Id.

Further, the law firm entered into a secret side agreement with a broker to assist the debtors in refinancing their commercial office building. Id. at 252. The agreement would allow the law firm to receive half of all broker commission earned. Id. at 253. As part of this agreement, the broker's out-of-pocket costs would be reimbursed, which the law firm did directly from the bankruptcy estate without any court approval. Id. at 259. Counsel's course of conduct demonstrated an egregious breach of good faith, a material concealment of conflicts of interest and repeated falsely sworn statements to the court. And justifiably, the court denied the law firm its fees and expenses. Id. at 273–74.

Even less on point is In re Harris Agency. 462 B.R. 514 (E.D. Pa. 2011). In Harris Agency, fees were denied after counsel's bad faith attempt to recover compensation for services counsel rendered *after* the effective date of disqualification. 462 B.R. at 524.

These facts are in direct contrast with the current case. Here, Dilworth acted in good faith and with candor throughout its representation of the Debtors. In its initial Section 327 application, Dilworth provided full information regarding the leases and relationship between the Manor Debtors and the Trust Debtors. There is no evidence of any concealment, misrepresentation, or bad faith. And, in contrast to Harris Agency where the firm continued to bill for services, upon entry of the District Court's vacatur order, Dilworth initiated prompt remedial action. The firm immediately ceased its representation of the Trust Debtors and facilitated a transition to Robinson & Cole over the course of two days. Dilworth also promptly withdrew its appearance in all Trust-related proceedings. Finally, Dilworth cooperated fully with UST oversight by providing the Trustee an unredacted LEDES time record and voluntarily agreeing to $7,628 in fee reductions.

Since Dilworth neither concealed conflicts nor billed for any post-disqualification work, the outcomes in Harris, and NNN do not guide the court toward denying the amended application.

### iii. *Benefit to Estates*

The scope of a "benefit to the estate is not restricted to an economic dollar for dollar interpretation." In re Holder, 207 B.R. 574, 584 (Bankr. M.D. Tenn. 1997). The term may also extend to whether the services rendered "promoted the bankruptcy process or administration of the estate." In re Holder, 207 B.R. at 584 *quoting* In re Spanjer Bros. Inc., 203 B.R. 85, 90 (Bankr. N.D. Ill. 1996).

Both the Manor Debtors and Trust Debtors derived benefits from Dilworth's representation during the joint retention period. Clearly these debtors are connected. Dilworth's defense against the aggressive litigation from Lehigh directly protected both estates. First, Dilworth contested Lehigh's Motion to Dismiss the Trusts and single-asset real estate motions (SARE). Second,

Dilworth protected the Trust Debtors' real property from immediate foreclosure. Third, Dilworth drafted and secured six separate interim cash collateral orders that allowed the facilities to continue operating and petitioned for the release of rent funds from Good Shepherd Rehabilitation held in escrow. Fourth, Dilworth defended depositions and conducted extensive discovery for all the debtors. Had Dilworth represented only the Manor Debtors from day one, counsel would still have been required to research, draft, and argue these same contested matters to protect the Manors. Jointly handling these issues during the initial months avoided duplicate filings and saved the estate from double billing.

### iv. *Absence of Actual Injury or Prejudice*

The Court also finds an absence of injury or prejudice to any of the estates resulting from Dilworth's period of joint representation. Most compelling on this point is the conduct of subsequent counsel following the disqualification order. Upon assuming representation of the Trust Debtors, substitute counsel did not alter or deviate from the litigation strategy or legal positions regarding the intercompany leases Dilworth previously established. On the contrary, substitute counsel maintained the exact same legal stance regarding the lease classification as residential leases.

### v. *Trustee's Approval*

The United States Trustee (the "UST") was established in 1978 to help aid in the administration of bankruptcy cases. In re Revco D.S., Inc., 989 F.2d 498, 500 (6th Cir. 1990). The UST plays a critical "supervisory role in the bankruptcy system" and acts as a "watchdog over the bankruptcy process." In re Larson, 553 B.R. 646, 652 (Bankr. W.D. Mich. 2016); H.R.Rep. No.95-595, at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 5966, 6049. In that "watchdog role,"

the UST is responsible for "protecting the public interest and ensuring that bankruptcy cases are conducted according to law." H.R.Rep. No.95-595, at 109 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, at 6070.

The UST's decision, as the "watchdog" of the bankruptcy process, not to object to the amended application provides support for the Court declining to exercise its Section 328(c) discretion to deny Dilworth's amended application. Dilworth submitted its complete, unredacted time records directly to the UST for review. Following that independent audit of Dilworth's time entries, the UST requested only a minor, informal fee reduction of $7,628.00 within Category B190. Dilworth voluntarily agreed to those reductions. After evaluating those records, the UST chose not to join in objecting to the fee application. On the contrary, the UST filed a formal letter on September 25, 2026, confirming that it had no objection to Dilworth's amended application.

Most cases in which fees are contested, the objection, at the very least, is joined by the UST. Even in the cases Lehigh cites for the Court, the objections are initiated by the UST. In re NNN 632 B.R. at 248; In re Federated at 44 F.3d at 1312; In re Harris Agency, 462 B.R. at 518. Therefore, it is particularly telling that the UST has chosen not to do so here.

Because the Easterday framework weighs against denying fees and the UST has not objected to the amended application, the Court declines to penalize debtor's counsel for the services provided up through the date of vacatur. The Court finds that Dilworth relied in good faith on the retention order entered by this Court and finds no compelling reason to penalize the firm for that reliance.

### D. Reasonable Fees

The bankruptcy court may award "reasonable compensation" for legal work that was "actual and necessary" to managing the estate, along with reimbursement for real, out-of-pocket expenses. In determining the amount of reasonable compensation for professional persons, the court considers the "nature, extent, and value of such services." Relevant factors in this inquiry include (1) the time spend on such services; (2) the rate charged for such services; (3) whether the services were necessary or beneficial to the administration of the case; (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; (5) whether the person has demonstrated skill and experience in the bankruptcy field; and (6) whether the compensation is reasonable based on customary compensation charged by comparably skilled practitioners.

The Third Circuit holds that Bankruptcy Courts have an affirmative duty, even in the absence of an objection, to review fee applications. In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 841 (3rd Cir. 1994). In reviewing fee applications, a Bankruptcy Court should not become lost in "meticulous analysis." In re Busy Beaver Bldg. Centers, 19 F.3d at 845. Our Court has applied these guidelines: the "fee review process is more art than science. The Court is not required to…determine an exact or a perfectly, precise fee for each case…fee review is a holistic one." In re Kyung Tae Ko, 560 B.R. 245, 250-51 (Bankr. E.D. Pa 2016). In reviewing fee application, a court should call on its professional experience, expert judgment, and understanding of the legal profession. In re Badyrka, 2022 WL 4656034 at *9 (Bankr. M.D. Pa. 2022).

The requested compensation of $1,293,392.50 in fees and $22,927.64 in expenses is reasonable compensation for actual, necessary services rendered by the law firm. Frankly, it is remarkable the figures are not larger given the amount of litigation in this case. Dilworth has

defended seven depositions, conducted high volume discovery, formulated a Chapter 11 plan, and defended motions in each of the Bankruptcy Court, District Court, and the Third Circuit Court of Appeals. Billing rates from the partners and associates ranged from $1350 per hour down to $380 per hour. Paralegals at the firm billed a range of $215 per hour on low end to $335 per hour on the upper end. Dilworth's billing rates align with customary market compensation charged by bankruptcy practitioners of comparable skill. The total hours expended were commensurate with the intricate corporate structure of the four debtors.

The Court quickly reiterates the necessary legal work that benefited the debtors' estates. From the outset of these cases: (1) Dilworth's work protected the properties from foreclosure; (2) ensured that the properties remained open for the 200 residents; (3) defended depositions and secured important cash collateral for use; (4) defended motions across multiple levels of the federal court system. Because these legal services were actual, necessary, and benefited the estates of the debtors, the requested compensation is fully justified under Section 330(a).

## V. CONCLUSION

For the reasons set forth above, the Court holds that Dilworth was employed under Section 327(a) through the period for which it seeks compensation in the amended application. The district court's vacatur of the retention order does not preclude this Court from analyzing fees under Section 328(c). And Section 328(c) confers permissive authority to deny compensation to professionals who are not disinterested at the commencement of employment. But the Court concludes that Dilworth acted with candor and disclosure, that its joint representation benefited the estates of the four debtors, and that its requested fees are reasonable given the complex, litigious nature of this bankruptcy thus far.

Accordingly, the Court declines to exercise its discretion to deny fees and expenses.



**Date: <u>November 23, 2026</u>**

**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**